**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

**Civil Action No.**

DINESH KALERA, Individually and on
Behalf of All Other Similarly Situated,

Plaintiff,

v.

MODIVCARE, INC., L. HEATH SAMPSON,
KENNETH SHEPARD, and BARBARA K.
GUTIERREZ,

Defendants.

JURY TRIAL DEMANDED

---

**CLASS ACTION COMPLAINT FOR VIOLATION OF**
**THE FEDERAL SECURITIES LAWS**

---

Plaintiff Dinesh Kalera ("Plaintiff"), individually and on behalf of all others similarly situated, by and through his attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon, among other things, his counsel's investigation, which includes, without limitation: (a) review and analysis of regulatory filings made by ModivCare, Inc. ("ModivCare" or the "Company"), with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by ModivCare; and (c) review of other publicly available information concerning ModivCare.

1

## <u>NATURE OF THE ACTION</u>

1.      This is a class action on behalf of persons and entities that purchased or otherwise acquired ModivCare securities between November 3, 2022, and September 15, 2024, inclusive (the "Class Period").  Plaintiff pursues claims against the Defendants (defined *infra*) under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Throughout the Class Period, ModivCare, which provides a suite of integrated supportive care solutions for public and private payors and their members, misled the market to believe certain contracts used in its non-emergency medical transportation ("NEMT") segment mitigated risks to its free cash flow.  In reality, the Company's free cash flow deteriorated throughout the Class Period.  When the truth began to reach the market, ModivCare's stock price suffered significant declines, harming investors.

3.      Throughout the Class Period, Defendants made materially false and/or misleading statements, as well as failed to disclose adverse facts about the Company's business, operations, and prospects.   Specifically, Defendants failed to disclose that certain contracts used in ModivCare's NEMT segment caused the Company's free cash flow to deteriorate and that, as a result, (1) contract renegotiations and pricing accommodations negatively impacted the Company's adjusted EBITDA; (2) the Company had insufficient liquidity; and (3) Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

4.      As a result of Defendants' wrongful acts and omission, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

5.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

6.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act (15 U.S.C. §78aa).

7.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  In addition, the Company's principal executive offices are located in this District.

8.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone and wire communications, and the facilities of a national securities exchange.

## PARTIES

9.     Plaintiff Dinesh Kalera, as set forth in the accompanying certification, incorporated by reference herein, purchased ModivCare securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

10.     Defendant ModivCare provides a suite of integrated supportive care solutions for public and private payors and their members.  ModivCare's common stock trades on the NASDAQ under the symbol "MODV."

11.     Defendant L. Heath Sampson ("Sampson") has served as the Company's President and Chief Executive Officer ("CEO") since July 27, 2022, and served as the Company's Chief Financial Officer ("CFO") from February 26, 2021, to September 2023.

12.     Defendant Kenneth Shepard ("Shepard") has served as the CFO of ModivCare Mobility, which comprises the Company's NEMT segment, since August 2022.

13.     Defendant Barbara Gutierrez ("Gutierrez") has served as the Company's CFO since September 2023.

14.     Defendants Sampson, Shepard, and Gutierrez (together, the "Individual Defendants" and together with the Company, "Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, i.e., the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material, nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

15.     Under its NEMT segment, ModivCare generates revenue by providing non-emergency medical transportation services directly to its customers.  These services are provided on either a capitated basis, which means paid on a per-member, per-month ("PMPM") basis for each eligible member, or on a fee-for-service ("FFS") basis, which means paid based on the volume of trips or services performed.  Payment for the Company's NEMT services is received from third-party payors, predominately made up of state Medicaid agencies and managed care organizations ("MCOs").

16.     From 2020 through the end of 2022, nearly all the Company's NEMT capitated contracts were "full risk" contracts, as opposed to "shared-risk" contracts.  Under full risk contracts, payors pay a fixed amount per eligible member per month and the Company assumed the responsibility of meeting the covered healthcare related transportation requirements for the number of eligible members in the payor's program.  By contrast, shared-risk contracts have provisions for reconciliations, risk corridors, and/or profit rebates.  These contracts allow for periodic reconciliations based on actual cost and/or trip volume and may result in refunds to the payor, or additional payments due from the payor based on the provisions contractually agreed upon.

## FALSE AND MISLEADING STATEMENTS

17.     On November 3, 2022, the start of the Class Period, before market hours, ModivCare issued a press release, on a Form 8-K filed with the SEC, reporting its financial results for third quarter 2022.  The press release stated, in relevant part, as follows:

**Third Quarter 2022 Highlights:**
- Revenue of $647.8 million, a 31.4% increase as compared to $493.1 million in Q3 2021
- Net loss of $28.5 million or $2.03 per diluted common share was primarily attributable to a goodwill impairment for Matrix
- Adjusted EBITDA of $51.8 million, Adjusted Net Income of $22.7 million and Adjusted EPS of $1.61
- Net cash used in operating activities during the quarter of $5.7 million
- Cash and cash equivalents of $72.7 million as of September 30, 2022, with $1,000.0 million principal amount of debt outstanding related to the Senior Unsecured Notes due 2025 and 2029
- Undrawn $325.0 million revolving credit facility as of September 30, 2022

18.     During the associated earnings call on the same day, Sampson touted the benefits

of the newly negotiated capitated contracts to the NEMT segment:

> On the transportation side, as you know, most of our -- 85% of our contracts are capitated. So there's really no kind of reimbursement change in the NEMT side. It is really about how we manage through that. In addition, and this is also something we've done over the last 12 to 18 months, is ensuring our contracts have been structured so we have a win-win, and able to share in these increased costs that are currently happening primarily in the transportation with the driver. So that's been beneficial to us. So those costs have come up that our transportation providers actually have to bear.

19.     On May 4, 2023, before market hours, the Company issued a press release, on a

Form 8-K filed with the SEC, reporting its financial results for first quarter 2023. The press release

stated, in relevant part:

**First Quarter 2023 Highlights:**
- Service revenue of $662.3 million, a 15.3% increase as compared to $574.5 million in Q1 2022
- Net loss of $4.0 million or $0.28 per diluted common share
- Adjusted EBITDA[] of $50.2 million, adjusted net income[] of $20.2 million and adjusted EPS[] of $1.42 per diluted common share
- Net cash used in operating activities during the quarter of $2.7 million
- Cash and cash equivalents of $12.8 million as of March 31, 2023, with $1.0 billion principal amount of debt outstanding related to the Senior Unsecured Notes due 2025 and 2029

- $15.0 million drawn on the $325.0 million revolving credit facility as of March 31, 2023

20.     During the associated earnings call, Sampson informed investors ModivCare had been preparing for Medicaid redetermination (*i.e.*, Medicaid coverage renewal that may result in loss of coverage for those beneficiaries who are no longer eligible for Medicaid) by transitioning many of its full risk contracts to shared-risk contracts:

> Additionally, we've been preparing for redetermination over the last several months. When we exit the pandemic in 2020 and 2021, we made a conscious effort to effectively and efficiently transition, a large portion of our previous full-risk contracts to contracts that are shared risk or fee-for-service arrangements, protecting ourselves and our customers. These shared risk contracts significantly derisk the financial impact from redetermination by setting contractual revenue rates, primarily based on trip volumes as opposed to membership. In many situations, we can fully offset the gross profit impact from lower membership from re-determination as these contracts reset monthly.

> Our remaining full-risk capitated contracts currently only account for approximately 20% of NEMT revenue, compared to 60% at the start of the pandemic. For these contracts we will continue to have anticipated contract repricing negotiations throughout the year, and annual actuarial pricing reset that allow us to normalize pricing in a post-redetermination environment. As it relates to our membership, we continue to believe that we can grow through the 10% to 15% redetermination headwinds through 2025, based on our new contract wins, existing market expansion, Medicare advantage growth, and just the underlying Medicaid market growth. In total, we believe that we have encapsulated the impact from redetermination in our 2023 outlook, as well as our 2024 outlook.

21.     On August 3, 2023, after the market closed, ModivCare issued a press release, on a Form 8-K with the SEC, reporting its financial results for second quarter 2023.  The press release stated, in relevant part:

> **Second Quarter 2023 Highlights:**
> - Service revenue of $699.1 million, an 11.3% increase as compared to $628.2 million in the second quarter of 2022
> - Net loss of $190.9 million or $13.47 per diluted common share, primarily attributable to goodwill impairment of $183.1 million

- Adjusted EBITDA[] of $52.4 million, adjusted net income[] of $20.8 million and adjusted EPS[] of $1.47 per diluted common share
- Cash used in operating activities during the quarter $108.2 million along with capex spend of $8.9 million
- Contract payables decreased by $78.5 million to $109.1 million and contract receivables increased by $17.4 million to $119.8 million, resulting in net contract receivables of $10.7 million as of June 30, 2023
- $126.5 million drawn on the $325.0 million revolving credit facility as of June 30, 2023
- Amended credit agreement's maximum Total Net Leverage Ratio to provide improved access to liquidity

22.     During the associated earnings call on the same day, Sampson continued to tout the benefits of the new shared-risk contracts to investors.  Specifically, Sampson stated:

> And the one point that you hit on again, which is really important, it's really critical, especially if some of these new coming into here, looking at that delta between the contract payables and contracts receivables. I'm just repeating what you said again, this is the first time that it's flipped to a receivable. So then your question more broadly, how does this work? Basically, our contracts are working post COVID. So the contracts that we've restructured primarily around really implementing these shared risk contracts have been very helpful for us and help protect our kind of long-term margin. So that's -- you will see fluctuations as we move through the years going in quarters. Those will still fluctuate.

> So the good thing now though, because of the COVID benefits -- now the contracts are going to work or they are. And I think they'll bump around. But the good thing is we have the receivables and the payables. And because we have so many contracts, we expect that to be kind of a normalized working capital fluctuations in and out, not the big swings like we've seen over the last couple of quarters.

> And then the other item coming out of COVID now, all the states or MCOs, we have more predictable and rigid time frame for when we paid us back. So it really is kind of a 3- to 6-month time frame. So this predictability and normalization coming out of COVID allows us to have a more predictable cash flow and then a more normalized working capital. So which is why we have a lot of confidence in the back part of this year that we will generate cash flow in accordance with how our P&L works. And I expect that to continue throughout the quarter into 2024.

23.     During the same call, Shepard informed investors that the new shared-risk contracts would continue to increase revenue:

Shifting to guidance. We raised our revenue guidance to a range of $2.75 billion to $2.8 billion, and we lowered our adjusted EBITDA guidance to a range of $200 million to $210 million. The increased revenue guidance was primarily due to higher NEMT utilization and transportation costs driving more revenue from our shared risk contracts. We lowered our adjusted EBITDA guidance due to the higher NEMT utilization and the [indiscernible] costs and a delay in the start of some of our new contract wins, which will start in early 2024.

To sum things up, our second quarter results were mixed compared to our expectations as revenue was better than expected due to shared risk, cost protection in our NEMT business and adjusted EBITDA was slightly below plan due to higher utilization. Despite these results and our guidance reset, we remain confident about our mission and long-term growth strategy, along with the expected benefits from the initiatives to drive efficiencies and create operating leverage. Our team is working diligently to win new business and improve cash flow, and I want to thank everyone at Modivcare for their hard work and dedication in providing high-quality care and delivering the best experience for our members.

24.    On February 22, 2024, before market hours, ModivCare issued a press release, on a Form 8-K filed with the SEC, reporting its financial results for fourth quarter 2023 and fiscal year 2023, respectively.  The press release stated, in relevant part:

**Fourth Quarter 2023 Summary:**
- Service revenue of $702.8 million, a 7.5% increase as compared to $653.9 million in the fourth quarter of 2022
- Net loss of $5.3 million, or $0.37 per diluted common share
- Adjusted EBITDA[] of $50.5 million, adjusted net income[] of $18.4 million and adjusted EPS[] of $1.29 per diluted common share
- Net cash used in operating activities during the quarter of $25.6 million and negative free cash flow[] of $36.8 million, primarily related to a delayed payment from a single client
- Contract receivables increased by $14.7 million to $144.0 million and contract payables decreased by $16.1 million to $117.5 million, resulting in net contract receivables of $26.5 million as of December 31, 2023
- $216.2 million of NEMT TCV[] won during the fourth quarter of 2023, including sizable managed Medicaid contracts contributing to total new wins that will outpace contract attrition in 2024
- $113.8 million drawn on our $325.0 million revolving credit facility
- As a subsequent event, in early 2024 we amended the leverage covenant to provide additional cushion for credit facility availability, ensuring sufficient liquidity

**Full Year 2023 Summary:**

- Service revenue of $2,751.2 million, a 9.9% increase as compared to $2,504.4 million in 2022
- Net loss of $204.5 million, or $14.43 per diluted common share
- Adjusted EBITDA[] of $204.4 million, adjusted net income[] of $79.9 million and adjusted EPS[] of $5.60 per diluted common share
- Net cash used in operating activities in 2023 of $83.0 million and negative free cash flow[] of $125.3 million
- Contract receivables increased by $72.8 million to $144.0 million and contract payables decreased by $76.8 million to $117.5 million
- In 2023, won $463.5 million of NEMT TCV[] or $141.8 million ACV[], as well as $10.6 million in ACV[] for remote patient monitoring

25.    During the associated earnings call on the same day, Gutierrez informed investors that the new shared-risk contracts not only protected the NEMT segment's margin but also increased utilization.  Specifically, Gutierrez stated:

Turning to a review of our segment financials. NEMT fourth quarter revenue increased 9% year-over-year to $499 million. Total membership decreased 5.5% year-over-year to 32.9 million members, and we averaged 33.6 million members for all of 2023. On a sequential basis, average monthly members decreased 2% during the fourth quarter, primarily due to Medicaid redetermination, which was in line with our expectations.

Trip volume increased 13% in the fourth quarter, while revenue per trip decreased 3.5% due to mix changes and an approximate 1% decrease in purchased services expense per trip, which drives the revenue in our shared risk contracts. Sequentially, NEMT gross margin increased 150 basis points as payroll and other expense per trip decreased 6% to $6.89, while purchase services per trip increased 2.5% to $42.24. The reduction in payroll and other expense per trip is being driven by our cost saving initiatives that Heath discussed, which are reducing our calls per trip.

\*    \*    \*

As a reminder, our margins are protected from increased utilization from redetermination on our shared risk contracts. Our shared risk Medicaid contracts accounted for approximately 60% of our NEMT revenue in 2023. Even though we'll lose some Medicaid members in these contracts, we expect higher pass through revenue under our shared risk contracts. Finally, the remainder of NEMT revenue, approximately 20% is generated from Medicaid advantage and fee-for-service arrangements.

26.     On May 2, 2024, after market hours, ModivCare issued a press release, on a Form 8-K filed with the SEC, reporting its financial results for first quarter 2024.  The press release stated, in relevant part:

**First Quarter 2024 Summary:**
- Service revenue of $684.5 million increased 3.3% from the first quarter of 2023
- Net loss of $22.3 million or $1.57 per diluted common share
- Adjusted EBITDA[] of $32.1 million, adjusted net loss[] of $1.2 million and adjusted EPS[] of negative $0.09 per diluted common share
- Cash provided by operating activities during the quarter of $9.6 million and free cash flow[] of $1.7 million
- Contract receivables, net of contract payables, of $25.9 million as of March 31, 2024
- Won $171.2 million of NEMT total contract value (TCV) during first quarter 2024 ($36.4 million annual contract value (ACV)), with implementation beginning in the second quarter of 2024

27.     During the associated earnings call the following day, before market hours, Gutierrez stated that average monthly NEMT membership decreased sequentially due to contract losses and Medicaid determinations.  Nevertheless, Gutierrez assured investors NEMT margin would improve throughout the year because of new contracts.  Specifically, Gutierrez stated:

NEMT revenue incrementally benefited from successful execution of contract settlements and negotiated pricing increases that were more favorable than expected. Average monthly membership decreased 12% sequentially to $29.1 million due to previously announced contract losses and Medicaid redetermination.

\*     \*     \*

NEMT adjusted EBITDA was in line with our expectations at $27 million or 5.7% of revenue. We expect to see margins improve throughout the year due to the onboarding of new contracts in the second and third quarters as well as the execution of our cost initiatives. During the first quarter, our membership was impacted by Medicaid redetermination of approximately 600,000 members. Our top 5 states with full-risk contracts are 80% through their respective redetermination period. Redetermination impacted first quarter revenue by $10 million and adjusted EBITDA by approximately $5 million. Overall, Medicaid redetermination is tracking in line to slightly better than we previously expected.

28.    The above statements were materially false and/or misleading and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose that certain contracts used in ModivCare's NEMT segment caused the Company's free cash flow to deteriorate and that, as a result, (1) contract renegotiations and pricing accommodations negatively impacted the Company's adjusted EBITDA; (2) the Company had insufficient liquidity; and (3) Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

## THE TRUTH EMERGES

29.    The truth began to emerge on May 4, 2023, before market hours, when the Company issued a press release, on a Form 8-K filed with the SEC, reporting its financial results for first quarter 2023.  During the associated earnings call on the same day, in addition to the false and misleading statements referenced above, Shepard revealed the Company experienced a reduction of cash flow from operations during the quarter.  Specifically, Shepard stated, in relevant part:

> Consolidated cash-flow from operations in the first quarter of 2023 was the use of approximately $3 million due to a $7 million reduction in contract payables and $31 million increase in contract receivables. Excluding these items, our cash flow from operation would have been better in the first quarter by $38 million.

Defendants continued to make false and misleading statements about the Company's cash flow throughout the Class Period.

30.    On this news, the Company's stock price fell $11.30, or nearly 16%, from $69.30 per share on May 3, 2023, to close at $58 per share on May 4, 2023, on unusually high trading volume.

31.     The truth continued to emerge on August 3, 2023, after market hours, when the Company issued a press release, on a Form 8-K filed with the SEC, reporting its financial results for second quarter 2023.  During the associated earnings call on the same day, in addition to the false and misleading statements referenced above, Sampson informed investors the Company experienced the expansion of a "large payable balance" that impacted the Company's cash flow from operations during the quarter.  Specifically, Sampson stated:

> Next, I'd like to address our second quarter cash flow from operations, which was negative $108 million, mainly due to a $96 million decrease in our net contract payables, less receivable balance during the quarter, along with a onetime $9.6 million arbitration settlement with a former employee. Post the pandemic, coupled with a shift to more shared risk NEMT contracts, we experienced a temporary timing mismatch between payments and collections, which created a large payable balance that we've been reducing over the past year.

Defendants continued to make false and misleading statements about the Company's cash flow throughout the Class Period.

32.     On this news, the Company's stock price fell $2.86, or nearly 7%, from $38.24 per share on August 3, 2023, to close at $35.38 per share on August 4, 2023, on unusually high trading volume.

33.     On February 23, 2024, before market hours, the Company issued a press release, on a Form 8-K filed with the SEC, reporting its financial results for fourth quarter 2023.  During the associated earnings call on the same day, in addition to the false and misleading statements referenced above, Sampson informed investors the Company suffered negative cash flow during the quarter, and that he expected the trend to continue for the first half of fiscal year 2024.  Specifically, Sampson stated:

> Firstly, our free cash flow for the fourth quarter was negative $37 million, which was below expectations, primarily due to delay in payment from an MCO client

> within a specific contract in Florida. Looking ahead, and primarily to us managing redetermination and the increased healthcare utilization environment, we anticipate our free cash flow for the first half of the year will be constrained to the ongoing build in contract receivables and the settlement of several large payables expected in the second quarter.

Defendants continued to make false and misleading statements about the Company's cash flow throughout the Class Period.

34.     On this news, the Company's stock price fell $17.25, or nearly 39%, from $43.87 per share on February 22, 2024, to close at $26.62 per share on February 23, 2024, on unusually high trading volume.

35.     On September 12, 2024, before market hours, the Company issued a press release, on a Form 8-K filed with the SEC, reporting, among other things, that it would "undertak[e] actions to seek additional capital, including filing a shelf registration statement" with the SEC to improve its liquidity.

36.     On this news, the Company's stock price fell $18.43, or nearly 59%, from $31.19 per share on September 11, 2024, to close at $12.76 per share on September 12, 2024, on unusually high trading volume.

37.     Finally, the truth continued to emerge on September 16, 2024, before market hours, when the Company issued a press release, on a Form 8-K filed with the SEC, reporting, titled "Modivcare Provides Financial Update."  Therein, the Company revised its 2024 Adjusted EBITDA guidance range from $185–$195 million to $170–$180 million, "primarily due to NEMT segment pricing accommodations made to strategically retain and expand key customer relationships."

38.    On this news, the Company's stock price fell $1.40 or nearly 10%, from $14.12 per share on September 15, 2024, to close at $12.72 per share on September 16, 2024, on unusually high trading volume.

## CLASS ACTION ALLEGATIONS

39.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired ModivCare securities November 3, 2022, and September 15, 2024, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

40.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, ModivCare's shares are actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class. Millions of ModivCare securities were traded publicly during the Class Period on the NASDAQ. Record owners and other members of the Class may be identified from records maintained by ModivCare or its transfer agent, and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

41.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

42.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

43.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' actions as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of ModivCare; and

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

44.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## UNDISCLOSED ADVERSE FACTS

45.     The market for ModivCare's securities was open, well-developed, and efficient at all relevant times.  As a result of these materially false and/or misleading statements, and/or failures to disclose, ModivCare's securities traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class, relying upon the integrity of the market price of the Company's securities and market information relating to ModivCare, purchased or otherwise acquired ModivCare's securities and have been damaged thereby.

46.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of ModivCare's securities, by publicly issuing false and/or misleading statements and/or omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and/or misleading.  The statements and omissions were materially false and/or misleading because they failed to disclose material adverse information and/or misrepresented the truth about ModivCare's business, operations, and prospects as alleged herein.

47.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ModivCare's financial well-being and prospects.  These material misstatements and/or omissions had the effect of creating, in the market, an unrealistically positive assessment of the Company and its financial well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class

purchasing the Company's securities at artificially inflated prices, thus causing the damages complained of herein when the truth was revealed.

## LOSS CAUSATION

48.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

49.     During the Class Period, Plaintiff and the Class purchased ModivCare's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

50.     As alleged herein, Defendants acted with scienter since Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding ModivCare, their control over, and/or receipt and/or modification of ModivCare's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning ModivCare, participated in the fraudulent scheme alleged herein.

## APPLICABILITY OF PRESUMPTION OF RELIANCE

## (FRAUD -ON-THE-MARKET DOCTRINE)

51.     The market for ModivCare's securities was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, ModivCare's securities traded at artificially inflated prices during the Class Period. On February 2, 2023, the Company's share price closed at a Class Period-high of $110.58 per share.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of ModivCare's securities and market information relating to ModivCare, and have been damaged thereby.

52.     During the Class Period, the artificial inflation of ModivCare's share prices were caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about ModivCare's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of ModivCare and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company shares.  Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

53.     At all relevant times, the market for ModivCare's securities was an efficient market for the following reasons, among others:

(a)     ModivCare shares met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market.

(b)     As a regulated issuer, ModivCare filed periodic public reports with the SEC and/or the NASDAQ.

(c)     ModivCare regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(d)     ModivCare was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

54.     As a result of the foregoing, the market for ModivCare's securities promptly digested current information regarding ModivCare from all publicly available sources and reflected such information in ModivCare's share price.  Under these circumstances, all purchasers of ModivCare's securities during the Class Period suffered similar injury through their purchase of ModivCare's securities at artificially inflated prices and a presumption of reliance applies.

55.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class' claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse

information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## NO SAFE HARBOR

56.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ModivCare who knew that the statement was false when made.

**FIRST CLAIM**

**Violation of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
Against All Defendants**

57.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

58.     During the Class Period, Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase ModivCare's securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants, and each defendant, took the actions set forth herein.

59.     Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for ModivCare's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein, or as controlling persons as alleged below.

60.     Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails and wires, engaged and participated in a continuous course of conduct to conceal adverse material information about ModivCare's financial well-being and prospects, as specified herein.

61.     Defendants employed devices, schemes, and artifices to defraud, while in possession of material adverse nonpublic information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of ModivCare's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about ModivCare and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

62.     Each of the Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports, and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

63.    Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  Such Defendant's material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing ModivCare's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

64.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of ModivCare's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trades, and/or in the absence of material adverse information that was known to or recklessly disregarded by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired ModivCare's securities during the Class Period at artificially high prices and were damaged thereby.

65.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that ModivCare was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their ModivCare securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

66.     By virtue of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

67.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## SECOND CLAIM

**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

68.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

69.     Individual Defendants acted as controlling persons of ModivCare within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision

making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading. Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

70.    In particular, Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

71.    As set forth above, ModivCare and Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as controlling persons, Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment as follows:

A.  Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.   Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.   Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.   Such other and further relief as the Court may deem just and proper.

### <u>JURY TRIAL DEMANDED</u>

Plaintiff hereby demands a jury trial.

DATED:  January 29, 2025   **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

         */s/ Matthew A Peller*
        Matthew A. Peller (2580059)
        Thomas L. Laughlin, IV
        Nicholas S. Bruno
        The Helmsley Building
        230 Park Avenue, 24th Floor
        New York, NY 10169
        Telephone: (212) 223-6444
        Facsimile:  (212) 223-6334
        mpeller@scott-scott.com
        tlaughlin@scott-scott.com
        nbruno@scott-scott.com

        *Counsel for Plaintiff Dinesh Kalera*

## CERTIFICATION PURSUANT TO FEDERAL SECURITIES LAWS

1.      I, Dinesh Kalera, make this declaration pursuant to §27(a)(2) of the Securities Act of 1933 ("Securities Act") and/or §21D(a)(2) of the Securities Exchange Act of 1934 ("Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a complaint against ModivCare, Inc. ("ModivCare" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire ModivCare securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired ModivCare securities during the Class Period, including providing testimony at deposition and trial, if necessary. I understand the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet (Schedule "A") lists all of my transactions in ModivCare securities during the Class Period, as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

1

I declare under penalty of perjury, under the laws of the United States of America, the foregoing is true and correct this day of __01/28/2025__.

Dinesh Kalera

# Schedule A

**MODIVCARE INC**                                    Ticker:     **MODV**     Cusip:     **60783X104**
Class Period: 11/03/2022 to 09/15/2024

**Dinesh Kalera**                                                **DATE**        **SHARES**     **PRICE**

Purchases: | DATE | SHARES | PRICE |
|---|---|---|
| 8/4/2023 | 100 | $35.15 |
| 8/4/2023 | 20 | $32.07 |
| 8/4/2023 | 20 | $32.45 |
| 8/4/2023 | 20 | $33.75 |
| 8/4/2023 | 20 | $32.75 |
| 8/4/2023 | 20 | $33.17 |
| 8/8/2023 | 50 | $34.10 |
| 8/8/2023 | 50 | $34.50 |
| 8/25/2023 | 20 | $34.75 |
| 8/25/2023 | 20 | $34.80 |
| 8/25/2023 | 20 | $34.70 |
| 8/25/2023 | 20 | $35.00 |
| 3/25/2024 | 168 | $24.40 |
| 3/26/2024 | 21 | $22.68 |
| 3/26/2024 | 18 | $22.55 |
| 3/26/2024 | 299 | $22.50 |
| 4/1/2024 | 170 | $22.20 |
| 4/17/2024 | 740 | $21.58 |
| 7/18/2024 | 98 | $24.03 |
| 7/18/2024 | 100 | $24.15 |
| 7/18/2024 | 56 | $24.72 |
| 8/1/2024 | 50 | $21.85 |
| 8/1/2024 | 50 | $21.85 |
| 8/1/2024 | 50 | $21.90 |

| | | | |
|---|---|---|---|
| | 8/1/2024 | 50 | $21.95 |
| | 8/1/2024 | 50 | $21.95 |
| | 8/1/2024 | 50 | $22.05 |
| | 8/1/2024 | 50 | $22.15 |
| | 8/1/2024 | 50 | $22.10 |
| | 8/1/2024 | 50 | $22.10 |
| | 8/1/2024 | 50 | $22.10 |
| | 8/5/2024 | 50 | $19.95 |
| | 8/5/2024 | 50 | $20.00 |
| | 8/5/2024 | 50 | $19.95 |
| | 8/6/2024 | 50 | $19.89 |
| | 8/6/2024 | 50 | $19.95 |
| | 8/7/2024 | 50 | $18.76 |
| | 8/7/2024 | 50 | $18.89 |
| | 8/7/2024 | 50 | $19.38 |
| | 8/7/2024 | 50 | $19.60 |
| | 8/7/2024 | 50 | $19.75 |
| | 9/12/2024 | 100 | $14.10 |
| | 9/12/2024 | 100 | $14.11 |
| **Sales:** | 1/22/2024 | 50 | $40.60 |
| | 8/8/2024 | 1 | $21.12 |
| | 8/13/2024 | 349 | $24.55 |
| | 8/30/2024 | 1 | $28.87 |
| | 9/4/2024 | 89 | $31.95 |
| | 9/5/2024 | 60 | $31.40 |
| | 9/6/2024 | 323 | $32.00 |
| | 9/9/2024 | 50 | $32.80 |
| | 9/9/2024 | 50 | $32.75 |
| | 9/9/2024 | 50 | $32.65 |
| | 9/9/2024 | 50 | $32.70 |
| | 9/9/2024 | 50 | $32.65 |
| | 9/9/2024 | 50 | $32.60 |
| | 9/9/2024 | 100 | $32.45 |
| | 9/9/2024 | 77 | $32.45 |

| | | |
|---|---|---|
| 9/9/2024 | 100 | $32.25 |
| 9/12/2024 | 200 | $13.95 |
| 9/13/2024 | 1 | $13.15 |