# EXHIBIT 2

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

------------------------------------------------------------ x

In re:

MODIVCARE INC., *et al.*,

                     Debtors.[1]

------------------------------------------------------------ x

: Chapter 11
:
: Case No. 25-90309 (ARP)
:
: (Jointly Administered)
:

**DISCLOSURE STATEMENT FOR JOINT CHAPTER 11 PLAN
OF REORGANIZATION OF MODIVCARE INC. AND ITS DEBTOR AFFILIATES**

| **HUNTON ANDREWS KURTH LLP** | **LATHAM & WATKINS LLP** |
|---|---|
| Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503) | Ray C. Schrock (NY Bar No. 4860631) |
| Catherine A. Rankin (Texas Bar. No. 24109810) | Keith A. Simon (NY Bar No. 4636007) |
| Brandon Bell (Texas Bar. No. 24127019) | George Klidonas (NY Bar No. 4549432) |
| Houston, Texas 77002 | Jonathan J. Weichselbaum (NY Bar No. 5676143) |
| Telephone: (713) 220-4200 | 1271 Avenue of the Americas |
| Email: taddavidson@hunton.com | New York, New York 10020 |
|      crankin@hunton.com | Telephone: (212) 906-1200 |
|      bbell@hunton.com | Email: ray.schrock@lw.com |
| |      keith.simon@lw.com |
| |      george.klidonas@lw.com |
| |      jon.weichselbaum@lw.com |

*Proposed Counsel for the Debtors and Debtors in Possession*

September 4, 2025
Houston, Texas

---

[1] A complete list of each of the Debtors in these chapter 11 cases (the "***Chapter 11 Cases***") and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' claims and noticing agent at https://www.veritaglobal.net/ModivCare. Debtor ModivCare Inc.'s principal place of business and the Debtors' service address in the Chapter 11 Cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

**DISCLOSURE STATEMENT**, **DATED SEPTEMBER 4**, **2025**

**MODIVCARE INC.,** ***ET AL***.

---

**THIS DISCLOSURE STATEMENT (THIS "*DISCLOSURE STATEMENT*") IS NOT A SOLICITATION OF VOTES ON THE PLAN.  ACCEPTANCES AND REJECTIONS OF THE PLAN MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT.  THIS DISCLOSURE STATEMENT REMAINS SUBJECT TO MATERIAL REVISION AND HAS NOT, AS OF THE DATE HEREOF, BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(A) OF THE BANKRUPTCY CODE.  THE DEBTORS HAVE SOUGHT ORDERS OF THE BANKRUPTCY COURT APPROVING THIS DISCLOSURE STATEMENT AS CONTAINING "ADEQUATE INFORMATION," AND APPROVING THE SOLICITATION OF VOTES AS BEING IN COMPLIANCE WITH SECTIONS 1125 AND 1126(B) OF THE BANKRUPTCY CODE.**

---

**THE VOTING DEADLINE TO ACCEPT OR REJECT THE PLAN IS 4:00 P.M. (PREVAILING CENTRAL TIME) ON NOVEMBER 7, 2025, UNLESS EXTENDED BY THE DEBTORS IN THEIR SOLE DISCRETION. THE RECORD DATE FOR DETERMINING WHICH HOLDERS OF CLAIMS MAY VOTE ON THE PLAN IS OCTOBER 6, 2025 (THE "*RECORD DATE*").**

---

A release opt out form and a notice of non-voting status (the "***Release Opt Out Form***") or a Ballot (as defined herein) containing an opt out election will be provided to you.  The Release Opt Out Form or Ballot, as applicable, will provide you with the option to not grant the Releases contained in section 10.6(b) of the Plan.  You must complete and timely return the Release Opt Out Form or Ballot, as applicable, to the Solicitation Agent by November 7, 2025 (unless extended by the Debtors, the "***Voting Deadline***") at 4:00 p.m. (Prevailing Central Time) in accordance with the instructions set forth in the Release Opt Out Form or Ballot (and accompanying notices), as applicable, for your opt-out to be valid; **OTHERWISE, YOU WILL BE DEEMED TO CONSENT TO AND BE BOUND BY THE RELEASES SET FORTH IN SECTION 10.6(B) OF THE PLAN**.  Please review the additional information set forth in this Disclosure Statement, the Release Opt Out Form or Ballot, as applicable, the Plan, and any other documents related to the Chapter 11 Cases that you may receive from time to time.  Please be advised that your decision to opt out of the releases in section 10.6(b) of the Plan does not affect the amount of distribution you will receive under the Plan.

---

### RECOMMENDATION BY THE DEBTORS

The Debtors believe the Plan is in the best interests of their creditors and other stakeholders.  All creditors entitled to vote on the Plan are urged to vote in favor of the Plan.

The Board of Directors of ModivCare Inc. has approved the transactions contemplated by the Solicitation and the Plan and recommend that all creditors whose votes are being solicited submit ballots to accept the Plan.  Holders of more than 90% of First Lien Claims, and more

than 70% of Second Lien Claims (each as defined herein) entitled to vote on the Plan have already agreed, subject to the terms and conditions of the Restructuring Support Agreement, to vote in favor of the Plan.

Case No. 1:25-cv-00306-GPG-KAS    Document 42-2    filed 09/19/25    USDC Colorado
Case 25-90309    Document 120    Filed in TXSB on 09/04/25    Page 4 of 175
pg 5 of 176

---

IMPORTANT INFORMATION REGARDING THIS DISCLOSURE STATEMENT
FOR YOU TO READ

---

ALL HOLDERS OF CLAIMS AND INTERESTS ENTITLED TO VOTE ON THE PLAN ARE ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. IN PARTICULAR, ALL HOLDERS OF CLAIMS AND INTERESTS SHOULD CAREFULLY READ AND CONSIDER THE RISK FACTORS SET FORTH IN ARTICLE X OF THIS DISCLOSURE STATEMENT – "CERTAIN RISK FACTORS TO BE CONSIDERED" – BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. THE PLAN SUMMARY AND STATEMENTS MADE IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN ITSELF AND ANY EXHIBITS ATTACHED TO THE PLAN AND THIS DISCLOSURE STATEMENT. IN THE EVENT OF ANY CONFLICT BETWEEN ANY DESCRIPTIONS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE TERMS OF THE PLAN, THE TERMS OF THE PLAN SHALL GOVERN.

HOLDERS OF CLAIMS OR INTERESTS SHOULD NOT CONSTRUE THE CONTENTS OF THIS DISCLOSURE STATEMENT AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE AND SHOULD CONSULT WITH THEIR OWN ADVISORS BEFORE CASTING A VOTE WITH RESPECT TO THE PLAN.

UPON CONFIRMATION OF THE PLAN, THE SECURITIES DESCRIBED IN THIS DISCLOSURE STATEMENT WILL BE OFFERED AND SOLD WITHOUT REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED, TOGETHER WITH THE RULES AND REGULATIONS PROMULGATED THEREUNDER (THE "*SECURITIES ACT*"), OR SIMILAR U.S. FEDERAL, STATE, OR LOCAL LAWS IN RELIANCE ON THE EXEMPTION SET FORTH IN SECTION 1145(A) OF THE BANKRUPTCY CODE AND/OR ANOTHER AVAILABLE EXEMPTION UNDER THE SECURITIES LAWS OF THE UNITED STATES. THE ABILITY TO OFFER AND SELL SECURITIES WITHOUT REGISTRATION IN RELIANCE ON SECTION 1145(A) OF THE BANKRUPTCY CODE AND/OR APPLICABLE SECURITIES LAWS, WHETHER FEDERAL, STATE, OR TERRITORIAL, SHALL NOT BE A CONDITION TO THE OCCURRENCE OF THE EFFECTIVE DATE. WITH RESPECT TO SECURITIES ISSUED PURSUANT TO SECTION 4(A)(2), AND/OR REGULATION D, SUCH SECURITIES WILL BE "RESTRICTED SECURITIES" SUBJECT TO RESALE RESTRICTIONS AND MAY BE RESOLD, EXCHANGED, ASSIGNED, OR OTHERWISE TRANSFERRED ONLY PURSUANT TO REGISTRATION UNDER THE SECURITIES ACT (OR AN APPLICABLE EXEMPTION FROM SUCH REGISTRATION REQUIREMENTS) AND OTHER APPLICABLE LAW.

NO SECURITIES TO BE ISSUED PURSUANT TO THE PLAN HAVE BEEN APPROVED OR DISAPPROVED BY THE U.S. SECURITIES AND EXCHANGE COMMISSION (THE "*SEC*") OR BY ANY STATE SECURITIES COMMISSION OR SIMILAR PUBLIC,

GOVERNMENTAL, OR REGULATORY AUTHORITY. THIS DISCLOSURE STATEMENT HAS NOT BEEN FILED FOR APPROVAL WITH THE SEC OR ANY STATE AUTHORITY AND NEITHER THE SEC NOR ANY STATE AUTHORITY HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE IN THE UNITED STATES. NEITHER THE SOLICITATION OF VOTES ON THE PLAN NOR THIS DISCLOSURE STATEMENT CONSTITUTES AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY SECURITIES IN ANY STATE OR JURISDICTION IN WHICH SUCH OFFER OR SOLICITATION IS NOT AUTHORIZED.

THE DEBTORS BELIEVE THAT THE SOLICITATION OF VOTES ON THE PLAN MADE BY THIS DISCLOSURE STATEMENT ARE EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT AND RELATED STATE STATUTES PURSUANT TO SECTION 4(A)(2) OF THE SECURITIES ACT AND/OR RULE 506 OF REGULATION D PROMULGATED THEREUNDER, AND PURSUANT TO REGULATION S UNDER THE SECURITIES ACT, AS APPLICABLE.

ALL SECURITIES DESCRIBED HEREIN ARE EXPECTED TO BE ISSUED WITHOUT REGISTRATION UNDER THE SECURITIES ACT OR ANY STATE SECURITIES LAWS ("*BLUE SKY LAWS*").

CERTAIN STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT, INCLUDING STATEMENTS INCORPORATED BY REFERENCE, PROJECTED FINANCIAL INFORMATION, AND OTHER FORWARD-LOOKING STATEMENTS, ARE SUBJECT TO A NUMBER OF ASSUMPTIONS, RISKS AND UNCERTAINTIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE DEBTORS, INCLUDING THE IMPLEMENTATION OF THE PLAN. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. FORWARD-LOOKING STATEMENTS SHOULD BE EVALUATED IN THE CONTEXT OF THE ESTIMATES, ASSUMPTIONS, UNCERTAINTIES, AND RISKS DESCRIBED HEREIN.

FURTHERMORE, READERS ARE CAUTIONED THAT ANY FORWARD-LOOKING STATEMENTS HEREIN, INCLUDING ANY PROJECTIONS, ARE BASED ON ASSUMPTIONS THAT ARE BELIEVED TO BE REASONABLE, BUT ARE SUBJECT TO A WIDE RANGE OF RISKS IDENTIFIED IN THIS DISCLOSURE STATEMENT. IMPORTANT ASSUMPTIONS AND OTHER IMPORTANT FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY INCLUDE, BUT ARE NOT LIMITED TO, THOSE FACTORS, RISKS AND UNCERTAINTIES DESCRIBED IN MORE DETAIL UNDER THE HEADING "CERTAIN RISK FACTORS TO BE CONSIDERED," AS WELL AS THE ABILITY OF MANAGEMENT TO EXECUTE ITS PLANS TO MEET ITS GOALS AND OTHER RISKS INHERENT IN THE DEBTORS' BUSINESSES. DUE TO THESE UNCERTAINTIES, READERS CANNOT BE ASSURED THAT ANY FORWARD-LOOKING STATEMENTS WILL PROVE TO BE CORRECT. PARTIES ARE CAUTIONED THAT THE FORWARD-LOOKING STATEMENTS

SPEAK AS OF THE DATE MADE, ARE BASED ON THE DEBTORS' CURRENT BELIEFS, INTENTIONS AND EXPECTATIONS, AND ARE NOT GUARANTEES OF FUTURE PERFORMANCE. ACTUAL RESULTS OR DEVELOPMENTS MAY DIFFER MATERIALLY FROM THE EXPECTATIONS EXPRESSED OR IMPLIED IN THE FORWARD-LOOKING STATEMENTS. THE DEBTORS ARE UNDER NO OBLIGATION TO (AND EXPRESSLY DISCLAIM ANY OBLIGATION TO) UPDATE OR ALTER ANY FORWARD-LOOKING STATEMENTS WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE, UNLESS INSTRUCTED TO DO SO BY THE BANKRUPTCY COURT OR REQUIRED BY APPLICABLE LAW.

NO INDEPENDENT AUDITOR OR ACCOUNTANT HAS REVIEWED OR APPROVED THE FINANCIAL PROJECTIONS OR THE LIQUIDATION ANALYSIS PROVIDED HEREIN.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS OTHERWISE SPECIFIED. THE TERMS OF THE PLAN GOVERN IN THE EVENT OF ANY INCONSISTENCY WITH THE SUMMARIES IN THE DISCLOSURE STATEMENT.

THE INFORMATION IN THE DISCLOSURE STATEMENT IS BEING PROVIDED SOLELY FOR PURPOSES OF VOTING TO ACCEPT OR REJECT THE PLAN OR OBJECTING TO CONFIRMATION. NOTHING IN THE DISCLOSURE STATEMENT MAY BE USED BY ANY PARTY FOR ANY OTHER PURPOSE.

ALL EXHIBITS TO THE DISCLOSURE STATEMENT ARE INCORPORATED INTO AND ARE A PART OF, THE DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN.

**TABLE OF CONTENTS**

**Page**

I. EXECUTIVE SUMMARY ...................................................................................................1

    A.    Purpose and Effect of the Plan..................................................................................2
    B.    Classification and Treatment of Claims and Equity Interests Under the
        Plan ...........................................................................................................................4
    C.    Solicitation Procedures ............................................................................................8
    D.    Voting Process .......................................................................................................12
    E.    Confirmation of the Plan........................................................................................15
    F.    Effectuation of the Plan .........................................................................................16
    G.    Risk Factors ...........................................................................................................16

II. BACKGROUND TO THE CHAPTER 11 CASES..................................................................18

    A.    OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS .........................18
    B.    History and Formation ...........................................................................................18
    C.    Current Business Operations...................................................................................19

III. CORPORATE AND CAPITAL STRUCTURE.....................................................................22

    A.    Corporate Structure................................................................................................22
    B.    Corporate Governance ...........................................................................................22
    C.    Capital Structure ....................................................................................................24

IV. KEY EVENTS LEADING TO COMMENCEMENT OF CHAPTER 11 CASES ................28

    A.    Challenges Facing Debtors' Business....................................................................28
    B.    Prepetition Restructuring Efforts ..........................................................................31
    C.    Restructuring Support Agreement and Plan ..........................................................32

V. PENDING AND FUTURE LITIGATION ...............................................................................34

VI. EVENTS DURING CHAPTER 11 CASES...........................................................................35

    A.    First Day Motions and Certain Related Relief.......................................................35
    B.    Debtor in Possession Financing and Use of Cash Collateral.................................36
    C.    Filing of the Schedules...........................................................................................37
    D.    Plan Investigations ................................................................................................37
    E.    Hotline Investigations ............................................................................................37

VII. SUMMARY OF THE PLAN ................................................................................................38

    A.    Classification and Treatment of Claims and Interests under the Plan ...................38
    B.    Acceptance or Rejection of the Plan; Effect of Rejection of the Plan...................39
    C.    Means of Implementation of the Plan....................................................................41

| | | |
|---|---|---|
| D. | Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies | 46 |
| E. | Provisions Governing Distributions | 50 |
| F. | Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests | 53 |
| G. | Conditions Precedent to the Occurrence of the Effective Date | 54 |
| H. | Discharge, Release, Injunction, and Related Provisions | 56 |
| I. | Definitions Relating to Releases | 57 |

**VIII. TRANSFER RESTRICTIONS AND CONSEQUENCES UNDER FEDERAL SECURITIES LAWS** ... 63

| | | |
|---|---|---|
| A. | Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers | 63 |
| B. | Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers | 64 |

**IX. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN** ... 66

**X. CERTAIN RISK FACTORS TO BE CONSIDERED** ... 67

| | | |
|---|---|---|
| A. | Certain Bankruptcy Law Considerations | 67 |
| B. | Additional Factors Affecting the Value of Reorganized Debtors | 70 |
| C. | Factors Relating to Equity Rights Offering | 76 |
| D. | Factors Relating to the Capital Structure of the Reorganized Debtors | 76 |
| E. | Factors Relating to Securities to Be Issued Under Plan | 80 |
| F. | Additional Factors | 82 |

**XI. VOTING PROCEDURES AND REQUIREMENTS** ... 84

| | | |
|---|---|---|
| A. | Voting Procedures | 84 |
| B. | Parties Entitled to Vote | 84 |
| C. | Voting Deadline | 85 |
| D. | Notice of Non-Voting Status | 86 |
| E. | Release Opt-Out Form | 86 |
| F. | Further Information, Additional Copies | 86 |

**XII. CONFIRMATION OF PLAN** ... 87

| | | |
|---|---|---|
| A. | Confirmation Hearing | 87 |
| B. | Objections to Confirmation | 87 |
| C. | Requirements for Confirmation of Plan | 88 |

**XIII. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF PLAN** ... 93

| | | |
|---|---|---|
| A. | Alternative Plan of Reorganization | 93 |
| B. | Sale Under Section 363 of the Bankruptcy Code | 93 |
| C. | Liquidation under Chapter 7 of Bankruptcy Code | 93 |

XIV. CONCLUSION AND RECOMMENDATION.................................................................95

**EXHIBITS**

**EXHIBIT A**        Plan

**EXHIBIT B**        Organizational Structure

**EXHIBIT C**        Liquidation Analysis

**EXHIBIT D**        Financial Projections

**EXHIBIT E**        Valuation Analysis

# I.
# EXECUTIVE SUMMARY

ModivCare Inc. ("**ModivCare**"), a Delaware corporation, and the other debtors and debtors in possession (collectively, the "**Debtors**" or the "**Company**"), submit this Disclosure Statement pursuant to section 1125 of title 11 of the United States Code, 11 U.S.C §§ 101-1532 (as amended from time to time, the "**Bankruptcy Code**") and other applicable law, in connection with the solicitation of votes (the "**Solicitation**") on the *Joint Chapter 11 Plan of Reorganization of ModivCare Inc. and its Debtor Affiliates* (the "**Plan**"),[2] which was filed contemporaneously herewith by the Debtors in the United States Bankruptcy Court for the Southern District of Texas (the "**Bankruptcy Court**").  A copy of the Plan is attached hereto as <u>Exhibit A</u>.

The Debtors are commencing this Solicitation to implement a comprehensive financial restructuring to significantly deleverage the Debtors' balance sheet to ensure the long-term viability of the Debtors' enterprise.  As a result of extensive, good faith, and arm's-length negotiations, the Debtors and Holders of approximately 90% of First Lien Claims, and 70% of Second Lien Claims (the "**Consenting Creditors**") entered into a restructuring support agreement (including any amendments, modifications and joinders thereto, the "**Restructuring Support Agreement**") dated as of August 20, 2025, a copy of which is attached as Exhibit B to the *Declaration of Chad J. Shandler in Support of the Debtors' Chapter 11 Petitions and First Day Relief* [Docket No. 14].  Under the terms of the Restructuring Support Agreement, the Consenting Creditors have agreed, subject to the terms and conditions of the Restructuring Support Agreement, to support a restructuring of the Debtors' existing capital structure and operations in chapter 11 and to vote to accept the Plan.

Prior to soliciting votes on a proposed plan of reorganization, section 1125 of the Bankruptcy Code requires debtors to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance or rejection of the plan of reorganization.  As such, this Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

This Executive Summary is being provided as an overview of the material items addressed in the Disclosure Statement and the Plan, which is qualified by reference to the entire Disclosure Statement and by the actual terms of the Plan (and including all exhibits attached hereto, to the Plan, and the Plan Supplement), and should not be relied upon for a comprehensive discussion of the Disclosure Statement and/or the Plan.

This Disclosure Statement includes, without limitation, information about:

- the Debtors' prepetition operating and financial history;

---

[2]    Capitalized terms used but not otherwise defined in this Disclosure Statement will have the meaning ascribed to such terms in the Plan. The summary of the Plan provided herein is qualified in its entirety by reference to the Plan. In the case of any inconsistency between this Disclosure Statement and the Plan, the Plan will govern.

- the events leading up to the commencement of the Chapter 11 Cases;

- the events that have occurred during the pendency of the Chapter 11 Cases;

- the solicitation procedures for voting on the Plan;

- the confirmation process and the voting procedures that Holders of Claims or Interests who are entitled to vote on the Plan must follow for their votes to be counted;

- the terms and provisions of the Plan, including certain effects of confirmation of the Plan, certain risk factors relating to the Debtors or the Reorganized Debtors, the Plan and the securities to be issued under the Plan, and the manner in which distributions will be made under the Plan; and

- the proposed organization, operations and financing of the Reorganized Debtors if the Plan is confirmed and becomes effective.

### A.   Purpose and Effect of the Plan

#### 1.   Plan of Reorganization Under Chapter 11 of the Bankruptcy Code

The Debtors are reorganizing pursuant to chapter 11 of the Bankruptcy Code, which is the principal business reorganization chapter of the Bankruptcy Code.  As a result, the confirmation of the Plan means that the Reorganized Debtors will continue to operate their businesses going forward and does not mean that the Debtors will be liquidated or forced to go out of business.

The proposed Restructuring will leave the Company's businesses intact and significantly deleverage the Debtors' capital structure, as its total funded indebtedness (including accrued but unpaid interest) will be reduced from approximately $1.4 billion to approximately $300 million inclusive of principal and accrued interest—an approximately 80% debt reduction relative to the debt balance as of the Petition Date.  This deleveraging will enhance the Company's long-term growth prospects and competitive position and allow the Debtors to emerge from the Chapter 11 Cases as a stronger, reorganized group of entities better able to invest in the business, deliver value to customers, continue providing critical services to persons in need, and withstand a challenging market environment.

Additionally, a bankruptcy court's confirmation of a plan binds debtors, any entity acquiring property under the plan, any holder of a claim against or equity interest in a debtor and all other entities as may be ordered by the bankruptcy court in accordance with the applicable provisions of the Bankruptcy Code to the terms and conditions of the confirmed plan, whether or not such entity voted on the particular plan or affirmatively voted to reject the plan.

#### 2.   Financial Restructurings Under the Plan

The Plan contemplates certain transactions, including, without limitation, the following transactions (described in greater detail in Article VII herein):

2

- The Chapter 11 Cases are being financed by a superpriority secured multi-draw $100 million term loan facility funded by certain of the First Lien Lenders (the "***DIP Facility***").

- To ensure the Reorganized Debtors are sufficiently capitalized going forward, the Reorganized Debtors will, on the effective date of the Plan, enter into (i) a new senior secured revolving loan facility with an aggregate principal commitment amount of up to $250 million, inclusive of a $150 million letter of credit sub-limit, and (ii) a new senior secured term loan agreement with an aggregate principal commitment of up to $300 million, which will refinance and replace the DIP Facility and the First Lien Loans.

- The Debtors will conduct a $200 million Equity Rights Offering, which all eligible Holders of Allowed General Unsecured Claims (except for First Lien Deficiency Claims and Second Lien Deficiency Claims) will be entitled to participate in.

- The treatment of certain Classes of Claims and Interests will be as follows:

  o Payment in full of all Allowed Administrative Claims, DIP Claims, Priority Tax Claims, Other Secured Claims, and Other Priority Claims, (or such other treatment rendering such claims Unimpaired);

  o With respect to each Holder of First Lien Claims, its Pro Rata Share (subject to application of the Equity Option) of the following:

    (a) with respect to any First Lien RCF Claims on account of unfunded First Lien Revolving LC Exposure as of the Effective Date, participation in the Exit LC Facility in an amount equal to each such Holder's participation in any such unfunded First Lien Revolving LC Exposure as of the Effective Date; and

    (b) with respect to any First Lien Claim other than unfunded First Lien Revolving LC Exposure:

      - the Exit Term Loans;

      - 98% of the New Common Interests, subject to dilution on account of the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP; and

      - Cash from the proceeds of the Equity Rights Offering, if applicable.

  o With respect to each Holder of Second Lien Claims, its Pro Rata Share of:

    (a) 2% of the New Common Interests, subject to dilution by the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP; and

    (b) the New Warrants.

3

o   With respect to each Eligible Holder of General Unsecured Claims, its Pro Rata Share of the right to purchase up to $200 million, in aggregate, of New Common Interests pursuant to the Equity Rights Offering; and

o   The Existing Parent Equity Interests will be canceled, and each Holder of an Existing Parent Equity Interest will not receive any distribution or retain any property on account of such Existing Parent Equity Interest.

- After the Effective Date, the New Board may adopt the Management Incentive Plan for the benefit of the new management of the Reorganized Debtors.  The MIP shall dilute all New Common Interests equally, including the New Common Interests issued pursuant to the Equity Rights Offering.

- After the Effective Date, the Reorganized Debtors will be a private company.

B.      Classification and Treatment of Claims and Equity Interests Under the Plan

The following table provides a summary of the classification and treatment of Claims and Interests and the potential distributions to Holders of Allowed Claims and Interests under the Plan.

The projected recoveries set forth in the table below are estimates only and, therefore, are subject to material change.  For a complete description of the Debtors' classification and treatment of Claims and Interests, reference should be made to the entire Plan and the risk factors described in Article X below.  The table is intended for illustrative purposes only and is not a substitute for a review of the Plan and the Disclosure Statement in their entirety.  For certain classes of Claims, the actual amount of Allowed Claims could be materially different than the estimated amounts shown in the table below.

| Class and Designation | Treatment under Plan | Approx. Percentage Recovery[3] |
|---|---|---|
| Class 1: Other Secured Claims | The legal, equitable, and contractual rights of Holders of Allowed Other Secured Claims are unaltered by the Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Other Secured Claim, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders) or the Reorganized Debtors, (i) such Holder shall receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days | 100% |

---

[3]   Approximate percentage recovery is illustrated prior to dilution from the MIP, the New Common Interests issued pursuant to the Equity Rights Offering, the DIP Backstop Premium, and the New Warrants.

| Class and Designation | Treatment under Plan | Approx. Percentage Recovery[3] |
|---|---|---|
| | after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such Holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired. | |
| Class 2: Other Priority Claims | The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by the Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders) or the Reorganized Debtors, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter. | 100% |
| Class 3: First Lien Claims | On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction settlement, release, and discharge and in exchange for each Allowed First Lien Claim, on the Effective Date or on another date acceptable to the Required Consenting First Lien Lenders, each Holder of an Allowed First Lien Claim shall receive its Pro Rata Share (subject to application of the Equity Option) of the following:<br><br>i.    with respect to any First Lien RCF Claims on account of unfunded First Lien Revolving LC Exposure as of the Effective Date, participation in the Exit LC Facility in an amount equal to each such Holder's participation in any such unfunded First Lien Revolving LC Exposure as of the Effective Date; | [ ● ]% |

| Class and Designation | Treatment under Plan | Approx. Percentage Recovery[3] |
|---|---|---|
| | ii.   with respect to any First Lien Claim other than unfunded First Lien Revolving LC Exposure:<br><br>    a.  the Exit Term Loans;<br><br>    b.  98% of the New Common Interests, subject to dilution on account of the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP; and<br><br>    c.  Cash from proceeds of the Equity Rights Offering, if applicable. | |
| **Class 4: Second Lien Claims** | On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction settlement, release, and discharge and in exchange for each Allowed Second Lien Claim, on the Effective Date or on another date acceptable to the Required Consenting First Lien Lenders, each Holder of an Allowed Second Lien Claim shall receive a Pro Rata Share of the following:<br><br>   i.  2% of the New Common Interests, subject to dilution by the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP; and<br><br>  ii.  the New Warrants. | [ ● ]% |
| **Class 5: General Unsecured Claims** | All General Unsecured Claims (including, for the avoidance of doubt, First Lien Deficiency Claims, Second Lien Deficiency Claims, and Unsecured Notes Claims) shall be canceled, released, and extinguished as of the Effective Date, and Holders of Allowed General Unsecured Claims shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claims; *provided* that, Eligible Holders of General Unsecured Claims (but excluding Holders of First Lien Deficiency Claims and Second Lien Deficiency Claims) shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for each General Unsecured | [ ● ]% |

| Class and Designation | Treatment under Plan | Approx. Percentage Recovery[3] |
|---|---|---|
| | Claim, their Pro Rata Share of the right to purchase up to $200,000,000, in aggregate, of New Common Interests pursuant to the Equity Rights Offering. | |
| Class 6: Intercompany Claims | On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims shall be either: (i) Reinstated or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors with the consent of the Required Consenting First Lien Lenders. | 100% |
| Class 7: Subordinated Claims | Holders of Subordinated Claims are not entitled to receive a recovery or distribution on account of such Subordinated Claim. On the Effective Date, Subordinated Claims shall be canceled, released, extinguished, and of no further force or effect. | 0% |
| Class 8: Intercompany Interests | On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either (i) Reinstated for administrative convenience or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors or Reorganized Debtors. | 100% |
| Class 9: Existing Parent Equity Interests | Holders of Existing Parent Equity Interests shall not receive or retain any distribution, property, or other value on account of such Existing Parent Equity Interests. On the Effective Date or as soon as reasonably practicable thereafter, all Existing Parent Equity Interests shall be canceled, released, extinguished, and of no further force and effect. | N/A |

**PLEASE TAKE NOTE OF THE FOLLOWING KEY DATES AND DEADLINES FOR THE CHAPTER 11 CASES AS SET FORTH IN THE RESTRUCTURING SUPPORT AGREEMENT:**

| | |
|---|---|
| **Deadline to commence the Chapter 11 Cases** | By no later than August 20, 2025 |
| **Deadline for entry of the Interim DIP Order** | By no later than August 23, 2025 |

| Deadline for filing of the Plan, Disclosure Statement, and the motion for approval of the Disclosure Statement and the Solicitation Materials | By no later than September 4, 2025 |
|---|---|
| Deadline for entry of the Final DIP Order | By no later than October 6, 2025 |
| Deadline for entry of the Solicitation Procedures Order | By no later than October 6, 2025 |
| Deadline for entry of the Confirmation Order | By no later than November 18, 2025 |
| Deadline for the occurrence of the Effective Date | By no later than December 8, 2025 |

**WHERE TO FIND ADDITIONAL INFORMATION: ModivCare files annual reports and quarterly reports with, and furnishes other information to, the SEC. Copies of any document filed with the SEC may be obtained by visiting the SEC website at http://www.sec.gov and performing a search under the "Company Filings" link. This Disclosure Statement incorporates SEC filings as if fully set forth herein including, but not limited to:**

- Annual report on Form 10-K for the fiscal year ended December 31, 2024, filed with SEC on March 6, 2025; and

- Quarterly report on Form 10-Q for the quarter ending March 30, 2025, filed with the SEC on May 9, 2025.

C.    Solicitation Procedures

1.    The Solicitation Procedures

On [ ● ], the Bankruptcy Court entered an order [Docket No. [ ● ]] (the "*Solicitation Procedures Order*") that, among other things: (a) approved this Disclosure Statement; (b) scheduled the hearing to consider confirmation of the Plan (the "*Confirmation Hearing*"); (c) established the deadline for filing objections to the Plan; (d) approved the notice of the Disclosure Statement hearing and the form and manner of the notice of the Confirmation Hearing; (e) established the Voting Record Date; and (f) approved the dates, procedures and forms applicable to the process of soliciting votes on and providing notice of the Plan, as well as certain vote tabulation procedures, approved the Assumption Procedures and the form and manner of the Assumption Notice (each as defined in the Solicitation Procedures Order).

The discussion of the procedures below is a summary of the solicitation and voting process. Detailed voting instructions will be provided with each Ballot (defined below) and are also set forth in greater detail in the Solicitation Procedures Order.

8

**PLEASE REFER TO THE INSTRUCTIONS ACCOMPANYING THE BALLOTS AND THE SOLICITATION PROCEDURES ORDER FOR MORE INFORMATION REGARDING VOTING REQUIREMENTS TO ENSURE THAT YOUR BALLOT IS PROPERLY AND TIMELY SUBMITTED SUCH THAT YOUR VOTE MAY BE COUNTED.**

> **2.** The Solicitation Agent

The Debtors have retained Kurtzman Carson Consultants LLC d/b/a Verita Global to, among other things, act as their solicitation and noticing agent (the "*Solicitation Agent*").

Specifically, the Solicitation Agent will assist the Debtors with: (a) mailing the Disclosure Statement Hearing Notice (as defined in the Solicitation Procedures Order); (b) the Confirmation Notice (as defined in the Solicitation Procedures Order); (c) mailing Solicitation Packages (as defined in the Solicitation Procedures Order and as described below); (d) soliciting votes on the Plan; (e) receiving, tabulating, and reporting on ballots cast for or against the Plan by Holders of Claims against the Debtors; (f) collecting Release Opt-Out Forms; (g) responding to inquiries from creditors and other stakeholders relating to the Plan, the Disclosure Statement, the Ballots and matters related thereto, including, without limitation, the procedures and requirements for voting to accept or reject the Plan and objecting to the Plan; and (h) if necessary, contacting creditors regarding the Plan and their Ballots.

> **3.** Holders of Claims Entitled to Vote on the Plan

Under the provisions of the Bankruptcy Code, not all holders of claims against and equity interests in a debtor are entitled to vote on a chapter 11 plan. The following table provides a summary of the status and voting rights of each Class (and, therefore, of each Holder of a Claim within such Class) under the Plan:

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 3 | **First Lien Claims** | **Impaired** | **Yes** |
| 4 | **Second Lien Claims** | **Impaired** | **Yes** |
| 5 | **General Unsecured Claims** | **Impaired** | **Yes** |
| 6 | Intercompany Claims | Unimpaired | No (Presumed to Accept) |

9

| Class | Designation | Treatment | Entitled to Vote |
|---|---|---|---|
| 7 | Subordinated Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to Accept) |
| 9 | Existing Parent Interests | Impaired | No (Deemed to Reject) |

Based on the foregoing, the Debtors are soliciting votes to accept the Plan only from Holders of Claims in Class 3, Class 4, and Class 5 (the "***Voting Classes***") because Holders of Claims in such Voting Classes are Impaired under the Plan and, therefore, have the right to vote to accept or reject the Plan.

The Debtors are **not** soliciting votes from (a) Holders of Other Secured Claims in Class 1, or Holders of Other Priority Claims in Class 2, because such parties are conclusively presumed to have accepted the Plan, (b) Holders of Subordinated Claims in Class 7, or Holders of Existing Parent Equity Interests in Class 9, because such parties are conclusively deemed to have rejected the Plan, and (c) Holders of Intercompany Claims or Intercompany Interests in Classes 6 and 8, because such parties are Affiliates and will be Unimpaired and conclusively presumed to have accepted the Plan (collectively, the "***Non-Voting Classes***").  In lieu of Solicitation Materials, Holders of Claims in Classes 1, 2, 7 and 9 will receive a Notice of Non-Voting Status and Release Opt-Out Form, each of which will include an option for such Holders to affirmatively opt out of the Third-Party Release contained in section 10.6(b) of the Plan.

### 4.     The Voting Record Date

The Bankruptcy Court has approved October 6, 2025 as the voting record date (the "***Voting Record Date***") with respect to all Claims and Interests in the Voting Classes.  The Voting Record Date is the date on which it will determined which Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan.

### 5.     Contents of Solicitation Packages

The following documents and materials will collectively constitute the Solicitation Packages:

- the Confirmation Notice, attached to the Solicitation Procedures Order;

- this Disclosure Statement (and exhibits annexed thereto, including the Plan);

- the Solicitation Procedures Order;

- to the extent applicable, a Ballot and/or notice, appropriate for the specific creditor, in substantially the forms attached to the Solicitation Procedures Order (as may be modified for particular classes and with instruction attached thereto); and

- such other materials as the Bankruptcy Court may direct.

### 6. Distribution of the Solicitation Materials to Holders of Claims Entitled to Vote on the Plan

With the assistance of the Solicitation Agent, the Debtors intend to distribute the Solicitation Packages on or before October 10, 2025 (the "***Solicitation Mailing Date***").  The Debtors submit that the timing of such distribution will provide such Holders of Claims with adequate time to review the materials required to allow such parties to make informed decisions with respect to voting on the Plan in accordance with Bankruptcy Rules 3017(d) and 2002(b).  The Debtors will make every reasonable effort to ensure that Holders who have more than one Allowed Claim in the Voting Classes receive no more than one set of Solicitation Materials.

### 7. Distribution of Notices to Holders of Claims in Non-Voting Classes

As set forth above, certain third-party Holders of Claims and Existing Parent Equity Interests are **not** entitled to vote on the Plan.  As a result, such parties will not receive Solicitation Packages and, instead, will receive a Non-Voting Status Notice and a Release Opt-Out Form.

The Holders of Intercompany Claims in Class 6 and Intercompany Interests in Class 8 are Affiliates of the Debtors.  As such, the Debtors will seek to waive any requirement to serve Holders of Intercompany Claims in Class 6 and Intercompany Interests in Class 8 with Solicitation Packages or any other notices.

### 8. Additional Distribution of Solicitation Documents

In addition to the distribution of Solicitation Packages to Holders of Claims in the Voting Classes, the Debtors will also provide parties who have filed requests for notice under Bankruptcy Rule 2002 as of the Voting Record Date with the Disclosure Statement, the Solicitation Procedures Order, and the Plan.  Additionally, parties may request (and obtain at the Debtors' expense) a copy of the Disclosure Statement (and any exhibits thereto, including the Plan) by: (a) calling the Solicitation Agent at the number shown on the Ballot received; (b) emailing ModivCare Inc., c/o Kurtzman Carson Consultants LLC, d/b/a Verita Global at ModivCareInfo@veritaglobal.com; (c) writing to ModivCare Inc., c/o Kurtzman Carson Consultants LLC, d/b/a Verita Global at 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (d) visiting the Debtors' restructuring website at: https://www.veritaglobal.net/ModivCare.  Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov.

### 9. Filing of Plan Supplement

The Debtors will file the Plan Supplement by October 31, 2025.  The Debtors will transmit a copy of the Plan Supplement to the Distribution List, as defined in this Section I.D.9.  Additionally, (and obtain at the Debtors' expense) a copy of the Plan Supplement by: (a) calling the Solicitation Agent at the number shown on the Ballot received; (b) emailing ModivCare Inc., c/o Kurtzman Carson

11

Consultants LLC, d/b/a Verita Global at ModivCareInfo@veritaglobal.com; (c) writing to ModivCare Inc., c/o Kurtzman Carson Consultants LLC, d/b/a Verita Global at 222 N. Pacific Coast Highway, Suite 300, El Segundo, CA 90245; and/or (d) visiting the Debtors' restructuring website at: https://www.veritaglobal.net/ModivCare. Parties may also obtain any documents filed in the Chapter 11 Cases for a fee via PACER at https://www.pacer.gov.

The Plan Supplement will include, among other things, the documents and forms of documents, schedules, and exhibits to the Plan (as more fully set forth in the definition for Plan Supplement in the Plan), all of which are incorporated by reference into, and are an integral part of, the Plan, as all of the same may be amended, supplemented, or modified from time to time.

As used herein, the term "***Distribution List***" means: (a) the United States Trustee for the Southern District of Texas; (b) the parties included on the Debtors' consolidated list of the holders of the thirty largest unsecured claims against the Debtors; (c) Paul Hastings LLP as counsel to the Prepetition First Lien Agent, Consenting Creditors, DIP Agent, and DIP Lenders; (d) Ankura Trust Company, LLC, as trustee for the Second Lien Notes; (e) Wilmington Saving Fund Society, FSB, as trustee for Unsecured Notes; (f) counsel to the Committee (if any); (g) the United States Attorney's Office for the Southern District of Texas; (h) the Internal Revenue Service; (i) the SEC; (j) the state attorneys general for states in which the Debtors conduct business; and (k) all parties that have requested or that are required to receive notice pursuant to Bankruptcy Rule 2002.

        D.       <u>Voting Process</u>

Holders of Claims entitled to vote on the Plan are advised to read the Solicitation Procedures Order, which sets forth in greater detail the voting instructions summarized herein.

        **1.**       <u>The Voting Deadline</u>

The Bankruptcy Court has approved 4:00 p.m. prevailing Central Time on November 7, 2025 as the Voting Deadline. The Voting Deadline is the date by which all Ballots must be properly executed, completed and delivered to the Solicitation Agent in order to be counted as votes to accept or reject the Plan.

        **2.**       <u>Types of Ballots</u>

The Debtors will provide the following ballots (collectively, the "***Ballots***") to Holders of Claims in the Voting Classes (*i.e.* Class 3, Class 4, and Class 5):

- "***First Lien Ballots***", the form of which is attached to the Solicitation Procedures Order as Exhibit 3, will be sent to Holders of Class 3 Claims;

- "***Second Lien Beneficial Holder Ballots***", the form of which is attached to the Solicitation Procedures Order as Exhibit 4-A, will be sent to beneficial Holders of Class 4 Claims;

- "***Second Lien Master Ballots***", the form of which is attached to the Solicitation Procedures Order as Exhibit 4-B, will be sent to Nominee Holders of Class 4 Claims;

12

- "***Unsecured Notes Beneficial Holder Ballots***", the form of which is attached to the Solicitation Procedures Order as Exhibit 5-A, will be sent to beneficial Holders of Unsecured Notes Claims;

- "***Unsecured Notes Master Ballots***", the form of which is attached to the Solicitation Procedures Order as Exhibit 5-B; will be sent to Nominee Holders of Class 5 Claims and

- "***GUC Ballots***", the form of which is attached to the Solicitation Procedures Order as Exhibit 5-C, will be sent to Holders of General Unsecured Claims, other than Unsecured Notes Claims.

Subject to the terms of the Restructuring Support Agreement, each Ballot will include an option for the applicable Holder of Claims to affirmatively opt out of the Third-Party Release contained in section 10.6(b) of the Plan.

### 3. Voting Instructions

Under the Plan, Holders of Claims in the Voting Classes are entitled to vote to accept or reject the Plan. Those Holders may vote by completing a First Lien Ballot, a Beneficial Holder Ballot, a Master Ballot, or a GUC Ballot, as applicable, and returning it to the Solicitation Agent so that it is **actually received** by the Voting Deadline. There are special voting rules and procedures for Beneficial Holders of Class 4 and Class 5 Claims, which are discussed in Section IV below (and set forth in greater detail in the Solicitation Procedures Order). Each Ballot will also allow Holders of Claims in the Voting Classes to opt-out of the Third-Party Release set forth in section 10.6(b) of the Plan. Any Holder of Claims in the Voting Classes that opts out of the Third-Party Release will not receive a Debtor Release or a Third-Party Release from the Releasing Parties, subject to the terms of the Restructuring Support Agreement.

**PLEASE REFER TO THE INSTRUCTIONS ATTACHED TO THE FIRST LIEN BALLOTS, BENEFICIAL HOLDER BALLOTS, OR MASTER BALLOTS THAT YOU HAVE RECEIVED FOR MORE DETAILED INFORMATION REGARDING THE VOTING REQUIREMENTS, RULES AND PROCEDURES APPLICABLE TO VOTING YOUR CLAIM.**

To be counted as votes to accept or reject the Plan, all First Lien Ballots, pre-validated Beneficial Holder Ballots, Master Ballots, and GUC Ballots, as applicable (all of which will clearly indicate the appropriate return address), are required to be properly executed, completed, dated and delivered according to the instructions contained thereon, so that they are **actually received** on or before the Voting Deadline by the Solicitation Agent in the manner described in the Ballots.

### 4. Voting Procedures

Prior to the Solicitation Mailing Date, the Solicitation Agent will determine the Nominees holding Second Lien Notes or Unsecured Notes on behalf of beneficial Holders of such Second Lien Notes or Unsecured Notes as of the Voting Record Date and will distribute an appropriate number of Solicitation Packages to such Record Owners to allow them to forward one to each applicable beneficial holder.

Nominees who elect to pre-validate Beneficial Holder Ballots must deliver Solicitation Packages, including pre-validated Beneficial Holder Ballots, to beneficial Holders along with a pre-addressed return envelope addressed to the Solicitation Agent.  Beneficial Holders who receive pre-validated Beneficial Holder Ballots must complete, date, execute and deliver such Beneficial Holder Ballots directly to the Solicitation Agent so they are actually received on or before the Voting Deadline.

Nominees who do not elect to pre-validate Beneficial Holder Ballots must deliver to the beneficial holders the Solicitation Materials, including Beneficial Holder Ballots and pre-addressed return envelopes addressed to the Record Owners.  Upon the return of completed Beneficial Holder Ballots, such Nominees will summarize and compile the votes cast and/or other relevant information onto the Master Ballots and date and return the Master Ballot(s) so that they are actually received on or before the Voting Deadline by the Solicitation Agent.

### 5. Tabulation of Votes

**THE FOLLOWING IS IMPORTANT INFORMATION REGARDING VOTING THAT SHOULD BE READ CAREFULLY BY ALL HOLDERS OF CLAIMS IN THE VOTING CLASSES.  PLEASE REFER TO THE SOLICITATION PROCEDURES ORDER AND ALL EXHIBITS ATTACHED THERETO, INCLUDING THE BALLOTS, FOR MORE DETAILED INFORMATION.**

- FOR YOUR VOTE TO BE COUNTED, YOUR FIRST LIEN BALLOT, PRE-VALIDATED BENEFICIAL HOLDER BALLOT, MASTER BALLOT, OR GUC BALLOT, AS APPLICABLE, MUST BE PROPERLY EXECUTED, COMPLETED, DATED AND DELIVERED SUCH THAT IT IS **ACTUALLY RECEIVED** ON OR BEFORE THE VOTING DEADLINE BY THE SOLICITATION AGENT.

- A HOLDER OF A CLAIM MAY CAST ONLY ONE VOTE PER EACH CLAIM SO HELD.  BY SIGNING AND RETURNING A FIRST LIEN BALLOT, BENEFICIAL HOLDER BALLOT, MASTER BALLOT, OR GUC BALLOT, EACH HOLDER OF A CLAIM WILL CERTIFY TO THE BANKRUPTCY COURT AND THE DEBTORS THAT NO OTHER FIRST LIEN BALLOTS, BENEFICIAL HOLDER BALLOTS, MASTER BALLOTS, OR GUC BALLOTS WITH RESPECT TO SUCH CLAIM HAS BEEN CAST OR, IF ANY OTHER FIRST LIEN BALLOT, BENEFICIAL HOLDER BALLOTS, MASTER BALLOTS, OR GUC BALLOTS HAVE BEEN CAST WITH RESPECT TO SUCH CLAIM, SUCH EARLIER FIRST LIEN BALLOT, BENEFICIAL HOLDER BALLOTS, MASTER BALLOTS, OR GUC BALLOTS ARE THEREBY SUPERSEDED.

- **ANY FIRST LIEN BALLOT, BENEFICIAL HOLDER BALLOT, MASTER BALLOT, OR GUC BALLOT THAT IS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE COUNTED TOWARD CONFIRMATION OF THE PLAN UNLESS THE DEBTORS HAVE GRANTED AN EXTENSION OF THE VOTING DEADLINE IN WRITING WITH RESPECT TO SUCH FIRST LIEN BALLOT, BENEFICIAL HOLDER BALLOT, MASTER BALLOT, OR GUC BALLOT.**

- **ADDITIONALLY, THE FOLLOWING FIRST LIEN BALLOTS, BENEFICIAL HOLDER BALLOTS, MASTER BALLOTS, AND GUC BALLOTS WILL <u>NOT</u> BE COUNTED:**

  o any Ballot received after the Voting Deadline unless the Debtors have granted an extension of the Voting Deadline in writing (email being sufficient) with respect to such Ballot;

  o any Ballot that is illegible or contains insufficient information to permit the identification of the claimant;

  o any Ballot cast by or on behalf of an entity that does not hold a Claim in a Voting Class;

  o any Ballot that is otherwise properly completed, executed and timely returned to the Solicitation Agent, but that (a) does not indicate an acceptance or rejection of the Plan, (b) indicates both an acceptance and rejection of the Plan, or (c) partially accepts and partially rejects the Plan;

  o any Ballot submitted by telecopy, facsimile, email, or other electronic means except for the Solicitation Agent's online balloting portal;

  o any unsigned Ballot;

  o in the event (a) a Ballot, (b) a group of Ballots within a Voting Class received from a single creditor, or (c) a group of Ballots received from the various Holders of multiple portions of a single Claim partially reject and partially accept the Plan, such Ballots may not be counted in the Debtors' discretion;

  o any Ballot sent to the Debtors, the Debtors' agents/representatives (other than the Solicitation Agent), or the Debtors' financial or legal advisors; and

  o any Ballot not cast in accordance with the procedures approved in the Solicitation Procedures Order.

E.    Confirmation of the Plan

  1.    The Confirmation Hearing

The Confirmation Hearing will commence at [ ● ] prevailing Central Time on November 18, 2025 before the Honorable Alfredo R. Perez, United States Bankruptcy Judge, in the United States Bankruptcy Court for Southern District of Texas, Houston Division, located at 515 Rusk Street, Houston, Texas 77002.  The Confirmation Hearing may be continued from time to time by the Bankruptcy Court or the Debtors without further notice other than by such adjournment being announced in open court or by a notice of adjournment filed with the Bankruptcy Court and served on such parties as the Bankruptcy Court may order.  Moreover, the Plan may be modified or amended, if necessary, pursuant to section 1127 of the Bankruptcy Code and in accordance with

15

the terms of the Restructuring Support Agreement, prior to, during, or as a result of the Confirmation Hearing, without further notice to parties in interest.

### 2.  Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan of reorganization.  **The deadline to object to the Plan is 4:00 p.m. prevailing Central Time on November 7, 2025**.  Any objection to confirmation of the Plan must be in writing, must conform to the Bankruptcy Rules and the Bankruptcy Local Rules, must set forth the name of the objector, the nature and amount of Claims or Interests held or asserted by the objector against the Debtors' estates or properties, the basis for the objection and the specific grounds therefore, and must be filed with the Bankruptcy Court.

UNLESS AN OBJECTION TO CONFIRMATION IS TIMELY FILED, IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

### 3.  Effect of Confirmation of the Plan

Article X of the Plan contains certain provisions relating to: (a) the compromise and settlement of Claims, Interests, and Causes of Action; (b) the release of the Released Parties by the Debtors and certain Holders of Claims and Interests, and each of their respective Related Persons; (c) exculpation of certain parties; and (d) an injunction from taking actions in connection with the foregoing, each as more fully set forth in Article X of the Plan.  **It is important to read such provisions carefully so that you understand the implications of these provisions with respect to your Claim such that you may cast your vote accordingly.**

**THE PLAN WILL BIND ALL HOLDERS OF CLAIMS AND INTERESTS IN THE DEBTORS TO THE MAXIMUM EXTENT PERMMITTED BY APLICABLE LAW, NOTWITHSTANDING WHETHER OR NOT SUCH HOLDER (A) WILL RECEIVE OR RETAIN ANY PROPERTY, INTEREST IN PROPERTY, OR OTHER VALUE UNDER THE PLAN, (B) HAS FILED A PROOF OF CLAIM OR EQUITY IN THE CHAPTER 11 CASES, OR (C) FAILED TO VOTE TO ACCEPT OR REJECT THE PLAN OR VOTE TO REJECT THE PLAN.**

### F.  Effectuation of the Plan

It will be a condition to effectuation of the Plan that all provisions, terms and conditions of the Plan are approved in the Confirmation Order unless otherwise satisfied or waived pursuant to the provisions of Article IX of the Plan.  Following Confirmation, the Plan will become effective on the Effective Date.

### G.  Risk Factors

**PRIOR TO DECIDING WHETHER AND HOW TO VOTE ON THE PLAN, EACH HOLDER OF A CLAIM IN A VOTING CLASS SHOULD CONSIDER CAREFULLY ALL OF THE INFORMATION IN THIS DISCLOSURE STATEMENT, INCLUDING THE**

RISK FACTORS DESCRIBED IN <u>SECTION X</u> HEREIN TITLED, "CERTAIN RISK FACTORS TO BE CONSIDERED."

## II.
## BACKGROUND TO THE CHAPTER 11 CASES

A.    OVERVIEW OF THE DEBTORS' BUSINESS OPERATIONS

ModivCare Inc. traces its roots back over thirty years, and certain of its business segments began providing non-emergency medical transportation ("*NEMT*") services to government-sponsored healthcare programs in the 1980s.  Since its founding, ModivCare has grown into a leading technology-enabled healthcare services company, connecting members to essential care through NEMT, personal care services ("*PCS*"), and remote patient monitoring ("*RPM*").  The Company's corporate segment includes general corporate services as well as the Company's virtual care and community-based monitoring innovation programs; additionally, the Company's ownership stake and minority interest in a national provider network of community-based clinicians delivering in-home and on-site services ("*Corporate*," and together with NEMT, PCS, and RPM, the "*Business Segments*").  Over the past decade, ModivCare has transformed into one of the nation's largest providers of supportive care solutions, serving millions of members annually across 48 states and the District of Columbia through a workforce of approximately 23,675 employees and thousands of contracted third-party transportation providers and their respective drivers who are employed by the Debtors and their non-Debtor affiliates.

ModivCare's services are engrained in the everyday lives of vulnerable populations.  For example, ModivCare coordinates millions of annual rides to and from doctors' offices, dialysis centers, and hospitals for Medicaid and Medicare members; provides in-home personal care services that allow seniors and persons with disabilities to live independently; and offers connected-care monitoring and digital engagement tools that promote preventive health and reduce avoidable hospitalizations, often in rural settings.  Through these services, ModivCare plays a critical role in supporting healthcare access and addressing social determinants of health for some of the nation's most at-risk communities.

B.    History and Formation

Founded in 1996 as The Providence Services Corporation, ModivCare concentrates on connecting people to their healthcare providers to improve outcomes and overall patient health.  ModivCare became publicly traded in 2003 through an initial public offering and, until recently, traded on the NASDAQ under the ticker MODV.  The Company has grown from a stand-alone non-emergency medical transportation provider to a multi-faceted supportive care solutions provider.  The Company has expanded organically and by acquiring several businesses, including:  (a) Charter LCI Corporation, the parent company of LogistiCare, Inc. (which is now ModivCare Solutions, LLC) in 2007; (b) Matrix Medical Network ("*Matrix*") in 2014 (which ModivCare later sold the majority interest to Frazier Healthcare Partners); (c) Circulation, Inc. in 2018; (d) National MedTrans, LLC in 2020; (e) OEP AM, Inc. (d/b/a Simplura Health Group) in 2020; (f) WellRyde in 2021; (g) Care Finders Total Care in 2021; (h) VRI Intermediate Holdings, LLC in 2021; and (i) Guardian Medical Monitoring in 2022.

The Company's headquarters are located in Denver, Colorado.

### C.    Current Business Operations

ModivCare's four Business Segments—NEMT, PCS, RPM, and Corporate—provide patient-centric services to its customers.  These Business Segments roll up into centralized and standardized operations, which enable the Company to cultivate best practices and efficiencies. Through these processes, the Company generally seeks to have a positive impact by closing certain health gaps and addressing the social determinants of health by serving those in need.  The Business Segments are designed to achieve these goals, improve access to care, and adapt to the ever changing healthcare industry, which must prepare for and react to anticipated shifts in the demographic dynamics of the United States, including an aging population with increased life expectancies (which is expected to increase general demand for healthcare services), an increasing prevalence in chronic illness (which require active and ongoing monitoring of patient health and data), an increasing demand for value-based versus fee-for-service care, and an increasing demand for in-home care.[4]

### i.    *NEMT*

Through NEMT, the Company provides non-emergency medical transportation to members of public and private insurance providers, including the state Medicaid and Medicare agencies, and managed care organizations ("***MCOs***").  The Company's primary customers are typically Medicaid or Medicare eligible members whose limited mobility or financial resources impede their ability to access necessary healthcare and social services.  The Company applies its proprietary technology platform to a network of approximately 4,100 transportation resources, including on-demand transportation network companies, mass transit entities, mileage reimbursement programs, taxis, and county-based emergency service providers.  Through these partnerships, ModivCare has become one of the nation's largest managers of non-emergency medical transportation for state governments and MCOs.  In 2024, the Company managed approximately 36.8 million trips for approximately 29.5 million average monthly members.

The Company's NEMT business depends in large part on contracts awarded by MCOs and state and other governmental entities, many of which are subject to competitive request for proposal ("***RFP***") processes.  In the ordinary course of business, the Company has experienced certain non-renewals of existing contracts and has not been awarded contracts under some RFPs, though it has appealed a number of those adverse determinations.  Thus far in 2025, the aggregate financial impact of such non-renewals and unsuccessful RFP outcomes is approximately $438 million in annualized lost revenue, which is reflected in the financial projections attached hereto as **Exhibit D**.  While these outcomes have presented challenges, the Company maintains a diversified customer base across multiple jurisdictions, which helps mitigate the impact of any single contract loss.

In addition to these challenges, the Company has also achieved meaningful successes in recent competitive processes, securing new contracts and renewals that are expected to generate approximately $86 million in annualized revenue.  These contract wins reflect the NEMT business' strong operating capabilities, proven service record, and ability to meet evolving

---

[4]    A complete March 2025 Investor Presentation is available at https://investors.modivcare.com/events-presentations/default.aspx.

customer and regulatory requirements.  The Company believes these new engagements will not only offset a portion of the revenue impact from non-renewals and unsuccessful RFPs but also strengthen its long-term customer relationships and reinforce its position as a trusted provider across multiple jurisdictions.

### ii. *PCS*

Through PCS, the Company provides in-home personal care services to customers by placing non-medical personal care assistants, home health aides, and skilled nurses in the home setting.  The Company places these in-home resources with Medicaid patients in need of assistance, including senior citizens and disabled adults.  ModivCare's PCS segment payors include government agencies, MCOs, commercial insurers and private individuals.  In 2024, ModivCare had approximately 14,000 caregivers throughout seven states who provided approximately 28 million hours of patient care.

### iii. *RPM*

Through RPM, the Company provides in-home monitoring services to support patient self-management and care management operations.  The RPM business segment enables seniors, the chronically ill, and people with disabilities to maintain their long-term independence by avoiding moves to long-term care facilities and preventable emergency room visits and hospitalizations. ModivCare provides a variety of services that leverage personal emergency response systems, monitoring devices, relationship-based care and data-driven patient engagement solutions.  In 2024, the Company served approximately 247,000 members of government insurance programs, members of healthcare provider organizations, and private individuals through RPM.

### iv. *Corporate*

Through Corporate, the Company's subsidiary, Higi Care LLC, provides data-driven personal health technologies through the placement of health monitoring systems at certain third-party brick and mortar stores, and community health monitoring services (under a management services organization "friendly PC" model).  Corporate also includes the Company's revenue from its non-controlling interest in a joint venture that maintains a national network of community-based clinicians who provide in-home and on-location services.  Finally, Corporate includes the Company's activities related to accounting, finance, internal audit and tax, and key corporate development functions.

### v. *Revenue Breakdown*

The Company's revenue streams are primarily driven by the NEMT segment and complemented by the PCS, RPM, and Corporate segments, as shown below:

| Segment | Year Ended December 31, 2023[5] | Year Ended December 31, 2024 | Quarter Ended March 31, 2025 |
|---|---|---|---|
| NEMT | $1,951,447 | $1,957,275 | $449,007 |
| PCS | $715,615 | $745,299 | $181,787 |
| RPM | $77,941 | $77,739 | $18,125 |
| Corporate and Other | $6,167 | $7,273 | $1,735 |
| **Consolidated ModivCare** | **$2,751,170** | **$2,787,586** | **$650,654** |

---

[5]    Excludes $5,037k of grant income for the year ended December 31, 2023.

# III.
# CORPORATE AND CAPITAL STRUCTURE

A.    Corporate Structure

The Debtors consist of ModivCare and its domestic wholly-owned subsidiaries, totaling 70 entities formed under the laws of, among other places, Delaware, New York, and Texas.  A chart illustrating the Company's organizational structure as at the Petition Date is attached hereto as **Exhibit B**.

B.    Corporate Governance

i.    *Board of Directors and Special Committees*

ModivCare is governed by its board of directors.  On June 17, 2025, ModivCare held its annual meeting of shareholders, during which its Board was elected.

The current Board consists of seven directors, as shown below:

| Name | Position | Notable Experience |
| --- | --- | --- |
| Todd J. Carter | Director | Mr. Carter is the Co-President and Chief Executive Officer of GCA Savvian Advisors, a global independent investment banking firm. Mr. Carter has served on a number of company, advisory, and non-profit boards of directors. |
| Alec Cunningham | Director | Mr. Cunningham has significant experience with publicly-funded, national healthcare programs. Mr. Carter has served as Chief Executive Officer of Wellcare and Chief Operating Officer of Aetna. |
| David Mounts Gonzales | Director | Mr. Mounts Gonzales is a General Partner of the AI Catalyst Fund, a significant shareholder in the Company.  Mr. Mounts Gonzales is an experienced chief executive and public company director, having served as Chief Executive Officer of Inmar Intelligence, a data-driven commerce and analytics platform. |
| Leslie V. Norwalk | Director, Chairperson of the Board | Ms. Norwalk is a director on the public company boards of NuVasiv Inc. and Endologix, Inc. Ms. Norwalk previously served as both the Acting Administrator and Deputy Administrator of the Centers for Medicare & Medicaid Services in the George W. Bush Administration. |

22

| Name | Position | Notable Experience |
|---|---|---|
| Erin L. Russell | Director | Ms. Russell has extensive experience as an investment professional and as a board member. Ms. Russell has previously sat on the boards of prominent healthcare companies including eHealth, Inc (Nasdaq: EHTH), Tivity Health Inc., and Devilbiss Healthcare. |
| L. Heath Sampson | Director and CEO | Mr. Sampson has over thirty years of leadership experience, having previously served as the Chief Executive Officer of Advanced Emissions Solutions, and serving in key leadership roles at Square Two Financial and First Data Corporation. |
| Daniel B. Silvers | Director | Mr. Silvers currently serves as the managing member of Matthews Lane Capital Partners LLC, an investment firm.  Mr. Silvers has extensive experience as a board member, having served on numerous boards across numerous industries. |

In connection with the terms of the Fifth Amendment (as defined and described below), the Company was required by the terms of its debt documents to appoint three independent directors from a list of directors provided by the First Lien Lenders.  The final of these new independent directors was seated on April 24, 2025.  The candidate list was highly negotiated with the Debtors and each independent director candidate had to have requisite expertise (including serving on public companies and within the healthcare industry) and independence.  The Board also established a committee comprised of three directors to oversee sales and marketing processes for the PCS and RPM segments (the "*Strategic Alternatives Committee*").  Since April 2025, the members of the Strategic Alternatives Committee have been Alec Cunningham, Erin L. Russell (Chairperson), and Daniel B. Silvers.

In addition, on June 20, 2025, the Board established a special committee of the Board (the "*Capital Structure Committee*") to investigate, review, evaluate, analyze, negotiate, and make recommendations to the Board to approve or reject, any changes to the Company's capital structure including all restructuring matters.  The members of the Capital Structure Committee are Todd  J. Carter, Alec Cunningham, David Mounts Gonzales, Erin L. Russell, and Daniel B. Silvers (Chairperson).  In the lead up to the Chapter 11 Cases, each of the Strategic Alternatives Committee and the Capital Structure Committee met at least weekly and have been coordinating amongst each other to discuss the various issues facing the Company and to explore all available options, including out-of-court options, sale, processes, and in-court processes, for the Company to address its financial challenges and maximize value.

23

The Board also has three other committees:  (a) a committee to oversee management's conduct of the Company's financial reporting process (the "*Audit Committee*"); (b) a committee to assist the Board in discharging its responsibilities relating to executive compensation; and (c) a committee to establish criteria for selecting new directors, to recommend a slate of nominees for election at the annual shareholder meeting, and to oversee healthcare compliance.  All directors, regardless of whether such director is a member of a committee of the Board, are invited to attend meetings of the various committees of the Board.

## ii.    *Management*

ModivCare is managed by its executive leadership team, which consists of the following persons.

| Name | Position |
|---|---|
| L. Heath Sampson | President and CEO |
| Jeffrey Bennett | Chief Strategy and Innovation Officer |
| Chelsey Berstler | Executive Vice President of PCS |
| Scott Kern | Vice President, Head of Corporate Development |
| Kenneth Shepard | Senior Vice President, Finance |
| Rebecca Orcutt | Senior Vice President, Chief Accounting Officer |
| Faisal Khan | Senior Vice President, General Counsel and Secretary |
| Chad Shandler | Chief Transformation Officer |

## C.    Capital Structure

The Debtors have both secured and unsecured funded debt claims.  A summary of the approximate outstanding principal amounts of the Debtors' funded debt obligations as of the Petition Date is set forth below.

| Facility | Outstanding Principal Balance | Maturity | Rate |
|---|---|---|---|
| Incremental Term Loan | $78.8 million | January 10, 2026 | SOFR + 7.50% |

| Facility | Outstanding Principal Balance | Maturity | Rate |
|---|---|---|---|
| First Lien Revolving Credit Facility | $270.7 million | February 3, 2027 | SOFR + 4.25% |
| First Lien Term Loan B | $522.2 million | July 1, 2031 | SOFR + 4.75% |
| Second Lien Notes | $316.2 million | October 1, 2029 | 5.0% Cash (10% PIK Toggle) |
| **Total Secured Debt** | **$1,187.9 million** | | |
| Unsecured Notes | $228.8 million | October 1, 2029 | 5.0% |
| **Total Funded Debt** | **$1,416.7 million** | | |

### i.  *First Lien Facility*

ModivCare is party to that certain *Credit Agreement*, dated as of February 3, 2022 (as amended by (a) the *Amendment No. 1 to Credit Agreement*, dated as of June 26, 2023, (b) the *Amendment No. 2 to Credit Agreement*, dated as of February 22, 2024, (c), the *Amendment No. 3 to Credit Agreement*, dated as of July 1, 2024, (d) the *Amendment No. 4 to the Credit Agreement*, dated as of September 30, 2024, and (e) the *Amendment No. 5 to Credit Agreement*, dated as of January 9, 2025 (the "*Fifth Amendment*"), and as further amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "*First Lien Credit Agreement*"), with, among other parties, JPMorgan Chase Bank, N.A., as administrative agent (including any successor thereto,[6] the "*First Lien Agent*"), and the other lenders party thereto (collectively, the "*First Lien Lenders*"), and certain subsidiaries of ModivCare from time to time party thereto as guarantors.  The First Lien Credit Agreement is secured by a first priority lien on substantially all of the property and assets of ModivCare and its guarantor subsidiaries.

As of the Petition Date, the Company has approximately $871.7 million outstanding under the First Lien Credit Agreement, comprising (a) $270.7 million in unpaid principal amount of revolving loans, plus accrued and unpaid interest, fees, costs (the "*First Lien RCF Facility*"), (b) $522.2 million in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due July 2031 (the "*First Lien Term Loans*"), and (c) $78.8 million in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due January 2026 (the "*First Lien Incremental*" and together with the First Lien RCF Facility, and the First Lien Term Loans, the "*First Lien Facility*").  The First Lien Incremental was provided to the Company pursuant to the Fifth Amendment.

---

[6] JPMorgan Chase Bank, N.A. has provided notice of intention to resign as First Lien Agent and will be replaced by Wilmington Trust, National Association.

### ii.      *Second Lien Notes*

As described more fully in paragraph (iii) below, ModivCare is party to an Unsecured Notes Indenture (as defined below).  Pursuant to the Fifth Amendment, ModivCare entered into an exchange agreement (the "*Exchange Agreement*"), dated January 9, 2025. As required by the Exchange Agreement, certain of the Unsecured Notes (as defined below) were exchanged pursuant to certain *Second Lien Senior Secured PIK Toggle Notes due October 1, 2029* (the "*Second Lien Notes*"), issued by ModivCare and pursuant to that certain *Second Lien Senior Secured PIK Toggle Notes Indenture*, dated as of March 7, 2025 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date, the "*Second Lien Notes Indenture*"), by and between ModivCare, as issuer, Ankura Trust Company, LLC, as trustee and notes collateral agent, the subsidiaries of ModivCare from time to time party thereto as guarantors, and holders of Second Lien Notes (the "*Second Lien Noteholders*").  The Second Lien Notes are secured by a second priority lien substantially all of the property and assets of ModivCare and its guarantor subsidiaries.  As of the Petition Date, the principal amount under the Second Lien Notes is approximately $316.2 million.

### iii.      *Unsecured Notes*

ModivCare is the issuer of certain *5.000% Senior Unsecured Notes due October 1, 2029* (the "*Unsecured Notes*") issued pursuant to that certain *Senior Notes Indenture*, dated August 24, 2021 (as amended prior to the date hereof, the "*Unsecured Notes Indenture*"), by and between ModivCare, as issuer, and Wilmington Saving Fund Society, FSB (as successor to The Bank of New York Mellon Trust Company, N.A.) as trustee, and the subsidiaries of ModivCare from time to time party thereto as guarantors.  In connection with the Exchange Agreement, the requisite holders of Unsecured Notes entered into that certain Fifth Supplemental Indenture, dated as of March 7, 2025, which, among other things, released all the guarantors of their guarantees under the Unsecured Notes Indenture.  Accordingly, the Unsecured Notes are only an obligation of ModivCare, as issuer under the Unsecured Notes Indenture.  The remaining balance of these Unsecured Notes are those that were not exchanged pursuant to the Exchange Agreement.  As of the Petition Date, the principal amount under the Unsecured Notes is approximately $228.8 million.

### iv.      *Other Non-Funded Debtor Obligations*

#### 1.      Trade Claims

In the ordinary course of business, the Debtors utilize certain vendors and service providers (the "*Trade Creditors*").  As at the Petition Date, the Debtors estimate that the aggregate amount of trade claims outstanding is approximately $123.9 million, the majority of which is owed to transportation providers.  These transportation providers, and certain other Trade Creditors, are a vital part of the Company's ability to continue providing much needed services to the Debtors' customers and patients.  Any interruption, even briefly, in the flow of goods and services from such creditors would have an immediate and adverse impact on the Debtors' ability to continue operating in the ordinary course.  Accordingly, as noted below, the Debtors' requested interim relief from the Bankruptcy Court on August 21, 2025 to pay prepetition amounts owed to those Trade Creditors who are critical to the Debtors' business.  Such relief was granted [Docket No. 64].

2.      Other General Unsecured Claims

As at the Petition Date, the Debtors anticipate approximately $25 million on account of claims against the Debtors (other than the Unsecured Notes, intercompany claims and claims of Trade Creditors described herein) as of the Petition Date that are neither secured by collateral nor entitled to priority under the Bankruptcy Code.

**IV.**
**KEY EVENTS LEADING TO**
**COMMENCEMENT OF CHAPTER 11 CASES**

A.    Challenges Facing Debtors' Business

The need to commence the Chapter 11 Cases was a result of a number of factors, including an unsustainable capital structure, rapidly deteriorating liquidity, negative industry trends, and customer de-risking by reducing exposure with ModivCare.  In an attempt to preserve and maximize value, ModivCare and its management team have been, and continue to seek to, implement turnaround initiatives to assure that the Company is operating at an optimal level despite the challenging capital structure.

i.    *Financial Challenges*

The Debtors' financial challenges date back to prior to the Fifth Amendment.  As of the twelve-month period ending March 2025, the Company's funded debt is approximately $1.4 billion and adjusted EBITDA is $162 million.  The Debtors' current balance sheet has had a corresponding negative and restrictive impact on the Debtors' liquidity and growth prospects.  The Debtors' unhedged annual cash interest expense for fiscal year 2025 under the prepetition capital structure would be in excess of $100 million at current interest rates.[7]

ii.    *Persistent Negative Industry Trends*

The non-emergency medical transportation and personal care services industries have faced persistent headwinds over the past several years.  Demographic shifts, evolving government reimbursement models, and tightening regulatory oversight have created sustained pressures on both cost structures and margins.  In particular, state Medicaid programs and MCOs—the Company's primary customers—have steadily increased their focus on cost containment, frequently driving reimbursement rates downward while simultaneously raising service quality expectations.  At the same time, the broader healthcare industry has experienced significant wage inflation, particularly for caregivers and transportation providers, as labor shortages and competition for skilled workers have intensified.

Further compounding these challenges, companies like ModivCare must navigate heightened insurance premiums and dynamic reimbursement and regulatory requirements tied to evolving federal and state regulatory frameworks.  In addition, the industry has seen mounting competitive pressures from smaller, more nimble regional operators and technology-driven entrants seeking to capture market share through lower-cost models, but without the same geographic range and scale. The net effect has been a highly competitive pricing environment in which customers prioritize cost savings, while providers struggle to absorb rising operating expenses.

Historically, ModivCare has sought to address these industry headwinds through investment in technology, strategic acquisitions, and efforts to achieve economies of scale and operational efficiencies.  However, the Company's ability to fully mitigate the impact of these structural

---

[7]    Assumes all cash interest and no PIK is elected.

28

industry changes has been constrained by its capital structure and liquidity profile.  As a result, persistent adverse industry dynamics, combined with escalating operating costs and pricing pressures, have materially impacted ModivCare's revenues, margins, and financial flexibility.

### iii.    *Changes in the Regulatory Landscape*

In addition to the aforementioned challenges, the Debtors are also responding to certain regulatory challenges.   The Debtors' significant customers are anticipating or have already begun implementing various state budget cuts, largely arising from:  (a) the One Big Beautiful Bill Act (the "*BBB*"), which marks a sizeable regulatory change in the healthcare industry and imposes significant reductions in the funding of and services covered by the Medicaid program, as well as the number of persons enrolled in Medicaid; and (b) the Budget Control Act of 2011 (the "*BCA*") and American Rescue Plan Act of 2021 (the "*ARPA*" and, together with the BBB and BCA, the "*Acts*"), which have resulted or will result in additional Medicare payment reductions, and thus a reduction in supplemental benefits (including NEMT services) offered by Medicare Advantage plans.[8]   Because many, if not all, of the Debtors' most significant customers are implementing, and/or considering the implementation of, budget cuts in response to the Acts, the Debtors anticipate adverse effects on their businesses and revenues in 2026.

Further, it is difficult to predict whether, when or what other deficit reduction initiatives may be proposed by Congress.  The Company anticipates that the federal budget deficit will continue to place pressures on government healthcare programs and impose additional spending reductions. These pressures have increased uncertainty in the healthcare industry, and this uncertainty has affected government agencies, companies operating in the industry (including the Debtors), and patients.

### iv.    *Emergency Funding and the Fifth Amendment*

The growth of ModivCare's services through the acquisitions has required substantial investment of capital, and the service of debt associated with the acquisitions has placed substantial stress on the Debtors.  Recognizing the potential risks relating to the Company's indebtedness, the Company began the process of evaluating strategic alternatives in the second half of 2024.  The Company hired FTI and Moelis to assist with this process and to help rationalize its business, reduce discretionary capital expenditures, and preserve liquidity.  The Company also sought to raise funds in the public markets, including from its existing lenders, to provide additional liquidity and address leverage concerns.

Ultimately, in January 2025, the Company undertook a series of capital structure initiatives designed to bolster liquidity and stabilize operations.  These initiatives included entering into the Fifth Amendment, which infused $75 million of new liquidity into the Company.  In March 2025, the Company consummated two transactions pursuant to which it issued $30 million of new Second Lien Notes and exchanged approximately $271 million of existing Unsecured Notes for additional Second Lien Notes.  Together, these transactions raised over $105 million in new financing and facilitated broad-based support across the Company's capital structure.  Absent the

---

[8]    The ARPA was to take effect in January 2022.  However, Congress delayed implementation of the reduction until 2025 and has yet to take action related to the ARPA payment reduction for 2025 or 2026.

29

Fifth Amendment and Second Lien Notes and their incremental critical liquidity, the Company may have been forced to commence the Chapter 11 Cases at that time.  In exchange, the First Lien Lenders limited certain baskets and imposed certain covenants on the Debtors.

**v.**      ***Rapidly Deteriorating Liquidity, Cash Calls from Surety Bond Providers & Operational Challenges***

While the aforementioned actions provided important near-term liquidity, they ultimately proved insufficient to overcome persistent industry headwinds and the Company's overall leverage profile. During the first half of 2025, and through July of 2025, the Company has continued to experience operational challenges, including delays in key customer repricing, increased volume of per-member rides under shared- risk contracts, and the Debtors' failure to transition to fee-for-service contracts.   These developments further intensified the Company's already difficult situation and raised broader concerns about its ability to maintain and grow its commercial relationships.

The Company has also faced challenges in retaining certain customers, further exacerbating the Company's operational challenges.  In the months preceding the Petition Date, two customers, one of which is the Company's largest customer as measured by revenue, informed the Company of their decision to not renew their customer contracts with the Company.  In addition, the Company recognized the legitimate risk that additional customers—many of whom have contracts terminable for convenience—could choose to disengage and terminate their respective contracts. As a result, customer derisking and stabilization became a central focus and legitimate concern for the Company and its stakeholders.

The Company's precarious financial condition also heightened concerns with its surety providers, whom the Company has entered into agreements with to satisfy its obligations owing to certain of the Company's customers.  These customers require financial assurance in the form of letters of credit or surety bonds, which is customary in the Company's industry. Depending on the terms of each surety bond arrangement, the sureties may require the Company to post significant cash collateral to secure their exposure under the outstanding surety bonds.  Historically, certain sureties have required some level of collateral, typically a letter of credit, to support performance obligations and could demand additional collateral in light of the Company's deteriorating financial position.  Any additional demands would further strain liquidity, which has been the case in 2025.  In January 2025, the Company had no posted collateral.  As of June 30, 2025, however, with no ability to provide further letters of credit, the Company has posted $38.3 million of cash collateral relating to $76.5 million outstanding surety bonds.  The Company had no choice but to meet the demands for collateral because if the Company were unable to satisfy these collateral requirements, it could be deemed in breach of certain customer contracts, potentially leading to contract terminations and a downward spiral that would further destabilize the business.

In addition to these ongoing operational issues, the Company recognized that it would be unable to satisfy certain financial conditions and covenants under the First Lien Credit Agreement, especially if the Company were to repay the Incremental Facility upon its maturity in January 2026.  Given these mounting pressures, the Company refocused on potential strategic alternatives, including a potential third-party equity investment, an out-of-court restructuring, and an in-court restructuring process.

30

B.       Prepetition Restructuring Efforts

In the months leading up to the Petition Date, the Debtors and their advisors engaged in a thorough and good-faith process to evaluate and pursue a range of strategic alternatives.  These efforts included incremental amendments, potential equity infusions, junior capital solutions, and targeted asset sales, alongside extensive negotiations with key creditor constituencies.  Although the Debtors explored each of these paths with diligence, none proved actionable on the required timeline or adequate to address the Company's capital structure and liquidity challenges.  The Debtors ultimately determined that a comprehensive, court-supervised restructuring represented the best and only viable path forward.

While the Debtors had hoped the Fifth Amendment and incremental Second Lien Notes would give them the liquidity and time to holistically address, they ultimately determined that commencing the Chapter 11 Cases was necessary to implement a comprehensive deleveraging and strengthen their financial position.  In evaluating their options, the Debtors also considered whether incremental amendments, extensions, or covenant relief could provide a bridge solution, but these measures proved inadequate to resolve the Company's structural balance sheet challenges. Accordingly, the Debtors initiated these cases to effectuate a restructuring that will: (a) reduce funded debt (including accrued but unpaid interest) by approximately $1.1 billion; (b) lower annual cash interest expense in light of the reduced funded debt; and (c) enable the Company to continue operating with a substantially improved balance sheet and liquidity profile.

In early July 2025, the Debtors executed non-disclosure agreements with a group of First Lien Lenders and Second Lien Noteholders that ultimately became the Consenting Creditors to explore strategic alternatives.  As an initial step, the Debtors sought to elicit a proposal that would provide additional liquidity to address near-term maturities and covenant pressure, but those efforts did not yield a viable solution given the lenders lack of interest in providing out-of-court financing so soon after the Incremental Facility.   The Debtors also analyzed a potential out-of-court junior investment, which was presented by the Debtors and their advisors, together with certain members of the Board, to the lenders and their advisors.  None of these proposals gained traction.  Following these efforts, the Debtors and their advisors commenced protracted, arm's-length negotiations with the Consenting Creditors regarding a comprehensive restructuring transaction.

At the same time, the Debtors pursued other strategic options, including potential equity investments and sales of PCS and RPM.  In the weeks leading up to the Petition Date, the Debtors executed non-disclosure agreements with two existing equity holders expressing interest in a potential investment and with over 15 potential strategic and financial bidders who expressed interest in acquiring PCS and RPM from the Debtors.  The Debtors carefully evaluated these alternatives with their advisors but concluded that neither the existing equity holders nor the contemplated asset sales proposed actionable transactions to address the Company's liquidity and debt burdens.

After weeks of negotiations with the Consenting Creditors and discussions with potential equity investors and potential bidders, the Debtors, with the assistance of the Advisors, determined that the proposed Restructuring with the Consenting Creditors was the only actionable option and the best path forward.  The process involved weeks of intense, arm's-length negotiations, including the exchange of multiple iterations of term sheets addressing both the Restructuring and the DIP

31

Financing.   Having exhausted other strategic alternatives, these negotiations culminated in the agreement now before the Court, which the Debtors believe provides the most viable path to maximize value and ensure the Company's long-term stability.

C.      Restructuring Support Agreement and Plan

On August 20, 2025, following extensive, good faith, arms' length negotiations, the Debtors entered into the Restructuring Support Agreement with the Consenting Creditors.  Pursuant to the Restructuring Support Agreement, the Consenting Creditors agreed to support the Restructuring by, among other things:

- providing $100 million in DIP financing to fund the Chapter 11 Cases and agreeing to roll such claims into an Exit Term Loan Facility;

- agreeing to exchange First Lien Claims for up to $200 million of an Exit Term Loan Facility and 98% of the pro forma equity of the Company, subject to dilution;

- agreeing to exchange Second Lien Claims for 2% of the pro forma equity of the Company, subject to dilution;

- providing the opportunity for certain holders of General Unsecured Claims to participate in an equity rights offering of up to $200 million; and

- permitting the Reorganized Debtors to enter into up to a $250 million Exit Revolver Credit Agreement, which provides for a letter of credit sublimit of up to $150 million.

Upon its full implementation, the Plan will effect a significant deleveraging of the Debtors' capital structure by reducing the Company's total funded debt (including accrued but unpaid interest) by approximately $1.1 billion.  The Restructuring Support Agreement and the Restructuring Term Sheet annexed thereto establish, among other things, the treatment of each the Classes set out in Section I above, and the following key terms:

**DIP Loan & Exit Loan Facilities; Rights Offering**

- The Chapter 11 Cases will be financed by the $100 million DIP Facility.

- On the Effective Date, the Reorganized Debtors will enter into (i) the Exit Facility Term Loan, which will refinance and replace the DIP Facility and a portion of the prepetition First Lien Claims, and (ii) the Exit Revolving Facility.

- The Debtors will conduct an Equity Rights Offering of up to $200 million, which will be open to all eligible Holders of Allowed General Unsecured Claims, but excluding Holders of First Lien Deficiency Claims and Second Lien Deficiency Claims.

32

Case No. 1:25-cv-00306-GPG-KAS    Document 42-2    filed 09/19/25    USDC Colorado
Case 25-90309   Document 120   Filed in TXSB on 09/04/25   Page 43 of 175
pg 44 of 176

## <u>Other Terms</u>

- The composition of the new board of directors of the Reorganized Parent will be determined by a committee consisting of certain holders comprising the Required Consenting First Lien Lenders, in consultation with the Debtors, and disclosed prior to emergence under section 1129(a)(5) of the Bankruptcy Code.

- The Plan will contain customary releases, exculpations, and injunctions among the parties to the Restructuring Support Agreement and certain other parties in interest.

## V.
## PENDING AND FUTURE LITIGATION

In the ordinary course of business, from time to time, the Company is the subject of complaints or litigation from shareholders, tort claimants, or other parties and or inquiries or investigations by government officials.  The Company may also be subject to employee claims based on, among other things, alleged discrimination, harassment, wrongful termination claims, wage and labor, and other claims brought by patients and customers.  The Company is currently subject to ongoing litigation that may result in potential Claims for monetary damages.  That risk will remain for so long as such litigation remains unresolved.

Additionally, there is a risk of future litigation.  Pending litigation or future litigation could result in a material judgment against the Debtors or the Reorganized Debtors.  Such litigation, and any judgment in connection therewith, could have a material negative effect on the Debtors or the Reorganized Debtors.

**VI.**
**<u>EVENTS DURING CHAPTER 11 CASES</u>**

    A.      <u>First Day Motions and Certain Related Relief</u>

The Debtors have continued their operations in the ordinary course during the pendency of the Chapter 11 Cases. To facilitate the efficient and expeditious implementation of the Plan through the Chapter 11 Cases, the Debtors have devoted substantial efforts to stabilizing their operations and preserving and restoring their relationships with, among others, vendors, customers, employees and utility providers. As a result of these efforts, the Debtors were able to minimize, as much as practicable, the negative impacts of the commencement of the Chapter 11 Cases.

            1.      <u>Substantive Motions</u>

On the Petition Date, the Debtors filed a number of motions (collectively referred to herein as "***First Day Motions***") with the Bankruptcy Court. At a hearing conducted on August 21, 2025, the Bankruptcy Court entered several orders (the "***First Day Orders***") granting the substantive relief requested in the First Day Motions. The First Day Orders enabled the Debtors to, among other things: (a) prevent interruptions to the Debtors' businesses'; (b) ease the strain on the Debtors' relationships with certain essential constituents, including employees, vendors, customers and utility providers; and (c) provide access to critical financing and capital.

            2.      <u>Procedural Motions</u>

To facilitate a smooth and efficient administration of the Chapter 11 Cases, the Bankruptcy Court entered certain "procedural" First Day Orders, by which the Bankruptcy Court (a) approved the joint administration (for procedural purposes only) of the Debtors' Chapter 11 Cases, (b) authorized the Debtors to file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (c) approved an extension of time to file the Debtors' Schedules, and (d) established Bar Dates and related procedures for filing Proofs of Claim.

            3.      <u>Stabilizing Operations</u>

Recognizing that any interruption of the Debtors' businesses, even for a brief period of time, would negatively impact their operations, relationships with their vendors, revenue and profits, the Debtors filed a number of First Day Motions to facilitate the stabilization of their operations and effectuate, as much as possible, a smooth transition into operations as debtors in possession. Specifically, in addition to certain orders discussed in greater detail below, the Debtors sought and obtained First Day Orders authorizing the Debtors to:

- pay prepetition wages, salaries, other compensation, reimbursable employee expenses and employee benefits [Docket No. 65];

- pay prepetition obligations on account of amounts owing to shippers and other potential lienholders [Docket No. 64];

- determine adequate assurance for future utility service and establish procedures for utility to object to such assurance [Docket No. 56];

35

- continue insurance coverage and a bonding program, and enter into new insurance policies and purchase new surety bonds or letters of credit, if necessary [Docket No. 57];

- maintain the existing cash management system [Docket No. 59]; and

- remit and pay certain taxes and fees [Docket No. 58].

In addition to the foregoing relief, to prevent the imposition of the automatic stay from disrupting their businesses and to ensure continued deliveries and services on favorable credit terms, the Debtors sought and obtained Bankruptcy Court approval to pay the prepetition claims of a substantial number of vendors and third-party service providers who the Debtors believe are essential to the ongoing operation of their businesses.  The Debtors' ability to pay the claims of these vendors and service providers was and remains critical to their ongoing business operations and ultimate success in the Chapter 11 Cases.

The Debtors are party to two unexpired collective bargaining agreements (the "**CBAs**").  To ensure there is minimal business disruption during the pendency of the Chapter 11 Cases, the Debtors do not intend to take any actions pursuant to section 1113 of the Bankruptcy Code.  Rather, the Debtors currently intend to assume the Debtors' two unexpired collective bargaining agreements, and any agreements, documents, or instruments relating thereto.

### 4. Claims Bar Date Order

On August 21, 2025, the Bankruptcy Court entered the *Order Establishing (A) Bar Dates and Related Procedures for Filing Proofs of Claim, (B) Approving the Form and Manner of Notice Thereof, and (C) Granting Related Relief* [Docket No. 66], setting the general deadline for filing a Proof of Claim in the Chapter 11 Cases as October 1, 2025 at 5:00 p.m. (Prevailing Central Time).

### B. Debtor in Possession Financing and Use of Cash Collateral

The Debtors also filed a motion to approve, on an interim basis, the DIP Facilities and the use of cash collateral (the "**DIP Motion**").  Through the DIP Motion, the Debtors sought permission from the Bankruptcy Court to, among other things, (i) obtain secured postpetition financing in the form of a multi-draw DIP Term Loan Facility, (ii) grant liens and superpriority administrative expense status on account thereof, (iii) utilize the cash collateral of prepetition secured parties, and (iv) modify the automatic stay imposed by section 362 of the Bankruptcy Code to the extent necessary.

**Following the hearing held on August 21, 2025, the Bankruptcy Court entered an order on August 21, 2025, approving the Debtors' DIP Motion on an interim basis and giving the Debtors access to up to $62.5 million [Docket Nos. 52 & 106].**

Access to postpetition financing, coupled with the use of cash collateral, allows the Debtors to, among other things: (i) continue their businesses in an orderly manner; (ii) maintain their valuable relationships with vendors, suppliers, customers and employees; and (iii) support their working capital, general corporate and overall operational needs.

C.      Filing of the Schedules

On August 21, 2025, the Bankruptcy Court entered the *Order (A) Extending the Time to File Schedules and Statements and 2015.3 Reports; (B) Modifying the Requirements of Bankruptcy Local Rule 2015-3; and (C) Granting Related Relief* [Docket No.54], setting September 17, 2025 as the deadline by which the Debtors must file their schedules.  On [ ● ], the Debtors filed their Schedules.

D.      Plan Investigations

Prior to the commencement of the Chapter 11 Cases, the Board empowered and authorized one of its independent directors, Daniel B. Silvers (the "***Independent Director***"), being the most recent appointee to the Board, to investigate potential claims that the Debtors might hold against their directors, officers, employees, lenders, stockholders, or advisors, review any proposed releases including, most notably, the releases proposed to be given under the Plan, and make a recommendation to the Board in connection therewith.  This investigation has continued since the commencement of the Chapter 11 Cases.  The Independent Director has been assisted and advised throughout the investigation by Latham & Watkins LLP ("***Latham***").  The investigation is focused on numerous types of claims, including, without limitation, the following: potential fraudulent conveyances; preferences; negligence, corporate mismanagement, or waste; and breaches of fiduciary duty.

E.      Hotline Investigations

Shortly prior to the commencement of the Chapter 11 Cases, the Audit Committee directed Latham to undertake an investigation with respect to compliance hotline allegations, including matters related to the Company's culture (the "***Hotline Investigation***").  The Company publicly disclosed the investigation in the Form 12b-25, NT 10-Q, filed with the SEC on August 12, 2025.  The Hotline Investigation has continued since the commencement of the Chapter 11 Cases.  The Company anticipates that it will publicly disclose additional information about the Hotline Investigation once it has concluded.

## VII.
## SUMMARY OF THE PLAN

**THE TERMS OF THE PLAN, A COPY OF WHICH IS ATTACHED AS EXHIBIT A TO THIS DISCLOSURE STATEMENT, ARE INCORPORATED BY REFERENCE HEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN THE DOCUMENTS REFERENCED THEREIN, WHICH ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS THERETO AND DEFINITIONS THEREIN).**

**THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENT OF SUCH TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN.  HOLDERS OF CLAIMS AGAINST, AND INTERESTS IN, THE DEBTORS AND OTHER INTERESTED PARTIES ARE URGED TO READ THE PLAN AND THE EXHIBITS THERETO IN THEIR ENTIRETY SO THAT THEY MAY MAKE AN INFORMED JUDGMENT CONCERNING THE PLAN.**

A.    <u>Classification and Treatment of Claims and Interests under the Plan</u>

The provisions of Article III of the Plan govern Claims against and Interests in the Debtors.  For all purposes under the Plan, each Class will exist for each of the Debtors; *provided*, that any Class that is vacant as to a particular Debtor will be treated in accordance with Article 3.5 of the Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, DIP Claims, Priority Tax Claims, Claims for the Premiums and Fees, and Professional Fee Claims as described in Article II of the Plan.

The categories of Claims and Interests listed below classify Claims and Interests for all purposes, including voting, Confirmation and distribution pursuant to the Plan and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Interest to be classified in a particular Class only to the extent that such Claim or Interest qualifies within the description of that Class and will be deemed classified in a different Class to the extent that any remainder of such Claim or Interest qualifies within the description of such different Class.  A Claim or an Interest is in a particular Class only to the extent that any such Claim or Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

**Summary of Classification and Treatment of Claims and Interests**

| Class | Claim | Status | Voting Rights |
|---|---|---|---|
| 1 | Other Secured Claims | Unimpaired | Presumed to Accept |
| 2 | Other Priority Claims | Unimpaired | Presumed to Accept |
| *3* | *First Lien Claims* | *Impaired* | *Entitled to Vote* |
| *4* | *Second Lien Claims* | *Impaired* | *Entitled to Vote* |
| *5* | *General Unsecured Claims* | *Impaired* | *Entitled to Vote* |
| 6 | Intercompany Claims | Unimpaired | Presumed to Accept |
| 7 | Subordinated Claims | Impaired | Deemed to Reject |
| 8 | Intercompany Interests | Unimpaired | Presumed to Accept |
| 9 | Existing Parent Equity Interests | Impaired | Deemed to Reject |

B.      Acceptance or Rejection of the Plan; Effect of Rejection of the Plan

1.      Presumed Acceptance of Plan

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject the Plan, the Plan shall be presumed accepted by such Class.

Class 1 and Class 2 are Unimpaired under the Plan.  Therefore, the Holders of Claims or Interests in such Classes are deemed to have accepted the Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Accordingly, the votes of such Holders shall not be solicited.  Notwithstanding their non-voting status, Holders of such Claims shall receive a Release Opt-Out Form solely for purposes of providing such Holders with the opportunity to opt out of the Third-Party Release.

2.      Voting Classes

Classes 3, 4, and 5 are Impaired under the Plan.  The Holders of Claims in such Classes as of the Voting Record Date are entitled to vote to accept or reject the Plan, including by acting through a voting Representative.  For purposes of determining acceptance and rejection of the Plan, votes shall be tabulated on a Debtor-by-Debtor basis.

Pursuant to section 1126(c) of the Bankruptcy Code, an impaired class of claims shall have accepted the plan if (a) the holders, including holders acting through a voting representative, of at least two-thirds (2/3) in amount of claims actually voting in such class have voted to accept the plan and (b) the holders, including holders acting through a voting representative, of more than one-half (1/2) in number of claims actually voting in such class have voted to accept the plan. Holders of Claims in the Voting Classes (or, if applicable, the voting Representatives of such Holders) shall receive Ballots containing detailed voting instructions.  For the avoidance of doubt, each Claim in the Classes entitled to vote to accept or reject the Plan that is not Allowed pursuant to the Plan, and in each case, is wholly contingent, unliquidated, or Disputed, in each case, shall be accorded one (1) vote and valued at one dollar ($1.00) for voting purposes only, and not for purposes of allowance or distribution.

### 3. Deemed Rejection of the Plan

Classes 7 and 9 are Impaired and Holders of Subordinated Claims and Existing Parent Equity Interests in such Classes shall receive no distribution under the Plan on account of such Claims or Interests, as applicable.  Therefore, the Holders of Subordinated Claims and Existing Parent Equity Interests are deemed to have rejected the Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled to vote to accept or reject the Plan.  Such Holders will, however, receive a Release Opt-Out Form to allow such Holders to affirmatively opt-out of the Third-Party Release.

### 4. Confirmation Pursuant to Section 1129(a)(10) and 1129(b) of the Bankruptcy Code

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of the Plan by any of the Voting Classes. The Debtors request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept the Plan pursuant to section 1126 of the Bankruptcy Code.  The Debtors reserve the right to modify the Plan or any Exhibit or the Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary, including by modifying the treatment applicable to a Class of Claims or Interests to render such Class of Claims or Interests Unimpaired to the extent permitted by the Bankruptcy Code and Bankruptcy Rules.

### 5. Subordinated Claims

The allowance, classification, and treatment of all Allowed Claims and Interests, and the respective distributions and treatments under the Plan, shall take into account and conform to the relative priority and rights of the Claims and Interests in each Class in connection with any contractual, legal, and equitable subordination rights relating thereto, whether arising under general principles of equitable subordination, sections 509 or 510 of the Bankruptcy Code, or otherwise; *provided*, that notwithstanding the foregoing, such Allowed Claims or Interests and their respective treatments set forth herein shall not be subject to setoff, demand, recharacterization, turnover, disgorgement, avoidance, or other similar rights of recovery asserted by any Person.  Pursuant to section 510 of the Bankruptcy Code, except where otherwise provided herein, the Reorganized Debtors reserve the right to re-classify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination rights relating thereto.  The Debtors or Reorganized Debtors, as applicable, reserve the right to seek a ruling from the Bankruptcy Court determining

whether any Claim should be subordinated pursuant to section 510(b) of the Bankruptcy Code and treated under the Plan as a Class 7 Subordinated Claim.

### 6.   Special Provision Governing Unimpaired Claims

Except as otherwise provided therein, nothing under the Plan shall affect or limit the Debtors' or the Reorganized Debtors' rights and defenses (whether legal or equitable) in respect of any Unimpaired Claims, including, all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims.

### 7.   Vacant and Abstaining Classes

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing does not have at least one Holder of a Claim or Interest that is Allowed, or temporarily Allowed under Bankruptcy Rule 3018, in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from the Plan for purposes of determining acceptance or rejection of the Plan pursuant to section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 8.   Controversy Concerning Impairment

If a controversy arises as to whether any Claim or Interest (or any Class of Claims or Interests) is Impaired under the Plan, the Bankruptcy Court shall, after notice and a hearing, determine such controversy on or before the Confirmation Date, absent consensual resolution of such controversy consistent with the Restructuring Support Agreement among the Debtors and the complaining Entity or Entities.

### 9.   Intercompany Interests and Intercompany Claims

To the extent Intercompany Interests and Intercompany Claims are Reinstated under the Plan, distributions on account of such Intercompany Interests and Intercompany Claims are not being received by Holders of such Intercompany Interests or Intercompany Claims on account of their Intercompany Interests or Intercompany Claims, but for the purposes of administrative convenience and to maintain the Debtors' (and their Affiliates') corporate structure, for the ultimate benefit of the Holders of New Common Interests, to preserve ordinary course intercompany operations, and in exchange for the Debtors' and Reorganized Debtors' agreement under the Plan to make certain distributions to the Holders of Allowed Claims.  Holders of Intercompany Interests and Intercompany are not entitled to vote to accept or reject the Plan, as such Holders will be Unimpaired and conclusively be presumed to accept the Plan.

### C.   Means of Implementation of the Plan

Article V of the Plan governs and describes the means of implementation of the Plan.

Article 5.1 ("***Restructuring Transactions***") of the Plan provides that, without limiting any rights and remedies of the Debtors or Reorganized Debtors under the Plan or applicable law, but in all cases subject to the terms and conditions of the Definitive Documents and any consents or approvals thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, together with any other transaction that may

41

be necessary or appropriate to effect any transaction described in the Restructuring Support Agreement, or described in, approved by, contemplated by, or necessary to effectuate the Plan, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of the Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of the Plan and having other terms for which the applicable Persons agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law or the filing of any elections; (d) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, elections, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (e) the execution, delivery, and Filing, if applicable, of the Definitive Documents; (f) the issuance of Plan Securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order or rule; and (g) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law (collectively, the "***Restructuring Transactions***").

Article 5.2 ("***Compromise and Settlement of Claims, Interests, and Controversies***") of the Plan provides that, in consideration for the classification, distribution, releases, and other benefits provided under the Plan, upon the Effective Date, the provisions of the Plan shall constitute an integrated, good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a Claim or an Interest Holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest.  The Plan shall be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019.  Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of such compromises, settlements, and transactions under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such compromises, settlements, and transactions are in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Allowed Interests, and each such compromise, settlement, and transaction, is far, equitable, and within the range of reasonableness.  Subject to the provisions of the Plan governing distributions, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.  As consideration for, among other things, the Releases provided pursuant to the Plan, the Consenting Creditors have agreed pursuant to the Restructuring Support Agreement, for the benefit of the Debtors and the Debtors' Estates, to make contributions to enable the implementation of the Plan, such contributions being fundamentally necessary to the implementation of the Plan, and without consideration, including the Releases, the Consenting Creditors would not have agreed to make the contributions reflected therein.  The compromises and settlements described under the Plan shall be non-severable from each other and from all other terms of the Plan.

Article 5.3 ("***Administrative Consolidation for Voting and Distribution Purposes Only***") of the Plan provides that, other than with respect to Debtor ModivCare, the Plan is premised upon the

42

substantive consolidation of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan distributions.  Each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of Claims and Interests under the Plan.  On the Effective Date, and except as otherwise expressly provided in the Plan, solely for voting, confirmation, and distribution purposes with respect to each Class of Claims or Interests, other than with respect to Debtor ModivCare: (a) all Claims or Interests in each respective Class shall be deemed merged or consolidated and treated as Claims or Interests against the Debtors on a consolidated basis; (b) each Claim or Interest in each respective Class will be deemed a single Claim against, or Interest in, the consolidated Debtors; (c) any Claim in a given Class based on a guaranty by any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished, so that any Claim against any Debtor and any guarantee thereof by any other Debtor, and any joint or several liability of any of the Debtors, shall be deemed to be one obligation of the consolidated Debtors; and (d) each Holder of any Allowed Claim or Interest in a given Class shall be entitled to a single recovery on account of such Claim or Interest, in accordance with the treatment provided under the Plan for such Class, regardless of whether such Holder filed Proofs of Claim against multiple Debtors or has Claims against multiple Debtors based on the same or similar debt.

Article 5.3 of the Plan further provides that such substantive consolidation is solely for voting, confirmation and distribution purposes with respect to each Class and shall not constitute a transfer of Assets or liabilities between the Debtors for any other purpose.  Moreover, the Plan's treatment shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the post-Effective Date Debtors or to seek to have any Claim subordinated in accordance with section 510 of the Bankruptcy Code or other applicable law.  Pursuant to section 510 of the Bankruptcy Code, the Debtors expressly reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto.  Except as provided in the Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to the Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

Article 5.11 ("***Cancellation of Existing Agreements Securities and Agreements***") provides that, except for the purpose of evidencing a right to a distribution under the Plan and except as otherwise set forth in the Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Reorganized Debtors, or any contract, instrument, or other agreement or document created in connection with the Plan, on the Effective Date, all agreements, instruments, notes, certificates, mortgages, security documents, Prepetition Funded Debt Documents, and any other documents evidencing any Claim or Interest (other than Intercompany Claims and Intercompany Interests that are not modified by the Plan) and any rights of any Holder in respect thereof shall be deemed canceled, discharged, and of no further force or effect, without any further act or action of any person under any applicable agreement, instrument, document, law, regulation, order, or rule, and the obligations of the Debtors thereunder shall be deemed automatically fully satisfied, released, and discharged.  Notwithstanding such cancellation and discharge on the Effective Date and the release of the Second Lien Notes Trustee and the First Lien Agent from their respective duties thereunder, the First Lien Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indenture shall continue in effect solely (a) to the extent

necessary to allow the Holders of First Lien Claims, Second Lien Claims, and Unsecured Notes Claims to receive distributions under the Plan in accordance therewith; (b) to the extent necessary to allow the Debtors, the Reorganized Debtors, and/or the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent each to make post-Effective Date distributions in accordance with the Plan at the expense of the Reorganized Debtors, subject to their respective rights as Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent under the First Lien Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indenture, as applicable, or take such other action expressly authorized by the Plan on account of Allowed First Lien Claims, Second Lien Claims, and Unsecured Notes Claims; and (c) to appear in the Chapter 11 Cases, *provided*, that nothing in the foregoing shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or the Plan or result in any liability or expense to the Reorganized Debtors.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.  For the avoidance of doubt, the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent shall have no ongoing duties to the Holders of the First Lien Claims, the Second Lien Claims, and the Unsecured Notes Claims under any of the canceled and discharged First Lien Credit Agreement, Second Lien Notes Indenture, Unsecured Notes Indenture, and Prepetition Funded Debt Documents following the Effective Date other than as expressly set forth in the Plan or Confirmation Order.

Article 5.15 ("***First Lien Claim Equity Option***") of the Plan provides that, prior to the Effective Date, each Holder of an Allowed First Lien Claim shall have the opportunity to irrevocably elect to receive (subject to the limitations set forth in the Election Procedures) (a) additional New Common Interests in lieu of receiving some or all of their pro rata share Exit Term Loans (the "***Equity Option***") or (b) additional Exit Term Loans in lieu of receiving some or all of their portion of the New Common Interests.  New Common Interests distributed pursuant to the Equity Option shall not reduce the aggregate amount of Exit Term Loans available for distribution.  The (a) New Common Interests distributed on account of the Equity Option shall reduce, on a ratable basis and at a ratio to be set forth in the Election Procedures, the amount of New Common Interests issued to each Holder of the Allowed First Lien Claims that elects to receive additional Exit Term Loans (to the extent available) in lieu of its pro rata portion of the New Common Interests and (b) the Exit Term Loans distributed on account of the equity Option shall reduce, on a ratable basis and at a ratio to be set forth in the Election Procedures, the amount of Exit Term Loans issued to each Holder of the Allowed First Lien Claims that elects to receive additional New Common Interests in lieu of its pro rata portion of the Exit Term Loans. Holders shall have the opportunity to make such election pursuant to the Election Procedures.

Article 5.16 ("***Issuance of New Common Interests and Deregistration***") of the Plan provides that, on the Effective Date, Reorganized Parent shall issue and deliver or reserve for issuance, as applicable, all of the New Common Interests issuable in accordance with the terms of the Plan and the other Definitive Documents. The issuance and delivery or reservation for issuance, as applicable, of such New Common Interests is authorized without the need for further corporate or other action or any consent or approval of any national securities exchange upon which the New Common Interests may be listed on or immediately following the Effective Date.  All of the New Common Interests issuable under the Plan and the other Definitive Documents shall, when so

issued in accordance with this Plan and/or any other applicable Definitive Documents, be duly authorized, validly issued, fully paid, and non-assessable. Each Holder of New Common Interests shall be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended from time to time following the Effective Date in accordance with their terms.  The New Corporate Governance Documents shall be binding on all Entities receiving New Common Interests (and their respective successors and permitted assigns), whether received pursuant to the Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Corporate Governance Document.  The issuance and delivery or reservation for issuance, as applicable, of the New Common Interests in accordance with the Plan and the other Definitive Documents are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest.

The Plan further provides that Reorganized Parent shall not be obligated to effect or maintain any listing of the New Common Interests for trading on any national securities exchange (within the meaning of the Exchange Act) and it has no current intention of maintaining or obtaining such listing.  The New Common Interests are expected to be delivered via book-entry transfer by the Distribution Agent in accordance with the Plan and the other Definitive Documents, rather than through the facilities of DTC; however, in the event the New Common Interests are DTC eligible on the Effective Date, delivery thereof may be made via DTC.  Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Common Interests shall be that number of shares or membership interests as may be designated in the New Corporate Governance Documents.  On and after the Effective Date, transfers of New Common Interests shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Corporate Governance Documents.

As promptly as reasonably practicable following the Effective Date, Reorganized Parent shall take all necessary steps in accordance with and to the extent permitted by the Exchange Act and Securities Act to terminate the registration of all Securities under the Exchange Act and Securities Act, including to de-register its Existing Parent Equity Interests, and to terminate its reporting obligations under sections 12, 13, and 15(d) of the Exchange Act, including by (1) filing, or causing any applicable national securities exchange to file, a Form 25 with the SEC under the Exchange Act, and (2) filing a Form 15 with the SEC under the Exchange Act.

Article 5.17 ("*Effectuating Documents; Further Transactions*") of the Plan provides that before, on, and after the Effective Date, the Debtors, the Reorganized Debtors, and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors or managers of the foregoing, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of the Plan, the New Corporate Governance Documents, the Exit Facilities Documents, and any Securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to the Plan.

Article 5.18 ("*Authority of the Debtors*") of the Plan provides that, effective on the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, will be empowered and authorized

45

to take or cause to be taken, before the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of the Plan, the Confirmation Order, the Definitive Documents, and the Restructuring Transactions.

Article 5.19 ("***Continuing Effectiveness of Final Orders***") of the Plan provides that payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court will continue in effect after the Effective Date, and that the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under the Plan.

Finally, as set forth more fully in the Plan, Article V of the Plan provides, among other things, that the Reorganized Debtors shall enter into agreements and amend their Corporate Governance Documents to the extent necessary to implement the terms and provisions of the Plan (Article 5.5).

D.   Treatment of Executory Contracts and Unexpired Leases; Employee Benefits; and Insurance Policies

Article VIII of the Plan governs the treatment of the Debtors' Executory Contracts and Unexpired Leases, among other things.

Article 8.1 ("***Assumption of Executory Contracts and Unexpired Leases***") of the Plan provides that, on the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors, including, but not limited to, employee contracts and offer letters (other than any individual employee contract or offer letter for which the parties separately agree to different treatment), which have not expired by their own terms on or prior to the Confirmation Date will be deemed assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that, in each case:

(i)   have been assumed and assigned, or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)   are the subject of a motion to reject Filed by the Debtors pending on the Effective Date;

(iii)   are identified as rejected Executory Contracts and Unexpired Leases by the Debtors on the Schedule of Rejected Executory Contracts and Unexpired Leases to be Filed in the Plan Supplement, which may be amended by the Debtors up to and through the Effective Date to add or remove Executory Contracts and Unexpired Leases by Filing with the Bankruptcy Court a subsequent Plan Supplement and serving it on the affected non-Debtor contract parties prior to the Effective Date;

(iv)   are rejected or terminated pursuant to the terms of the Plan; or

(v)   are the subject of a pending Cure dispute.

Article 8.1 further provides that, without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, the Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, assumptions and assignments, and the rejection of Executory Contracts and Unexpired Leases set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases provided for in the Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

The Plan further provides that, to the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to the Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change of control" provision, "change of control" provision, or provision with words of similar import) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of the Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or consummation of the Plan, then such provision shall be deemed modified such that the transactions contemplated by the Plan shall not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of the Plan.

In addition, each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to the Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of the Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

The Debtors reserve the right, on or before the Effective Date, to amend the Schedule of Rejected Executory Contracts and Unexpired Leases and/or to add or remove any Executory Contract and Unexpired Lease; *provided*, the Debtors or Reorganized Debtors, as applicable, may amend the Schedule of Rejected Executory Contracts or Unexpired Leases to add or delete any Executory Contracts or Unexpired Leases after such date to the extent agreed to by the relevant counterparties or approved by an order of the Bankruptcy Court.

The Plan further provides that, the inclusion or exclusion of a contract or lease on any schedule or exhibit will not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

Article 8.2 ("***Payments Related to Assumption of Executory Contracts and Unexpired Leases***") of the Plan provides that any monetary defaults under each Executory Contract and Unexpired Lease to be assumed, or assumed and assigned, pursuant to the Plan will be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the amount of the Cure Claim in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.

The Plan further provides that in the event of a dispute regarding (a) the amount of any Cure Claim, (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed or (c) any other matter pertaining to assumption, the Cure Claims will be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

Article 8.3 ("***Claims on Account of the Rejection of Executory Contracts or Unexpired Leases***") of the Plan provides that all Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to the Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within twenty-one (21) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a General Unsecured Claim.

The Plan further provides that any Person or Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so will be forever barred, estopped and enjoined from asserting such Claim, and such Claim will not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors, and their Estates and their respective Assets and property will be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided in the Plan.  Further, all such Claims will, as of the Effective Date, be subject to the permanent injunction set forth in Article X, Section 10.5 of the Plan.

Article 8.4 ("***Survival of the Debtors' Indemnification Obligations***") of the Plan provides that, except as otherwise provided in the Plan or the Confirmation Order, and subject to the Schedule of Retained Causes of Action, to the fullest extent permitted by applicable law, the Indemnification Obligations shall not be discharged, impaired, or otherwise affected by the Plan; *provided*, that the Debtors or the applicable Reorganized Debtors, as applicable, shall not indemnify any such officers, directors, agents, or employees of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' Indemnification Obligations.  Except as otherwise provided in the Plan, all such Indemnification Obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under the Plan.

Article 8.5 ("***Employee Plans***") of the Plan concerns the Debtors' Compensation and Benefit Programs and the Debtors' Workers' Compensation Contracts.

Article 8.5(a) provides that all Employee Plans that exist as of the Petition Date shall be assumed on the Effective Date as Executory Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code, and that the assumption of any Employee Plans shall not trigger any applicable change of

48

control, immediate vesting, termination, or similar provisions therein, including any right to severance pay in connection with a change in control.

The Plan further provides that, unless expressly agreed to in writing between the Debtors and the Required Consenting First Lien Lenders (except as provided in the Restructuring Support Agreement) if an Employee Plan provides in part for an award or potential award of Interests or consideration based on the value of Interests that have not vested into Existing Parent Equity Interests as of the Petition Date, such Employee Plan shall be assumed in all respects other than the provisions of such agreement relating to Interest awards, which interest awards shall be canceled and discharged.

Article 8.5(b) provides that, as of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under all applicable workers' compensation programs and in accordance with all applicable workers' compensation Laws in states in which the Reorganized Debtors operate.  Any Claims arising under workers' compensation programs shall be deemed withdrawn once satisfied without any further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that nothing in the Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable law, including non-bankruptcy Law, with respect to any such workers' compensation programs; *provided further*, that nothing therein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

Article 8.6 ("***Insurance Policies***") of the Plan provides that all insurance policies to which any Debtor is a party as of the Effective Date, shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtors or the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms and shall survive unimpaired under the Plan, and all such insurance policies shall vest in the Reorganized Debtors. Coverage for defense and indemnity under the D&O Policies shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies and on terms no less favorable than the Debtors' existing policies.

In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

In the event that the Debtors determine that an Allowed Claim is covered in full or in part under one of the Debtors' insurance policies, no distributions under this Plan shall be made on account

of such Allowed Claim unless and until, and solely to the extent that, (i) the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, and (ii) an insurer authorized to issue a coverage position under such insurance policy, or the agent of such insurer, issues a formal determination, which the Debtors in their sole discretion do not contest, that coverage under such insurance policy is excluded or otherwise unavailable for losses arising from such Allowed Claim.  Any proceeds available pursuant to one of the Debtors' insurance policies shall reduce the Allowed amount of a Claim on a dollar-for-dollar basis.  To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim in full or in part (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  If an applicable insurance policy has a SIR, the Holder of an Insured Claim shall have an Allowed General Unsecured Claim or a Subordinated Claim, as applicable, solely up to the amount of the SIR that may be established upon the liquidation of the Insured Claim.  Such SIR shall be considered satisfied pursuant to this Plan through allowance of the General Unsecured Claim or Subordinated Claim, as applicable, solely in the amount of the applicable SIR, if any; *provided*, that nothing herein obligates the Debtors or the Reorganized Debtors to otherwise satisfy any SIR under any insurance policy.  Any recovery on account of the Insured Claim in excess of the SIR established upon the liquidation of the Claim shall be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof. Nothing in this Plan shall be construed to limit, extinguish, or diminish the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.

Article 8.9 ("***Reservation of Rights***") of the Plan provides that neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to the Plan or in the Plan Supplement, nor anything contained in the Plan, will constitute an admission by the Debtors that any contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtor or their respective Affiliates has any liability thereunder.

Article 8.9 further provides that, except as otherwise provided in the Plan, nothing in the Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-Executory Contract or any Unexpired Lease or expired lease.  Further, nothing in the Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any Unexpired Lease or expired lease.

If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtors or Reorganized Debtors, as applicable, will have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by Filing a notice indicating such altered treatment.

    E.    <u>Provisions Governing Distributions</u>

Article VI of the Plan sets forth the mechanics by which Plan distributions will be made.

Article 6.1 ("***Distributions Generally***") of the Plan provides that the Distribution Agent shall make all distributions under the Plan to the appropriate Holders of Allowed Claims in accordance with the terms of the Plan, provided that initial Plan distributions shall be made to or at the direction of the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent, as applicable, for further distribution in accordance with the Prepetition Funded Debt Documents, respectively.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan. Except as otherwise provided in the Plan, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Article 6.3 ("***Distribution Record Date***") of the Plan provides that, as of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests.  It further provides that the Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date, and that with respect to payment of any Cure Claims or disputes over any Cure Claims, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.  Notwithstanding the foregoing, Distribution Record Date will not apply to distributions in respect of securities deposited with DTC, the Holders of which will receive distributions, if any, in accordance with the customary exchange procedures of DTC or the Plan. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC will be considered a single Holder for purposes of distributions.

Article 6.4 ("***Date of Distributions***") of the Plan provides that, except as otherwise provided in the Plan (including payments made in the ordinary course of the Debtors' business) or as paid pursuant to a prior Bankruptcy Court order, on the Effective Date or, if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, or as otherwise determined in accordance with the Plan and the Confirmation Order, including the treatment provisions of Article IV of the Plan, each Holder of an Allowed Claim shall receive the full amount of the distributions that such Holder of an Allowed Claim is entitled to under the Plan; *provided*, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate (but subject in all respects to the Definitive Documents); *provided further*, that the Reorganized Debtors may make distributions of Plan Securities following the Effective Date, including to Holders of Disputed Claims that become Allowed Claims; *provided further*, that any Holder participating in the Equity Rights Offering may inform the Distribution Agent pursuant to the Equity Rights Offering Procedures that the distributions in respect of such Holder's Allowed Claims shall be made to one or more of its Affiliates, designees or Related Funds.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII of the Plan; *provided*, that any Plan Security that is issuable to Holders of Allowed Claims but is withheld from distribution on account

51

of a Holder of a Disputed Claim shall not be issued until such time such Disputed Claim is resolved and the Plan Securities are to be distributed. Except as specifically provided in the Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in the Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

Article 6.4 of the Plan further provides that, for all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; *provided*, that Claims held by a single entity against different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for each such Claim against each applicable Debtor. Any such Claims shall be released pursuant to Article X of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code. For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

Article 6.13 ("*Unclaimed Property*") of the Plan provides that, one year from the later of (a) the Effective Date and (b) the date that is ten (10) Business Days after the date of a distribution on an Allowed Claim, all distributions payable on account of such Claim that are undeliverable or otherwise unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall automatically, without need for any further action by or approval of any Person, including, without limitation, the Bankruptcy Court, revert to the Reorganized Debtors or their successors or assigns, and all Claims of any other person (including the Holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's Filings.

Article 6.19 ("*Setoffs*") of the Plan provides that, (a) the Debtors and the Reorganized Debtors, or such Entity's designee as instructed by such Debtor or Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made pursuant to the Plan on account of such Claim, any and all Claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors or their successors may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim thereunder shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the Holder of such Claim, and (b) in no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor, unless (i) the Debtors or the Reorganized Debtors, as applicable, have consented or (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, this

does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date.

Finally, as set forth more fully in the Plan, Article VI of the Plan provides, among other things, that: (a) to the extent applicable, the Reorganized Debtors will comply with all tax withholding and reporting requirements, and all distributions pursuant to the Plan will be subject to such requirements (6.22); (b) except as otherwise provided in the Plan or as otherwise required by law, distributions with respect to an Allowed Claim will be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any (6.20); (c) unless otherwise specifically provided for in the Plan, any other Definitive Document, the Confirmation Order, or any other Final Order of the Bankruptcy Court, or required by applicable bankruptcy law (including as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest will not accrue or be paid on any Claims and no Holder of a Claim or Interest will be entitled to interest accruing on or after the Petition Date on any Claim (6.10); and (d) the Distribution Agent shall not be required to make any distribution of Cash less than one hundred dollars ($100) to any Holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to Article VI, Section 6.18, such distribution shall be added to any subsequent distribution to be made on behalf of the Holder's Allowed Claim (6.18).

F.      Procedures for Resolving Disputed, Contingent, and Unliquidated Claims or Interests

As noted in Section VI of this Disclosure Statement, the Bar Date Order established (i) October 1, 2025, at 5:00 p.m. (prevailing Central Time) as the deadline for any entity to file a proof of claim based on a prepetition claim against any Debtor and (ii) February 16, 2026 at 5:00 p.m. (prevailing Central Time) as the deadline for any governmental unit to file a proof of claim against an Debtor.

Article 7.1(a) ("*Allowance and Disallowance of Claims*") of the Plan provides that, after the Effective Date, and except as otherwise provided in the Plan, the Reorganized Debtors will have and will retain any and all available rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may, but are not required to, contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code will be disallowed if: (a) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code;

53

and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

Article 7.2 ("*Claims Administration Responsibilities*") of the Plan provides that except as otherwise specifically provided in the Plan, after the Effective Date, the Reorganized Debtors will have the sole authority: (a) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (b) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (c) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided in the Plan, from and after the Effective Date, each Reorganized Debtor will have and retain any and all rights and defenses such Debtor had immediately before the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to the Plan.

Article 7.3 ("*Adjustments to Claims or Interests Without Objection*") of the Plan provides that any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the claims register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

Article 7.4 ("*No Distributions Pending Allowance*") of the Plan provides that if any portion of a Claim is Disputed, no payment or distribution provided hereunder will be made on account of such Claim unless and until such Claim becomes an Allowed Claim; *provided* that if only a portion of a Claim is Disputed, such Claim will be deemed Allowed in the amount not Disputed and payment or distribution will be made on account of such undisputed amount.

Section 7.5 ("*Distributions After Allowance*") of the Plan provides that to the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) will be made to the Holder of such Allowed Claim in accordance with the provisions of the Plan.  As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors will provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under the Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

G.    Conditions Precedent to the Occurrence of the Effective Date

Article IX of the Plan sets forth the conditions precedent to the Effective Date, and related matters. The conditions precedent set forth at Article 9.1(b) of the Plan ("*Conditions Precedent to the Occurrence of the Effective Date*") include:

(i)    the Restructuring Support Agreement shall not have been terminated as to the Required Consenting First Lien Lenders or the Required Consenting Second Lien Noteholders, and shall be in full force and effect;

54

(ii)  the Bankruptcy Court shall have entered the Final DIP Order, which order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(iii)  the Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(iv)  the Exit Facilities Document shall have been entered into by the Reorganized Debtors, and all conditions precedent to the effectiveness of the Exit Facilities Documents, other than the occurrence of the Effective Date, shall have been satisfied or waived in accordance with the terms thereof, such that the Exit Facilities Documents will be in full force and effect on the occurrence of the Effective Date;

(v)  all Restructuring Fees and Expenses shall have been paid in full in Cash in accordance with the terms of the Plan and the Restructuring Support Agreement;

(vi)  the Definitive Documents shall (a) be consistent with the Restructuring Term Sheet and the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party, and (c) to the extent applicable, shall be adopted by the applicable Entity on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

(vii)  all governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by the Restructuring Term Sheet and the Restructuring Support Agreement shall have been obtained, not subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

(viii)  the Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by the Plan; and

(ix)  the Professional Fee Escrow shall have been established and funded in full in Cash.

Article 9.2 ("***Timing of Conditions Precedent***") of the Plan provides that, notwithstanding when a Condition Precedent to the Effective Date occurs, for the purposes of the Plan, such Condition Precedent shall be deemed to have occurred simultaneously upon the completion of the Conditions Precedent to the Effective Date; *provided*, that to the extent a Condition Precedent (the "***Prerequisite Condition***") may be required to occur prior to another Condition Precedent (a "***Subsequent Condition***") then, for purposes of the Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

Article 9.3 ("***Waiver of Conditions Precedent***") provides that each of the conditions precedent of the Plan may be waived in writing by the Debtors and the Required Consenting First Lien Lenders (except as otherwise provided in the Restructuring Support Agreement); *provided*, that the waiver of the Conditions Precedent in Article IX, Section 9.1(b)(ix) shall require the consent of the affected Professionals.

Article 9.3 further provides that the stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(c) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

Article 9.4 ("***Effect of Non-Occurrence of the Effective Date***") of the Plan addresses the effect of non-occurrence of the Effective Date.  It provides that if the Effective Date does not occur Plan will be null and void in all respects and nothing contained in the Plan or this Disclosure Statement shall: (a) constitute a waiver or release of any claims by or Claims against or Interests in the Debtors; (b) prejudice in any manner the rights of any Entity; or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, or any other Entity.

H. <u>Discharge, Release, Injunction, and Related Provisions</u>

Article X of the Plan addresses releases, injunctions, exculpatory provisions and related provisions as follows: *Discharge of Claims and Termination of Interests* (10.3); *Releases by the Debtors* (10.6(a)); *Releases by Holders of Claims and Interests* (10.6(b)); *Exculpation* (10.7); and *Permanent Injunction* (10.5).[9]

**Article 10.6(b) of the Plan contains a Third-Party Release by all Releasing Parties.  Pursuant to Article 10.6(b) of the Plan, the following are the Releasing Parties:** (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Creditors; (d) the First Lien Agent; (e) the DIP Lenders; (f) the DIP Backstop Commitment Parties; (g) the DIP Agent; (h) the Second Lien Notes Trustee; (i) [reserved]; (j) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (k) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; (l) each Related Party of each Entity in clauses (a) through (k), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (k) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (i); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party;" *provided, further,* that the Second Lien Notes Trustee and the First Lien Agent

---

[9] The Debtors and their Estates are continuing their ongoing internal investigation.  Nothing herein will constitute or be deemed a waiver of any rights related to such internal investigation.

56

shall be Releasing Parties solely in their respective capacities as Second Lien Notes Trustee and the First Lien Agent and not individually or in any other capacity.

I.    Definitions Relating to Releases

The following definitions are important to understanding the scope of the releases being given under the Plan:

"*Exculpated Party*" means each of the following in their capacities as such and, in each case, to the maximum extent permitted by law: (a) the Debtors and their Estates and (b) each director of the Debtors; and (c) the committee of unsecured creditors (if appointed).

"*Released Parties*" means, collectively, each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Creditors, (d) the First Lien Agent; (e) the DIP Lenders; (f) the DIP Backstop Commitment Parties; (g) the DIP Agent; (h) the Second Lien Notes Trustee; (i) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Releases as provided on its respective ballot; (j) each Holder of a Claim or Interest in a Non-Voting Class that does affirmatively elect to "opt out" of the Third-Party Releases as provided on its respective Release Opt-Out Form; and (k) with respect to each of the foregoing persons in clauses (a) through (j), all Related Parties.  Notwithstanding the foregoing, any Person that opts out of the releases set forth in the Plan shall not be deemed a "Released Party" thereunder; *provided*, that any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases, or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before or at the Confirmation Hearing (and in the case of the latter on the record), shall not be a "Released Party" thereunder; *provided, further*, any Person or Entity (and each such Person or Entity's Related Parties) that files an objection with the Bankruptcy Court to any substantive pleading in the Chapter 11 Cases, including to approval of the DIP Facility or the confirmation of the Plan, or commences any Cause of Action in the Bankruptcy Court or any other court of competent jurisdiction against any director of the Debtors, or against any Consenting Creditor relating to such Consenting Creditor's secured Claims, shall not be a Released Party.

"*Releasing Parties*" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Creditors; (d) the First Lien Agent; (e) the DIP Lenders; (f) the DIP Backstop Commitment Parties; (g) the DIP Agent; (h) the Second Lien Notes Trustee; (i) [reserved]; (j) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective ballot; (k) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; (l) each Related Party of each Entity in clauses (a) through (k), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (k) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (i); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection

57

is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party;" *provided, further,* that the Second Lien Notes Trustee and the First Lien Agent shall be Releasing Parties solely in their respective capacities as Second Lien Notes Trustee and the First Lien Agent and not individually or in any other capacity.

**1.**     Releases, Exculpation and Injunction

**i.**        *Releases by the Debtors (10.6(a))*

**To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in the Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of Debtors, Reorganized Debtors, Reorganized Parent, and the Estates, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Persons who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, has and is deemed to have, forever and unconditionally released, and absolved each Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, Reorganized Parent, or the Reorganized Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (i) the governance, management, transactions, ownership, or operation of the Debtors or the Non-Debtor Affiliates, (ii) the purchase, acquisition, sale, merger or rescission of any business line, Assets, or Security of the Debtors or the Non-Debtor Affiliates, (iii) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate and any other Entity (including Consenting Creditors), (v) the Prepetition Funded Debt Documents, (vi) the Debtors' and Non-Debtor Affiliates' in- or out-of-court restructuring efforts, (vii) intercompany transactions, (viii) the formulation, preparation, dissemination, negotiation, solicitation, entry into, Filing, or consummation of the Plan, the Plan Supplement the Disclosure Statement, the Restructuring Support Agreement and related prepetition transactions, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, the New Corporate Governance Documents, the Chapter 11 Cases, or any Restructuring Transaction, (ix) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, the New Corporate Governance Documents, the Chapter 11 Cases, the pursuit of Confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant**

to the Plan, (x) the distribution, including any disbursements made by a Distribution Agent, of property under the Plan, or any other related agreement, or (xi) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Debtors do not release Claims or Causes of Action (1) that are of a commercial nature and arise in the ordinary course of business, such as accounts receivable and accounts payable on account of goods being sold and services being performed; (2) arising under an Executory Contract or Unexpired Lease that is assumed by the Debtors; or (3) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud (but not, for the avoidance of doubt, fraudulent transfers),gross negligence, or willful misconduct). Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person under the Plan, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any agreement, Claim, or obligation arising or assumed under the Plan or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in the Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing the Plan; (2) a good-faith settlement and compromise of the Claims released by the Debtors; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, the Reorganized Parent or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

### ii. *Releases by Holders of Claims or Interests (10.6(b))*

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in the Plan or the Confirmation Order, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Persons who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, has and is deemed to have, forever and unconditionally, released, and absolved each Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, the

**Reorganized Parent, or the Reorganized Debtors that such Person would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (i) the governance, management, transactions, ownership, or operation of the Debtors or the Non-Debtor Affiliates, (ii) the purchase, acquisition, sale, merger, or rescission of any business line, Assets, or Security of the Debtors or the Non-Debtor Affiliates, (iii) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate and any other Person (including Consenting Creditors), (v) the Prepetition Funded Debt Documents, (vi) the Debtors' and Non-Debtor Affiliates' in- or out-of-court restructuring efforts, (vii) intercompany transactions, (viii) the formulation, preparation, dissemination, negotiation, solicitation, entry into, Filing, or consummation of the Plan, the Plan Supplement the Disclosure Statement, the Restructuring Support Agreement and related prepetition transactions, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, the New Corporate Governance Documents, the Chapter 11 Cases, or any Restructuring Transaction, (ix) any contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, or the New Corporate Governance Documents, the Chapter 11 Cases, the pursuit of Confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, (x) the distribution, including any disbursements made by a Distribution Agent, of property under the Plan, or any other related agreement, or (xi) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Releasing Parties do not release Claims or Causes of Action (1) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct) or (2) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors, the Reorganized Parent, or the Reorganized Debtors. Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person under the Plan, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement the Plan or any agreement, Claim, or obligation arising or assumed under the Plan or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.**

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in the Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

### iii.    *Exculpation (10.7)*

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person for any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or consummation (as applicable) of the Plan, the Restructuring Support Agreement and related prepetition transactions, and the Disclosure Statement including any disbursements made by a Distribution Agent in connection with the Plan, the Disclosure Statement, the Definitive Documents, the Corporate Governance Documents, the Prepetition Funded Debt Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with the Plan, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of the Plan; *provided*, that the foregoing provisions of this exculpation shall not operate to waive or release: (a) any Claims or Causes of Action arising from willful misconduct, gross negligence, or actual fraud (but not, for the avoidance of doubt, fraudulent transfers) of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (b) the rights of any Person to enforce the Plan. and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with the Plan, or assumed pursuant to the Plan or Final Order of the Bankruptcy Court; *provided further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions.

The Exculpated Parties have, and upon consummation of the Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to the Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of the Plan or such distributions made pursuant to the Plan.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person.  For the avoidance of doubt and notwithstanding anything else contained in the Plan, the foregoing exculpation shall be limited to Persons that served as Estate fiduciaries during the Chapter 11 Cases.

#### iv.    *Permanent Injunction (10.5)*

**Except as otherwise expressly provided in the Restructuring Support Agreement, the Plan or the Confirmation Order, from and after the Effective Date, all Persons are, to the fullest extent permitted under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (1) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (2) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order; (3) creating, perfecting, or enforcing any Lien or encumbrance; (4) asserting a right of setoff or subrogation of any kind; or (5) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to the Plan or the Confirmation Order against any Person so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated).  All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.**

**No Person may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article IX hereof, without the Bankruptcy Court (i) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (ii) specifically authorizing such Person to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable; *provided*, that the foregoing shall only apply to Claims or Causes of Action brought against a Released Party if such Person bringing such Claim or Cause of Action is a Releasing Party.  At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person seeking to commence or pursue such Claim or Cause of Action File a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination.  For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending.  The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.**

# VIII.
## TRANSFER RESTRICTIONS AND
## <u>CONSEQUENCES UNDER FEDERAL SECURITIES LAWS</u>

The Reorganized Debtors believe that the offer and sale of New Common Interests (other than New Common Interests issued pursuant to the Equity Rights Offering) and the New Warrants (and the sale of New Common Interests upon exercise of the Warrants) under the Plan (collectively, the "***1145 Securities***") to each Person who is not deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code will be exempt, pursuant to section 1145(a) of the Bankruptcy Code, without further act or action by any Entity, from registration under (i) section 5 of the Securities Act, and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer or sale of securities.  To the extent section 1145(a) of the Bankruptcy Code is not applicable for the offer and sale of any Plan Securities (including the New Common Interests issued pursuant to the Equity Rights Offering), the Reorganized Debtors may rely upon other applicable exemptions from registration, including the exemptions provided by Section 4(a)(2) of the Securities Act and Regulation D promulgated thereunder.

The 1145 Securities offered or sold by the Reorganized Debtors under the Plan pursuant to section 1145(a) of the Bankruptcy Code will be unrestricted securities as set forth in section 1145(c) of the Bankruptcy Code and, generally, may be sold without registration under the Securities Act by the recipients thereof. Plan Securities that are not issued pursuant to section 1145 of the Bankruptcy Code will be considered "restricted securities" (within the meaning of Rule 144 under the Securities Act) and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act. Any transfers of Plan Securities will also be subject to (i) compliance with any applicable state or foreign securities laws, if any, and the rules and regulations of the SEC, if any, applicable at the time of any future transfer of such securities or instruments; (ii) the restrictions, if any, on the transferability of such securities under the terms of the Reorganized Debtors' organizational documents; and (iii) any other applicable regulatory approvals and requirements.

A.    <u>Section 1145 of the Bankruptcy Code Exemption and Subsequent Transfers</u>

Section 1145(a) of the Bankruptcy Code generally exempts from registration under the Securities Act and state and local laws the offer or sale under a chapter 11 plan of a security of the debtor, of an affiliate participating in a joint plan with the debtor, or of a successor to the debtor under a plan, if such securities are offered or sold in exchange for a claim (including a claim for an administrative expense) against, or an interest in, the debtor or such affiliate, or principally in such exchange and partly for cash.  Section 1145(a) of the Bankruptcy Code also exempts from registration (i) the offer of a security through any warrant, option, right to subscribe or conversion privilege that is sold in the manner provided in the prior sentence, and (ii) the sale of a security upon the exercise of such warrant, option, right or privilege.  The Reorganized Debtors believe that, pursuant to section 1145(a) of the Bankruptcy Code, without further act or action by any Entity, the offer and sale of the 1145 Securities will be exempt from the registration requirements under (i) section 5 of the Securities Act, and all rules and regulations promulgated thereunder, and (ii) any state or local law requiring registration for the offer or sale of securities, in each case except for offers and sales to any Person who is deemed to be an "underwriter" as defined in section 1145(b) of the Bankruptcy Code.

These securities generally may be resold without registration under the Securities Act unless the holder is an "underwriter" with respect to such securities, as that term is defined in section 1145(b) of the Bankruptcy Code. In addition, these securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. To the extent that Persons who receive securities issued under the Plan are deemed to be "underwriters," resales by those Persons would not be exempted from registration under the Securities Act or other applicable law by section 1145 of the Bankruptcy Code. Persons deemed to be "underwriters" may, however, be permitted to sell such securities without registration pursuant to the provisions of Rule 144 under the Securities Act as described below.

Section 1145(b) of the Bankruptcy Code defines "underwriter" for purposes of the Securities Act as one who, except with respect to ordinary trading transactions, (i) purchases a claim against, interest in, or claim for an administrative expense in the case concerning, the debtor, if such purchase is with a view to distribution of any security received or to be received in exchange for such a claim or interest, (ii) offers to sell securities offered or sold under the plan of reorganization for the holder of such securities, (iii) offers to buy securities offered or sold under the plan of reorganization from the holder of such securities, if the offer to buy is with a view to distribution of such securities and under an agreement made in connection with the plan of reorganization, with the consummation of the plan of reorganization, or with the offer or sale of securities under the plan of reorganization, or (iv) is an issuer, as used in section 2(a)(11) of the Securities Act, with respect to such securities. The definition of an "issuer" for purposes of whether a person is an underwriter under section 1145(b)(1)(D) of the Bankruptcy Code, includes Persons directly or indirectly controlling, controlled by or under direct or indirect common control with the issuer. "Control," as defined in Rule 405 of the Securities Act, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, or otherwise.  The legislative history of section 1145 of the Bankruptcy Code suggests that a creditor who owns ten percent (10%) or more of a class of voting securities of a reorganized debtor may be presumed to be a "controlling person" and, therefore, an underwriter.  However, the staff of the SEC has not endorsed this view.

Whether or not any particular Person would be deemed to be an "underwriter" with respect to the 1145 Securities or any other security to be issued pursuant to the Plan depends upon various facts and circumstances applicable to that Person. Accordingly, the Debtors express no view as to whether any particular Person receiving 1145 Securities or any other securities under the Plan would be considered an "underwriter" under section 1145(b) of the Bankruptcy Code with respect to such securities.

### B.    Section 4(a)(2) of the Securities Act Exemption and Subsequent Transfers

Section 4(a)(2) of the Securities Act provides that the offer and sale of securities by an issuer in transactions not involving a public offering is exempt from the registration requirements under the Securities Act. Regulation D is a non-exclusive safe harbor from the registration requirements under the Securities Act promulgated by the SEC under section 4(a)(2) of the Securities Act. In reliance upon this exemption, Plan Securities other than the 1145 Securities will be offered and sold pursuant to section 4(a)(2) of the Securities Act or Regulation D thereunder and will be exempt from registration under the Securities Act. Such securities will be considered "restricted securities" (within the meaning of Rule 144 under the Securities Act), will bear customary legends

and transfer restrictions, and may not be transferred except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144 under the Securities Act.

Generally, Rule 144 under the Securities Act permits the public sale of securities if certain conditions are met, including a required holding period, certain current public information regarding the issuer being available, and compliance with applicable volume, manner of sale and notice requirements.  If the issuer is not subject to the reporting requirements of section 13 or 15(d) of the Exchange Act, adequate current public information as specified under Rule 144 is available if certain company information is made publicly available, as specified in Rule 144(c)(2). As promptly as reasonably practicable following the Effective Date, Reorganized Parent expects to terminate the registration of all Securities under sections 13 and 15(d) of the Exchange Act and continue as a private company, and therefore there can be no assurance that current public information as specified in Rule 144 will be available.

***

To the extent certified or issued by way of direct registration on the records of Reorganized Parent's transfer agent, each book entry position or certificate representing, or issued in exchange for or upon the transfer, sale or assignment of, any Plan Security that is not an 1145 Security, as well as certificates evidencing the Plan Securities held by holders of 10% or more of the New Common Interests, or who to the Reorganized Debtors' knowledge are underwriters as defined in section 1145(b) of the Bankruptcy Code, shall, upon issuance, be deemed to contain or be stamped or otherwise imprinted, as applicable, with a restrictive legend in substantially the following form:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE WERE ORIGINALLY ISSUED ON [DATE OF ISSUANCE], HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "ACT"), OR ANY OTHER APPLICABLE STATE SECURITIES LAWS, AND MAY NOT BE SOLD, OFFERED FOR SALE, OR OTHERWISE TRANSFERRED IN THE ABSENCE OF AN EFFECTIVE REGISTRATION STATEMENT UNDER THE ACT AND APPLICABLE STATE SECURITIES LAWS OR AN AVAILABLE EXEMPTION FROM REGISTRATION THEREUNDER."

The Reorganized Debtors will also reserve the right to stop the transfer of any such securities if such transfer is not pursuant to an effective resale registration statement or pursuant to an available exemption from the registration requirements of applicable securities laws.

In any case, recipients of securities issued under the Plan are advised to consult with their own legal advisors as to the availability of any such exemption from registration requirements under state law in any given instance and as to any applicable requirements or conditions to such availability.

***

65

## IX.
## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

[TO COME]

## X.
## CERTAIN RISK FACTORS TO BE CONSIDERED

Prior to voting to accept or reject the Plan, holders of Claims should read and carefully consider the risk factors set forth below, in addition to the information set forth in this Disclosure Statement together with any attachments, exhibits, or documents incorporated by reference hereto. The factors below should not be regarded as the only risks associated with the Plan or its implementation. Additional risk factors identified in ModivCare's public filings with the SEC may also be applicable to the matters set out herein and should be reviewed and considered in conjunction with this Disclosure Statement, to the extent applicable. The risk factors set forth in ModivCare's annual report on Form 10-K for the fiscal year ended December 31, 2024, filed with the SEC on March 6, 2025, as may be updated by ModivCare's other public filings with the SEC, are hereby incorporated by reference. New factors, risks and uncertainties emerge from time to time and it is not possible to predict all such factors, risks and uncertainties.

### A.    Certain Bankruptcy Law Considerations

#### i.    *General*

Although the Debtors believe that the Chapter 11 Cases will not be materially disruptive to their business, the Debtors cannot be certain that this will be the case, including if the Effective Date is prolonged. Although the Plan is designed to minimize the length of the Chapter 11 Cases, it is impossible to predict with certainty the amount of time that one or more of the Debtors may spend in bankruptcy or to assure parties in interest that the Plan will be confirmed. The Chapter 11 Cases will also involve additional expense and may divert some of the attention of the Debtors' management away from business operations.

#### ii.    *Risk of Material Adverse Effect on Operations*

The commencement of the Chapter 11 Cases could adversely affect the relationship between the Debtors and their customers, employees, vendors, lenders, partners and others. There is a risk, due to uncertainty about the Company's future, that: (i) customers could terminate or choose not to renew existing contracts and seek alternative providers; (ii) customers' confidence in the Debtors' ability to provide products and services could erode and, as a result, there could be a significant and precipitous decline in revenues, profitability, and cash flow; (iii) it may be more difficult to attract or replace employees; (iv) employees could be distracted from performance of their duties or more easily attracted to other career opportunities; (v) suppliers, vendors, and service providers could terminate their relationship with the Debtors or require financial assurances or enhanced performance; and (vi) additional involvement by regulatory, taxing, and other authorities may increase the administrative burden on the Debtors and their operations. These factors could adversely affect the Debtors' ability to obtain confirmation of the Plan.

#### iii.    *Risk of Non-Confirmation of the Plan*

Although the Debtors believe that the Plan will satisfy all requirements necessary for confirmation by the Bankruptcy Court, there can be no assurance that the Bankruptcy Court will reach the same conclusion or that modifications to the Plan will not be required for confirmation or that such modifications would not necessitate re-solicitation of votes on the Plan. Moreover, the Debtors can

67

make no assurances that they will receive the requisite votes for acceptance to confirm the Plan or satisfy all of the conditions for confirmation required under the Plan. Even if all Voting Classes vote in favor of the Plan or the requirements for "cramdown" are met with respect to any Class that rejected the Plan, the Bankruptcy Court could decline to confirm the Plan if it finds that any of the statutory requirements for confirmation are not met. If the Plan is not confirmed, it is unclear what distributions holders of Claims or Interests ultimately would receive with respect to their Claims or Interests in a subsequent plan of reorganization or otherwise. Non-confirmation of the Plan could result in protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers. In such circumstances, the Debtors may no longer have consent to use Cash Collateral, or have access to the DIP Facility, such that there would likely be a significant strain on liquidity and the Debtors' ability to continue its businesses.

Even if the Plan is confirmed and implemented, the Debtors may not be able to achieve their stated goals. The Debtors continue to face a number of risks, such as changes in economic conditions, changes in the Debtor's regulatory environment or industry, changes in demand for their services and increasing expenses. Some of these risks become more acute when a case under the Bankruptcy Code continues for a protracted period without indication of how or when the case may be completed. As a result of these risks and others, there is no guarantee that the implementation of the Plan will achieve the Debtors' stated goals. Furthermore, even if ModivCare's debt and other liabilities are reduced or discharged through the implementation of the Plan, the Debtors may need to raise additional funds through public or private debt or equity financing or other various means to fund our business after the completion of the Chapter 11 Cases. The Debtors' access to additional financing may be limited, if it is available at all. Therefore, adequate funds may not be available when needed or may not be available on favorable terms, or at all.

### iv.   *Severability of the Plan*

The Debtors cannot guarantee that the Bankruptcy Court will approve every provision of the Plan, and certain provisions may be modified or removed, while the rest of the Plan will be confirmed.

### v.   *Risk of Failing to Satisfy the Vote Requirement*

In the event that the Debtors are unable to get sufficient votes from the Classes that are entitled to vote on the Plan, the Debtors may seek to accomplish an alternative chapter 11 plan or seek to cram down the Plan on non-accepting Classes. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to holders of Allowed Claims as those proposed in the Plan.

### vi.   *Non-Consensual Confirmation*

If any impaired class of claims or equity interests does not accept or is deemed not to accept a plan of reorganization, a bankruptcy court may nevertheless confirm such plan at the proponent's request if at least one impaired class has voted to accept the plan (with such acceptance being determined without including the vote of any "insider" in such class), and as to each impaired class that has not accepted the Plan, the Bankruptcy Court determines that the plan "does not

discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. If any Class votes to reject the plan, then these requirements must be satisfied with respect to such rejecting Classes.  The Debtors believe that the Plan satisfies these requirements.

### vii.    *Risk Related to Parties in Interest Objecting to the Debtors' Classification of Claims and Interests*

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.  The Debtors believe that the classification of Claims and Interests under the Plan complies with the requirements set forth in the Bankruptcy Code. However, there can be no assurance that a party in interest will not object or that the Bankruptcy Court will approve the classifications.

### viii.    *Risk of Non-Occurrence of the Effective Date*

Although the Debtors believe that the Effective Date will occur soon after the Confirmation Date, there can be no assurance as to the timing of the Effective Date.  If the conditions precedent to the Effective Date set forth in the Plan have not occurred or have not been waived as set forth in Article IX of the Plan, then the Confirmation Order may be vacated, in which event no distributions would be made under the Plan, the Debtors and all holders of Claims or Interests would be restored to the status quo as of the day immediately preceding the Confirmation Date, and the Debtors' obligations with respect to Claims and Interests would remain unchanged.  Nonoccurrence of the Effective Date could result in substantial changes to the Plan and protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.  In such circumstances, the Debtors may no longer have consent to use Cash Collateral, or have access to the DIP Facility, such that there would likely be a significant strain on liquidity and the Debtors' ability to continue its businesses.

### ix.    *Risk of Termination of the Restructuring Support Agreement*

The Restructuring Support Agreement contains certain provisions that give the Debtors and the Consenting Creditors (as defined in the Restructuring Support Agreement) the ability to terminate the Restructuring Support Agreement if various conditions are satisfied.  Termination of the Restructuring Support Agreement could result in substantial changes to the Plan and protracted Chapter 11 Cases, which could significantly and detrimentally impact the Debtors' relationships with vendors, suppliers, employees, and major customers.  In such circumstances, the Debtors may no longer have consent to use Cash Collateral, or have access to the DIP Facility, such that there would likely be a significant strain on liquidity and the Debtors' ability to continue its businesses.

### x.    *Conversion into Chapter 7 Cases*

If no plan of reorganization can be confirmed, or if the Bankruptcy Court otherwise finds that it would be in the best interest of holders of Claims and Interests, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be appointed or elected to liquidate the Debtors' assets for distribution in accordance with the priorities established by the Bankruptcy Code.  Please refer to section XIII.C hereof, as well as the

Liquidation Analysis attached hereto as **Exhibit C**, for a discussion of the effects that a chapter 7 liquidation would have on the recoveries of holders of Claims and Interests.

> xi.       *Risks Related to Possible Objections to the Plan*

There is a risk that certain parties could oppose and object to either the entirety of the Plan or specific provisions of the Plan.  Although the Debtors believe that the Plan complies with all relevant Bankruptcy Code provisions, there can be no guarantee that a party in interest will not file an objection to the Plan or that the Bankruptcy Court will not sustain such an objection.

> xii.      *Releases, Injunctions, and Exculpations Provisions May Not Be Approved*

Article X of the Plan provides for certain releases, injunctions, and exculpations for Claims and Causes of Action that may otherwise be asserted against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable.  The releases, injunctions, and exculpations provided in the Plan are subject to objection by parties in interest and may not be approved.  If the releases and exculpations are not approved, certain parties may not be considered Releasing Parties, Released Parties, or Exculpated Parties, and certain Released Parties or Exculpated Parties may withdraw their support for the Plan.

> B.       Additional Factors Affecting the Value of Reorganized Debtors

> i.       *Claims Could Be More than Projected*

There can be no assurance that the estimated Allowed amount of Claims in certain Classes will not be significantly more than projected, which, in turn, could reduce the value of distributions substantially.  Inevitably, some assumptions will not materialize, and unanticipated events and circumstances may affect the ultimate results.  Therefore, the actual amount of Allowed Claims may vary from the Debtors' projections and feasibility analysis, and the variation may be material.

> ii.      *Projections and Other Forward-Looking Statements Are Not Assured, and Actual Results May Vary*

Certain of the information contained in this Disclosure Statement is, by nature, forward-looking, and contains estimates and assumptions which might ultimately prove to be incorrect, and contains projections that may differ materially from actual future experiences.  There are uncertainties associated with any projections and estimates, and they should not be considered assurances or guarantees of the amount of funds or the amount of Claims in the various Classes that might be Allowed.

The Debtors have prepared financial projections (the "***Financial Projections***") on a consolidated basis based on certain assumptions, as set forth in **Exhibit D** hereto.  The Financial Projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the Financial Projections or the ability to achieve forecasted results.

Many of the assumptions underlying the Financial Projections are subject to uncertainties that are beyond the control of the Debtors or Reorganized Debtors including the timing, confirmation, and consummation of the Plan, demand or price for services, inflation, and other unanticipated market and economic conditions.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the Financial Projections may be inaccurate in material respects.  In addition, unanticipated events and circumstances occurring after the approval of this Disclosure Statement by the Bankruptcy Court, including any natural disasters, terrorist attacks, or health epidemics, may affect the actual financial results achieved.  Such results may vary significantly from the forecasts and such variations may be material.

### iii.    *Risks Associated with Debtors' Business and Industry and Financial Conditions*

#### (a)    Risks Associated with Potential Litigation, Including Litigation Arising Out of the Chapter 11 Cases

In the future, the Reorganized Debtors may become parties to litigation.  In general, litigation can be expensive and time consuming to bring or defend against.  Such litigation could result in settlements or damages that could significantly affect the Reorganized Debtors' financial results. It is also possible that certain parties will commence litigation with respect to the treatment of their Claims under the Plan.  It is not possible to predict the potential litigation that the Reorganized Debtors may become party to, nor the final resolution of such litigation.  The impact of any such litigation on the Reorganized Debtors' businesses and financial stability, however, could be material.

#### (b)    Risks Associated with the Loss of Key Personnel

The Debtors' recent liquidity issues and the Chapter 11 Cases have created distractions and uncertainty for key management personnel and employees.  As a result, the Debtors may experience increased levels of employee attrition.  Because competition for experienced personnel can be significant, the Debtors may be unable to find acceptable replacements with comparable skills and experience, and the loss of such key management personnel could adversely affect the Debtors' ability to operate their businesses.  In addition, a loss of key personnel or material erosion of employee morale could have a material adverse effect on the Debtors' ability to meet expectations and to execute our strategy and implement operational initiatives thereby adversely affecting the Debtors' businesses and the results of operations.

#### (c)    Risks Associated with Governmental Laws and Regulations and Compliance

The Company's operations are subject to federal, state, local, foreign and international laws and regulations regulating the healthcare industry and budgeting of the same.  Such laws and regulations have impacted, and may continue to impact the Company, including but not limited to anticipated reductions in the funding of and services covered by Medicaid, as well as the number of persons enrolled in Medicaid.  Changes to the regulatory landscape applicable to the Debtors'

71

Case No. 1:25-cv-00306-GPG-KAS    Document 42-2    filed 09/19/25    USDC Colorado
Case 25-90309   Document 120   Filed in TXSB on 09/04/25   Page 82 of 175
Page 83 of 176

businesses could have a material adverse effect on their results of operations and financial condition. If changes in Medicare, Medicaid or other state and local medical and social programs result in a reduction in available funds for the services the Debtors offer, a reduction in the number of beneficiaries eligible for our services or a reduction in the number of hours or amount of services that beneficiaries eligible for our services may receive, then the Debtors' revenues and profitability could be negatively impacted. The Debtors' profitability depends principally on the levels of government-mandated payment rates and their ability to manage the cost of providing services. These are critical components of the Debtors' businesses, and therefore, any reduction in the funding of, or enrollment in, such programs could have a material adverse effect on the Debtors' business.

Further, the United States healthcare industry is subject to extensive federal and state oversight. Both federal and state government agencies have increased coordinated civil and criminal enforcement efforts related to the healthcare industry. Regulations related to the healthcare industry are extremely complex and, in many instances, the industry does not have the benefit of significant regulatory or judicial interpretation of those laws. Medicare and Medicaid anti-fraud and abuse laws prohibit certain business practices and relationships related to items and services reimbursable under Medicare, Medicaid and other governmental healthcare programs, including the payment or receipt of remuneration to induce or arrange for referral of patients or recommendation for the provision of items or services covered by Medicare or Medicaid or any other federal or state healthcare program, often referred to as the Anti-Kickback Statute. Federal and state laws also prohibit the submission of false or fraudulent claims, including claims to obtain reimbursement under Medicare and Medicaid, under what is commonly referred to as the False Claims Act. The Debtors have implemented policies to help assure compliance with these regulations as they become effective, but interpretations different from our interpretations or enforcement of these laws and regulations in the future could subject the Debtors' practices to allegations of impropriety, illegality, or overpayment, or could require the Debtors to make changes in their facilities, equipment, personnel, services or the manner in which they conduct their business, any of which could increase costs and could materially adversely affect their business and results of operations.

(d)    Risks Associated with Cost-Saving Initiatives

The Debtors have and may continue to undertake internal restructurings, contract negotiations, and other initiatives intended to reduce expenses.  These initiatives may not lead to the benefits the Debtors expect, may be disruptive to the Debtors' personnel and operations, and may require substantial management time and attention.  Moreover, the Debtors could encounter delays in executing their plans, which could entail further disruption and associated costs.  If these disruptions result in a decline in productivity of the Debtors' personnel, negative impacts on operations, or if they experience unanticipated expenses associated with these initiatives, the Debtors' business and operating results may be harmed.

(e)    Risks Associated with Retaining or Attracting Customers

The Debtors generate a significant amount of revenue from a limited number of payors under a relatively small number of contracts.  As a result, future revenue is highly dependent in part on the retention of their existing customer base.  A significant proportion of the Debtors' key contracts

72

are terminable for convenience, and as such, customers may decide to terminate or reduce the scope of their contracts with the Debtors in the future the Debtors may not be able to replace a customer that elects to terminate or fails to renew its contract with them.  The loss of, reduction in amounts generated by, or changes in methods or regulations governing payments for the Debtors' services under these contracts, individually or in the aggregate, could have a material adverse impact on the Debtors' revenue and results of operations.

As noted in Section II above, much of the Debtors' NEMT business depends in large part on contracts awarded by MCOs and state and other governmental entities, many of which are subject to RFPs.  From time to time, the Debtors' have experienced the termination, renegotiation, or loss of contracts or segments of contracts.  The loss of, or reduction in amounts generated by, or changes in methods or regulations governing payments for the Debtors' services under these contracts, individually or in the aggregate, could have a material adverse impact on the Debtors' revenue and results of operations.  Further, loss of any of these contracts, or segments thereof, could negatively influence its relationships with other contract counterparties.

A variety of factors could affect the Debtors' ability to successfully retain and attract customers, including the level of demand for their products, the quality of the Debtors' customer service, the Debtors' ability to update their products and develop new products needed by customers, and the Debtors' ability to compete with competitors.

(f)      Risks Associated with Collections

Prompt billing and collection are important factors in the Debtors' liquidity.  Billing and collection of their accounts receivable are subject to the complex regulations that govern Medicare and Medicaid reimbursement and rules imposed by non-government payors.  The Debtors' inability to bill and collect on a timely basis pursuant to these regulations and rules could subject them to payment delays that could have a material adverse effect on their business, financial position, results of operations and liquidity.  It is possible that documentation support, system problems, Medicare, Medicaid or other payor issues, particularly in markets transitioning to managed care for the first time, or industry trends may extend our collection period, which may adversely affect their working capital, and their working capital management procedures may not successfully mitigate this risk.

The timing of payments made under the Medicare and Medicaid programs is subject to governmental budgetary constraints, resulting in an increased period of time between submission of claims and subsequent payment under specific programs, most notably under the Medicare and Medicaid managed programs.  In addition, the Debtors may experience delays in reimbursement as a result of the failure to receive prompt approvals related to change of ownership applications for acquired or other facilities or from delays caused by their or other third parties' information system failures.  The Debtors may also experience delayed payment of reimbursement rate increases that are subject to the approval of the CMS and/or various state agencies before claims can be submitted or paid at the new rates.  Any delays experienced for the foregoing or other reasons could have a material adverse effect on the Debtors' business, results of operations and financial condition.

(g)    Risks Associated with Competition

The Debtors operate in a highly competitive industry.  In the NEMT segment, the Debtors compete with a variety of national organizations that provide similar healthcare and social services related to transportation, some of which have greater name recognition as well as greater financial, technical, political, marketing, and other resources that contribute to a larger number of clients or payors than the Debtors.  The market in which the Debtors operate is influenced by technological developments that affect cost-efficiency and quality of services.  Accordingly, the Debtors' success depends on their ability to develop services that address these customers' changing needs and to provide technology needed to deliver these services on a cost-effective basis.

Further, the personal care services industry in which the Debtors operate is highly competitive and fragmented.  There are relatively few barriers to entry in some of the home healthcare services markets in which the Debtors operate.  Accordingly, other companies, including hospitals and other healthcare organizations that are not currently providing in-home personal care services, may expand their services to include those services or similar services.  In addition, state certificates of need (CON) laws which often limit the ability of competitors to enter into a given market, are not uniform throughout the United States and are frequently the subject of efforts to limit or repeal such laws.  If states remove existing CON laws, the Debtors could face increased competition in these states.

In the Monitoring segment, the Debtors currently face competition from a range of companies, including specialized software and solution providers that offer similar solutions, often at substantially lower prices, and that are continuing to develop additional products and becoming more sophisticated and effective.  In addition, large, well-financed health plans have in some cases developed their own telehealth, expert medical service or chronic condition management tools and may provide these solutions to their customers at discounted prices.  Competition from specialized software and solution providers, health plans and other parties will result in continued pricing pressures, which is likely to lead to price declines in certain product segments, which could negatively impact the Debtors' sales, profitability and market share.

The Debtors have experienced, and expect to continue to experience, competition from new entrants into the markets in which they operate.  Increased competition may result in pricing pressures, loss of or failure to gain market share, or loss of or failure to gain clients or payors, any of which could have a material adverse effect on the Debtors' operating results.  The Debtors' business may also be adversely affected by the consolidation of competitors, which may result in increased pricing pressure or negotiating leverage with payors, or by the provision of their services by payors or clients directly to customers, including through the acquisition of competitors.  Further, as a result of their indebtedness, the Reorganized Debtors may be more vulnerable to such competitive conditions.

(h)    Risks Associated with Cybersecurity Attacks

The Debtors' information technology systems are critically important to their operations, and they must implement and maintain appropriate and sufficient infrastructure and IT systems to support their existing and future business processes.  The Debtors provide services to individuals and others that require them to collect, process, maintain and retain a variety of sensitive and personal

confidential information in their computer systems, including proprietary information, intellectual property, patient identifiable health information, employee information, financial information and other personal information about their customers and end-users, such as names, addresses, phone numbers, email addresses, identification numbers, sensitive health information, and payment account information.  The Debtors also rely on their IT systems (some of which are supported by third party vendors) to manage the information, communications and business processes for other business functions, including a wide variety of health care infrastructure and operations such as marketing, sales, logistics, customer service, accounting and administrative functions.  The secure operation of such IT systems and the processing and maintenance of this information is critical to business operations and strategy.  Despite actions to mitigate or eliminate risk, the Debtors' information systems may be vulnerable to damage, disruptions or shutdowns due to the activity of hackers, employee error or malfeasance, or other disruptions, including power outages, telecommunication or utility failures, natural disasters, or other catastrophic events.  The occurrence of any of these events could compromise the Debtors' information systems, and the information stored there (including customer information) could be accessed, publicly disclosed, lost, or stolen.  Any such access, disclosure or other loss of information could result in legal claims or proceedings, liability or regulatory penalties under laws protecting the privacy of personal information, disruption of operations, and damage to the Debtors' reputation, all of which could adversely affect their business, financial condition and results of operations.

(i)      Risks Associated with Accurate Reporting of Financial Results

The Debtors have established internal controls over financial reporting.  However, internal controls over financial reporting may not prevent or detect misstatements or omissions in the Debtors' financial statements because of their inherent limitations, including the possibility of human error, and the circumvention or overriding of controls or fraud.  Therefore, even effective internal controls can provide only reasonable assurance with respect to the preparation and fair presentation of financial statements.  If the Debtors fail to maintain the adequacy of their internal controls, the Debtors may be unable to provide financial information in a timely and reliable manner within the time periods required under the terms of the agreements governing the Debtors' indebtedness.  Any such difficulties or failure could materially adversely affect the Debtors' business, results of operations, and financial condition.  Further, the Debtors may discover other internal control deficiencies in the future and/or fail to adequately correct previously identified control deficiencies, which could materially adversely affect the Debtors' businesses, results of operations, and financial condition.

iv.      *Transfers or Issuances of the Debtors' Equity, Before or in Connection with Their Chapter 11 Proceedings, May Impair Their Ability to Utilize Their Federal Income Tax Net Operating Loss Carryforwards in Future Years*

Under U.S. federal income tax law, a corporation is generally permitted to deduct from taxable income net operating losses carried forward from prior years.  The Debtors' consolidated group for U.S. federal income tax purposes of which ModivCare is the parent had consolidated NOLs and NOL carryforwards of approximately $283 million as of December 31, 2024. The Debtors believe that their consolidated group likely generated additional NOLs for the 2025 tax year.  The

75

Debtors' ability to utilize their NOL carryforwards to offset future taxable income and to reduce their U.S. federal income tax liability is subject to certain requirements and restrictions.  If ModivCare experiences an "ownership change," as defined in section 382 of the Tax Code, the Debtors' ability to use their NOL carryforwards may be substantially limited, which could increase the taxes paid by the Debtors and have a negative impact on their after-tax cash flow, financial position and results of operations.  Generally, there is an "ownership change" if one or more stockholders owning 5% or more of a corporation's common stock have aggregate increases in their ownership of such stock of more than 50 percentage points over the prior three-year period. Under section 382 of the Tax Code, absent an applicable exception, if a corporation undergoes an "ownership change," the amount of its NOLs that may be utilized to offset future table income generally is subject to an annual limitation.  Even if the NOL carryforwards are subject to limitation under section 382 of the Tax Code, the NOLs can be further reduced by the amount of discharge of indebtedness arising in a chapter 11 case under section 108 of the Tax Code.

Following the implementation of a plan of reorganization, it is likely that an "ownership change" will be deemed to occur and the Debtors' NOLs will be subject to annual limitation.

### v.        *Golden Parachute Deduction Limitation*

In connection with the transactions described in the Plan and Disclosure Statement, some or all of the payments and benefits (including potential severance benefits, as applicable) to certain employees and other disqualified individuals may not be deductible for federal income tax purposes as a result of such payments being "excess parachute payments" under section 280G of the Tax Code.

### C.        Factors Relating to Equity Rights Offering

### i.        *Debtors Could Modify and/or Cancel the Equity Rights Offering Procedures*

The Debtors may modify the Equity Rights Offering Procedures, to, among other things, adopt additional detailed procedures if necessary in the Debtors' business judgment.  This might include if there is insufficient interest and participation in the Equity Rights Offering for it to proceed (given that the Equity Rights offering is not backstopped).  Such modifications, or the cancellation of the Equity Rights Offering, may adversely affect the rights of those participating, or wishing to participate, in the Equity Rights Offering.

### D.        Factors Relating to the Capital Structure of the Reorganized Debtors

### i.        *Variances from Financial Projections*

The Debtors have prepared financial projections on a consolidated basis with respect to the Reorganized Debtors based on certain assumptions as set forth in **Exhibit D** hereto.  The projections have not been compiled, audited, or examined by independent accountants, and neither the Debtors nor their advisors make any representations or warranties regarding the accuracy of the projections or the ability to achieve forecasted results.

Many of the assumptions underlying the projections are subject to significant uncertainties that are beyond the control of the Debtors or Reorganized Debtors, including the timing, confirmation, and consummation of the Plan, consumer demands for the Reorganized Debtors' products and services, macroeconomic, political, legal and regulatory events that may affect the Reorganized Debtors' industries, and other unanticipated market and economic conditions.  Some assumptions may not materialize, and unanticipated events and circumstances may affect the actual results.  Projections are inherently subject to substantial and numerous uncertainties and to a wide variety of significant business, economic, and competitive risks, and the assumptions underlying the projections may be inaccurate in material respects.

In addition, if the Debtors emerge from chapter 11, the amounts reported in subsequent consolidated financial statements may materially change relative to historical consolidated financial statements, including as a result of revisions to the Debtors' operating plans pursuant to a plan of reorganization.  The Reorganized Debtors also may be required to adopt "fresh start" accounting in accordance with Accounting Standards Codification 852 ("Reorganizations"), in which case their assets and liabilities will be recorded at fair value as of the fresh start reporting date, which may differ materially from the recorded values of assets and liabilities on the Debtors' consolidated balance sheets.  The Reorganized Debtors' financial results after the application of fresh start accounting also may be different from historical trends.  The Financial Projections contained in **Exhibit D** hereto do not currently reflect the impact of fresh start accounting, which may have a material impact on the Financial Projections.

### ii.    *Leverage*

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have a significant amount of secured indebtedness.  On the Effective Date, after giving effect to the transactions contemplated by the Plan, the Reorganized Debtors will have approximately $300 million in funded indebtedness (exclusive of the Exit Revolving Facility, and the letter of credit sublimit contemplated therein).

The degree to which the Reorganized Debtors will be leveraged could have important consequences, placing the Reorganized Debtors at a competitive disadvantage to other, less leveraged competitors, because, among other things: it could affect the Reorganized Debtors' ability to satisfy their obligations under their indebtedness following the Effective Date; a portion of the Reorganized Debtors' cash flow from operations will be used for debt service and therefore will be unavailable to support operations or for working capital, capital expenditures, expansion, acquisitions or general corporate or other purposes; the Reorganized Debtors' ability to refinance their then-existing debt, obtain additional debt financing or equity financing, or pursue mergers, acquisitions and asset sales, on terms acceptable to them or at all, may be limited and their costs of borrowing may be increased; as a result of their indebtedness, the Reorganized Debtors may be more vulnerable to economic downturns and their ability to withstand competitive pressures may be limited; and the Reorganized Debtors' operational flexibility in planning for, or reacting to, changes, opportunities and challenges in their businesses, including changes in the market sector in which they compete, changes in their business and strategic opportunities, and adverse developments in their operations, may be severely limited.

### iii.    *Ability to Service Debt*

Although the Reorganized Debtors will have less indebtedness than the Debtors, the Reorganized Debtors will still have significant interest expense and principal repayment obligations.  The Reorganized Debtors' ability to make payments on and to refinance their debt will depend on their future financial and operating performance and their ability to generate cash in the future.  This, to a certain extent, is subject to general economic, business, financial, competitive, legislative, regulatory and other factors that are beyond the control of the Reorganized Debtors.

Although the Debtors believe the Plan is feasible, there can be no assurance that the Reorganized Debtors will be able to generate sufficient cash flow from operations or that sufficient future borrowings will be available to pay off the Reorganized Debtors' debt obligations.  The Reorganized Debtors may need to refinance all or a portion of their debt on or before maturity; however, there can be no assurance that the Reorganized Debtors will be able to refinance any of their debt on commercially reasonable terms or at all.

If the Reorganized Debtors' cash flows and capital resources are insufficient to fund their debt service obligations and other cash requirements, the Reorganized Debtors could face substantial liquidity problems and could be forced to reduce or delay investments and capital expenditures or to sell assets or operations, seek additional capital or restructure or refinance their indebtedness and settlement obligations.  The Reorganized Debtors may not be able to effect any such alternative measures, if necessary, on commercially reasonable terms or at all and, even if successful, such alternative actions may not allow the Reorganized Debtors to meet their scheduled debt service obligations and settlement obligations.  The agreements governing the Reorganized Debtors' indebtedness at emergence are expected to (a) have terms and conditions that restrict their ability to dispose of assets and the use of proceeds from any such dispositions and (b) restrict their ability to raise debt capital.

The Reorganized Debtors' inability to generate sufficient cash flows to satisfy their debt obligations, or to refinance their indebtedness on commercially reasonable terms or at all, would materially and adversely affect their financial position and results of operations.

If the Reorganized Debtors cannot make scheduled payments on their debt, an event of default may result.  An event of default may allow the creditors to accelerate the related debt as well as any other debt to which a cross-acceleration or cross-default provision applies.  If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the lenders thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

### iv.    *Obligations Under Exit Facilities*

The Reorganized Debtors' obligations under the Exit Facilities are expected to be secured by liens on substantially all of the assets of the Reorganized Debtors (subject to certain exclusions set forth therein).  If the Reorganized Debtors become insolvent or are liquidated, or if there is a default under certain financing agreements, including, but not limited to, the Exit Facilities, and payment on any obligation thereunder is accelerated, the holders of the loans thereunder would be entitled, subject to the applicable intercreditor agreements and other applicable credit documents, to

78

exercise the remedies available to a secured creditor under applicable law, including foreclosure on the collateral that is pledged to secure the indebtedness thereunder, and they would have a claim on the assets securing the obligations under the applicable facility that would be superior to any claim of the holders of unsecured debt of the obligors of the Exit Facilities.

### v.    *Restrictive Covenants*

The financing agreements governing the Reorganized Debtors' indebtedness are expected to contain various covenants that may limit the discretion of the Reorganized Debtors' management by restricting the Reorganized Debtors' ability to, among other things, incur additional indebtedness, incur liens, pay dividends or make certain restricted payments, make acquisitions and investments, consummate certain asset sales, enter into certain transactions with affiliates, or merge, consolidate or sell or dispose of all or substantially all of their assets.  As a result of these covenants, the Reorganized Debtors will be limited in the manner in which they conduct their business and may be unable to engage in favorable business activities or finance future operations or capital needs.

Any failure to comply with the restrictions of the financing agreements may result in an event of default under such financial agreements.  An event of default under a financing agreement may allow the creditors under such financing agreement to accelerate the related debt as well as allow the creditors under any other debt to which a cross-acceleration or cross-default provision applies to accelerate such debt as well.  If the Reorganized Debtors are unable to repay amounts outstanding under their financing agreements when due, the creditor thereunder could, subject to the terms of the financing agreements, seek to foreclose on the collateral that is pledged to secure the indebtedness outstanding under such facility.

As a result of these restrictions, the Reorganized Debtors may be limited in how they conduct their business, unable to raise additional debt or equity financing to operate during general economic or business downturns, unable to respond to changing circumstances or to pursue business strategies and unable to compete effectively, execute their growth strategy or take advantage of new business opportunities.

### vi.    *Additional Financing*

The Reorganized Debtors may be able to incur substantial additional indebtedness in the future.  Although agreements governing the Reorganized Debtors' indebtedness are expected to restrict the incurrence of additional indebtedness, these restrictions are and will be subject to a number of qualifications and exceptions and the additional indebtedness incurred in compliance with these restrictions could be substantial.  If new debt is added to the Reorganized Debtors' current debt levels, the related risks that the Reorganized Debtors face could intensify.

Moreover, the Reorganized Debtors may need to seek additional financing for general corporate purposes.  For example, they may need funds to make acquisitions or for capital expenditures or operating expenses needed to remain competitive in their market sector.  The Reorganized Debtors may be unable to obtain any desired additional financing on terms that are favorable or acceptable to them, including as a result of their debt levels or if there is a decline in the demand for their products or in the solvency of their customers, vendors or suppliers or other significantly

79

unfavorable changes in economic conditions occur.  Depending on market conditions, adequate funds may not be available to the Reorganized Debtors on acceptable terms or at all, and they may be unable to fund expansion, successfully develop or enhance products, or respond to competitive pressures, any of which could have a material adverse effect on the Reorganized Debtors' competitive position, business, financial condition, results of operations, and cash flows.

E.    Factors Relating to Securities to Be Issued Under Plan

### i.    *Market for Securities*

There will be no public market for the New Common Interests or the New Warrants.  Accordingly, the liquidity of such instruments will be limited.  The liquidity of any private market for New Common Interests and New Warrants will depend upon, among other things, the number of holders of New Common Interests or New Warrants, the Reorganized Debtors' financial performance, and the market for similar securities, none of which can be determined or predicted.  Accordingly, there can be no assurance that active trading markets for New Common Interests or New Warrants will develop, nor can any assurance be given as to the liquidity or prices at which such securities might be traded.  In the event active trading markets do not develop or are not maintained, holders of the New Common Interests or New Warrants may experience substantial difficulty in transferring or reselling such securities or may be unable to transfer or sell them at all.  Even if such a market were to exist, such securities could trade at prices higher or lower than the estimated value set forth in this Disclosure Statement depending upon many factors, including prevailing interest rates, markets for similar securities, industry conditions, and the performance of, and investor expectations for, the Reorganized Debtors.  Accordingly, holders of the New Common Interests and New Warrants may bear certain risks associated with holding securities for an indefinite period of time.

### ii.    *Potential Dilution*

The ownership percentage represented by the New Common Interests issued or deemed to be issued on the Effective Date under the Plan will be subject to dilution from the equity issued in connection with the New Warrants, the Equity Rights Offering, the MIP, and the conversion of any options, warrants, convertible securities, exercisable securities, or other securities that may be issued post-emergence.  In the future, similar to all companies, additional equity financings or other share issuances by any of the Reorganized Debtors could adversely affect the value of the New Common Interests issuable upon such conversion.  The amount and dilutive effect of any of the foregoing could be material.

### iii.    *Compliance with Terms of the Exit Facilities*

The Plan provides that the Debtors will enter into the Exit Facilities on the Effective Date.  The Debtors believe that they will have sufficient cash flow to make all required interest payments on the Exit Facilities.  If the Debtors' actual financial performance does not meet their cash flow projections, however, and if other sources of liquidity are not available, there is a risk that the Debtors might be unable to pay interest and principal payments on the Exit Facilities.  Additionally, the Exit Facilities will contain restrictive covenants that could limit the Debtors'

80

ability to operate their business flexibly, affecting strategic decisions, capital expenditures, and overall financial performance. Such covenants may include restrictions on incurring additional debt, granting liens, making certain acquisitions and investments, making certain dispositions, making dividends, stock repurchases and other restricted payments or engaging in specific transactions, which could impact the Company's growth and operational efficiency.

### iv. *Significant Holders*

Certain holders of First Lien Claims are expected to, or have the ability to, acquire a significant ownership interest in the New Common Interests pursuant to the Plan. Should these holders act collectively, these holders may, among other things, exercise a controlling influence over the Reorganized Debtors and have the power to elect directors and approve significant transactions. This concentration of ownership could also facilitate or hinder a negotiated change of control of the Reorganized Debtors and, consequently, have an impact upon the value of the New Common Interests. The significant ownership stake may allow these holders, should they act collectively, to appoint a majority of the board of directors, potentially influencing the Company's management and strategic direction. This could lead to changes in corporate governance practices, business strategies, and capital allocation policies that align with the interests of the major shareholders. The interests of these significant holders may not always align with those of other shareholders or the Reorganized Debtors, potentially leading to conflicts in decision-making. Lastly, this ownership structure could either attract potential acquirers due to the ease of negotiating with a small group of major shareholders or deter them if the Holders are not interested in selling their stakes.

### v. *Equity Interests Subordinated to Reorganized Debtors' Indebtedness*

In any subsequent liquidation, dissolution, or winding up of the Reorganized Debtors, the New Common Interests would rank below all debt claims against the Reorganized Debtors. As a result, holders of the New Common Interests will not be entitled to receive any payment or other distribution of assets upon the liquidation, dissolution, or winding up of the Reorganized Debtors until after all the Reorganized Debtors' debt obligations have been satisfied.

### vi. *Implied Value Not Intended to Represent Trading Value of New Common Interests*

The valuation of the Reorganized Debtors is not intended to represent the trading value of New Common Interests in private markets and is subject to additional uncertainties and contingencies, all of which are difficult to predict. Actual market prices of such securities at issuance will depend upon, among other things: (i) prevailing interest rates; (ii) conditions in the financial markets; (iii) the anticipated initial securities of creditors receiving New Common Interests under the Plan, some of which may prefer to liquidate their investment rather than hold it on a long-term basis; and (iv) other factors that generally influence the prices of securities. The actual market prices of the New Common Interests may be volatile. Many factors, including factors unrelated to the Reorganized Debtors' actual operating performance and other factors not possible to predict, could cause the market prices of the New Common Interests to rise and fall. Accordingly, the implied value, stated herein and in the Plan, of the securities to be issued does not necessarily reflect, and

should not be construed as reflecting, values that will be attained for the New Common Interests in private markets.

### vii.    *Certain Holders of Securities May Be Restricted in Their Ability to Transfer or Sell Their Securities*

To the extent that securities issued under the Plan are done so in reliance on the exemption from registration under section 1145(a)(1) of the Bankruptcy Code, such securities may be resold by the holders thereof without registration under the Securities Act unless the holder is an "underwriter," as defined in section 1145(b) of the Bankruptcy Code with respect to such securities.  Resales by holders of Claims who 1145 Securities pursuant to the Plan that are deemed to be "underwriters" would not be exempted by section 1145 of the Bankruptcy Code from registration under the Securities Act or applicable law.  In addition, certain securities under the Plan will be issued pursuant to other exemptions from the registration requirements of the Securities Act, including pursuant to section 4(a)(2) thereof and/or Regulation D promulgated thereunder, and such securities will be "restricted" securities under applicable securities laws, and subject to comparable restrictions on transferability.  Holders of securities not exempted by section 1145 of the Bankruptcy Code, including the foregoing restricted securities, would only be permitted to sell such securities without registration if they are able to comply with an applicable exemption from registration, including Rule 144 under the Securities Act.  Additionally, to the extent any holder is deemed an "affiliate" of the Reorganized Debtors, the resale of any securities issued under section 1145 of the Bankruptcy Code by that holder will be subject to the "control securities" restrictions of Rule 144 under the Securities Act.

The securities issued under the Plan will not initially be registered under the Securities Act or any state securities laws, and the Debtors make no representations regarding the right of any holder of such securities to freely resell such securities.

### viii.    *No Dividends*

Reorganized Parent does not anticipate paying any dividends on the New Common Interests as it expects to retain any future cash flows for debt reduction and to support its operations.  In addition, covenants in the documents governing the Reorganized Parent's indebtedness may restrict its ability to pay cash dividends and may prohibit the payment of dividends and certain other payments.  As a result, the success of an investment in the New Common Interests may depend entirely upon any future appreciation in the value of the New Common Interests.  There is, however, no guarantee that the New Common Interests will appreciate in value or even maintain their initial value.

### F.    Additional Factors

### i.    *Debtors Could Withdraw Plan*

Subject to the terms of, and without prejudice to, the rights of any party to the Restructuring Support Agreement, including consent rights contained therein, the Plan may be revoked or withdrawn prior to the Confirmation Date by the Debtors.

### ii.   *Debtors Have No Duty to Update*

The statements contained in this Disclosure Statement are made by the Debtors as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date.  The Debtors have no duty to update this Disclosure Statement unless otherwise ordered to do so by the Bankruptcy Court.

### iii.   *No Representations Outside this Disclosure Statement Are Authorized*

No representations concerning or related to the Debtors, the Chapter 11 Cases, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement.  Any representations or inducements made to secure your vote for acceptance or rejection of the Plan that are other than those contained in, or included with, this Disclosure Statement should not be relied upon in making the decision to vote to accept or reject the Plan.

### iv.   *No Legal or Tax Advice Is Provided by this Disclosure Statement*

The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each holder of a Claim or Interest should consult their own legal counsel and accountant as to legal, tax, and other matters concerning their Claim or Interest.  This Disclosure Statement is not legal advice to you.  This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan or object to confirmation of the Plan.

### v.   *No Admission Made*

Nothing contained herein or in the Plan will constitute an admission of, or will be deemed evidence of, the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests.

### vi.   *Certain Tax Consequences*

For a discussion of certain tax considerations to the Debtors and certain holders of Claims in connection with the implementation of the Plan, see Article IX hereof.

# XI.
## VOTING PROCEDURES AND REQUIREMENTS

Before voting to accept or reject the Plan, each holder of a Claim or Interest entitled to vote on the Plan (a "*Voting Party*") should carefully review the Plan attached hereto as **Exhibit A**. All descriptions of the Plan set forth in this Disclosure Statement are subject to the terms and conditions of the Plan. **This Disclosure Statement has not been approved by the Bankruptcy Court**.

### A.    Voting Procedures

Voting Parties in each Class should provide all of the information requested by the applicable Ballot, and should complete and return all Ballots received in accordance with the instructions provided.

### B.    Parties Entitled to Vote

Under the Bankruptcy Code, only holders of claims or interests in "impaired" classes are entitled to vote on a plan. Under section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or interest as it existed before the default.

If, however, the holder of an impaired claim or interest will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and interests do not actually vote on the plan. If a claim or interest is not impaired by the plan, the Bankruptcy Code presumes the holder of such claim or interest to have accepted the plan and, accordingly, holders of such claims and interests are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

The Claims in the following Classes are impaired under the Plan and entitled to vote to accept or reject the Plan:

- Class 3 — First Lien Claims;

- Class 4 — Second Lien Claims; and

- Class 5 — General Unsecured Claims.

Case No. 1:25-cv-00306-GPG-KAS    Document 42-2    filed 09/19/25    USDC Colorado
Case 25-90309   Document 120 Filed in TXSB on 09/04/25   Page 95 of 175
pg 96 of 176

C.    Voting Deadline

All Voting Parties have been sent a ballot to vote to accept or reject the Plan (the "***Ballot***") together with this Disclosure Statement.  Such Voting Parties should read the Ballot carefully and follow the instructions contained therein.  Please use only the Ballot that accompanies this Disclosure Statement to cast your vote.  Each Ballot contains detailed voting instructions and sets forth in detail, among other things, the deadlines, procedures, and instructions for voting to accept or reject the Plan, the Voting Record Date for voting purposes, and the applicable standards for tabulating Ballots.

Each Ballot also provides Voting Parties with the ability to opt out of certain of the releases contained in the Plan.  To the extent a Voting Party wishes to opt out of the identified releases, the Voting Party must check the box on the Ballot indicating such Voting Party is electing to opt out of the releases and follow the instructions on the applicable Ballot to properly submit their elections.

The Debtors have engaged Kurtzman Carson Consultants, LLC d/b/a Verita Global as their Solicitation Agent to assist in the transmission of voting materials and in the tabulation of votes with respect to the Plan.  **FOR YOUR VOTE TO BE COUNTED, YOUR BALLOT OR A MASTER BALLOT CAST ON YOUR BEHALF MUST BE RECEIVED BY THE SOLICITATION AGENT ON OR BEFORE THE VOTING DEADLINE OF 4:00 P.M. (CENTRAL TIME) ON NOVEMBER 7, 2025, UNLESS EXTENDED BY THE DEBTORS.**

IF A BALLOT IS DAMAGED OR LOST, YOU MAY CONTACT THE SOLICITATION AGENT AT THE NUMBER SET FORTH BELOW TO RECEIVE A REPLACEMENT BALLOT. ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE A VOTE FOR ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED.

IF YOU HAVE ANY QUESTIONS CONCERNING VOTING PROCEDURES, YOU MAY CONTACT THE SOLICITATION AGENT AT:

**E-mail**: **ModivCareInfo@veritaglobal.com (with a reference to "ModivCare Solicitation Inquiry" in the subject line**)

Additional copies of this Disclosure Statement, the Plan, and the Plan Supplement (when filed) are available upon written request made to the Solicitation Agent, at the e-mail address set forth immediately above or at the following address:

**ModivCare Inc.**
**c/o Verita Ballot Processing Center**
**222 N. Pacific Coast Highway, Suite 300**
**El Segundo, CA 90245**

**ANY BALLOT THAT IS EXECUTED AND RETURNED BUT WHICH DOES NOT INDICATE EITHER AN ACCEPTANCE OR REJECTION OF THE PLAN WILL NOT BE COUNTED. OTHER THAN A CLASS 4 MASTER BALLOT OR A CLASS 5 MASTER BALLOT, ANY BALLOT THAT INDICATES BOTH AN ACCEPTANCE AND A REJECTION OF THE PLAN WILL NOT BE COUNTED.  THE DEBTORS, IN THEIR SOLE DISCRETION, MAY REQUEST THAT THE SOLICITATION AGENT ATTEMPT TO CONTACT SUCH VOTERS TO CURE ANY SUCH DEFECTS IN THE BALLOTS.  THE FAILURE TO VOTE DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.  AN OBJECTION TO THE CONFIRMATION OF THE PLAN, EVEN IF TIMELY SERVED, DOES NOT CONSTITUTE A VOTE TO ACCEPT OR REJECT THE PLAN.**

> D.      Notice of Non-Voting Status

Holders of Claims in Class 1 and Class 2 are Unimpaired and presumed to accept the Plan.  Holders of Claims in Class 7 and Interests in Class 9 are Impaired and deemed to reject the Plan. Holders of Claims in Class 6 and Class 8 are Affiliates and will be Unimpaired and presumed to accept the Plan.[10]  Accordingly, Holders of Claims and Interests in Classes 1, 2, 7, and 9 will receive a notice informing them of their non-voting status (the "***Notice of Non-Voting Status***").  The Debtors are requesting a waiver of any requirement to provide Holders of Claims and Interests in Class 6 and Class 8 a Notice of Non-Voting Status or any other solicitation materials.

> E.      Release Opt-Out Form

Together with the Notice of Non-Voting Status, Holders of Claims and Interests in Classes 1, 2, 7, and 9 will receive a form to complete and return if the party elects to opt out of the releases contemplated by the Plan ("***Release Opt-Out Form***").  To the extent a Holder of Claims and Interests in Class 1, 2, 7, and 9 wishes to elect to opt-out of the releases, such Holder must return the Release Opt-Out Form, with the box checked indicating such Holder is electing to opt-out of the releases, to the Solicitation Agent **before 4:00 p.m**. (**prevailing Central Time**) **on November 7, 2025**.

> F.      Further Information, Additional Copies

If you have any questions or require further information about the voting procedures for voting your Claim, or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits to such documents, please contact the Solicitation Agent.

---

[10]    The Debtors have asked the Bankruptcy Court to waive the bankruptcy notice requirement with respect to Class 6 – Intercompany Claims and Class 8 – Intercompany Interests to relieve the Debtors of the need to serve a Notice of Non-Voting Status or any other type of notice in connection with the Plan on holders of such Claims and Interests.

# XII.
# CONFIRMATION OF PLAN

A.    Confirmation Hearing

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court to hold a confirmation hearing upon appropriate notice to all required parties.  Notice of the Confirmation Hearing will be provided to all known creditors and equity holders or their representatives.  The Confirmation Hearing may be adjourned from time to time by the Bankruptcy Court without further notice except for the announcement of the continuation date made at the Confirmation Hearing, at any subsequent continued Confirmation Hearing, or pursuant to a notice filed on the docket for the Chapter 11 Cases.

B.    Objections to Confirmation

Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to the confirmation of a plan.  Any objection to confirmation of the Plan must (i) be in writing; (ii) conform to the applicable Bankruptcy Rules and the Bankruptcy Local Rules; (iii) set forth the name of the objecting party, the basis for the objection, and the specific grounds thereof; (iv) include proposed language that if included in the Plan would remedy the matters set forth in the objection; and (v) be filed with the Court, together with proof of service.  In addition to being filed with the Court, any such responses or objections must be served on the following parties so as to be received by November 7, 2025 at 4:00 p.m. (prevailing Central Time):

(a)    **Debtors** at
ModivCare Inc.,
6900 E. Layton Avenue, Suite 1100 & 1200
Denver, CO 80237
Attn:   Faisal Khan (Faisal.Khan@modivcare.com)


 (b)    **Counsel to Debtors** at
Latham & Watkins LLP
1271 Avenue of the Americas
New York, New York 10020
Attn: Ray C. Schrock (Ray.Schrock@lw.com)
        Keith A. Simon (Keith.Simon@lw.com)
        George Klidonas (George.Klidonas@lw.com)
        Jonathan J. Weichselbaum
        (Jon.Weichselbaum@lw.com)

and

Hunton Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, Texas 77002
Attn: Timothy A. ("Tad") Davidson II (TadDavidson@hunton.com)

Catherine A. Rankin (CRankin@hunton.com)
Brandon Bell (BBell@hunton.com)

**Office of U.S. Trustee** at
Office of the United States Trustee for the Southern District of Texas
515 Rusk Street, Suite 3516
Houston, Texas 77002
Attn: Jana Whitworth (Jana.Whitworth@usdoj.gov)
    Andrew Jimenez (andrew.jimenez@usdoj.gov)

(a)   **Counsel to the First Lien Agent, the Consenting Creditors, the DIP Lenders, and the DIP Agent** at
Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Attn: Kris Hansen (krishansen@paulhastings.com)
    Matt Warren (mattwarren@paulhastings.com)
    Lindsey Henrikson (lindsey.henrikson@paulhastings.com)

---

**IF AN OBJECTION TO CONFIRMATION IS NOT TIMELY SERVED AND FILED BY NOVEMBER 7, 2025 AT 4:00 P.M. (PREVAILING CENTRAL TIME), IT MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

---

C.   Requirements for Confirmation of Plan

i.   *Requirements of Section 1129(a) of Bankruptcy Code*

At the Confirmation Hearing, the Bankruptcy Court will determine whether the confirmation requirements specified in section 1129(a) of the Bankruptcy Code have been satisfied, including whether:

(a)   the Plan complies with the applicable provisions of the Bankruptcy Code;

(b)   the Debtors have complied with the applicable provisions of the Bankruptcy Code;

(c)   the Plan has been proposed in good faith and not by any means forbidden by law;

(d)   any payment made or promised by the Debtors, for services or for costs and expenses in or in connection with the Chapter 11 Cases, or in connection with the Plan and incident to the Chapter 11 Cases, has been disclosed to the Bankruptcy Court, and any such payment made before

88

confirmation of the Plan is reasonable, or if such payment is to be fixed after confirmation of the Plan, such payment is subject to the approval of the Bankruptcy Court as reasonable;

(e) the Debtors have disclosed, to the extent known, the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director or officer of the Reorganized Debtors, an affiliate of the Debtors participating in the Plan with the Debtors, or a successor to the Debtors under the Plan, and the appointment to, or continuance in, such office of such individual is consistent with the interests holders of Claims and Interests and with public policy, and the Debtors have disclosed the identity of any insider who will be employed or retained by the Reorganized Debtors, and the nature of any compensation for such insider;

(f) with respect to each Class of Claims or Interests, each holder of an Impaired Claim or Interest has either accepted the Plan or will receive or retain under the Plan, on account of such holder's Claim, property of a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtors were liquidated on the Effective Date of the Plan under chapter 7 of the Bankruptcy Code;

(g) except to the extent the Plan meets the requirements of section 1129(b) of the Bankruptcy Code (as discussed further below), each Class of Claims or Interests either accepted the Plan or is not impaired under the Plan;

(h) except to the extent that the holder of a particular Claim has agreed to a different treatment of such Claim, the Plan provides that Administrative Expense Claims, Other Priority Claims, and Priority Tax Claims will be paid in full or receive such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code;

(i) at least one Class of impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any insider holding a Claim in such Class;

(j) confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan; and

(k)    all fees payable under section 1930 of title 28, as determined by the Bankruptcy Court at the Confirmation Hearing, have been paid or the Plan provides for the payment of all such fees on the Effective Date of the Plan.

As provided above, among the requirements for confirmation are that the Plan is: (A) accepted by all impaired Classes of Claims and Interests entitled to vote or, if rejected or deemed rejected by an impaired Class, that the Plan "does not discriminate unfairly" and is "fair and equitable" as to such Class; (B) in the "best interests" of the holders of Claims and Interests impaired under the Plan; and (C) feasible.

### ii.    *Acceptance of Plan*

Under the Bankruptcy Code, a class accepts a chapter 11 plan if (i) holders of two-thirds (2/3) in amount and (ii) with respect to holders of claims, more than a majority in number of the allowed claims in such class (other than those designated under section 1126(e) of the Bankruptcy Code) vote to accept the plan.  Holders of Claims or Interests that fail to vote are not counted in determining the thresholds for acceptance of the plan.

If any impaired Class of Claims or Interests does not accept the Plan, the Bankruptcy Court may still confirm the Plan at the request of the Debtors if at least one Class of Claims has accepted the Plan and, as to each Impaired Class of Claims or Interests that has not accepted the Plan (or is deemed to reject the Plan), the Plan "does not discriminate unfairly" and is "fair and equitable" under the so-called "cramdown" provisions set forth in section 1129(b) of the Bankruptcy Code. The "unfair discrimination" test applies to classes of claims or interests that are of equal priority and are receiving different treatment under the plan.  A chapter 11 plan does not discriminate unfairly, within the meaning of the Bankruptcy Code, if the legal rights of a dissenting class are treated in a manner consistent with the treatment of other classes whose legal rights are substantially similar to those of the dissenting class and if no class of claims or interests receives more than it legally is entitled to receive for its claims or interests.  The test does not require that the treatment be the same or equivalent, but that such treatment be "fair."  The "fair and equitable" test applies to classes of different priority and status (e.g., secured versus unsecured; claims versus interests) and includes the general requirement that no class of claims receive more than 100% of the allowed amount of the claims in such class.  As to a dissenting class, if any, the test sets different standards that must be satisfied for the plan to be confirmed, depending on the type of claims or interests in such class.  The following sets forth the "fair and equitable" test that must be satisfied as to each type of class for a plan to be confirmed if such class rejects the plan:

- **Secured Creditors**.  Each holder of an impaired secured claim either (a) retains its liens on the property, to the extent of the allowed amount of its secured claim, and receives deferred cash payments having a value, as of the effective date of the plan, of at least the allowed amount of such secured claim, (b) has the right to credit bid the amount of its claim if its property is sold and retains its lien on the proceeds of the sale, or (c) receives the "indubitable equivalent" of its allowed secured claim.

- **Unsecured Creditors**.  Either (a) each holder of an impaired unsecured claim receives or retains under the Plan, property of a value, as of the effective date of the

Plan, equal to the amount of its allowed claim or (b) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- **Interests**.  Either (a) each equity interest holder will receive or retain under the plan property of a value equal to the greater of (i) the fixed liquidation preference or redemption price, if any, of such equity interest and (ii) the value of the equity interest or (b) the holders of interests that are junior to the interests of the dissenting class will not receive or retain any property under the plan.

The Debtors believe the Plan satisfies the "fair and equitable" requirement with respect to any rejecting Class.

**IF ALL OTHER CONFIRMATION REQUIREMENTS ARE SATISFIED AT THE CONFIRMATION HEARING, THE DEBTORS WILL ASK THE BANKRUPTCY COURT TO RULE THAT THE PLAN MAY BE CONFIRMED ON THE GROUND THAT THE SECTION 1129(b) REQUIREMENTS HAVE BEEN SATISFIED**.

### iii.    *Best Interests Test*

As noted above, with respect to each impaired class of claims and equity interests, confirmation of a plan requires that each such holder either: (a) accept the plan; or (b) receive or retain under the plan property of a value, as of the effective date of the plan, that is not less than the value such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  This requirement is referred to as the "best interests test."

This test requires a bankruptcy court to determine what the holders of allowed claims and allowed equity interests in each impaired class would receive from a liquidation of the debtor's assets and properties in the context of a liquidation under chapter 7 of the Bankruptcy Code.  To determine if a plan is in the best interests of each impaired class, the value of the distributions from the proceeds of the liquidation of the debtor's assets and properties (after subtracting the amounts attributable to the aforesaid claims) is then compared with the value offered to such classes of claims and equity interests under the plan.

Under the Plan, all holders of Impaired Claims and Interests will receive property with a value not less than the value such holder would receive in a liquidation under chapter 7 of the Bankruptcy Code.  This conclusion is based primarily on: (a) consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Interests; and (b) the Liquidation Analysis attached hereto as **Exhibit C**.

Any liquidation analysis is speculative, as it is necessarily premised on assumptions and estimates that are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  The Liquidation Analysis provided in **Exhibit C** is solely for the purpose of disclosing to holders of Claims and Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.  There can be no assurance as to values that would actually be realized in a chapter 7 liquidation nor can there be any assurance

that a bankruptcy court will accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(7) of the Bankruptcy Code.

### iv.     *Feasibility*

Section 1129(a)(11) of the Bankruptcy Code requires that a debtor demonstrate that confirmation of a plan is not likely to be followed by liquidation or the need for further financial reorganization. For purposes of determining whether the Plan meets this requirement, the Debtors have analyzed their ability to meet their obligations under the Plan.  As part of this analysis, the Debtors have prepared the consolidated financial projections for the Reorganized Debtors (collectively with the reserve information, development of schedules, and financial information, the "*Financial Projections*") for fiscal years 2026 through 2029.  The Financial Projections, and the assumptions on which they are based, are attached hereto as **Exhibit D**.  Based upon such Financial Projections, the Debtors conclude they will have sufficient resources to make all payments required pursuant to the Plan and that confirmation of the Plan is not likely to be followed by liquidation or the need for further reorganization.  Moreover, Article IX hereof sets forth certain risk factors that could impact the feasibility of the Plan.

The Financial Projections assume that the Plan will be consummated in accordance with its terms and that all transactions contemplated by the Plan will be consummated on or prior to [ ● ] (the "*Effective Date*").  Any significant delay in the Effective Date may have a significant negative impact on the operations and financial performance of the Debtors including, but not limited to, an increased risk or inability to meet forecasts and the incurrence of higher reorganization expenses.

The Debtors do not, as a matter of course, publish their business plans or strategies, projections or anticipated financial position.  Accordingly, the Debtors do not anticipate that they will, and disclaim any obligation to, furnish updated business plans or Financial Projections to parties in interest after the Confirmation Date or otherwise make such information public.  In connection with the planning and development of the Plan, the Financial Projections were prepared by the Debtors, with the assistance of their professionals, to present the anticipated impact of the Plan. The Financial Projections assume that the Plan will be implemented in accordance with its stated terms.  The Financial Projections are based on forecasts of key economic variables and may be significantly impacted by business, industry, regulatory, market and financial uncertainties and contingencies, and a variety of other factors.

Consequently, the estimates and assumptions underlying the Financial Projections are inherently uncertain and are subject to material business, economic, and other uncertainties.  Therefore, such Financial Projections, estimates, and assumptions are not necessarily indicative of current values or future performance, which may be significantly less or more favorable than set forth herein.

The Financial Projections should be read in conjunction with the assumptions, qualifications, and explanations set forth in this Disclosure Statement, the Plan, and the Plan Supplement, in their entirety, and the historical consolidated financial statements (including the notes and schedules thereto).

# XIII.
## ALTERNATIVES TO CONFIRMATION
## AND CONSUMMATION OF PLAN

The Debtors have evaluated several alternatives to the Plan. After studying these alternatives, the Debtors have concluded that the Plan is the best alternative and will maximize recoveries to parties in interest, assuming confirmation and consummation of the Plan. If the Plan is not confirmed and consummated, the alternatives to the Plan are (i) the preparation and presentation of an alternative reorganization, (ii) a sale of some or all of the Debtors' assets pursuant to section 363 of the Bankruptcy Code, or (iii) a liquidation under chapter 7 of the Bankruptcy Code.

### A.    Alternative Plan of Reorganization

If the Plan is not confirmed, the Debtors (or if the Debtors' exclusive period in which to file a plan of reorganization has expired, any other party in interest) could attempt to formulate a different plan. Such a plan might involve either (i) a reorganization and continuation of the Debtors' business or (ii) an orderly liquidation of their assets. The Debtors, however, believe that the Plan, as described herein, enables their stakeholders to realize the most value under the circumstances. In addition, if the Plan is not confirmed pursuant to the terms of the Restructuring Support Agreement, the Consenting Creditors have the right to terminate the Restructuring Support Agreement (and all obligations thereunder) either in its entirety or as to themselves only, as applicable.

### B.    Sale Under Section 363 of the Bankruptcy Code

If the Plan is not confirmed, the Debtors could seek from the Bankruptcy Court, after notice and hearing, authorization to sell their assets under section 363 of the Bankruptcy Code. Holders of Allowed Claims in Class 3 would be entitled to credit bid on any property to which their security interest is attached to the extent of the value of such security interest, and to offset their Claims against the purchase price of the property. In addition, the security interests in the Debtors' assets held by Holders of Claims in Class 3 would attach to the proceeds of any sale of the Debtors' assets to the extent of their secured interests therein. Upon analysis and consideration of this alternative, the Debtors do not believe a sale of their assets under section 363 of the Bankruptcy Code would yield a higher recovery for the holders of Claims and Interests under the Plan.

### C.    Liquidation under Chapter 7 of Bankruptcy Code

If no plan can be confirmed, the Chapter 11 Cases may be converted to cases under chapter 7 of the Bankruptcy Code in which a trustee would be elected or appointed to liquidate the assets of the Debtors for distribution to their creditors in accordance with the priorities established by the Bankruptcy Code. The effect that a chapter 7 liquidation would have on the recovery of holders of Allowed Claims and Interests is set forth in the Liquidation Analysis attached hereto as **Exhibit C**.

The Debtors believe that liquidation under chapter 7 would result in smaller distributions to creditors than those provided for in the Plan because of, among other things, the delay resulting from the conversion of the Chapter 11 Cases, the additional administrative expenses associated with the appointment of a trustee and the trustee's retention of professionals who would be required

to become familiar with the many legal and factual issues in the Chapter 11 Cases, and the loss in value attributable to an expeditious liquidation of the Debtors' assets as required by chapter 7.

[*Remainder of page intentionally left blank.*]

94

# XIV.
## CONCLUSION AND RECOMMENDATION

The Debtors believe the Plan is in the best interests of all stakeholders and urge the holders of Claims in Classes 3, 4, and 5 to vote in favor thereof.

Dated:     September 4, 2025

Respectfully submitted,


By:       */s/ Chad J. Shandler*
Name:    Chad J. Shandler
Title:     Chief Transformation Officer

On behalf of ModivCare Inc. and its Debtor Affiliates

*Signature Page for Disclosure Statement for Joint Prearranged Chapter 11 Plan of*
*Reorganization of ModivCare Inc. and its Debtor Affiliates*

**Exhibit A**

Plan

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| ------------------------------------------------------------ | x | |
| | : | |
| In re: | : | Chapter 11 |
| | : | |
| MODIVCARE INC., *et al.*, | : | Case No. 25-90309 |
| | : | |
| Debtors.[1] | : | (Jointly Administered) |
| | : | |
| ------------------------------------------------------------ | x | |

**JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF MODIVCARE INC. AND ITS DEBTOR AFFILIATES**

**HUNTON ANDREWS KURTH LLP**
Timothy A. ("Tad") Davidson II (Texas Bar No. 24012503)
Catherine A. Rankin (Texas Bar No. 24109810)
Brandon Bell (Texas Bar No. 24127019)
600 Travis Street, Suite 4200
Houston, TX 77002
Telephone:  (713) 220-4200
Email:   taddavidson@hunton.com
        crankin@hunton.com
        bbell@hunton.com

**LATHAM & WATKINS LLP**
Ray C. Schrock (NY Bar No. 4860631)
Keith A. Simon (NY Bar No. 4636007)
George Klidonas (NY Bar No. 4549432)
Jonathan J. Weichselbaum (NY Bar No. 5676143)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
Email:   ray.schrock@lw.com
        keith.simon@lw.com
        george.klidonas@lw.com
        jon.weichselbaum@lw.com

*Proposed Counsel for the Debtors
and Debtors in Possession*

Dated:   September 4, 2025
        Houston, Texas

---

[1]   A complete list of each of the Debtors in the Chapter 11 Cases and the last four digits of each Debtor's taxpayer identification number (if applicable) may be obtained on the website of the Debtors' proposed claims and noticing agent at https://www.veritaglobal.net/ModivCare.  Debtor ModivCare Inc.'s principal place of business and the Debtors' service address in the Chapter 11 Cases is 6900 E. Layton Avenue, Suite 1100 & 1200, Denver, Colorado 80237.

**JOINT CHAPTER 11 PLAN OF
REORGANIZATION OF MODIVCARE INC. AND ITS DEBTOR AFFILIATES**

ModivCare Inc. and each of the other debtors and debtors-in-possession in the above-captioned cases (collectively, the "*Debtors*") jointly propose this Plan for the treatment and resolution of the outstanding Claims against, and Interests in, the Debtors.  Capitalized terms used shall have the meanings ascribed to such terms in Article I.A unless defined elsewhere in this Plan.

Other than with respect to Debtor ModivCare Inc., the Plan provides for the substantive consolidation of all of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan distributions.  The Debtors seek to consummate the Restructuring Transactions on the Effective Date.  Each Debtor is a proponent of this Plan within the meaning of section 1129 of the Bankruptcy Code.

This Plan shall be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019.

Reference is made to the Disclosure Statement for a discussion of the Debtors' history, businesses, results of operations, historical financial information, projections, and future operations, as well as a summary and analysis of this Plan and certain related matters, including distributions to be made under this Plan.  There also are other agreements and documents, which shall be Filed with the Bankruptcy Court, that are referenced in this Plan, the Plan Supplement, or the Disclosure Statement as exhibits and schedules.  All such exhibits and schedules are incorporated into and are a part of this Plan as if set forth in full herein.  Subject to certain restrictions and requirements set forth in 11 U.S.C. § 1127, Fed. R. Bankr. P. 3019, and the terms and conditions set forth in the Restructuring Support Agreement and this Plan, the Debtors reserve the right to alter, amend, modify, revoke, or withdraw this Plan before its substantial consummation.

> **ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THIS PLAN ARE ENCOURAGED TO READ THIS PLAN AND THE DISCLOSURE STATEMENT IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THIS PLAN.**

# ARTICLE I.

## DEFINITIONS AND INTERPRETATION.

### A.      Definitions.

The following terms shall have the respective meanings specified below:

"*Administrative Claim*" means a Claim for costs and expenses of administration of the Chapter 11 Cases pursuant to sections 503(b), 507(a)(2), 507(b), or 1114(e)(2) of the Bankruptcy Code, including, without limitation:  (a) the actual and necessary costs and expenses incurred on or after the Petition Date until and including the Effective Date of preserving the Estates and operating businesses, including fees and expenses Allowed by the Bankruptcy Court as compensation for services rendered or reimbursement of expenses incurred through and including the Effective Date under sections 330, 331, 503(b)(2), 503(b)(3), 503(b)(4), or 503(b)(5) of the Bankruptcy Code; and (b) all fees and charges assessed against the Estates pursuant to section 1930 of chapter 123 of title 28 of the United States Code.

"*Affiliate*" shall, with respect to an Entity, have the meaning set forth in section 101(2) of the Bankruptcy Code as if such Entity were a debtor in a case under the Bankruptcy Code.

"*Allowed*" means, with reference to any Claim or Interest, (a) any Claim or Interest arising on or before the Effective Date (i) as to which no objection to allowance, priority, or secured status, and no request for estimation or other challenge, including, without limitation, pursuant to section 502(d) of the Bankruptcy Code or otherwise, has been interposed prior to the Effective Date, or (ii) as to which any objection has been determined by a Final Order to the extent such objection is determined in favor of the respective Holder, (b) any Claim or Interest that is compromised, settled, or otherwise resolved pursuant to the authority of the Debtors or Reorganized Debtors, as applicable, (c) any Claim or Interest as to which the liability of the Debtors or Reorganized Debtors, as applicable, and the amount thereof are determined by a Final Order of a court of competent jurisdiction other than the Bankruptcy Court, or (d) any Claim or Interest expressly allowed hereunder; *provided*, *however*, that notwithstanding the foregoing, (x) unless expressly waived by this Plan (including as to the First Lien Claims and the Second Lien Claims), the Allowed amount of Claims or Interests shall be subject to and shall not exceed the limitations under or maximum amounts permitted by the Bankruptcy Code, including sections 502 or 503 of the Bankruptcy Code, to the extent applicable, and (y) the Reorganized Debtors shall retain all claims and defenses with respect to Allowed Claims that are Reinstated or otherwise Unimpaired pursuant to the Plan.

"*Asset*" means all rights, title, and interests of the Debtors or Reorganized Debtors, as applicable, in and to property of whatever type or nature, including real, personal, mixed, intellectual, tangible, and intangible property.

"*Avoidance Action*" means any and all actual or potential avoidance, recovery, subordination, or similar actions or remedies that may be brought by or on behalf of the Debtors or the Estates under the Bankruptcy Code or applicable non-bankruptcy law, including actions or remedies arising under chapter 5 and section 724(a) of the Bankruptcy Code or under similar or related local, state, federal, or foreign statutes and common law, including fraudulent transfer laws, fraudulent conveyance laws, or other similar related laws, in each case whether or not litigation to prosecute such Claim(s) and Cause(s) of Action was commenced prior to the Effective Date.

"*Bankruptcy Code*" means title 11 of the United States Code, 11 U.S.C. § 101, et seq., as amended from time to time, as applicable to the Chapter 11 Cases.

"**Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of Texas, Houston Division, or such other court having jurisdiction over the Chapter 11 Cases.

"**Bankruptcy Rules**" means the Federal Rules of Bankruptcy Procedure as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code and any Local Bankruptcy Rules of the Bankruptcy Court, in each case, as amended from time to time and applicable to the Chapter 11 Cases.

"**Business Day**" means any day, other than a Saturday, Sunday, "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)), or any other day on which banking institutions in New York, New York are required or authorized by law or executive order to close by law or executive order.

"**Cash**" means cash in legal tender of the United States of America and cash equivalents, including bank deposits, checks, and other similar items.

"**Cash Collateral**" shall have the meaning set forth in the DIP Orders.

"**Causes of Action**" means any action, claim, cross-claim, third-party claim, cause of action, controversy, dispute, proceeding, demand, right, lien, indemnity, contribution, guaranty, suit, obligation, liability, loss, debt, fee or expense, damage, interest, judgment, cost, account, defense, remedy, offset, power, privilege, proceeding, license and franchise of any kind or character whatsoever, known, unknown, foreseen or unforeseen, existing or hereafter arising, contingent or non-contingent, matured or unmatured, suspected or unsuspected, liquidated or unliquidated, Disputed or undisputed, secured or unsecured, assertable directly or derivatively (including any alter ego theories), choate, inchoate, reduced to judgment or otherwise whether arising before, on, or after the Petition Date, in contract or in tort, in law or in equity or pursuant to any other theory of law (including under any state or federal Securities laws).  Causes of Action also includes: (a) any right of setoff, counterclaim or recoupment and any claim for breach of contract or for breach of duties imposed by law or in equity; (b) the right to object to Claims or Interests; (c) any claim pursuant to section 362 or chapter 5 of the Bankruptcy Code; (d) any claim or defense including fraud, mistake, duress and usury and any other defenses set forth in section 558 of the Bankruptcy Code; (e) any state law fraudulent transfer claim; and (f) any Avoidance Actions.

"**Chapter 11 Cases**" means (a) when used with reference to a particular Debtor, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court, and (b) when used with reference to all Debtors, the jointly administered cases under chapter 11 of the Bankruptcy Code commenced by the Debtors in the Bankruptcy Court.

"**Claim**" means (a) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured, or (b) a right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured, each as set forth in section 101(5) of the Bankruptcy Code.

"**Class**" means any group of Claims or Interests classified as set forth in <u>Article III</u> of this Plan pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.

"**Collateral**" means any Asset of an Estate that is subject to a Lien securing the payment or performance of a Claim, which Lien is not invalid and has not been avoided under the Bankruptcy Code or applicable non-bankruptcy law, and any Security as such term is defined in section 101(49) of the Bankruptcy Code.

"***Conditions Precedent***" has the meaning set forth in <u>Article IX</u> of this Plan.

"***Confirmation***" means the Bankruptcy Court's entry of the Confirmation Order on the docket of the Chapter 11 Cases.

"***Confirmation Date***" means the date upon which Confirmation occurs.

"***Confirmation Hearing***" means the hearing to be held by the Bankruptcy Court pursuant to sections 105(d)(2)(B)(vi) and 1128 of the Bankruptcy Code to consider (a) final approval of the Disclosure Statement under sections 1125 and 1126(b) of the Bankruptcy Code (if not previously approved on a final basis) and (b) Confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

"***Confirmation Order***" means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code, and if not previously approved, approving the Disclosure Statement on a final basis pursuant to section 1125 of the Bankruptcy Code.

"***Consenting Creditors***" means, collectively, the Consenting First Lien Lenders, the Consenting Second Lien Noteholders, and any other person who executes or is required to execute a joinder to the Restructuring Support Agreement in accordance with the terms thereof.

"***Consenting First Lien Lenders***" means the Initial Consenting First Lien Lenders together with any First Lien Lender that subsequently becomes a party to the Restructuring Support Agreement as a "Consenting First Lien Lender" thereunder.

"***Consenting Second Lien Noteholders***" means the Holders of Second Lien Claims that are party to the Restructuring Support Agreement together with any Holder of Second Lien Claims that subsequently becomes a party to the Restructuring Support Agreement as a "Consenting Second Lien Noteholder" thereunder.

"***Corporate Governance Documents***" means, with respect to any Person other than a natural person, the organizational and corporate governance documents for each such Person including limited liability company agreements, operating agreements, certificates of incorporation, certificates of formation, certificates of limited partnership, articles of organization (or equivalent organizational documents), warrant agreements, certificates of designation for preferred stock or other forms of preferred equity, by-laws, partnership agreements, shareholders' agreements, members' agreement, or equivalent governing documents.

"***Cure Claim***" means a Claim based upon a Debtor's defaults (unless such defaults, or the Claim arising as a result of such defaults, are waived or modified by the applicable counterparty) under an Executory Contract or an Unexpired Lease assumed by such Debtor under section 365 of the Bankruptcy Code, other than a default that is not required to be cured pursuant to section 365(b)(2) of the Bankruptcy Code.

"***D&O Policy***" means, collectively, all insurance policies (including any "tail policy") issued or providing coverage to any of the Debtors for current or former directors', managers', and officers' liability, and all agreements, documents, or instruments related thereto.

"***Debtor***" or "***Debtors***" has the meaning set forth in the introductory paragraph of this Plan.

"***Debtor Release***" means the releases set forth in <u>Article X</u>, <u>Section 10.6(a)</u>.

"***Definitive Documents***" means, collectively, all documents and agreements governing the Restructuring Transactions and shall include all documents necessary or reasonably desirable to implement the Restructuring Transactions, including, but not limited to: (a) this Plan and the Plan Supplement; (b) the Disclosure Statement and the Solicitation Packages and exhibits related thereto; (c) the Solicitation Procedures Order; (d) the Confirmation Order; (e) the Exit Facilities Documents; (f) the New Warrants Agreement; (g) the New Corporate Governance Documents; (h) the Equity Rights Offering Documents; (i) the DIP Backstop Commitment Letters; (j) the New Common Interests Documents; (k) the DIP Documents; and (l) any other agreement, document, instrument, material pleading and/or order entered into, or utilized, in connection with or to implement the Restructuring Transaction (together with any exhibit, amendment, modification or supplement thereto), in each case, consistent with the Restructuring Support Agreement.

"***DIP Agent***" means the "Administrative Agent" and the "Collateral Agent" (each, as defined in the DIP Credit Agreement), solely in its capacity as administrative agent and collateral agent under the DIP Credit Agreement, its successors, assigns, or any replacement agent appointed pursuant to the terms of the DIP Credit Agreement.

"***DIP Backstop Commitment Letters***" means those certain backstop commitment letters entered into by the Debtors and the Backstop Parties (as defined in the Restructuring Support Agreement).

"***DIP Backstop Commitment Parties***" means the DIP Backstop Commitment Parties as defined in the DIP Backstop Commitment Letters.

"***DIP Backstop Premium***" means the DIP Backstop Commitment Parties' backstop premium, received by the DIP Backstop Commitment Parties in the allocations set forth in their respective DIP Backstop Commitment Letters, which premium shall be payable on the Effective Date, in full in-kind in the form of New Common Interests equal to 20% of the aggregate New Common Interests, subject to dilution by the MIP, the New Warrants, and the New Common Interests issued pursuant to the Equity Rights Offering.

"***DIP Claims***" means all Claims held by the DIP Lenders or the DIP Agent on account of, arising under, or relating to the DIP Credit Agreement, the DIP Facility, or the DIP Orders, including Claims for all principal amounts outstanding, and any and all fees, interest, expenses, indemnification obligations, reimbursement obligations, and other amounts due under the DIP Documents.

"***DIP Credit Agreement***" means that certain Superpriority Secured Debtor In Possession Credit Agreement dated as of August 22, 2025 and entered into by and among ModivCare, as borrower, the guarantors party thereto, the DIP Agent, and lenders party thereto (as may be amended, restated, amended and restated, supplemented or otherwise modified from time to time in accordance with its terms).

"***DIP Documents***" means the DIP Credit Agreement, the other "Loan Documents" as defined in the DIP Credit Agreement, and the DIP Backstop Commitment Letters, in each case as amended, amended and restated, supplemented or otherwise modified from time to time in accordance with the terms thereof prior to the Effective Date.

"***DIP Facility***" means the debtor-in-possession financing facility provided by the DIP Lenders.

"***DIP Lenders***" means the lenders party to the DIP Credit Agreement from time to time.

"***DIP Loans***" means the loans extended under the DIP Facility.

4

"***DIP Orders***" means, collectively, the Interim DIP Order and the Final DIP Order.

"***Disclosure Statement***" means the disclosure statement in respect of this Plan, including all exhibits, schedules, supplements, modifications, amendments, annexes and attachments thereto, as approved or ratified by the Bankruptcy Court pursuant to sections 1125 and 1126 of the Bankruptcy Code.

"***Disputed***" means with respect to a Claim: (a) any Claim, which is disputed under Article VII of this Plan or as to which the Debtors have interposed and not withdrawn an objection or request for estimation that has not been determined by a Final Order; (b) any Claim, proof of which was required to be timely and proper but as to which no such Proof of Claim was Filed; (c) any Claim that is listed in the Schedules, if any are Filed, as unliquidated, contingent, or disputed, and as to which no request for payment or Proof of Claim has been Filed; or (d) any Claim that is otherwise disputed by any of the Debtors or the Reorganized Debtors in accordance with applicable law or contract, which dispute has not been withdrawn, resolved or overruled by a Final Order.  To the extent the Debtors dispute only the amount of a Claim, such Claim shall be deemed Allowed in the amount the Debtors do not dispute, if any, and Disputed as to the balance of such Claim.

"***Distribution Agent***" means any Entity (including any applicable Debtor or Reorganized Debtor, as applicable, if it acts in such capacity) in its capacity as a Distribution Agent under Article VI of this Plan.

"***Distribution Record Date***" means the Effective Date, or such other time as designated by the Debtors with the consent of the Required Consenting First Lien Lenders.

"***DTC***" means The Depository Trust Company.

"***Effective Date***" means the date on which (a) no stay of the Confirmation Order is in effect, (b) each of the conditions precedent set forth in Article IX of this Plan have been satisfied or waived in accordance with the terms of Article IX, and (c) the Debtors File a notice declaring the Plan effective. Without limiting the foregoing, any action to be taken on the Effective Date may be taken on or as soon as reasonably practicable after the Effective Date.

"***Election Procedures***" means the procedures with respect to the Equity Option (including limitations with respect thereto) to be set forth in the Plan Supplement, in form and substance acceptable to the Required Consenting First Lien Lenders.

"***Eligible Holder***" means a Holder of an Allowed General Unsecured Claim that is an Accredited Investor (as defined in Rule 501 under the Securities Act) or Qualified Institutional Buyer (as defined in Rule 144A under the Securities Act).

"***Employee Plans***" means the employment agreements (including but not limited to offer letters) and severance policies, and all employment, compensation and benefit plans, retention plans, workers' compensation programs, savings plans, retirement plans, deferred compensation plans, healthcare plans, disability plans, severance plans, incentive plans, life and accidental and dismemberment insurance plans, and policies and programs of each of the Debtors applicable to any of its employees and retirees, in each case existing as of the Effective Date.

"***Entity***" means an individual, corporation, partnership, limited liability partnership, limited liability company, association, joint stock company, joint venture, estate, trust, unincorporated organization, government unit (as defined in section 101(27) of the Bankruptcy Code) or any political subdivision thereof, or other person (as defined in section 101(41) of the Bankruptcy Code) or other entity.

"*Equity Option*" has the meaning set forth in Article V, Section 5.15 of this Plan.

"*Equity Rights Offering*" means that certain equity rights offering to be consummated by the Reorganized Parent on the Effective Date in accordance with the Equity Rights Offering Documents, pursuant to which the Reorganized Parent shall issue to certain Eligible Holders of Allowed General Unsecured Claims the right to purchase New Common Interests for an aggregate amount of up to $200,000,000 at a valuation equal to the Equity Rights Offering Valuation, pursuant to applicable exemptions from registration under the Securities Act and/or section 1145 of the Bankruptcy Code.

"*Equity Rights Offering Documents*" means, collectively, the agreements, instruments, certificates or other documents memorializing the Equity Rights Offering, as may be amended, restated, supplemented, or otherwise modified from time to time according to their respective terms.

"*Equity Rights Offering Procedures*" means those certain rights offering procedures with respect to the Equity Rights Offering as set forth in the Equity Rights Offering Documents and as approved by the Bankruptcy Court.

"*Equity Rights Offering Valuation*" means a valuation of the New Common Interests such that Holders of First Lien Claims would recover 100% on account of their Allowed First Lien Claims, and Holders of Second Lien Claims would recover 75% on account of their Allowed Second Lien Claims.

"*Estate*" or "*Estates*" means, individually or collectively, the estate or estates of the Debtors created under section 541 of the Bankruptcy Code.

"*Exculpated Parties*" means each of the following in their capacities as such and, in each case, to the maximum extent permitted by law: (a) the Debtors and their Estates; and (b) each director of the Debtors; and (c) the committee of unsecured creditors (if appointed).

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Executory Contract*" means a contract to which one or more Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Existing Parent Equity Interest*" means all issued, unissued, authorized, or outstanding ordinary shares or shares of common stock, preferred stock, other instrument evidencing an ownership interest, and/or any other Interest, in ModivCare, whether or not transferable, together with any warrants, options, equity-based awards, or contractual rights to purchase or acquire such interests at any time and all rights arising with respect thereto that existed immediately before the Effective Date.

"*Exit Facilities*" means, collectively, (a) the Exit Term Loan Facility and (b) the Exit Revolving Facility.

"*Exit Facilities Documents*" means, collectively, (a) the Exit Term Loans Documents and (b) the Exit Revolver Documents.

"*Exit Facility Term Credit Agreement*" means that certain credit agreement to be entered into in connection with the Exit Term Loan Facility.  The Exit Facility Term Credit Agreement shall be dated on or around the Effective Date, by and among Reorganized Parent, as borrower, the administrative agent and collateral agent thereto, and the lenders party thereto.

"***Exit Revolving Facility***" means a revolving credit facility in the principal amount of up to $250,000,000, inclusive of a letter of credit sublimit of up to $150,000,000 (the "***Exit LC Facility***") under the Exit Revolver Credit Agreement, secured by a first priority security interest in and lien on substantially all of the Reorganized Debtors' Assets, subject to customary limitations and exclusions.

"***Exit Revolver Credit Agreement***" means a Revolving Credit Agreement to be entered into by ModivCare, as borrower, and lenders to be determined, on or around the Effective Date, and which shall be for an amount of up to $250,000,000, with a sublimit for letters of credit of up to $150,000,000.

"***Exit Revolver Documents***" means the Exit Revolver Credit Agreement and any other agreement, document and/or instrument entered or entered into in connection with the Exit Revolver Credit Agreement.

"***Exit Term Loan Facility***" means the credit agreement to be entered into by the Reorganized Debtors for a takeback term loan facility with terms and conditions to be set forth in the Plan Supplement.

"***Exit Term Loans***" means the loans under the Exit Term Loan Facility.

"***Exit Term Loans Documents***" means the Exit Facility Term Credit Agreement and any other agreement, document and/or instrument entered into in connection with the Exit Term Loan Facility.

"***File***" or "***Filed***" or "***Filing***" means file, filed, or filing, respectively, with the Bankruptcy Court or its authorized designee in the Chapter 11 Cases.

"***Final DIP Order***" means the order entered by the Bankruptcy Court authorizing the Debtors to enter into the DIP Credit Agreement and approving, among other things, the DIP Facility and the Debtors' use of Cash Collateral, and the parties' rights with respect thereto on a final basis (as may be amended, supplemented or modified from time to time).

"***Final Order***" means as applicable, an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the relevant subject matter, which has not been reversed, stayed, modified, or amended, including any order subject to appeal but for which no stay of such order has been entered, and as to which the time to appeal, seek certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceeding for a new trial, reargument, or rehearing has been timely taken, or as to which any appeal that has been taken or any petition for certiorari that has been or may be Filed has been withdrawn with prejudice, resolved by the highest court to which the order or judgment was appealed or from which certiorari could be sought, or any request for new trial, reargument, or rehearing has been denied, resulted in no stay pending appeal or modification of such order, or has otherwise been dismissed with prejudice; *provided*, that no order or judgment shall fail to be a "Final Order" solely because of the possibility that a motion under rules 59 or 60 of the Federal Rules of Civil Procedure or any analogous Bankruptcy Rule (or any analogous rules applicable in another court of competent jurisdiction) or sections 502(j) or 1144 of the Bankruptcy Code has been or may be Filed with respect to such order or judgment.

"***First Lien Agent***" means JPMorgan Chase Bank, N.A., as administrative agent under the First Lien Credit Agreement or any successor agent duly appointed under the terms of the First Lien Credit Agreement.

"***First Lien Agent and Consenting Creditor Advisors***" means, collectively, Paul Hastings LLP and Lazard Freres & Co. LLC as, respectively, legal advisor and investment banker, to the First Lien Agent and the Consenting Creditors.

"*First Lien Claims*" means the First Lien Term Loan Claims, the First Lien RCF Claims, and the First Lien Incremental Claims.

"*First Lien Credit Agreement*" means that certain Credit Agreement, dated as of February 3, 2022, as amended, restated, amended and restated, supplemented, or otherwise modified from time to time, including by that certain Amendment No. 5 to the Credit Agreement, dated as of January 9, 2025, by and among ModivCare, the First Lien Lenders and the First Lien Agent comprising the First Lien RCF, the First Lien Incremental, and the First Lien Term Loans.

"*First Lien Credit Documents*" means the First Lien Credit Agreement together with all other related documents, instruments, and agreements, in each case, as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

"*First Lien Deficiency Claims*" means the portion of the First Lien Credit Agreement that is determined pursuant to section 506(a) of the Bankruptcy Code or similar provision to be unsecured.

"*First Lien Incremental*" means $78,750,000 in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due January 2026 under the First Lien Credit Agreement.

"*First Lien Incremental Claim*" means any Claim on account of the First Lien Incremental, including accrued but unpaid interest thereon through the Petition Date.

"*First Lien Lenders*" means those certain lenders party to the First Lien Credit Agreement.

"*First Lien Loans*" means the First Lien RCF, the First Lien Incremental and the First Lien Term Loans.

"*First Lien RCF*" means the $325,000,000 in unpaid principal amount of revolving loans and LC Exposure (as defined in the First Lien Credit Agreement), plus accrued and unpaid interest, fees, costs, and expenses under the First Lien Credit Agreement.

"*First Lien RCF Claims*" means any Claim on account of the First Lien RCF, including accrued but unpaid interest thereon through the Petition Date.

"*First Lien Revolving LC Exposure*" means the LC Exposure comprising the undrawn amount of Letters of Credit which remain undrawn as of the Effective Date under the First Lien Credit Agreement.

"*First Lien Term Loan Claims*" means any Claim on account of the First Lien Term Loans, including accrued but unpaid interest thereon through the Petition Date.

"*First Lien Term Loans*" means $522,239,938 in unpaid principal amount of term loans, plus accrued and unpaid interest, fees, costs, and expenses due July 2031 under the First Lien Credit Agreement.

"*General Unsecured Claim*" means any prepetition Claim (including, for the avoidance of doubt, First Lien Deficiency Claims and Second Lien Deficiency Claims against the Debtors that are non-priority and unsecured, and, solely as it relates to ModivCare Inc., Unsecured Notes Claims) against the Debtors that is not an Administrative Claim, Priority Tax Claim, First Lien Claim, Second Lien Claim, Other Secured Claim, and Other Priority Claim.

"*Governmental Unit*" means any supranational, national, state, municipal, local or foreign government, any court, tribunal, arbitrator or arbitral body (public or private), administrative agency, commission or other governmental official, authority or instrumentality (including any legislature, commission, regulatory administrative authority, governmental agency, bureau, branch or department).

"*Holder*" means any Person that is the record or beneficial owner of any Claim or Interest, including any nominees, investment managers, investment advisors, sub-advisors, or managers of funds or discretionary accounts that hold, or trustees of trusts that hold, any Claim or Interest.

"*Impaired*" means, with respect to a Claim, Interest, or Class of Claims or Interests, "impaired" within the meaning of section 1124 of the Bankruptcy Code.

"*Indemnification Obligation*" means, collectively, any and all obligations of the Debtors pursuant to their corporate charters, bylaws, limited liability company agreements, memorandum and articles of association, or other organizational documents or agreements to indemnify all current and former officers, directors, agents or employees, in each case solely in their capacity as such, employed by the Debtors on and/or after the Petition Date.

"*Initial Consenting First Lien Lenders*" means those Initial Consenting First Lien Lenders as defined in the Restructuring Support Agreement.

"*Insured Claim*" means any Claim or portion of a Claim that is, or may be, insured under any insured policy.

"*Intercompany Claim*" means any Claim against a Debtor held by another Debtor.

"*Intercompany Interest*" means any Interest in a Debtor held by another Debtor.

"*Interest*" means any equity security (as defined in section 101(16) of the Bankruptcy Code) of the Debtors, including all shares (or any class thereof), common stock, preferred stock, limited liability company interests, membership interests, and any other equity, ownership, or profits interests of any Debtor, and options, warrants, rights, stock appreciation rights, phantom units, incentives, restricted stock units, commitments, calls, redemption rights, repurchase rights, or other securities or arrangements, whether fully vested or vesting in the future, to acquire or subscribe for, or which are convertible into, or exercisable or exchangeable for the shares (or any class thereof) of, common stock, preferred stock, limited liability company interests, membership interests, or any other equity, ownership, or profits interests of any Debtor (in each case whether or not arising under or in connection with any employment agreement), excluding, for the avoidance of doubt, convertible debt securities.

"*Interim DIP Order*" means the *Interim Order (A) Authorizing the Debtors to Obtain Postpetition Financing, (B) Granting Liens and Providing Claims with Superpriority Administrative Expense Status, (C) Authorizing the Use of Cash Collateral, (D) Modifying the Automatic Stay, (E) Scheduling a Final Hearing, and (F) Granting Related Relief* entered by the Bankruptcy Court at Docket No. 106 in the Chapter 11 Cases.

"*IRS*" means the Internal Revenue Service of the United States of America.

"*Lien*" has the meaning set forth in section 101(37) of the Bankruptcy Code.

"*Local Bankruptcy Rules*" means the Bankruptcy Local Rules for the United States Bankruptcy Court for the Southern District of Texas.

"*Management Incentive Plan*" or "*MIP*" means the management incentive plan to be adopted by the New Board, which plan shall reserve for certain employees, officers and directors of the Reorganized Parent eight percent (8%) of the New Common Interests on a fully-diluted basis, pursuant to which the quantum, form, terms, allocation, and vesting of all awards under the MIP will be determined by the New Board.

"*ModivCare*" means ModivCare Inc.

"*New Board*" means the initial composition of the board of directors or managers of Reorganized Parent, which shall consist of members appointed by a pre-emergence committee consisting of the Required Consenting First Lien Lenders who will be the largest holders of New Common Interests, in consultation with the Debtors, and disclosed in the Plan Supplement prior to emergence in accordance with section 1129(a)(5) of the Bankruptcy Code in the Plan Supplement.

"*New Corporate Governance Documents*" means the new Corporate Governance Documents of the Reorganized Debtors after giving effect to the Restructuring Transactions, as applicable, including any shareholders agreement, limited liability company agreement, or similar document.

"*New Common Interests*" means a single class of new common equity interests of Reorganized Parent to be issued (a) on the Effective Date or (b) as otherwise permitted pursuant to this Plan, the New Corporate Governance Documents and the New Common Interests Documents.

"*New Common Interests Documents*" means any and all documents required to implement, issue, or distribute the New Common Interests.

"*New Warrants*" means, collectively, the Series A Warrants, the Series B Warrants, and the Series C Warrants, each as defined in the New Warrants Term Sheet.

"*New Warrants Agreement*" means the form of warrant agreement governing New Warrants.

"*New Warrants Documents*" means the New Warrants, New Warrants Agreement and New Warrants Term Sheet, and any and all documents required to implement, issue, or distribute the New Warrants.

"*New Warrants Term Sheet*" means the term sheet attached as Annex 3 to the Restructuring Term Sheet describing the material terms of New Warrants.

"*Non-Debtor Affiliates*" means the Debtors' Affiliates that are not Debtors.

"*Non-Voting Class*" means each of: Class 1 (Other Secured Claims), Class 2 (Other Priority Claims), Class 6 (Intercompany Claims), Class 7 (Subordinated Claims), Class 8 (Intercompany Interests), and Class 9 (Existing Parent Equity Interests).

"*Other Priority Claim*" means any Claim, other than an Administrative Claim or a Priority Tax Claim, entitled to priority in right of payment under section 507(a) of the Bankruptcy Code.

"*Other Secured Claim*" means any secured claim that is not a First Lien Claim or Second Lien Claim.

"***Person***" means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, Governmental Unit, or other Entity.

"***Petition Date***" means August 20, 2025.

"***Plan***" means this joint chapter 11 plan, including all appendices, exhibits, schedules, and supplements hereto (including any appendices, schedules, and supplements to this Plan contained in the Plan Supplement), as the same may be amended, supplemented, or modified from time to time in accordance with the provisions of the Bankruptcy Code and the terms hereof.

"***Plan Securities***" means, collectively, the New Common Interests, the New Warrants and any other Securities to be distributed and/or issued under this Plan (including any New Common Interests issued or issuable upon or on account of the Management Incentive Plan, the DIP Backstop Premium, the Equity Rights Offering, and/or the exercise of the New Warrants).

"***Plan Supplement***" means any supplemental appendix to this Plan containing certain documents and forms of documents, schedules, and exhibits relevant to the implementation of the Plan, as may be amended modified or supplemented from time to time in accordance with the terms of this Plan, and the Bankruptcy Code and the Bankruptcy Rules, which shall include, but shall not be limited to: (a) the New Corporate Governance Documents; (b) the New Common Interests Documents; (c) the New Warrants Documents; (d) the Exit Facilities Documents; (e) the Equity Rights Offering Documents; (f) the Schedule of Rejected Executory Contracts and Unexpired Leases; (g) any disclosures required under section 1129(a)(5) of the Bankruptcy Code (including, to the extent known and determined, a document disclosing the identity of the directors and officers of the Reorganized Debtors); and (h) the Election Procedures.

"***Prepetition Funded Debt Documents***" means, collectively, the First Lien Credit Documents, and the Second Lien Notes Documents, and the Unsecured Notes Indenture.

"***Priority Tax Claim***" means any Claim of a Governmental Unit of the kind specified in section 507(a)(8) of the Bankruptcy Code.

"***Pro Rata Share***" means, except as provided, with respect to any distribution on account of an Allowed Claim, a distribution equal in amount to the ratio (expressed as a percentage) that the amount of such Allowed Claim bears to the aggregate amount of all Allowed Claims in its Class.

"***Professional***" means an Entity: (a) employed pursuant to a Bankruptcy Court order in accordance with sections 327, 363, or 1103 of the Bankruptcy Code and to be compensated for services rendered before or on the Effective Date pursuant to sections 327, 328, 329, 330, 331, or 363 of the Bankruptcy Code; or (b) awarded compensation and reimbursement by the Bankruptcy Court pursuant to section 503(b)(4) of the Bankruptcy Code that are not Restructuring Expenses.

"***Professional Fee Claim***" means all Claims for fees and expenses (including transaction and success fees) incurred by a Professional on or after the Petition Date to the extent such fees and expenses have not been paid pursuant to an order of the Bankruptcy Court.

"***Professional Fee Claims Estimate***" has the meaning set forth in Article II, Section 2.6.

"***Professional Fee Escrow***" means an escrow account established and funded pursuant to Article II, Section 2.5 of this Plan.

11

"*Proof of Claim*" means a proof of Claim Filed against any of the Debtors in the Chapter 11 Cases.

"*Reinstatement*" or "*Reinstated*" or "*Reinstate*" means, with respect to Claims and Interests, that the Claim or Interest shall be rendered Unimpaired in accordance with section 1124 of the Bankruptcy Code.

"*Related Fund*" means, with respect to any Holder of Allowed Claims, any Affiliates (including at the institutional level) of such Holder or any fund, account (including any separately managed accounts) or investment vehicle that is controlled, managed, advised or sub-advised by such Holder, an Affiliate of such Holder, or by the same investment manager, advisor or subadvisor as such Holder.

"*Related Parties*" means with respect to a Person, that Person's current and former affiliates, and such Person's and its current and former affiliates' current and former directors, managers, officers, equity holders (regardless of whether such interests are held directly or indirectly), affiliated investment funds or investment vehicles, predecessors, participants, successors, and assigns, subsidiaries, and each of their respective current and former equity holders, officers, directors, managers, principals, members, employees, agents, fiduciaries, trustees, advisory board members, financial advisors, limited partners, general partners, attorneys, accountants, managed accounts or funds, management companies, fund advisors, investment bankers, consultants, investment managers, investment advisors, representatives, and other professionals, and such Person's respective heirs, executors, estates, and nominees, each in their capacity as such.

"*Release Opt-Out Form*" means the form to be provided to Holders (other than Debtors or Non-Debtor Affiliates) of Claims and Interests in the Non-Voting Classes through which such Holders may elect to affirmatively opt out of the Third-Party Release.

"*Released Parties*" means, collectively, each of: (a) the Debtors; (b) the Reorganized Debtors; (c) the Consenting Creditors, (d) the First Lien Agent; (e) the DIP Lenders; (f) the DIP Backstop Commitment Parties; (g) the DIP Agent; (h) the Second Lien Notes Trustee; (i) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of the Third-Party Releases as provided on its respective ballot; (j) each Holder of a Claim or Interest in a Non-Voting Class that does affirmatively elect to "opt out" of the Third-Party Releases as provided on its respective Release Opt-Out Form; and (k) with respect to each of the foregoing persons in clauses (a) through (j), all Related Parties. Notwithstanding the foregoing, any Person that opts out of the releases set forth in the Plan shall not be deemed a "Released Party" hereunder; *provided*, that any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases, or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before or at the Confirmation Hearing (and in the case of the latter on the record), shall not be a "Released Party" hereunder; *provided, further*, any Person or Entity (and each such Person or Entity's Related Parties) that files an objection with the Bankruptcy Court to any substantive pleading in the Chapter 11 Cases, including to approval of the DIP Facility or the confirmation of this Plan, or commences any Cause of Action in the Bankruptcy Court or any other court of competent jurisdiction against any director of the Debtors, or against any Consenting Creditor relating to such Consenting Creditor's secured Claims, shall not be a Released Party.

"*Releases*" means, collectively, the releases set forth in Article X, Section 10.6.

"*Releasing Parties*" means, collectively, each of, and in each case in its capacity as such: (a) each Debtor; (b) each Reorganized Debtor; (c) the Consenting Creditors; (d) the First Lien Agent; (e) the DIP Lenders; (f) the DIP Backstop Commitment Parties; (g) the DIP Agent; (h) the Second Lien Notes Trustee; (i) [reserved]; (j) each Holder of a Claim in a Voting Class that does not affirmatively elect to "opt out" of

12

the Third-Party Release as provided on its respective ballot; (k) each Holder of a Claim or Interest in a Non-Voting Class that does not affirmatively elect to "opt out" of the Third-Party Release as provided on its respective Release Opt-Out Form; (l) each Related Party of each Entity in clauses (a) through (k), solely to the extent such Related Party (I) would be obligated to grant a release under principles of agency if it were so directed by the Entity in the foregoing clauses (a) through (k) to whom they are related or (II) may assert Claims or Causes of Action on behalf of or in a derivative capacity by or through an Entity in clause (a) through (i); *provided*, that, any Holder of a Claim or Interest that timely objects to the Third-Party Release, either through (i) a formal objection Filed on the docket of the Chapter 11 Cases or (ii) an informal objection provided to the Debtors by electronic mail, and such objection is not withdrawn on the docket of the Chapter 11 Cases or via electronic mail, as applicable, before the Confirmation Hearing, shall not be a "Releasing Party;" *provided, further,* that the Second Lien Notes Trustee and the First Lien Agent shall be Releasing Parties solely in their respective capacities as Second Lien Notes Trustee and the First Lien Agent and not individually or in any other capacity.

"***Reorganized Debtors***" means a Debtor, or any successor or assign thereto, by merger, consolidation, reorganization, or otherwise, in the form of a corporation, limited liability company, partnership, or other form, as the case may be, on and after the Effective Date, including Reorganized Parent.

"***Reorganized Parent***" means, from and after the Effective Date, ModivCare or such other Entity as may be determined by the Debtors and the Required Consenting First Lien Lenders, to be the Debtors' new corporate parent, as reorganized pursuant to the Plan or as otherwise agreed between the Debtors and the Required Consenting First Lien Lenders.

"***Required Consenting Creditors***" means, collectively, the Required Consenting First Lien Lenders and the Required Consenting Second Lien Noteholders.

"***Required Consenting First Lien Lenders***" means, as of any date of determination, the Consenting First Lien Lenders holding at least 50.1% in aggregate principal amount outstanding of the First Lien Claims held by all of the Consenting First Lien Lenders as of such date.

"***Required Consenting Second Lien Noteholders***" means, as of any date of determination, the Consenting Second Lien Noteholders holding at least 50.1% in aggregate principal amount outstanding of the Second Lien Claims held, beneficially owned, or managed by all of the Consenting Second Lien Noteholders as of such date.

"***Restructuring Expenses***" means all reasonable and documented fees, costs, and expenses of (a) each of the First Lien Agent and Consenting Creditor Advisors, in each case: (i) in connection with the negotiation, formulation, preparation, execution, delivery, implementation, consummation and/or enforcement this Plan, the other Definitive Documents, the Restructuring Transactions, and the transactions contemplated hereby and thereby; and (ii) as otherwise provided under the First Lien Credit Documents, or engagement letters or fee reimbursement letters entered into between the applicable Debtors, on the one hand, and any First Lien Agent and Consenting Creditor Advisor, on the other hand, with respect to the fees, costs, and expenses of any First Lien Agent and Consenting Creditor Advisor and (b) the Second Lien Notes Trustee.

"***Restructuring Support Agreement***" means that certain Restructuring Support Agreement, dated as of August 20, 2025, by and among the Debtors and the Consenting Creditors, including all exhibits, annexes, and schedules attached thereto (as may be amended, supplemented or modified from time to time and including in accordance with the terms thereof).

"**_Restructuring Term Sheet_**" means that certain Restructuring Term Sheet attached as Exhibit A to the Restructuring Support Agreement.

"**_Restructuring Transactions_**" means the transactions set forth in Article V, Section 5.1.

"**_Schedule of Rejected Executory Contracts and Unexpired Leases_**" means the schedule of Executory Contracts and Unexpired Leases to be rejected by the Debtors pursuant to this Plan, if any, and to be included in the Plan Supplement, as the same may be amended, modified, or supplemented from time to time.

"**_Schedule of Retained Causes of Action_**" means a schedule of Causes of Action to be retained by the Reorganized Debtors as set forth in the Plan Supplement.

"**_Second Lien Claim_**" means any Claim on account of the Second Lien Notes or otherwise arising under the Second Lien Notes Indentures, including accrued but unpaid interest, fees, costs and expenses.

"**_Second Lien Deficiency Claims_**" mean the portion of the Second Lien Notes that are determined pursuant to section 506(a) of the Bankruptcy Code or similar provision to be unsecured.

"**_Second Lien Notes_**" means those certain second lien senior secured PIK toggle notes due October 1, 2029, issued pursuant to the Second Lien Notes Indenture.

"**_Second Lien Notes Documents_**" means the Second Lien Notes Indenture, together with all other related documents, instruments, and agreements, in each case, as supplemented, amended, restated, amended and restated, or otherwise modified from time to time.

"**_Second Lien Notes Indenture_**" means that second lien senior secured PIK toggle notes indenture, dated as of February 25, 2025 by and between ModivCare and the Second Lien Notes Trustee, as amended, restated, amended and restated, supplemented or otherwise modified from time to time prior to the Petition Date.

"**_Second Lien Notes Trustee_**" means Ankura Trust Company, LLC or any successor trustee duly appointed under the terms of the Second Lien Notes Indenture.

"**_Secured Claim_**" means a Claim (a) secured by a Lien on Collateral to the extent of the value of such Collateral as (i) set forth in this Plan, (ii) agreed to by the Holder of such Claim and the Debtors, or (iii) determined by a Final Order in accordance with section 506(a) of the Bankruptcy Code exceeds the value of the Claim, or (b) secured by the amount of any right of setoff of the Holder thereof in accordance with section 553 of the Bankruptcy Code; _provided_, that, nothing in this definition shall alter the terms of any subordination pursuant to section 510 of the Bankruptcy Code.

"**_Securities Act_**" the Securities Act of 1933, as amended.

"**_Security_**" or "**_Securities_**" means any instruments that qualify as a "security" under Section 2(a)(1) of the Securities Act.

"**_Solicitation Packages_**" means materials used in connection with the solicitation of votes on the Plan, including the Disclosure Statement, and any procedures established by the Bankruptcy Court with respect to solicitation of votes on the Plan.

14

"*Solicitation Procedures Order*" means the order of the Bankruptcy Court approving the solicitation procedures and the Solicitation Packages, and scheduling the Confirmation Hearing.

"*Subordinated Claims*" means any claim subject to subordination under section 510 of the Bankruptcy Code.  Notwithstanding anything to the contrary outside of this definition in the Plan, any Claim that satisfies the definition of a Subordinated Claim shall be a Subordinated Claim notwithstanding that such Claim would otherwise satisfy the definition of another type of Claim.

"*Subsequent Condition*" shall have the meaning ascribed to such term in Article IX, Section 9.2 herein.

"*Third-Party Release*" means the releases given by the Releasing Parties to the Released Parties in Article X, Section 10.6(b).

"*Unexpired Lease*" means a lease to which one or more of the Debtors is a party that is subject to assumption or rejection under section 365 of the Bankruptcy Code.

"*Unimpaired*" means, with respect to a Class of Claims or Interests, a Class of Claims or Interests that is unimpaired within the meaning of section 1124 of the Bankruptcy Code.

"*Unsecured Notes*" means those certain 5.000% senior unsecured notes due October 1, 2029, issued pursuant to the Unsecured Notes Indenture.

"*Unsecured Notes Claims*" means any Claim on account of the Unsecured Notes, including accrued but unpaid interest thereon through the Petition Date.

"*Unsecured Notes Indenture*" means that certain that certain Senior Notes Indenture, dated as of August 24, 2021 (as amended, restated, amended and restated, supplemented, or otherwise modified from time to time), by and between ModivCare, as issuer, and the Unsecured Notes Trustee (defined below) governing ModivCare's $228,835,000 aggregate principal amount of 5.00% Senior Notes due 2029.

"*Unsecured Notes Trustee*" means Wilmington Saving Fund Society, FSB (as successor to The Bank of New York Mellon Trust Company, N.A.) or any successor trustee duly appointed under the terms of the Unsecured Notes Indenture.

"*Voting Classes*" means, collectively, Class 3 (First Lien Claims), Class 4 (Second Lien Claims), and Class 5 (General Unsecured Claims).

### B.    Interpretation; Application of Definitions and Rules of Construction.

Unless otherwise specified, all section or exhibit references in this Plan are to the respective section in, or exhibit to, this Plan, as the same may be amended, waived, or modified from time to time. The words "herein," "hereof," "hereto," "hereunder," and other words of similar import refer to this Plan as a whole and not to any particular section, subsection, or clause contained therein and have the same meaning as "in this Plan," "of this Plan," "to this Plan," and "under this Plan," respectively.  The words "includes" and "including" are not limiting and shall be deemed to be followed by the words "without limitation."  The headings in this Plan are for convenience of reference only and shall not limit or otherwise affect the provisions hereof.  For purposes herein: (a) in the appropriate context, each term, whether stated in the singular or plural, shall include both the singular and plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) any reference herein to a contract, lease, instrument, release, indenture, or other agreement or document being in a

particular form or on particular terms and conditions means that the referenced document shall be substantially in that form or substantially on those terms and conditions; (c) unless otherwise specified herein, all references herein to "Articles" are references to Articles hereof or hereto; (d) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (e) any term used in capitalized form herein that is not otherwise defined but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to that term in the Bankruptcy Code or the Bankruptcy Rules, as the case may be; (f) any docket number references in this Plan shall refer to the docket number of any document Filed with the Bankruptcy Court in the Chapter 11 Cases; (g) references to "shareholders," "directors," and/or "officers" shall also include "members" and/or "managers," as applicable, as such terms are defined under the applicable state limited liability company laws; (h) except as otherwise provided herein, any reference to a document or agreement that is to be issued or entered into that is dependent on an election to be made pursuant to this Plan or an event occurring shall be deemed to be followed by the words "if applicable"; (i) any immaterial effectuating provisions may be interpreted by the Debtors, or after the Effective Date, the Reorganized Debtors, in such a manner that is consistent with the overall purpose and intent of this Plan all without further notice to or action, order, or approval of the Bankruptcy Court or any other Entity; *provided*, that any effectuating provision that has an economic impact will not be considered "immaterial"; and (j) except as otherwise provided, any references to the Effective Date shall mean the Effective Date or as soon as reasonably practicable thereafter.  To the extent that the treatment, allowance, or disallowance of any Claim herein is interpreted as a Claim objection, this Plan shall be deemed a Claim objection to such Claim.

### C.    **Computation of Time**.

Unless otherwise specifically stated herein, the provisions of Bankruptcy Rule 9006(a) shall apply in computing any period of time prescribed or allowed herein.  If the date on which a transaction may occur pursuant to this Plan shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next Business Day but shall be deemed to have been completed as of the required date.

### D.    **Reference to Monetary Figures**.

All references in this Plan to monetary figures shall refer to the legal tender of the United States of America, unless otherwise expressly provided.

### E.    **Reference to the Debtors or the Reorganized Debtors**.

Except as otherwise specifically provided in this Plan to the contrary, references in this Plan to the Debtors or the Reorganized Debtors shall have the meaning ascribed to them in Article I, to the extent the context requires.

### F.    **Controlling Document**.

In the event of an inconsistency between this Plan and the Plan Supplement, the terms of the relevant document in the Plan Supplement shall control (unless stated otherwise in such Plan Supplement document or the Confirmation Order).  In the event of an inconsistency between this Plan and any other instrument or document created or executed pursuant to this Plan, or between this Plan and the Disclosure Statement, this Plan shall control.  The provisions of this Plan and of the Confirmation Order shall be construed in a manner consistent with each other so as to effectuate the purposes of each; *provided*, that if there is determined to be any inconsistency between any Plan provision and any provision of the Confirmation Order that cannot be so reconciled, then, solely to the extent of such inconsistency, the

provisions of the Confirmation Order shall govern and any such provision of the Confirmation Order shall be deemed a modification of this Plan.

### G. Consultation, Notice, Information and Consent Rights.

Notwithstanding anything herein to the contrary, any and all consultation, information, notice, and consent rights of the parties to the Restructuring Support Agreement, the DIP Documents, as applicable, and as respectively set forth therein and in the DIP Orders, shall be incorporated herein by reference (including to the applicable definitions in Article I.A) and fully enforceable as if stated in full herein. In the case of conflict with respect to consultation, information, notice, and consent rights between the Restructuring Support Agreement, on the one hand, and the Plan, on the other, the Restructuring Support Agreement shall control and govern.

## ARTICLE II.

## ADMINISTRATIVE, PRIORITY TAX, DIP CLAIMS, AND PROFESSIONAL FEE CLAIMS

### 2.1. *Administrative Claims*.

Except to the extent that a Holder of an Allowed Administrative Claim agrees to different treatment, each Holder of an Allowed Administrative Claim (other than a Professional Fee Claim) shall receive, in full and final satisfaction of such Allowed Administrative Claim, (i) Cash in an amount equal to such Allowed Administrative Claim on the Effective Date or as soon as practicable thereafter or (ii) such other treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code and as agreed to by the Debtors; *provided*, that Allowed Administrative Claims representing liabilities incurred in the ordinary course of business by the Debtors, as debtors in possession (and excluding, for the avoidance of doubt, the DIP Backstop Premium), shall be paid by the Debtors or the Reorganized Debtors, as applicable, in the ordinary course of business, consistent with past practice and in accordance with the terms and subject to the conditions of any orders, course of dealing or agreements governing, instruments evidencing, or other documents relating to such transactions.

### 2.2. *Priority Tax Claims*.

Except to the extent that a Holder of an Allowed Priority Tax Claim agrees to less favorable treatment, on the earlier of (a) the Effective Date, to the extent such Claim is an Allowed Priority Tax Claim on the Effective Date, (b) the first Business Day after the date that is thirty (30) calendar days after the date such Priority Tax Claim becomes an Allowed Priority Tax Claim, or (c) the date such Allowed Priority Tax Claim is due and payable in the ordinary course, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Priority Tax Claim, at the sole option of the Debtor or the Reorganized Debtors, as applicable, (i) Cash in an amount equal to such Allowed Priority Tax Claim or (ii) treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code; *provided*, that the Debtors and the Reorganized Debtors, as applicable, reserve the right to prepay all or a portion of any such amounts at any time under this option without penalty or premium.

### 2.3. *Restructuring Expenses*.

The Restructuring Expenses incurred, or estimated to be incurred, up to and including the Effective Date (or, with respect to necessary post-Effective Date activities, after the Effective Date), shall be paid in full in Cash on the Effective Date or as soon as reasonably practicable thereafter (to the extent not previously paid during the course of the Chapter 11 Cases, on the dates on which such amounts would be required to

be paid under the DIP Orders or the Restructuring Support Agreement, as applicable) in accordance with, and subject to, the terms of the Restructuring Support Agreement, without any requirement to File a fee application with the Bankruptcy Court or without any requirement for Bankruptcy Court review or approval. All Restructuring Expenses to be paid on the Effective Date shall be estimated prior to and as of the Effective Date and such estimates shall be delivered to the Debtors at least five (5) calendar days before the anticipated Effective Date; *provided*, that such estimates shall not be considered an admission or limitation with respect to such Restructuring Expenses. On the Effective Date, or as soon as practicable thereafter, final invoices for all Restructuring Expenses incurred prior to and as of the Effective Date shall be submitted to the Debtors. Payment of the fees and expenses of the Second Lien Notes Trustee and the First Lien Agent as Restructuring Expense through the Effective Date of the Plan and their inclusion as Released Parties is being provided in consideration of elimination by the Plan of the Second Lien Notes Trustee and the First Lien Agent's respective rights to exercise their charging lien rights against distributions under their respective Prepetition Funded Debt Documents.

2.4.    ***Professional Fee Claims***.

All Professionals seeking approval by the Bankruptcy Court of Professional Fee Claims shall (i) File, on or before the date that is forty-five (45) days after the Effective Date (unless extended by the Reorganized Debtors), their respective applications for final allowances of compensation for services rendered and reimbursement of expenses incurred and (ii) be paid in full, in Cash, in such amounts as are Allowed by the Bankruptcy Court or authorized to be paid in accordance with the order(s) relating to or allowing any such Professional Fee Claims.

2.5.    ***Professional Fee Escrow***.

(a)     As soon as reasonably practicable after the Confirmation Date and no later than the Effective Date, the Debtors shall establish and fund the Professional Fee Escrow with Cash equal to the Professional Fee Claims Estimate. No Liens, Claims, or Interests shall encumber the Professional Fee Escrow or Cash held in the Professional Fee Escrow in any way. Subject to the DIP Orders, the Professional Fee Escrow (including funds held in the Professional Fee Escrow) (i) shall not be and shall not be deemed property of the Debtors, their Estates, or the Reorganized Debtors, and (ii) shall be held in trust for the Professionals; *provided*, that funds remaining in the Professional Fee Escrow after all Allowed Professional Fee Claims have been irrevocably paid in full in cash pursuant to one or more Final Orders of the Bankruptcy Court shall revert to the Reorganized Debtors. Allowed Professional Fee Claims shall be paid in Cash to such Professionals from funds held in the Professional Fee Escrow when such Claims are Allowed by an order of the Bankruptcy Court; *provided*, that the Debtors' obligations with respect to Professional Fee Claims shall not be limited nor deemed to be limited in any way to the balance of funds held in the Professional Fee Escrow.

(b)     If the amount of funds in the Professional Fee Escrow is insufficient to fund payment in full of all Allowed Professional Fee Claims and any other Allowed amounts owed to Professionals, the deficiency shall be promptly, and, in any event, by no later than five (5) Business Days of the Debtors or the Reorganized Debtors, as applicable, being alerted to such deficiency, funded in Cash to the Professional Fee Escrow from the Debtors' Estates or Reorganized Debtors, as applicable, without any further action or order of the Bankruptcy Court.

(c)     Any objections to Professional Fee Claims shall be served and Filed no later than twenty-one (21) days after Filing of the final applications for compensation or reimbursement.

2.6.     ***Professional Fee Claims Estimate***.

Each Professional shall estimate in good faith its unpaid Professional Fee Claim and other unpaid fees and expenses incurred in rendering services to the Debtors, before and as of the Effective Date and shall deliver such reasonable, good faith estimate to the Debtors no later than five (5) Business Days prior to the Effective Date (such estimate the "***Professional Fee Claims Estimate***"); *provided*, that such estimate shall not limit, nor shall it be construed as limiting, the amount of the fees and expenses that are the subject of the Professional's final request for payment of Filed Professional Fee Claims.  If a Professional does not provide an estimate, the Debtors shall estimate in good faith the unpaid and unbilled fees and expenses of such Professional.  The total aggregate amount so estimated to be outstanding as of the anticipated Effective Date shall be utilized by the Debtors to determine the amount to be funded to the Professional Fee Escrow; *provided*, that the Reorganized Debtors shall use Cash on hand to increase the amount of the Professional Fee Escrow to the extent fee applications are Filed after the Effective Date in excess of the amount held in the Professional Fee Escrow based on such estimates.

2.7.     ***DIP Backstop Premium.***

On the Effective Date, the DIP Backstop Premium shall be paid in accordance with the terms of the DIP Backstop Commitment Letters and this Plan.

2.8.     ***DIP Claims.***

Notwithstanding anything to the contrary herein and except to the extent that a Holder of an Allowed DIP Claim agrees to less favorable treatment, each Holder of an Allowed DIP Claim shall receive, in full and final satisfaction, settlement, release, and discharge of such Claim, its Pro Rata Share of Exit Term Loans, including, for the avoidance of doubt, DIP Professional Fees and Restructuring Fees and Expenses, which shall be paid in full in cash in accordance with the terms of the DIP Orders and the Plan, as applicable.

2.9.     ***Post-Confirmation Date Fees and Expenses***.

(a)     Except as otherwise specifically provided in this Plan, on and after the Confirmation Date, the Debtors or Reorganized Debtors, as applicable, may, in the ordinary course of business and without any further notice to or action, order, or approval of the Bankruptcy Court, pay in Cash all reasonable and documented legal, professional, or other fees and expenses related to implementation of this Plan incurred by the Debtors or the Reorganized Debtors, as applicable.

(b)     Upon and following the Confirmation Date, any requirement that Professionals comply with sections 327 through 331, 363, and 1103 of the Bankruptcy Code in seeking retention for services rendered after such date shall terminate, and the Debtors or the Reorganized Debtors, as applicable, may employ any Professional in the ordinary course of business without any further notice to or action, order, or approval of the Bankruptcy Court.

# ARTICLE III.

## CLASSIFICATION OF CLAIMS AND INTERESTS.

3.1.     ***Classification in General***.

A Claim or Interest is placed in a particular Class for all purposes, including voting, confirmation, and distribution under this Plan and under sections 1122 and 1123(a)(1) of the Bankruptcy Code; *provided*,

19

Case No. 1:25-cv-00306-GPG-KAS    Document 42-2    filed 09/19/25    USDC Colorado
Case 25-90309   Document 120   Filed in TXSB on 09/04/25   Page 128 of 175
page 129 of 176

that a Claim or Interest is placed in a particular Class for the purpose of receiving distributions pursuant to this Plan only to the extent that such Claim or Interest is an Allowed Claim or Allowed Interest in that Class and such Claim or Interest has not been satisfied, released, or otherwise settled prior to the Effective Date. All of the potential Classes for the Debtors are set forth herein.  Certain Debtors may not have any Holders of Claims or Interests in a particular Class or Classes, and such Claims or Interests shall be treated as set forth in Article III, Section 3.5 herein.

In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtors have not classified Administrative Claims, Priority Tax Claims, and DIP Claims, as described in Article II herein.

Other than with respect to Debtor ModivCare, the Debtors shall be substantively consolidated solely for the purposes of voting, determining which Class or Classes have accepted the Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan distributions.

### 3.2.    *Formation of Debtor Groups for Convenience Only*.

This Plan groups the Debtors together solely for the purpose of describing treatment under this Plan, confirmation of this Plan, and making distributions in respect of Claims and Interests under this Plan. Such groupings shall not affect any Debtor's status as a separate legal Entity, change the organizational structure of the Debtors' business enterprise, constitute a change of control of any Debtor for any purpose, cause a merger or consolidation of any legal Entities, or cause the transfer of any Assets; and, except as otherwise provided by or permitted under this Plan, all Debtors shall continue to exist as separate legal Entities after the Effective Date.

### 3.3.    *Summary of Classification*.

The following table designates the Classes of Claims against and Interests in each of the Debtors and specifies which of those Classes are (a) Impaired or Unimpaired by this Plan, (b) entitled to vote to accept or reject this Plan in accordance with section 1126 of the Bankruptcy Code, and (c) presumed to accept or deemed to reject this Plan.  In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims, DIP Claims (including the DIP Backstop Premium), Priority Tax Claims, and Restructuring Expenses have not been classified.  The classification of Claims and Interests set forth herein shall apply separately to each Debtor.

| Class | Designation | Treatment | Entitled to Vote |
|-------|-------------|-----------|------------------|
| 1 | Other Secured Claims | Unimpaired | No (Presumed to Accept) |
| 2 | Other Priority Claims | Unimpaired | No (Presumed to Accept) |
| 3 | First Lien Claims | Impaired | Yes |
| 4 | Second Lien Claims | Impaired | Yes |
| 5 | General Unsecured Claims | Impaired | Yes |
| 6 | Intercompany Claims | Unimpaired | No (Presumed to Accept) |
| 7 | Subordinated Claims | Impaired | No (Deemed to Reject) |
| 8 | Intercompany Interests | Unimpaired | No (Presumed to Accept) |
| 9 | Existing Parent Equity Interests | Impaired | No (Deemed to Reject) |

20

### 3.4. *Special Provision Governing Unimpaired Claims*.

Except as otherwise provided in this Plan, nothing under this Plan shall affect, diminish, or impair the rights of the Debtors or the Reorganized Debtors, as applicable, in respect of any Unimpaired Claims, including all rights in respect of legal and equitable defenses to, or setoffs or recoupments against, any such Unimpaired Claims; and, except as otherwise specifically provided in this Plan, nothing herein shall be deemed to be a waiver or relinquishment of any Claim, Cause of Action, right of setoff, or other legal or equitable defense that the Debtors had immediately prior to the Petition Date, against or with respect to any Claim that is Unimpaired (including, for the avoidance of doubt, any Claim that is Reinstated) by this Plan. Except as otherwise specifically provided in this Plan, the Reorganized Debtors shall have, retain, reserve, and be entitled to assert all such Claims, Causes of Action, rights of setoff, and other legal or equitable defenses that the Debtors had immediately prior to the Petition Date fully as if the Chapter 11 Cases had not been commenced, and all of the Reorganized Debtors' legal and equitable rights with respect to any Reinstated Claim or Claim that is otherwise Unimpaired by this Plan may be asserted after the Confirmation Date and the Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.

### 3.5. *Elimination of Vacant Classes*.

Any Class of Claims or Interests that, as of the commencement of the Confirmation Hearing, does not have at least one Holder of a Claim or Interest that is Allowed, or temporarily Allowed under Bankruptcy Rule 3018, in an amount greater than zero for voting purposes shall be considered vacant, deemed eliminated from this Plan for purposes of determining acceptance or rejection of this Plan pursuant to section 1129(a)(8) of the Bankruptcy Code with respect to that Class.

### 3.6. *No Waiver*.

Nothing contained in this Plan shall be construed to waive a Debtor's or other Person's right to object on any basis to any Disputed Claim.

### 3.7. *Voting Classes*.

Classes 3, 4, and 5 are Impaired under this Plan.  The Holders of Claims in such Classes as of the Voting Record Date are entitled to vote to accept or reject this Plan.

### 3.8. *Presumed Acceptance of this Plan.*

If a Class contains Claims or Interests eligible to vote and no Holders of Claims or Interests eligible to vote in such Class vote to accept or reject this Plan, this Plan shall be presumed accepted by such Class.

Classes 1, 2, 6, and 8 are Unimpaired under this Plan.  Therefore, the Holders of Claims or Interests in such Classes are presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code and are not entitled to vote to accept or reject this Plan.

### 3.9. *Deemed Rejection of this Plan.*

Classes 7 and 9 are Impaired and Holders of Subordinated Claims and Existing Parent Equity Interests in such Classes shall receive no distribution under this Plan on account of such Claims or Interests, as applicable.  Therefore, the Holders of Subordinated Claims and Existing Parent Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code and are not entitled

21

to vote to accept or reject this Plan.  Such Holders will, however, receive a Release Opt-Out Form to allow such Holders to affirmatively opt-out of the Third-Party Release.

3.10.    ***Confirmation Pursuant to Sections 1129(a)(10) and 1129(b) of the Bankruptcy Code.***

Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of Confirmation by acceptance of this Plan by any of the Voting Classes.  The Debtors shall seek Confirmation of this Plan under section 1129(b) of the Bankruptcy Code with respect to any Impaired Class that does not accept this Plan.  The Debtors reserve the right to modify this Plan or any Exhibit or the Plan Supplement in order to satisfy the requirements of section 1129(b) of the Bankruptcy Code, if necessary.

# ARTICLE IV.

## TREATMENT OF CLAIMS AND INTERESTS.

4.1.    ***Other Secured Claims (Class 1).***

(a)    *Classification*: Class 1 consists of Other Secured Claims.

(b)    *Treatment*: The legal, equitable, and contractual rights of Holders of Allowed Other Secured Claims are unaltered by this Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Other Secured Claim agrees to less favorable treatment of its Allowed Other Secured Claim, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Other Secured Claim, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders) or the Reorganized Debtors, (i) such Holder shall receive payment in full in Cash, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Secured Claim becomes an Allowed Other Secured Claim, in each case, or as soon as reasonably practicable thereafter or (ii) such Holder shall receive such other treatment so as to render such holder's Allowed Other Secured Claim Unimpaired.

(c)    *Impairment and Voting*:  Class 1 is Unimpaired, and the Holders of Other Secured Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Secured Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Other Secured Claims.  Holders of Other Secured Claims shall be provided a Release Opt-Out Form solely for the purpose of enabling such Holders of Other Secured Claims to affirmatively opt-out of the Third-Party Release.

4.2.    ***Other Priority Claims (Class 2).***

(a)    *Classification*: Class 2 consists of Other Priority Claims.

(b)    *Treatment*: The legal, equitable, and contractual rights of the Holders of Allowed Other Priority Claims are unaltered by this Plan.  On or as soon as reasonably practicable after the Effective Date, except to the extent that a holder of an Allowed Other Priority Claim agrees to less favorable treatment, in full and final satisfaction, settlement, release, and discharge and in exchange for each Allowed Other Priority Claim, each holder of an Allowed Other Priority Claim shall, at the option of the Debtors (with the consent of the Required Consenting First Lien Lenders) or the Reorganized Debtors, (i) be paid in full in Cash or (ii) otherwise receive treatment consistent with the provisions of section 1129(a)(9) of the Bankruptcy Code, payable on the later of the Effective Date and the date that is ten (10) Business Days after the date on which such Other Priority Claim becomes an Allowed Other Priority Claim, in each case, or as soon as reasonably practicable thereafter.

22

(c)      *Impairment and Voting*: Class 2 is Unimpaired, and the Holders of Other Priority Claims are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Other Priority Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to Other Priority Claims.  Holders of Other Priority Claims shall be provided a Release Opt-Out Form solely for the purpose of enabling such Holders of Other Priority Claims to affirmatively opt-out of the Third-Party Release.

4.3.    ***First Lien Claims (Class 3)***.

(a)      *Classification*: Class 3 consists of First Lien Claims.

(b)      *Allowance*: The First Lien Claims shall be Allowed in the aggregate principal amount of $871,689,024.49 plus accrued and unpaid interest as of the Petition Date in the amount of $9,271,809.29, plus other fees, costs, and expenses under the First Lien Credit Documents.

(c)      *Treatment*: On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed First Lien Claim agrees to less favorable treatment, in full and final satisfaction settlement, release, and discharge and in exchange for each Allowed First Lien Claim, on the Effective Date or on another date acceptable to the Required Consenting First Lien Lenders, each Holder of an Allowed First Lien Claim shall receive its Pro Rata Share (subject to application of the Equity Option) of the following:

(i)      with respect to any First Lien RCF Claims on account of unfunded First Lien Revolving LC Exposure as of the Effective Date, participation in the Exit LC Facility in an amount equal to each such Holder's participation in any such unfunded First Lien Revolving LC Exposure as of the Effective Date;

(ii)      with respect to any First Lien Claim other than unfunded First Lien Revolving LC Exposure:

    A.  the Exit Term Loans;

    B.  98% of the New Common Interests, subject to dilution on account of the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP; and

    C.  Cash from the proceeds of the Equity Rights Offering, if applicable.

In accordance with the First Lien Credit Agreement, the distributions set forth in subclause 4.3(c)(ii) shall be distributed *first* on account of First Lien Claims consisting of accrued and unpaid interest as of the Petition Date until such amounts received are equal to the full face amount of such accrued and unpaid interest as of the Petition Date and *second* on account of First Lien Claims consisting of principal and any other obligations under the First Lien Credit Agreement.

(d)      *Impairment and Voting*: Class 3 is Impaired, and the Holders of First Lien Claims in Class 3 are entitled to vote to accept or reject this Plan.

23

4.4. ***Second Lien Claims (Class 4)***.

      (a)    *Classification*: Class 4 consists of Second Lien Claims.

      (b)    *Allowance*: The Second Lien Claims shall be deemed Allowed in the aggregate principal amount of $316,223,250.00 plus accrued and unpaid interest as of the Petition Date in the amount of $6,236,625.21, plus other fees, costs, and expenses of the Trustee and the Notes Collateral Agent (each as defined in the Second Lien Notes Documents) under the Second Lien Notes Documents.

      (c)    *Treatment*: On or as soon as reasonably practicable after the Effective Date, except to the extent that a Holder of an Allowed Second Lien Claim agrees to less favorable treatment, in full and final satisfaction settlement, release, and discharge and in exchange for each Allowed Second Lien Claim, on the Effective Date or on another date acceptable to the Required Consenting First Lien Lenders, each Holder of an Allowed Second Lien Claim shall receive a Pro Rata Share of the following:

      (i)    2% of the New Common Interests, subject to dilution by the DIP Backstop Premium, the Equity Rights Offering (if applicable), the New Warrants, and the MIP; and

      (ii)    the New Warrants.

      (d)    *Impairment and Voting.*  Class 4 is Impaired, and the Holders of Second Lien Claims are entitled to vote to accept or reject this Plan.

4.5. ***General Unsecured Claims (Class 5)***.

      (a)    *Classification*: Class 5 consists of General Unsecured Claims.

      (b)    *Treatment*: All General Unsecured Claims (including, for the avoidance of doubt, First Lien Deficiency Claims, Second Lien Deficiency Claims, and Unsecured Notes Claims) shall be canceled, released, and extinguished as of the Effective Date, and Holders of Allowed General Unsecured Claims shall not receive or retain any distribution, property, or other value on account of such General Unsecured Claims; *provided that*, Eligible Holders of General Unsecured Claims (but excluding Holders of First Lien Deficiency Claims and Second Lien Deficiency Claims) shall receive, in full and final satisfaction, settlement, release, and discharge and in exchange for each General Unsecured Claim, their Pro Rata Share of the right to purchase up to $200,000,000, in aggregate, of New Common Interests pursuant to the Equity Rights Offering.

      (c)    *Impairment and Voting*: Class 5 is Impaired, and the Holders of General Unsecured Claims are entitled to vote to accept or reject this Plan.

4.6. ***Intercompany Claims (Class 6)***.

      (a)    *Classification*: Class 6 consists of Intercompany Claims.

      (b)    *Treatment*: On or as soon as reasonably practicable after the Effective Date, all Intercompany Claims shall be either: (i) Reinstated or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors with the consent of the Required Consenting First Lien Lenders.

      (c)    *Impairment and Voting*: Class 6 is Unimpaired and the Holders of Intercompany Claims in Class 6 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the

24

Bankruptcy Code.  Therefore, Holders of Intercompany Claims are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Claims.

4.7.    ***Subordinated Claims (Class 7)***.

(a)    *Classification*: Class 7 consists of Subordinated Claims.

(b)    *Treatment*: Holders of Subordinated Claims are not entitled to receive a recovery or distribution on account of such Subordinated Claim.  On the Effective Date, Subordinated Claims shall be canceled, released, extinguished, and of no further force or effect.

(c)    *Impairment and Voting*: Class 7 is Impaired and not receiving any distribution under this Plan, and Holders of Subordinated Claims are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Subordinated Claims are not entitled to vote to accept or reject this Plan.  Holders of Subordinated Claims shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

4.8.    ***Intercompany Interests (Class 8)***.

(a)    *Classification*: Class 8 consists of Intercompany Interests.

(b)    *Treatment*: On or as soon as reasonably practicable after the Effective Date, all Intercompany Interests shall be, at the option of the Debtors, either: (i) Reinstated for administrative convenience or (ii) set off, settled, distributed, contributed, merged, canceled, or released, in each case, in the discretion of the Debtors or Reorganized Debtors.

(c)    *Impairment and Voting*: Class 8 is Unimpaired and the Holders of Intercompany Interests in Class 8 are conclusively presumed to have accepted this Plan pursuant to section 1126(f) of the Bankruptcy Code.  Therefore, Holders of Intercompany Interests are not entitled to vote to accept or reject this Plan, and the votes of such Holders will not be solicited with respect to such Intercompany Interests.

4.9.    ***Existing Parent Equity Interests (Class 9).*** Classification: Class 9 consists of Existing Parent Equity Interests.

(b)    *Treatment*: Holders of Existing Parent Equity Interests shall not receive or retain any distribution, property, or other value on account of such Existing Parent Equity Interests.  On the Effective Date or as soon as reasonably practicable thereafter, all Existing Parent Equity Interests shall be canceled, released, extinguished, and of no further force and effect.

(c)    *Impairment and Voting*: Class 9 is Impaired and not receiving any distribution under this Plan, and Holders of Existing Parent Equity Interests are deemed to have rejected this Plan pursuant to section 1126(g) of the Bankruptcy Code.  Therefore, Holders of Existing Parent Equity Interests are not entitled to vote to accept or reject this Plan.  Holders of Existing Parent Equity Interests shall be provided a Release Opt-Out Form solely for purposes of affirmatively opting out of the Third-Party Release.

# ARTICLE V.

## MEANS FOR IMPLEMENTATION.

5.1.    ***Restructuring Transactions***.

Without limiting any rights and remedies of the Debtors or Reorganized Debtors under this Plan or applicable law, but in all cases subject to the terms and conditions of the Definitive Documents and any consents or approvals thereunder, the entry of the Confirmation Order shall constitute authorization for the Reorganized Debtors to take, or to cause to be taken, together with any other transaction that may be necessary or appropriate to effect any transaction described in the Restructuring Support Agreement, or described in, approved by, contemplated by, or necessary to effectuate this Plan, including: (a) the execution and delivery of any appropriate agreements or other documents of merger, amalgamation, consolidation, restructuring, conversion, disposition, transfer, formation, organization, dissolution, or liquidation containing terms that are consistent with the terms of this Plan, and that satisfy the requirements of applicable law and any other terms to which the applicable Persons may agree, including the documents comprising the Plan Supplement; (b) the execution and delivery of appropriate instruments of transfer, assignment, assumption, or delegation of any Asset, property, right, liability, debt, or obligation on terms consistent with the terms of this Plan and having other terms for which the applicable Persons agree; (c) the filing of appropriate certificates or articles of incorporation, reincorporation, merger, amalgamation, consolidation, conversion, or dissolution pursuant to applicable state law or the filing of any elections; (d) such other transactions that are required to effectuate the Restructuring Transactions, including any mergers, consolidations, restructurings, conversions, elections, dispositions, transfers, formations, organizations, dissolutions, or liquidations; (e) the execution, delivery, and Filing, if applicable, of the Definitive Documents; (f) the issuance of Plan Securities, all of which shall be authorized and approved in all respects, in each case, without further action being required under applicable law, regulation, order or rule; and (g) all other actions that the applicable Persons determine to be necessary or appropriate, including making filings or recordings that may be required by applicable law (collectively, the "***Restructuring Transactions***").

5.2.    ***Compromise and Settlement of Claims, Interests, and Controversies***.

Pursuant to sections 363 and 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the classification, distribution, releases, and other benefits provided under this Plan, upon the Effective Date, the provisions of this Plan shall constitute an integrated, good faith compromise and settlement of all Claims, Interests, and controversies relating to the contractual, legal, equitable, and subordination rights that a Claim or an Interest Holder may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made on account of such Allowed Claim or Allowed Interest. This Plan shall be deemed a motion to approve the good-faith compromises and settlements of all Claims, Interests, Causes of Action, and controversies pursuant to Bankruptcy Rule 9019.    Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all such Allowed Claims, Allowed Interests, and controversies under Bankruptcy Rule 9019, as well as a finding by the Bankruptcy Court that such compromises, settlements, and transactions are in the best interests of the Debtors, their Estates, and Holders of Allowed Claims and Allowed Interests, and each such compromise, settlement, and transaction, is fair, equitable, and within the range of reasonableness.    Subject to the provisions of this Plan governing distributions, all distributions made to Holders of Allowed Claims and Allowed Interests in any Class are intended to be and shall be final.    As consideration for, among other things, the Releases provided pursuant to this Plan, the Consenting Creditors have agreed pursuant to the Restructuring Support Agreement, for the benefit of the Debtors and the Debtors' Estates, to make contributions to enable the implementation of this Plan, such contributions being fundamentally necessary to the implementation of this Plan, and without consideration, including the Releases, the Consenting

Creditors would not have agreed to make the contributions reflected herein. The compromises and settlements described herein shall be non-severable from each other and from all other terms of this Plan.

5.3.    *Administrative Consolidation for Voting and Distribution Purposes Only*.

Other than with respect to Debtor ModivCare, this Plan is premised upon the substantive consolidation of the Debtors solely for the purposes of voting, determining which Class or Classes have accepted this Plan, confirming the Plan, and the resulting treatment of all Claims and Interests and Plan distributions. Each Debtor shall continue to maintain its separate corporate existence for all purposes other than the treatment of Claims and Interests under this Plan. On the Effective Date, and except as otherwise expressly provided in this Plan, solely for voting, confirmation, and distribution purposes with respect to each Class of Claims or Interests, other than with respect to Debtor ModivCare: (a) all Claims or Interests in each respective Class shall be deemed merged or consolidated and treated as Claims or Interests against the Debtors on a consolidated basis; (b) each Claim or Interest in each respective Class will be deemed a single Claim against, or Interest in, the consolidated Debtors; (c) any Claim in a given Class based on a guaranty by any Debtor of the obligations of any other Debtor shall be deemed eliminated and extinguished, so that any Claim against any Debtor and any guarantee thereof by any other Debtor, and any joint or several liability of any of the Debtors, shall be deemed to be one obligation of the consolidated Debtors; and (d) each Holder of any Allowed Claim or Interest in a given Class shall be entitled to a single recovery on account of such Claim or Interest, in accordance with the treatment provided under this Plan for such Class, regardless of whether such Holder filed Proofs of Claim against multiple Debtors or has Claims against multiple Debtors based on the same or similar debt.

Such substantive consolidation is solely for voting, confirmation and distribution purposes with respect to each Class and shall not constitute a transfer of Assets or liabilities between the Debtors for any other purpose.

Moreover, this Plan's treatment shall not affect any subordination provisions set forth in any agreement relating to any Claim or Interest or the ability of the post-Effective Date Debtors or to seek to have any Claim subordinated in accordance with section 510 of the Bankruptcy Code or other applicable law. Pursuant to section 510 of the Bankruptcy Code, the Debtors expressly reserve the right to reclassify any Allowed Claim or Interest in accordance with any contractual, legal, or equitable subordination relating thereto. Except as provided in this Plan, all subordination rights that a Holder of a Claim may have with respect to any distribution to be made pursuant to this Plan shall be discharged and terminated, and all actions related to the enforcement of such subordination rights shall be permanently enjoined.

5.4.    *Continued Corporate Existence; Effectuating Documents; Corporate Action; Restructuring Transactions*.

(a)    Except as otherwise provided in this Plan or the Plan Supplement, the Debtors shall continue to exist after the Effective Date as Reorganized Debtors in accordance with the applicable laws of the respective jurisdictions in which they are incorporated or organized and pursuant to the respective Corporate Governance Documents (or other analogous formation, constituent, or Corporate Governance Documents) in effect before the Effective Date or the New Corporate Governance Documents or other applicable Corporate Governance Documents, except to the extent such certificate of incorporation, certificate of formation, bylaws or operating agreement (or other analogous formation, constituent, or Corporate Governance Documents) are amended by this Plan or otherwise, and to the extent any such

27

document is amended, such document is deemed to be amended pursuant to this Plan and requires no further action or approval (other than any requisite filings required under applicable state or federal law).

(b)    Notwithstanding anything herein to the contrary, on or about the Effective Date or as soon as reasonably practicable thereafter, the Debtors or the Reorganized Debtors, as applicable, shall take all actions set forth in and contemplated by this Plan, and enter into any transaction, and may take all actions as may be necessary or appropriate to effectuate the transactions described in, approved by, contemplated by, or necessary or appropriate to effectuate this Plan, including the Restructuring Transactions.

(c)    Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (i) the assumption of Executory Contracts and Unexpired Leases as provided herein; (ii) the selection, or criteria for selection, of managers, directors, or officers for the Reorganized Debtors; (iii) the issuance of the New Common Interests and the New Warrants, and entry into the New Common Interests Documents and the New Warrants Documents; (iv) entry into the Exit Facilities and Exit Facilities Documents, (v) the issuance and/or distribution of the Plan Securities; (vi) implementation of, and performance under, the Management Incentive Plan; (vii) the consummation of the Equity Rights Offering; (viii) entry into the New Corporate Governance Documents; and (ix) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.

(d)    The Confirmation Order shall and shall be deemed to, pursuant to sections 363, 1123, and 1142 of the Bankruptcy Code, authorize and direct parties, as applicable, among other things, to perform all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by, or necessary to effectuate this Plan, including the Restructuring Transactions.

(e)    Each officer, director, or manager of the Debtors is (and each officer, director, or manager of the Reorganized Debtors shall be) authorized and empowered to issue, execute, deliver, File, or record such contracts, Securities, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and the Plan Securities in the name of and on behalf of the Reorganized Debtors, all of which shall be authorized and approved in all respects, in each case, without the need for any approvals, authorization, consents, or any further action required under applicable law, regulation, order, or rule (including any action by the stockholders or directors or managers of the Debtors or the Reorganized Debtors) except for those expressly required pursuant to this Plan.

(f)    All matters provided for in this Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with this Plan or the Restructuring Transactions shall be deemed to have occurred and shall be in effect, without any requirement of further action by the directors, managers, or officers of the Debtors or the Reorganized Debtors or by any other stakeholder, and with like effect as though such action had been taken unanimously by the stockholders, directors, managers, or officers, as applicable, of the Debtors or Reorganized Debtors.

5.5.    ***New Corporate Governance Documents***.

Subject to Article V, Section 5.4, the Reorganized Debtors shall enter into agreements and amend their Corporate Governance Documents to the extent necessary to implement the terms and provisions of this Plan. Without limiting the generality of the foregoing, as of the Effective Date, each of the Reorganized Debtors shall be governed by the New Corporate Governance Documents applicable to it. On the Effective Date, the Corporate Governance Documents of each of the Reorganized Debtors will be

deemed to be modified to prohibit the issuance of non-voting equity Securities, solely to the extent required under section 1123(a)(6) of the Bankruptcy Code. On or immediately before the Effective Date, each Reorganized Debtors shall file its applicable New Corporate Governance Documents, if any, with the applicable Secretary of State and/or other applicable authorities in its jurisdiction of incorporation or formation in accordance with applicable laws of its jurisdiction of incorporation or formation, to the extent required for such New Corporate Governance Documents to become effective.

### 5.6.    *Intercompany Interests; Corporate Reorganization*.

To the extent Reinstated under this Plan, on the Effective Date, the Intercompany Interests (a) shall be Reinstated for the ultimate benefit of the Holders of Claims that receive Plan Securities under this Plan, and their Holders shall receive no recovery or distribution, and (b) without the need for any further corporate action or approval of any board of directors, board of managers, managers, management, or stockholders of any Debtor or Reorganized Debtor, as applicable, the certificates and all other documents representing the Reinstated Intercompany Interests shall be deemed to be in full force and effect.

### 5.7.    *Exit Facilities Documents*.

(a)    On the Effective Date, the Reorganized Debtors shall be authorized to execute, deliver, and enter into the Exit Facilities Documents without further (i) notice to or order or other approval of the Bankruptcy Court, (ii) act or omission under applicable law, regulation, order, or rule, (iii) vote, consent, authorization, or approval of any Person, or (iv) action by the Holders of Claims or Interests.  The Exit Facilities Documents shall constitute legal, valid, binding and authorized joint and several obligations of the applicable Reorganized Debtors, enforceable in accordance with their respective terms and such obligations shall not be enjoined or subject to discharge, impairment, release, avoidance, recharacterization, or subordination under applicable law, this Plan, or the Confirmation Order.  The financial accommodations to be extended pursuant to the Exit Facilities Documents (and other definitive documentation related thereto) are reasonable and are being extended, and shall be deemed to have been extended, in good faith and for legitimate business purposes.

(b)    Confirmation of this Plan shall be deemed approval of the Exit Facilities, and the Exit Facilities Documents, all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, and authorization of the Reorganized Debtors to enter into, execute, and deliver the Exit Facilities Documents.

(c)    On the Effective Date, all Liens and security interests granted pursuant to the applicable Exit Facilities Documents shall be (i) valid, binding, automatically perfected, and enforceable Liens and security interests in the personal and real property described in and subject to such document, with the priorities established in respect thereof under applicable non-bankruptcy law and (ii) not subject to avoidance, recharacterization, or subordination under any applicable law, this Plan, or the Confirmation Order.

(d)    The Reorganized Debtors and the Persons granted Liens and security interests under the applicable Exit Facilities Documents are authorized to make all filings and recordings and to obtain all governmental approvals and consents necessary to establish and perfect such Liens and security interests under the provisions of the applicable state, provincial, federal, or other law (whether domestic or foreign) that would be applicable in the absence of this Plan and the Confirmation Order (it being understood that perfection shall occur automatically by virtue of the entry of the Confirmation Order without the need for any filings or recordings) and will thereafter cooperate to make all other filings and recordings that otherwise would be necessary under applicable law to give notice of such Liens and security interests to third parties.

5.8.    *Equity Rights Offering*.

(a)    On the Effective Date, the Debtors or the Reorganized Debtors, as applicable, shall cause the Equity Rights Offering to be consummated, pursuant to the Equity Rights Offering Documents and this Plan and subject to the Equity Rights Offering Procedures.  The Equity Rights Offering shall have been conducted prior to the Effective Date, and the New Common Interests shall be issued pro rata to the participants in the Equity Rights Offering, pursuant to the Equity Rights Offering Documents and this Plan and subject to the Equity Rights Offering Procedures.

(b)    Entry of the Solicitation Procedures Order shall constitute Bankruptcy Court approval of the Equity Rights Offering, the Equity Rights Offering Documents, and all transactions contemplated thereby, and all actions to be taken, undertakings to be made, and obligations to be incurred by the Reorganized Debtors in connection therewith, including the issuance of New Common Interests pursuant thereto and the payment of all fees, indemnities, expenses, and other payments provided for in connection therewith, and authorization of the Reorganized Debtors to enter into and execute any other documents necessary to effectuate the transactions in this Article V, Section 5.8.

(c)    The consummation of the Equity Rights Offering is conditioned on the consummation of the other transactions contemplated by this Plan and satisfaction with the applicable conditions specified in the Equity Rights Offering Documents.  The New Common Interests sold in the Equity Rights Offering may not be sold, transferred, or assigned, except in the circumstances set forth in the Equity Rights Offering Documents and subject to the transfer provisions, if any, and other applicable provisions set forth in the Corporate Governance Documents of the applicable issuers.  The proceeds of the Equity Rights Offering shall fund Cash payments to Holders of Allowed First Lien Claims.

5.9.    *Exemption from Securities Laws*.

(a)    No registration statement shall be filed under the Securities Act, or pursuant to any state securities laws, with respect to the offer, issuance and distribution of the Plan Securities under this Plan, the Equity Rights Offering Documents, the Confirmation Order, or the New Warrants Documents.

(b)    The offer, sale, issuance, and distribution of the Plan Securities in exchange for Claims pursuant to Article II, Article III, Article IV and other provisions of this Plan, the Restructuring Transactions, the Confirmation Order, the Equity Rights Offering Documents, and the New Warrants Documents shall be exempt from, among other things, the registration requirements of Section 5 of the Securities Act and any other applicable United States, state, or local law requiring registration for the offer or sale of a Security pursuant to section 1145(a) of the Bankruptcy Code to the fullest extent permissible.

(c)    To the extent any portion of the Plan Securities is not eligible for the exemption of registration provided by section 1145 of the Bankruptcy Code (including any New Common Interests to be issued pursuant to the Equity Rights Offering), the offering, sale, issuance, and distribution of such Plan Securities shall be made in reliance upon Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder and on equivalent state law registration exemptions or, solely to the extent such exemptions are not available, other available exemptions from registration under the Securities Act.  Any Plan Securities that are not issued pursuant to section 1145(a) of the Bankruptcy Code will be considered "restricted" Plan Securities, will bear customary legends and transfer restrictions, and may not be resold except pursuant to an effective registration statement or under an available exemption from the registration requirements of the Securities Act, such as, under certain conditions, the resale provisions of Rule 144A, Regulation S, and/or Rule 144 of the Securities Act, subject to, in each case, the transfer provisions, if any, and other applicable provisions set forth in the Corporate Governance Documents of the applicable issuers.

Any recipients of the Plan Securities that are Affiliates of Reorganized Parent will receive "control" Plan Securities that will be subject to the "control securities" restrictions of Rule 144 of the Securities Act.

(d)    The Reorganized Debtors and Reorganized Parent need not provide any further evidence other than this Plan and the Confirmation Order with respect to the treatment of the Plan Securities under applicable securities laws.  The availability of the exemption under section 1145 of the Bankruptcy Code or any other applicable securities laws shall not be a condition to the occurrence of the Effective Date.

5.10.    *New Warrants Agreement*.

On the Effective Date, the Reorganized Debtors and Holders of Allowed Second Lien Claims shall enter into the New Warrants Agreement and all New Warrants shall be issued and exercisable into New Common Interests, subject to the terms and conditions of the New Warrants Agreement, and shall be subject to dilution by the MIP.

5.11.    *Cancellation of Existing Securities and Agreements*.

Except for the purpose of evidencing a right to a distribution under this Plan and except as otherwise set forth in this Plan, including with respect to Executory Contracts or Unexpired Leases that shall be assumed by the Reorganized Debtors, or any contract, instrument, or other agreement or document created in connection with this Plan, on the Effective Date, all agreements, instruments, notes, certificates, mortgages, security documents, Prepetition Funded Debt Documents, and any other documents evidencing any Claim or Interest (other than Intercompany Claims and Intercompany Interests that are not modified by this Plan) and any rights of any Holder in respect thereof shall be deemed canceled, discharged, and of no further force or effect, without any further act or action of any person under any applicable agreement, instrument, document, law, regulation, order, or rule, and the obligations of the Debtors thereunder shall be deemed automatically fully satisfied, released, and discharged.  Notwithstanding such cancellation and discharge on the Effective Date and the release of the Second Lien Notes Trustee and the First Lien Agent from their respective duties thereunder, the First Lien Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indenture shall continue in effect solely (a) to the extent necessary to allow the Holders of First Lien Claims, Second Lien Claims, and Unsecured Notes Claims to receive distributions under this Plan in accordance therewith; (b) to the extent necessary to allow the Debtors, the Reorganized Debtors, and/or the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent each to make post-Effective Date distributions in accordance with this Plan at the expense of the Reorganized Debtors, subject to their respective rights as Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent under the First Lien Credit Agreement, the Second Lien Notes Indenture, and the Unsecured Notes Indenture, as applicable, or take such other action expressly authorized by this Plan on account of Allowed First Lien Claims, Second Lien Claims, and Unsecured Notes Claims; and (c) to appear in the Chapter 11 Cases, *provided*, that nothing in the foregoing shall affect the discharge of Claims pursuant to the Bankruptcy Code, the Confirmation Order, or this Plan or result in any liability or expense to the Reorganized Debtors.  Nothing contained herein shall be deemed to cancel, terminate, release, or discharge the obligation of the Debtors or any of their counterparties under any Executory Contract or Unexpired Lease to the extent such Executory Contract or Unexpired Lease has been assumed by the Debtors pursuant to a Final Order of the Bankruptcy Court or hereunder.  For the avoidance of doubt, the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent shall have no ongoing duties to the Holders of the First Lien Claims, the Second Lien Claims, and the Unsecured Notes Claims under any of the canceled and discharged First Lien Credit Agreement, Second Lien Notes Indenture, Unsecured Notes

31

Indenture, and Prepetition Funded Debt Documents following the Effective Date other than as expressly set forth in this Plan or Confirmation Order.

### 5.12. *Cancellation of Existing Parent Equity Interests and other Interests*.

(a)      Except as otherwise specifically provided herein, including pursuant to <u>Article V</u>, <u>Section 5.4(a)</u> of this Plan, all notes, instruments, certificates or other agreement or document evidencing debt of the Debtors, Existing Parent Equity Interests, and other Interests will be canceled and obligations of the Debtors thereunder will be discharged and of no further force or effect, except, where applicable, for the purpose of allowing the applicable agents and trustees to receive distributions from the Debtors under this Plan and to make any further distributions to the applicable Holders on account of their Claims.

(b)      Upon the full payment or other satisfaction of its Allowed Other Secured Claim, or promptly thereafter, any Lien securing any Other Secured Claim shall be deemed released and the Holder of such Allowed Other Secured Claim shall deliver to the Debtors or the Reorganized Debtors, as applicable, any Collateral or other property of a Debtor held by such Holder, together with any termination statements, instruments of satisfaction, or releases of all security interests with respect to its Allowed Other Secured Claim that may be reasonably required to terminate any related financing statements, mortgages, mechanics' or other statutory Liens, or lis pendens, or similar interests or documents.

(c)      After the Effective Date and following the (i) distributions to Holders on account of Allowed DIP Claims, Allowed First Lien Claims, and Allowed Second Lien Claims and (ii) payment of the Restructuring Expenses, any Lien securing such Claims shall be deemed released and the Debtors or the Reorganized Debtors may, in their sole discretion, take any action necessary to terminate, cancel, extinguish, and/or evidence the release of any and all mortgages, deeds of trust, Liens, pledges, and other security interests with respect to the DIP Claims, First Lien Claims, and Second Lien Claims, including the preparation and filing, in form, substance, and content of any and all documents necessary to terminate, satisfy, or release any mortgages, deeds of trust, Liens, pledges, and other security interests held by the DIP Agent, the First Lien Agent, the Second Lien Notes Trustee, and Holders of DIP Claims, and First Lien Claims, Second Lien Claims, including UCC-3 termination statements.

### 5.13. *Officers and Boards of Directors*.

(a)      On the Effective Date, the New Board of the Reorganized Debtors shall be appointed by a pre-emergence committee consisting of certain Holders comprising the Required Consenting First Lien Lenders, in consultation with the Debtors, and disclosed in the Plan Supplement prior to emergence in accordance with section 1129(a)(5) of the Bankruptcy Code. The identity of the New Board members will be disclosed in the Plan Supplement at or prior to the Confirmation Hearing.  Except to the extent that an existing director of ModivCare is designated to serve on the New Board, the existing directors of ModivCare in their capacities as such, shall be deemed to have resigned or shall otherwise cease to be a director of ModivCare on the Effective Date.  Each independent director of the Debtors, in such capacity, shall not have any of his/her respective privileged and confidential documents, communications, or information transferred (or deemed transferred) to the Reorganized Debtors, Reorganized Parent, or any other Entity without such director's prior written consent unless such information constitutes property of the Debtors.

(b)      The existing directors of each of ModivCare's subsidiaries shall remain in their current capacities as directors of the applicable Reorganized Debtor until replaced or removed in accordance with the organizational documents of the applicable Reorganized Debtors.

(c)	The existing officers of the Debtors as of the Effective Date shall remain in their current capacities as officers of the Reorganized Debtors, subject to their right to resign and the ordinary rights and powers of the New Board to remove or replace them in accordance with the New Corporate Governance Documents and any applicable agreements (including, but not limited to, employment agreements and offer letters) that are assumed pursuant to this Plan.

5.14.	*Management Incentive Plan*.

After the Effective Date, the New Board shall adopt and implement the Management Incentive Plan.

5.15.	*First Lien Claim Equity Option*

Prior to the Effective Date, each Holder of an Allowed First Lien Claim shall have the opportunity to irrevocably elect to receive (subject to the limitations set forth in the Election Procedures) (a) additional New Common Interests in lieu of receiving some or all of their pro rata share Exit Term Loans (the "Equity Option") or (b) additional Exit Term Loans in lieu of receiving some or all of their portion of the New Common Interests. New Common Interests distributed pursuant to the Equity Option shall not reduce the aggregate amount of Exit Term Loans available for distribution. The (a) New Common Interests distributed on account of the Equity Option shall reduce, on a ratable basis and at a ratio to be set forth in the Election Procedures, the amount of New Common Interests issued to each Holder of the Allowed First Lien Claims that elects to receive additional Exit Term Loans (to the extent available) in lieu of its pro rata portion of the New Common Interests and (b) the Exit Term Loans distributed on account of the equity Option shall reduce, on a ratable basis and at a ratio to be set forth in the Election Procedures, the amount of Exit Term Loans issued to each Holder of the Allowed First Lien Claims that elects to receive additional New Common Interests in lieu of its pro rata portion of the Exit Term Loans. Holders shall have the opportunity to make such election pursuant to the Election Procedures.

5.16.	*Issuance of New Common Interests and Deregistration*.

On the Effective Date, Reorganized Parent shall issue and deliver or reserve for issuance, as applicable, all of the New Common Interests issuable in accordance with the terms of this Plan and the other Definitive Documents. The issuance and delivery or reservation for issuance, as applicable, of such New Common Interests is authorized without the need for further corporate or other action or any consent or approval of any national securities exchange upon which the New Common Interests may be listed on or immediately following the Effective Date. All of the New Common Interests issuable under this Plan and the other Definitive Documents shall, when issued in accordance with this Plan and/or any other applicable Definitive Documents, be duly authorized, validly issued, fully paid, and non-assessable. Each Holder of New Common Interests shall be deemed, without further notice or action, to have agreed to be bound by the New Corporate Governance Documents, as the same may be amended from time to time following the Effective Date in accordance with their terms. The New Corporate Governance Documents shall be binding on all Entities receiving New Common Interests (and their respective successors and permitted assigns), whether received pursuant to this Plan or otherwise and regardless of whether such Entity executes or delivers a signature page to any New Corporate Governance Document. The issuance and delivery or reservation for issuance, as applicable, of the New Common Interests in accordance with this Plan and the other Definitive Documents are authorized without the need for any further limited liability company or corporate action and without any further action by any Holder of a Claim or Interest.

Reorganized Parent shall not be obligated to effect or maintain any listing of the New Common Interests for trading on any national securities exchange (within the meaning of the Exchange Act) and it has no current intention of maintaining or obtaining such listing. The New Common Interests are expected

33

to be delivered via book-entry transfer by the Distribution Agent in accordance with this Plan and the other Definitive Documents, rather than through the facilities of DTC; however, in the event the New Common Interests are DTC eligible on the Effective Date, delivery thereof may be made via DTC. Upon the Effective Date, after giving effect to the Restructuring Transactions, the New Common Interests shall be that number of shares or membership interests as may be designated in the New Corporate Governance Documents. On and after the Effective Date, transfers of New Common Interests shall be made in accordance with applicable United States law, United States securities laws (as applicable), and the New Corporate Governance Documents.

As promptly as reasonably practicable following the Effective Date, Reorganized Parent shall take all necessary steps in accordance with and to the extent permitted by the Exchange Act and the Securities Act to terminate the registration of all Securities under the Exchange Act and Securities Act, including to de-register its Existing Parent Equity Interests, and to terminate its reporting obligations under sections 12, 13, and 15(d) of the Exchange Act, including by (a) filing, or causing any applicable national securities exchange to file, a Form 25 with the SEC under the Exchange Act, and (b) filing a Form 15 with the SEC under the Exchange Act.

5.17.    ***Effectuating Documents; Further Transactions***.

Before, on, and after the Effective Date, the Debtors, the Reorganized Debtors, and the directors, managers, officers, authorized persons, and members of the boards of directors or managers and directors or managers of the foregoing, are authorized to and may issue, execute, deliver, file, or record such contracts, securities, notes, instruments, certificates, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and provisions of this Plan, the New Corporate Governance Documents, the Exit Facilities Documents, and any Securities issued pursuant to this Plan in the name of and on behalf of the Reorganized Debtors, without the need for any approvals, authorizations, actions, or consents except for those expressly required pursuant to this Plan.

5.18.    ***Authority of Debtors***.

Effective on the Confirmation Date, the Debtors and the Reorganized Debtors, as applicable, shall be empowered and authorized to take or cause to be taken, before the Effective Date, all actions necessary or appropriate to achieve the Effective Date and enable the Reorganized Debtors to implement effectively the provisions of this Plan, the Confirmation Order, the Definitive Documents, and the Restructuring Transactions.

5.19.    ***Continuing Effectiveness of Final Orders***.

Payment authorization granted to the Debtors under any prior Final Order entered by the Bankruptcy Court shall continue in effect after the Effective Date. Accordingly, the Debtors or the Reorganized Debtors may pay or otherwise satisfy any Claim to the extent permitted by, and subject to, the applicable Final Order without regard to the treatment that would otherwise be applicable to such Claim under this Plan.

5.20.    ***Nonconsensual Confirmation***.

To the extent any Voting Class has not voted to accept this Plan, the Debtors intend to undertake to have the Bankruptcy Court confirm this Plan under section 1129(b) of the Bankruptcy Code as to any Classes that reject or are deemed to reject this Plan.

5.21.   ***Closing of the Chapter 11 Cases***.

After an Estate has been fully administered, the Reorganized Debtors shall be authorized, but not directed, to submit one or more motion(s) to the Bankruptcy Court for entry of one or more order(s) that close and issue final decrees for any of the Chapter 11 Cases, for any Debtor, in each case in accordance with the Bankruptcy Code and the Bankruptcy Rules.

5.22.   ***Notice of Effective Date***.

On or as soon as practicable after the Effective Date, the Debtors shall File a notice of the occurrence of the Effective Date with the Bankruptcy Court.

## ARTICLE VI.

## DISTRIBUTIONS.

6.1.   ***Distributions Generally***.

The Distribution Agent shall make all distributions under this Plan to the appropriate Holders of Allowed Claims in accordance with the terms of this Plan, provided that initial Plan distributions shall be made to or at the direction of the Second Lien Notes Trustee, the Unsecured Notes Trustee, and the First Lien Agent, as applicable, for further distribution in accordance with the Prepetition Funded Debt Documents, respectively.

If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII.  Except as otherwise provided herein, Holders of Claims shall not be entitled to postpetition interest, dividends, or accruals on the distributions provided for herein, regardless of whether such distributions are delivered on or at any time after the Effective Date.

6.2.   ***Special Rules for Distributions to Holders of Disputed Claims***.

Except as otherwise agreed by the relevant parties: (a) no partial payments and no partial distributions shall be made with respect to a Disputed Claim until all such disputes in connection with such Disputed Claim have been resolved by settlement or Final Order; and (b) any Entity that holds both an Allowed Claim and a Disputed Claim shall not receive any distribution on the Allowed Claim unless and until all objections to the Disputed Claim have been resolved by settlement or Final Order or such Claims or Interests have been Allowed or expunged.

6.3.   ***Distribution Record Date***.

As of the close of business on the Distribution Record Date, the various transfer registers for each of the Classes of Claims or Interests as maintained by the Debtors or their respective agents, shall be deemed closed, and there shall be no further changes in the record Holders of any of the Claims or Interests.  The Debtors or the Reorganized Debtors shall have no obligation to recognize any transfer of the Claims or Interests occurring on or after the Distribution Record Date.  In addition, with respect to payment of any Cure Claims or disputes over any Cure Claims, neither the Debtors nor the Distribution Agent shall have any obligation to recognize or deal with any party other than the non-Debtor party to the applicable Executory Contract or Unexpired Lease as of the Distribution Record Date, even if such non-Debtor party has sold, assigned, or otherwise transferred its Cure Claim.  Notwithstanding the foregoing, the Distribution Record Date shall not apply to distributions in respect of securities deposited with DTC, the Holders of

which shall receive distributions, if any, in accordance with the customary exchange procedures of DTC or this Plan. For the avoidance of doubt, in connection with a distribution through the facilities of DTC (if any), DTC shall be considered a single Holder for purposes of distributions.

6.4.    ***Date of Distributions***.

(a)    Except as otherwise provided in this Plan (including payments made in the ordinary course of the Debtors' business) or as paid pursuant to a prior Bankruptcy Court order, on the Effective Date or, if a Claim or Interest is not Allowed on the Effective Date, on the date that such Claim or Interest becomes Allowed, or, in each case, as soon as reasonably practicable thereafter, or as otherwise determined in accordance with this Plan and the Confirmation Order, including the treatment provisions of Article IV of this Plan, each Holder of an Allowed Claim shall receive the full amount of the distributions that such Holder of an Allowed Claim is entitled to under this Plan; *provided*, that the Reorganized Debtors may implement periodic distribution dates to the extent they determine them to be appropriate (but subject in all respects to the Definitive Documents); *provided further*, that the Reorganized Debtors may make distributions of Plan Securities following the Effective Date, including to Holders of Disputed Claims that become Allowed Claims; *provided further*, that any Holder participating in the Equity Rights Offering may inform the Distribution Agent pursuant to the Equity Rights Offering Procedures that the distributions in respect of such Holder's Allowed Claims shall be made to one or more of its Affiliates, designees or Related Funds.  If and to the extent that there are Disputed Claims, distributions on account of any such Disputed Claims shall be made pursuant to the provisions set forth in Article VII; *provided*, that any Plan Security that is issuable to Holders of Allowed Claims but is withheld from distribution on account of a Holder of a Disputed Claim shall not be issued until such time such Disputed Claim is resolved and the Plan Securities are to be distributed.  Except as specifically provided in this Plan, Holders of Allowed Claims shall not be entitled to interest, dividends, or accruals on the distributions provided for in this Plan, regardless of whether such distributions are delivered on or at any time after the Effective Date.

(b)    For all purposes associated with distributions under the Plan, all guarantees by any Debtor of the obligations of any other Debtor, as well as any joint and several liability of any Debtor with respect to any other Debtor, shall be deemed eliminated so that any obligation that could otherwise be asserted against more than one Debtor shall result in a single distribution under the Plan; provided, that Claims held by a single entity against different Debtors that are not based on guarantees or joint and several liability shall be entitled to the applicable distribution for each such Claim against each applicable Debtor. Any such Claims shall be released pursuant to Article X of the Plan and shall be subject to all potential objections, defenses, and counterclaims, and to estimation pursuant to section 502(c) of the Bankruptcy Code.  For the avoidance of doubt, this shall not affect the obligation of each and every Debtor to pay fees payable pursuant to section 1930(a) of the Judicial Code until such time as a particular Chapter 11 Case is closed, dismissed, or converted, whichever occurs first.

6.5.    ***Delivery of Distributions to the First Lien Loans.***

All distributions with respect to the First Lien Claims shall be made to or at the direction of the First Lien Agent. As a condition precedent to the distributions provided for in this subsection, the Holders of Allowed First Lien Claims shall be deemed to have surrendered their First Lien Loans and all such surrendered First Lien Loans and the related book entry positions and other documents shall be deemed to be canceled in accordance with Article V, Section 5.11 of the Plan as of the Effective Date in exchange for such distributions.

6.6.    *Delivery of Distributions to the Second Lien Notes.*

All distributions with respect to the Second Lien Notes shall be made to or at the direction of the Second Lien Notes Trustee. As a condition precedent to the distributions provided for in this subsection, the Holders of Allowed Second Lien Claims shall be deemed to have surrendered their Second Lien Notes and all such surrendered Second Lien Notes and the related book entry positions and other documents shall be deemed to be canceled in accordance with Article V, Section 5.11 of the Plan as of the Effective Date in exchange for such distributions.

6.7.    *Distribution Agent*.

All distributions under this Plan to Claims other than with respect to the First Lien Loans, and the Second Lien Notes shall be made by the applicable Distribution Agent which may be a Debtor, Reorganized Debtor, or such other Entity designated as Distribution Agent pursuant to the Plan Supplement, on or after the Effective Date or as otherwise provided herein.  A Distribution Agent shall not be required to give any bond or surety or other Security for the performance of its duties, and all reasonable fees and expenses incurred by such Distribution Agents directly related to distributions hereunder shall be reimbursed by the Reorganized Debtors.

6.8.    *Rights and Powers of Distribution Agent*.

(a)    From and after the Effective Date, the Distribution Agent, solely in its capacity as Distribution Agent, shall be exculpated by all Entities, including Holders of Claims against and Interests in the Debtors and other parties in interest, from any and all Claims, Causes of Action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Distribution Agent by this Plan or any order of the Bankruptcy Court entered pursuant to or in furtherance of this Plan, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct, fraud, malpractice, criminal conduct, or *ultra vires* acts of such Distribution Agent.  No Holder of a Claim or Interest or other party in interest shall have or pursue any Claim or Cause of Action vested in a Distribution Agent by order of the Bankruptcy Court, pursuant to this Plan, or as deemed by such Distribution Agent to be necessary and proper to implement the provisions hereof.

(b)    The Distribution Agent shall be empowered to: (i) take, and otherwise effectuate, all actions and execute all agreements, instruments, and other documents necessary to perform its duties under this Plan; (ii) make all applicable distributions or payments provided for under this Plan; (iii) employ professionals to represent it with respect to its responsibilities; and (iv) exercise such other powers (A) as may be vested in the Distribution Agent by order of the Bankruptcy Court (including any Final Order issued after the Effective Date) or pursuant to this Plan or (B) as deemed by the Distribution Agent to be necessary and proper to implement the provisions of this Plan.

6.9.    *Expenses of Distribution Agent*.

Except as otherwise ordered by the Bankruptcy Court and subject to the written agreement of the Reorganized Debtors, the reasonable and documented fees and expenses incurred by the Distribution Agent acting in such capacity (including reasonable and documented attorneys' fees and expenses) on or after the Effective Date shall be paid in Cash by the Reorganized Debtors in the ordinary course of business.

6.10.    *No Postpetition Interest*.

Except as otherwise specifically provided for in this Plan, the Confirmation Order, any other Definitive Document, another Final Order of the Bankruptcy Court, or required by applicable bankruptcy

37

law (including, without limitation, as required pursuant to section 506(b) or section 511 of the Bankruptcy Code), postpetition interest shall not accrue or be paid on any Claims, and no Holder of a Claim shall be entitled to interest accruing on such Claim on or after the Petition Date.

### 6.11. *Delivery of Distributions*.

Subject to Bankruptcy Rule 9010, all distributions to any Holder of an Allowed Claim shall be made by a Distribution Agent, who shall transmit such distribution to the applicable Holders of Allowed Claims (or to the DIP Agent, Second Lien Notes Trustee, and the First Lien Agent, as applicable, as provided herein in the case of DIP Claims, the First Lien Claims, and the Second Lien Claims); *provided*, that any Holder participating in the Equity Rights Offering as of the Distribution Record Date may send a written notice to the Distribution Agent that the distributions in respect of such Holder's Allowed Claims shall be made to one or more of its Affiliates, designees or Related Funds; *provided further*, that such Holder and relevant Affiliate, designee, or Related Fund comply with all applicable withholding and reporting requirements set forth in Article VI, Section 6.22 of this Plan. If a distribution to any Holder is returned as undeliverable, no further distributions shall be made to such Holder unless and until such Distribution Agent is notified in writing of such Holder's then-current address, at which time all currently-due, missed distributions shall be made to such Holder as soon as reasonably practicable thereafter without interest. Nothing herein shall require the Distribution Agent to attempt to locate Holders of undeliverable distributions and, if located, assist such Holders in complying with Article VI, Section 6.22 of this Plan.

### 6.12. *Distributions as of Effective Date*.

Distributions to Holders of Disputed Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims shall be deemed to have been made on the Effective Date.

### 6.13. *Unclaimed Property*.

One year from the later of (a) the Effective Date and (b) the date that is ten (10) Business Days after the date of a distribution on an Allowed Claim, all distributions payable on account of such Claim that are undeliverable or otherwise unclaimed shall be deemed unclaimed property under section 347(b) of the Bankruptcy Code and shall automatically, without need for need for any further action by or approval of any Person, including, without limitation, the Bankruptcy Court, revert to the Reorganized Debtors or their successors or assigns, and all Claims of any other person (including the Holder of a Claim in the same Class) to such distribution shall be discharged and forever barred. The Reorganized Debtors and the Distribution Agent shall have no obligation to attempt to locate any Holder of an Allowed Claim other than by reviewing the Debtors' books and records and the Bankruptcy Court's Filings.

### 6.14. *Time Bar to Cash Payments*.

Checks issued by the Distribution Agent in respect of Allowed Claims shall be null and void if not negotiated within ninety (90) days after the date of issuance thereof. Thereafter, the amount represented by such voided check shall irrevocably revert to the Reorganized Debtors, and any Claim in respect of such voided check shall be discharged and forever barred, notwithstanding any federal or state escheat laws to the contrary. Requests for reissuance of any check shall be made to the applicable Distribution Agent by

the Holder of the Allowed Claim to whom such check was originally issued, prior to the expiration of the ninety (90) day period.

6.15.    *Manner of Payment under Plan*.

Except as otherwise specifically provided in this Plan, at the option of the Debtors or the Reorganized Debtors, as applicable, any Cash payment to be made hereunder may be made by a check or wire transfer or as otherwise required or provided in applicable agreements or customary practices of the Debtors.

6.16.    *Satisfaction of Claims*.

Except as otherwise specifically provided in this Plan, any distributions and deliveries to be made on account of Allowed Claims under this Plan shall be in complete and final satisfaction, release, settlement, and discharge of and exchange for such Allowed Claims.

6.17.    *Fractional Interests*.

No fractional shares of New Common Interests shall be distributed. If any distributions of New Common Interests pursuant to this Plan would result in the issuance of a fractional share of New Common Interests, then the number of shares of New Common Interests to be issued in respect of such distribution will be calculated to one decimal place and rounded up or down to the closest whole share (with a half share or greater rounded up and less than a half share rounded down). The total number of shares of New Common Interests to be distributed in connection with this Plan shall be adjusted as necessary to account for the rounding provided for in this Article VI, Section 6.15. No consideration shall be provided in lieu of fractional shares that are rounded down. Neither the Reorganized Debtors nor the Distribution Agent shall have any obligation to make a distribution that is less than one (1) share of New Common Interests. Fractional shares of New Common Interests that are not distributed in accordance with this section shall be returned to, and the ownership thereof shall vest in, the Reorganized Debtors.

6.18.    *Minimum Cash Distributions*.

The Distribution Agent shall not be required to make any distribution of Cash less than one hundred dollars ($100) to any Holder of an Allowed Claim; *provided*, that if any distribution is not made pursuant to this Article VI, Section 6.18, such distribution shall be added to any subsequent distribution to be made on behalf of the Holder's Allowed Claim.

6.19.    *Setoffs*.

(a)    The Debtors and the Reorganized Debtors, or such Entity's designee as instructed by such Debtor or Reorganized Debtor, as applicable, may, but shall not be required to, set off or recoup against any Claim, and any distribution to be made pursuant to this Plan on account of such Claim, any and all Claims, rights, and Causes of Action of any nature whatsoever that the Debtors or the Reorganized Debtors or their successors may have against the Holder of such Claim pursuant to the Bankruptcy Code or applicable non-bankruptcy law; *provided*, that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by a Debtor or a Reorganized Debtor or its successor of any claims, rights, or Causes of Action that a Debtor or Reorganized Debtor or its successor or assign may possess against the Holder of such Claim.

(b)    In no event shall any Holder of Claims be entitled to set off any such Claim against any claim, right, or Cause of Action of the Debtor or Reorganized Debtor, unless (i) the Debtors or the

39

Reorganized Debtors, as applicable, have consented or (ii) such Holder has Filed a motion with the Bankruptcy Court requesting the authority to perform such setoff on or before the Confirmation Date, and notwithstanding any indication in any Proof of Claim or otherwise that such Holder asserts, has, or intends to preserve any right of setoff pursuant to section 553 of the Bankruptcy Code or otherwise. Notwithstanding the foregoing, this paragraph does not create any new rights to setoff or recoupment that did not exist under any applicable law or agreement in existence prior to the Effective Date.

### 6.20.   *Allocation of Distributions Between Principal and Interest*.

Except as otherwise provided in <u>Section 4.3(c)</u> of this Plan and subject to <u>Article VI</u>, <u>Section 6.10</u> herein or as otherwise required by law (as reasonably determined by the Reorganized Debtors), distributions with respect to an Allowed Claim shall be allocated first to the principal portion of such Allowed Claim (as determined for United States federal income tax purposes) and, thereafter, to the remaining portion of such Allowed Claim, if any.

### 6.21.   *No Distribution in Excess of Amount of Allowed Claim*.

Notwithstanding anything in this Plan to the contrary, no Holder of an Allowed Claim shall receive, on account of such Allowed Claim, distributions in excess of the Allowed amount of such Claim.

### 6.22.   *Compliance with Tax Requirements.*

(a)    In connection with this Plan and all distributions hereunder, the Reorganized Debtors or other applicable Distribution Agent shall comply with all applicable withholding and reporting requirements imposed by any Governmental Unit, and all distributions hereunder and all related agreements shall be subject to any such withholding and reporting requirements.  The Reorganized Debtors or other applicable Distribution Agent shall have the right, but not the obligation, to take any and all actions that may be necessary or appropriate to comply with such applicable withholding and reporting requirements, including (i) withholding distributions and amounts therefrom pending receipt of information necessary to facilitate such distributions, including properly executed withholding certification forms, and (ii) in the case of a non-Cash distribution that is subject to withholding, withholding an appropriate portion of such property and either liquidating such withheld property to generate sufficient funds to pay applicable withholding taxes (or reimburse the distributing party for any advance payment of the withholding tax) or pay the withholding tax using its own funds and retain such withheld property.  Notwithstanding any provision in this Plan to the contrary, all Persons holding Claims or Interests shall be required to provide any information necessary to effect information reporting and the withholding of any taxes (or establish eligibility for an exclusion therefrom), and each Holder of an Allowed Claim or an Allowed Interest will have the sole and exclusive responsibility for the satisfaction and payment of any tax obligations imposed by any Governmental Unit, including income, withholding, and other tax obligations, on account of such distribution.  Any amounts withheld or reallocated pursuant to this <u>Article VI</u>, <u>Section 6.22</u> shall be treated as if distributed to the Holder of the Allowed Claim or Allowed Interest.

(b)    Any Person or Entity entitled to receive any property as an issuance, distribution or otherwise under this Plan shall, upon request, deliver to the applicable Reorganized Debtor or other applicable Distribution Agent, or such other Person designated by the Reorganized Debtor or the Distribution Agent, an IRS Form W-9 or, if the payee is a foreign Person or Entity, the applicable version of IRS Form W-8, or any other forms or documents reasonably requested by a Reorganized Debtor or Distribution Agent to reduce or eliminate any withholding required by any applicable Governmental Unit.

# ARTICLE VII.

## PROCEDURES FOR RESOLVING DISPUTED CLAIMS

7.1.    *Allowance and Disallowance of Claims*.

(a)    After the Effective Date, and except as otherwise provided in this Plan, the Reorganized Debtors shall have and shall retain any and all available rights and defenses that the Debtors had with respect to any Claim immediately before the Effective Date, including the right to assert any objection to Claims based on the limitations imposed by section 502 of the Bankruptcy Code.  The Debtors and the Reorganized Debtors may, but are not required to, contest the amount and validity of any Disputed Claim or contingent or unliquidated Claim in the ordinary course of business in the manner and venue in which such Claim would have been determined, resolved or adjudicated if the Chapter 11 Cases had not been commenced.

(b)    All Claims and Interests of any Entity from which property is sought by the Debtors under sections 542, 543, 550, or 553 of the Bankruptcy Code or that the Debtors or the Reorganized Debtors allege is a transferee of a transfer that is avoidable under sections 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of the Bankruptcy Code shall be disallowed if: (i) the Entity, on the one hand, and the Debtors or the Reorganized Debtors, as applicable, on the other hand, agree or the Bankruptcy Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (ii) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

7.2.    *Claims Administration Responsibilities*.

Except as otherwise specifically provided in this Plan, after the Effective Date, the Reorganized Debtors shall have the authority: (i) to File, withdraw, or litigate to judgment, objections to Claims or Interests; (ii) to settle or compromise any Disputed Claim or Interest without any further notice to or action, order, or approval by the Bankruptcy Court; and (iii) to administer and adjust the Claims Register to reflect any such settlements or compromises without any further notice to or action, order, or approval by the Bankruptcy Court.  For the avoidance of doubt, except as otherwise provided herein, from and after the Effective Date, each Reorganized Debtor shall have and retain any and all rights and defenses such Debtor had immediately before the Effective Date with respect to any Disputed Claim or Interest, including the Causes of Action retained pursuant to this Plan.

7.3.    *Adjustment to Claims or Interests Without Objection*.

Any duplicate Claim or Interest or any Claim or Interest that has been paid, satisfied, amended, or superseded may be adjusted or expunged on the claims register by the Reorganized Debtors without the Reorganized Debtors having to File an application, motion, complaint, objection, or any other legal proceeding seeking to object to such Claim or Interest and without any further notice to or action, order, or approval of the Bankruptcy Court.

7.4.    *No Distributions Pending Allowance*.

If any portion of a Claim is Disputed, no payment or distribution provided hereunder may be made on account of such Claim unless and until such Claim becomes an Allowed Claim; *provided* that

if only a portion of a Claim is Disputed, such Claim may be deemed Allowed in the amount not Disputed and payment or distribution shall be made on account of such undisputed amount.

7.5.     ***Distributions After Allowance***.

To the extent that a Disputed Claim ultimately becomes an Allowed Claim, distributions (if any) shall be made to the Holder of such Allowed Claim in accordance with the provisions of this Plan. As soon as reasonably practicable after the date that the order or judgment of the Bankruptcy Court allowing any Disputed Claim becomes a Final Order, the Reorganized Debtors shall provide to the Holder of such Claim the distribution (if any) to which such Holder is entitled under this Plan as of the Effective Date, without any postpetition interest to be paid on account of such Claim.

7.6.     ***Claim Resolution Procedures Cumulative***.

All of the Claims, objection, estimation, and resolution procedures in this Plan are intended to be cumulative and not exclusive of one another.  Claims may be estimated and subsequently settled, compromised, withdrawn, or resolved in accordance with this Plan without further notice or Bankruptcy Court approval.

## ARTICLE VIII.

### TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES.

8.1.     ***Assumption or Rejection of Executory Contracts and Unexpired Leases*** .

(a)     On the Effective Date, all Executory Contracts and Unexpired Leases of the Debtors, including, but not limited to, employee contracts and offer letters (other than any individual employee contract or offer letter for which the parties separately agree to different treatment), which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed assumed by the Debtors in accordance with, and subject to, the provisions and requirements of sections 365 and 1123 of the Bankruptcy Code, except for those Executory Contracts and Unexpired Leases that, in each case:

(i)     have been assumed, assumed and assigned, or rejected by the Debtors by prior order of the Bankruptcy Court;

(ii)     are the subject of a motion to reject Filed by the Debtors pending on the Effective Date;

(iii)     are identified as rejected Executory Contracts and Unexpired Leases by the Debtors on the Schedule of Rejected Executory Contracts and Unexpired Leases to be Filed in the Plan Supplement, which may be amended by the Debtors up to and through the Effective Date to add or remove Executory Contracts and Unexpired Leases by Filing with the Bankruptcy Court a subsequent Plan Supplement and serving it on the affected non-Debtor contract parties;

(iv)     are rejected or terminated pursuant to the terms of this Plan; or

(v)     are the subject of a pending Cure Dispute.

(b)     Without amending or altering any prior order of the Bankruptcy Court approving the assumption or rejection of any Executory Contract or Unexpired Lease, the Confirmation Order shall constitute an order of the Bankruptcy Court approving such assumptions, assumptions and assignments,

and the rejection of Executory Contracts and Unexpired Leases set forth in the Schedule of Rejected Executory Contracts and Unexpired Leases provided for in this Plan pursuant to sections 365 and 1123 of the Bankruptcy Code as of the Effective Date.

(c)    To the extent any provision in any Executory Contract or Unexpired Lease assumed or assumed and assigned (as applicable) pursuant to this Plan or any prior order of the Bankruptcy Court (including, without limitation, any "change in control" provision, "change of control" provision, or provision with words of similar import) prohibits, restricts or conditions, or purports to prohibit, restrict or condition, or is modified, breached or terminated, or deemed modified, breached or terminated by, (i) the commencement of the Chapter 11 Cases or the insolvency or financial condition of any Debtor at any time before the closing of its respective Chapter 11 Case, (ii) any Debtor's or any Reorganized Debtor's assumption or assumption and assignment (as applicable) of such Executory Contract or Unexpired Lease or (iii) the Confirmation or consummation of this Plan, then such provision shall be deemed modified such that the transactions contemplated by this Plan shall not entitle the non-Debtor party thereto to modify or terminate such Executory Contract or Unexpired Lease or to exercise any other default-related rights or remedies with respect thereto, and any required consent under any such contract or lease shall be deemed satisfied by the Confirmation of this Plan.

(d)    Each Executory Contract and Unexpired Lease assumed and/or assigned pursuant to this Plan shall revest in and be fully enforceable by the applicable Reorganized Debtor or the applicable assignee in accordance with its terms and conditions, except as modified by the provisions of this Plan, any order of the Bankruptcy Court approving its assumption and/or assignment, or applicable law.

(e)    The Debtors reserve the right, on or before the Effective Date, to amend the Schedule of Rejected Executory Contracts and Unexpired Leases and/or to add or remove any Executory Contract and Unexpired Lease; *provided*, the Debtors or Reorganized Debtors, as applicable, may amend the Schedule of Rejected Executory Contracts or Unexpired Leases to add or delete any Executory Contracts or Unexpired Leases after such date to the extent agreed to by the relevant counterparties or approved by an order of the Bankruptcy Court.

(f)    The inclusion or exclusion of a contract or lease on any schedule or exhibit shall not constitute an admission by any Debtor that such contract or lease is an Executory Contract or Unexpired Lease or that any Debtor has any liability thereunder.

8.2.    ***Payments Related to Assumption of Executory Contracts and Unexpired Leases***.

Any monetary defaults under each Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to this Plan shall be satisfied, pursuant to section 365(b)(1) of the Bankruptcy Code, by payment of the amount of the Cure Claim in Cash on the Effective Date or on such other terms as the parties to such Executory Contracts or Unexpired Leases may otherwise agree.  In the event of a dispute regarding:  (a) the amount of any Cure Claim; (b) the ability of the Reorganized Debtors to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under the Executory Contract or the Unexpired Lease to be assumed; or (c) any other matter pertaining to assumption, the Cure Claims shall be paid following the entry of a Final Order resolving the dispute and approving the assumption of such Executory Contracts or Unexpired Leases; *provided*, that the Debtors or the Reorganized Debtors, as applicable, may settle any dispute

43

regarding the amount of any Cure Claim without any further notice to or action, order or approval of the Bankruptcy Court.

### 8.3.    *Claims on Account of the Rejection of Executory Contracts or Unexpired Leases*.

(a)    All Proofs of Claim with respect to Claims arising from the rejection of Executory Contracts or Unexpired Leases, pursuant to this Plan or the Confirmation Order, if any, must be Filed with the Bankruptcy Court within twenty-one (21) days after service of an order of the Bankruptcy Court (including the Confirmation Order) approving such rejection.  Any Claim arising from the rejection of Executory Contracts or Unexpired Leases that becomes an Allowed Claim is classified and shall be treated as a General Unsecured Claim.

(b)    Any Person or Entity that is required to File a Proof of Claim arising from the rejection of an Executory Contract or an Unexpired Lease that fails to timely do so shall be forever barred, estopped and enjoined from asserting such Claim, and such Claim shall not be enforceable, against the Debtors, the Reorganized Debtors or the Estates, and the Debtors, the Reorganized Debtors and their Estates and their respective Assets and property shall be forever discharged from any and all indebtedness and liability with respect to such Claim unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein.  All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in <u>Article X</u>, <u>Section 10.5</u> hereof.

### 8.4.    *Survival of the Debtors' Indemnification Obligations*.

Except as otherwise provided in this Plan or the Confirmation Order, and subject to the Schedule of Retained Causes of Action, to the fullest extent permitted by applicable law, the Indemnification Obligations shall not be discharged, impaired, or otherwise affected by this Plan; *provided*, that the Debtors or the applicable Reorganized Debtors, as applicable, shall not indemnify any such officers, directors, agents, or employees of the Debtors for any Claims or Causes of Action arising out of or relating to any act or omission for which indemnification is barred under applicable law or that is excluded under the terms of the foregoing organizational documents or applicable agreements governing the Debtors' Indemnification Obligations.  Except as otherwise provided in this Plan, all such Indemnification Obligations shall be deemed and treated as Executory Contracts that are assumed by the Debtors under this Plan.

### 8.5.    *Employee Plans*.

(a)    All Employee Plans that exist as of the Petition Date shall be assumed on the Effective Date as Executory Contracts pursuant to sections 365 and 1123 of the Bankruptcy Code.  For the avoidance of doubt, the assumption of any Employee Plans shall not trigger any applicable change of control, immediate vesting, termination, or similar provisions therein, including any right to severance pay in connection with a change in control.  For the avoidance of doubt, unless expressly agreed to in writing between the Debtors and the Required Consenting First Lien Lenders (except as provided in the Restructuring Support Agreement) if an Employee Plan provides in part for an award or potential award of Interests or consideration based on the value of Interests that have not vested into Existing Parent Equity Interests as of the Petition Date, such Employee Plan shall be assumed in all respects other than the provisions of such agreement relating to Interest awards, which interest awards shall be canceled and discharged.

(b)    As of the Effective Date, the Debtors and the Reorganized Debtors shall continue to honor their obligations under all applicable workers' compensation programs and in accordance with all applicable workers' compensation Laws in states in which the Reorganized Debtors operate.  Any Claims arising under workers' compensation programs shall be deemed withdrawn once satisfied without any

44

further notice to or action, order, or approval of the Bankruptcy Court; *provided*, that nothing in this Plan shall limit, diminish, or otherwise alter the Debtors' or Reorganized Debtors' defenses, Causes of Action, or other rights under applicable law, including non-bankruptcy Law, with respect to any such workers' compensation programs; *provided further*, that nothing herein shall be deemed to impose any obligations on the Debtors in addition to what is provided for under applicable state Law.

8.6.     *Insurance Policies.*

(a)     All insurance policies to which any Debtor is a party as of the Effective Date, including any D&O Policy, shall be deemed to be and treated as Executory Contracts and shall be assumed by the applicable Debtors or the Reorganized Debtors and shall continue in full force and effect thereafter in accordance with their respective terms and shall survive unimpaired under the Plan, and all such insurance policies shall vest in the Reorganized Debtors.  Coverage for defense and indemnity under the D&O Policies shall remain available to all individuals within the definition of "Insured" in any D&O Policy.

(b)     In addition, after the Effective Date, all officers, directors, agents, or employees who served in such capacity at any time before the Effective Date shall be entitled to the full benefits of any D&O Policy (including any "tail" policy) for the full term of such policy regardless of whether such officers, directors, agents, and/or employees remain in such positions after the Effective Date, in each case, to the extent set forth in such policies and on terms no less favorable than the Debtors' existing policies.

(c)     In addition, after the Effective Date, the Reorganized Debtors shall not terminate or otherwise reduce the coverage under any D&O Policy (including any "tail policy") in effect as of the Petition Date, and any current and former directors, officers, members, managers, agents or employees of any of the Debtors who served in such capacity at any time prior to the Effective Date shall be entitled to the full benefits of any such D&O Policy for the full term of such policy regardless of whether such members, managers, directors, and/or officers remain in such positions after the Effective Date to the extent set forth in such policies.

(d)     In the event that the Debtors determine that an Allowed Claim is covered in full or in part under one of the Debtors' insurance policies, no distributions under this Plan shall be made on account of such Allowed Claim unless and until, and solely to the extent that, (i) the Holder of such Allowed Claim has exhausted all remedies with respect to such insurance policy, and (ii) an insurer authorized to issue a coverage position under such insurance policy, or the agent of such insurer, issues a formal determination, which the Debtors in their sole discretion do not contest, that coverage under such insurance policy is excluded or otherwise unavailable for losses arising from such Allowed Claim.  Any proceeds available pursuant to one of the Debtors' insurance policies shall reduce the Allowed amount of a Claim on a dollar-for-dollar basis.  To the extent that one or more of the Debtors' insurers agrees to satisfy a Claim in full or in part (if and to the extent adjudicated by a court of competent jurisdiction), then immediately upon such insurers' agreement, the applicable portion of such Claim may be expunged without a Claim objection having to be Filed and without any further notice to or action, order, or approval of the Bankruptcy Court.  If an applicable insurance policy has a SIR, the Holder of an Insured Claim shall have an Allowed General Unsecured Claim or a Subordinated Claim, as applicable, solely up to the amount of the SIR that may be established upon the liquidation of the Insured Claim.  Such SIR shall be considered satisfied pursuant to this Plan through allowance of the General Unsecured Claim or Subordinated Claim, as applicable, solely in the amount of the applicable SIR, if any; *provided*, that nothing herein obligates the Debtors or the Reorganized Debtors to otherwise satisfy any SIR under any insurance policy.  Any recovery on account of the Insured Claim in excess of the SIR established upon the liquidation of the Claim shall be recovered solely from the Debtors' insurance coverage, if any, and only to the extent of available insurance coverage and any proceeds thereof.  Nothing in this Plan shall be construed to limit, extinguish, or diminish

45

the insurance coverage that may exist or shall be construed as a finding that liquidated any Claim payable pursuant to an insurance policy.

### 8.7. *Assignment*.

To the extent provided under the Bankruptcy Code or other applicable law, any Executory Contract or Unexpired Lease assumed and assigned, or otherwise transferred, hereunder shall remain in full force and effect for the benefit of the transferee or assignee in accordance with its terms, notwithstanding any provision in such Executory Contract or Unexpired Lease (including those of the type set forth in section 365(b)(2) of the Bankruptcy Code) that prohibits, restricts, or conditions such transfer or assignment.  To the extent provided under the Bankruptcy Code or other applicable law, any provision that prohibits, restricts, or conditions the assignment or transfer of any such Executory Contract or Unexpired Lease or that terminates or modifies such Executory Contract or Unexpired Lease or allows the counterparty to such Executory Contract or Unexpired Lease to terminate, modify, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon any such transfer and assignment, constitutes an unenforceable anti-assignment provision and is void and of no force or effect.

### 8.8. *Modifications, Amendments, Supplements, Restatements, or Other Agreements*.

Unless otherwise provided herein or by separate order of the Bankruptcy Court, each Executory Contract and Unexpired Lease that is assumed shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract or Unexpired Lease.

### 8.9. *Reservation of Rights*.

(a)      Neither the exclusion nor inclusion of any contract or lease by the Debtors on any exhibit, schedule, or other annex to this Plan or in the Plan Supplement, nor anything contained in this Plan, will constitute an admission by the Debtors that any such contract or lease is or is not in fact an Executory Contract or Unexpired Lease or that the Debtors or the Reorganized Debtors or their respective Affiliates has any liability thereunder.

(b)      Except as otherwise provided in this Plan, nothing in this Plan will waive, excuse, limit, diminish, or otherwise alter any of the defenses, claims, Causes of Action, or other rights of the Debtors and the Reorganized Debtors under any executory or non-Executory Contract or any Unexpired Lease or expired lease.

(c)      Nothing in this Plan will increase, augment, or add to any of the duties, obligations, responsibilities, or liabilities of the Debtors or the Reorganized Debtors under any executory or non-Executory Contract or any Unexpired Lease or expired lease.

(d)      If there is a dispute regarding a Cure Claim or whether a contract or lease is or was executory or unexpired at the time of assumption or rejection under this Plan, the Debtors or Reorganized Debtors, as applicable, shall have sixty (60) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease by Filing a notice indicating such altered treatment.

## ARTICLE IX.

**CONDITIONS PRECEDENT TO CONSUMMATION OF THIS PLAN**.

9.1.    *Conditions Precedent to the Effective Date*.

(a)    The effectiveness of this Plan will be subject to the satisfaction or waiver in writing of customary conditions to effectiveness, as well as such other conditions as may be agreed by the Debtors and the Required Consenting Creditors, including the Conditions Precedent to effectiveness set forth in Article IX (as applicable).

(b)    The following are Conditions Precedent to the Effective Date of this Plan; *provided*, that each condition precedent may be waived by the Debtors with the consent of the Required Consenting Creditors, in each case, with such consent rights being exercised in accordance with the Restructuring Support Agreement:

(i)    The Restructuring Support Agreement shall not have been terminated as to the Required Consenting First Lien Lenders or Required Consenting Second Lien Noteholders, and shall be in full force and effect;

(ii)    The Bankruptcy Court shall have entered the Final DIP Order, which order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(iii)    The Bankruptcy Court shall have entered the Confirmation Order, and such Confirmation Order shall not have been reversed, stayed, amended, modified, dismissed, vacated, or reconsidered;

(iv)    The Exit Facilities Documents shall have been entered into by the Reorganized Debtors, and all conditions precedent to the effectiveness of the Exit Facilities Documents, other than the occurrence of the Effective Date, shall have been satisfied or waived in accordance with the terms thereof, such that the Exit Facilities Documents will be in full force and effect on the occurrence of the Effective Date;

(v)    All Restructuring Expenses shall have been paid in full in Cash in accordance with the terms of this Plan and the Restructuring Support Agreement;

(vi)    The Definitive Documents (a) shall be consistent with the Restructuring Term Sheet and the Restructuring Support Agreement and otherwise approved by the applicable parties thereto consistent with their respective consent and approval rights as set forth in the Restructuring Support Agreement, (b) shall have been executed or deemed executed and delivered by each party thereto, and any conditions precedent related thereto shall have been satisfied or waived by the applicable party thereto, and (c) to the extent applicable, shall be adopted by the applicable Entity on terms consistent with the Restructuring Support Agreement and the Restructuring Term Sheet;

(vii)    All governmental and third-party approvals and consents necessary, if any, in connection with the transactions contemplated by the Restructuring Term Sheet and the Restructuring Support Agreement shall have been obtained, not subject to unfulfilled conditions, and be in full force and effect, and all applicable waiting periods shall have expired without action being taken or threatened by any competent authority that would restrain, prevent or otherwise impose materially adverse conditions on such transactions;

47

(viii)    The Debtors shall have implemented the Restructuring Transactions and all transactions contemplated by this Plan; and

(ix)    The Professional Fee Escrow shall have been established and funded in full in Cash.

9.2.    *Timing of Conditions Precedent*.

Notwithstanding when a Condition Precedent to the Effective Date occurs, for the purposes of this Plan, such Condition Precedent shall be deemed to have occurred simultaneously upon the completion of the Conditions Precedent to the Effective Date; *provided*, that to the extent a Condition Precedent (the "*Prerequisite Condition*") may be required to occur prior to another Condition Precedent (a "*Subsequent Condition*") then, for purposes of this Plan, the Prerequisite Condition shall be deemed to have occurred immediately prior to the applicable Subsequent Condition regardless of when such Prerequisite Condition or Subsequent Condition shall have occurred.

9.3.    *Waiver of Conditions Precedent*.

(a)    Each of the Conditions Precedent of this Plan may be waived in writing by the Debtors and the Required Consenting First Lien Lenders (except as otherwise provided in the Restructuring Support Agreement); *provided*, that the waiver of the Condition Precedent in Article IX, Section 9.1(b)(ix) shall require the consent of the affected Professionals.

(b)    The stay of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall be deemed waived by and upon the entry of the Confirmation Order, and the Confirmation Order shall take effect immediately upon its entry.

9.4.    *Effect of Non-Occurrence of the Effective Date*.

If the Effective Date does not occur, this Plan shall be null and void in all respects and nothing contained in this Plan or the Disclosure Statement shall (a) constitute a waiver or release of any Claims by or against or any Interests in the Debtors, (b) prejudice in any manner the rights of any Entity, or (c) constitute an admission, acknowledgement, offer, or undertaking by the Debtors, any of the Consenting Creditors, or any other Entity.

## ARTICLE X.

## EFFECT OF CONFIRMATION AND CONSUMMATION OF PLAN.

10.1.    *Vesting of Assets in the Reorganized Debtors*.

Except as otherwise provided herein, or in any agreement, instrument, or other documents incorporated into this Plan, on the Effective Date, pursuant to section 1141(b) and (c) other applicable provisions of the Bankruptcy Code, all property in each Debtor's Estate, all Causes of Action, and any property acquired by any of the Debtors under this Plan shall vest in each respective Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances unless expressly provided otherwise by this Plan or Confirmation Order and subject to the terms of the Definitive Documents.  For the avoidance of doubt, all rights, benefits, and protections provided to any of the Debtors or their Estates pursuant to this Plan, the Plan Supplement, or the Confirmation Order including the release, exculpation, and injunction provisions provided in Article X of this Plan, shall vest in each respective Reorganized Debtor unless expressly provided otherwise by this Plan or the Confirmation Order.  On and after the Effective Date,

except as otherwise provided herein, each Reorganized Debtor may operate its business and may use, acquire, or dispose of property and pursue, compromise or settle any Claims, Interests, or Causes of Action without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules. Without limiting the foregoing, the Reorganized Debtors may pay the charges that they incur on or after the Effective Date for professional fees, disbursements, expenses, or related support services without application to the Bankruptcy Court.

### 10.2.    *Binding Effect*.

As of the Effective Date, this Plan shall bind all Holders of Claims against and Interests in the Debtors and their respective successors and assigns, notwithstanding whether any such Holders were (a) Impaired or Unimpaired under this Plan, (b) presumed to accept or deemed to reject this Plan, (c) failed to vote to accept or reject this Plan, or (d) voted to reject this Plan.

### 10.3.    *Discharge of Claims and Termination of Interests*.

Pursuant to section 1141(d) of the Bankruptcy Code, and except as otherwise specifically provided in the Definitive Documents, this Plan or in a contract, instrument, or other agreement or document executed pursuant to this Plan, the distributions, rights, and treatment that are provided in this Plan shall be in complete satisfaction, discharge, and release, effective as of the Effective Date, of Claims, Interests, and Causes of Action of any nature whatsoever, including any interest accrued on Claims or Interests from and after the Petition Date, whether known or unknown, against, liabilities of, Liens on, obligations of, rights against, and interests in, the Debtors or any of their Assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims and Interests, including demands, liabilities, and Causes of Action that arose before the Effective Date, any contingent or non-contingent liability on account of representations or warranties issued on or before the Effective Date, and all debts of the kind specified in sections 502(g), 502(h), or 502(i) of the Bankruptcy Code, in each case whether or not (i) a Proof of Claim based upon such debt or right is Filed or deemed Filed pursuant to section 501 of the Bankruptcy Code; (ii) a Claim or Interest based upon such debt, right, or Interest is Allowed pursuant to section 502 of the Bankruptcy Code; or (iii) the Holder of such a Claim or Interest has voted to accept this Plan. Any default or "event of default" by the Debtors with respect to any Claim or Interest that existed immediately before or on account of the filing of the Chapter 11 Cases shall be deemed cured (and no longer continuing) as of the Effective Date with respect to a Claim that is Unimpaired by this Plan. The Confirmation Order shall be a judicial determination of the discharge of all Claims and Interests subject to the Effective Date occurring.

### 10.4.    *Term of Injunctions or Stays*.

Unless otherwise provided herein or in a Final Order of the Bankruptcy Court, all injunctions or stays arising under or entered during the Chapter 11 Cases under section 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the later of the Effective Date and the date indicated in the order providing for such injunction or stay.

### 10.5.    *Permanent Injunction*.

Except as otherwise expressly provided in the Restructuring Support Agreement, this Plan or the Confirmation Order, from and after the Effective Date, all Persons are, to the fullest extent permitted under Section 524 and other applicable provisions of the Bankruptcy Code, permanently enjoined from (a) commencing or continuing, in any manner or in any place, any suit, action or other proceeding of any kind; (b) enforcing, attaching, collecting, or recovering in any manner or means any judgment, award, decree, or order; (c) creating, perfecting, or enforcing any Lien or encumbrance; (d) asserting a right of setoff or

subrogation of any kind; or (e) commencing or continuing in any manner any action or other proceeding of any kind, in each case on account of or with respect to any Claim, demand, liability, obligation, debt, right, Cause of Action, Interest, or remedy released or to be released, exculpated or to be exculpated, settled or to be settled, or discharged or to be discharged pursuant to this Plan or the Confirmation Order against any Person so released, discharged, or exculpated (or the property or estate of any Person or Entity so released, discharged, or exculpated). All injunctions or stays provided for in the Chapter 11 Cases under Sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until the Effective Date.

No Person may commence or pursue a Claim or Cause of Action, as applicable, of any kind against the Debtors, the Reorganized Debtors, the Exculpated Parties, or the Released Parties, as applicable, that relates to or is reasonably likely to relate to any act or omission in connection with, relating to, or arising out of a Claim or Cause of Action, as applicable, subject to Article IX hereof, without the Bankruptcy Court (a) first determining, after notice and a hearing, that such Claim or Cause of Action, as applicable, represents a colorable Claim of any kind, and (b) specifically authorizing such Person to bring such Claim or Cause of Action, as applicable, against any such Debtor, Reorganized Debtor, Exculpated Party, or Released Party, as applicable; provided, that the foregoing shall only apply to Claims or Causes of Action brought against a Released Party if such Person bringing such Claim or Cause of Action is a Releasing Party. At the hearing for the Bankruptcy Court to determine whether such Claim or Cause of Action represents a colorable Claim of any kind, the Bankruptcy Court may, or shall if any Debtor, Reorganized Debtor, Exculpated Party, Released Party, or other party in interest requests by motion (oral motion being sufficient), direct that such Person seeking to commence or pursue such Claim or Cause of Action File a proposed complaint with the Bankruptcy Court embodying such Claim or Cause of Action, such complaint satisfying the applicable Rules of Federal Procedure, including Rule 8 and Rule 9 (as applicable), which the Bankruptcy Court shall assess before making a determination. For the avoidance of doubt, any party that obtains such determination and authorization and subsequently wishes to amend the authorized complaint or petition to add any Claims or Causes of Action not explicitly included in the authorized complaint or petition must obtain authorization from the Bankruptcy Court before filing any such amendment in the court where such complaint or petition is pending. The Bankruptcy Court reserves jurisdiction to adjudicate any such claims to the maximum extent provided by the law.

10.6. *Releases*.

(a)    Releases by the Debtors.

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in this Plan or the Confirmation Order, pursuant to section 1123(b) of the Bankruptcy Code, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each of Debtors, Reorganized Debtors, Reorganized Parent, and the Estates, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Persons who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through, for, or because of the foregoing Persons, has and is deemed to have, forever and unconditionally released, and absolved each Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, Reorganized Parent, or the Reorganized Debtors, that such Entity would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Entity, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (i) the governance, management, transactions, ownership, or operation of the Debtors or the Non-Debtor Affiliates, (ii) the purchase, acquisition, sale, merger or rescission of any business line, Assets, or Security of the Debtors or

50

the Non-Debtor Affiliates, (iii) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate and any other Entity (including Consenting Creditors), (v) the Prepetition Funded Debt Documents, (vi) the Debtors' and Non-Debtor Affiliates' in- or out-of-court restructuring efforts, (vii) intercompany transactions, (viii) the formulation, preparation, dissemination, negotiation, solicitation, entry into, Filing, or consummation of this Plan, the Plan Supplement the Disclosure Statement, the Restructuring Support Agreement and related prepetition transactions, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, the New Corporate Governance Documents, the Chapter 11 Cases, or any Restructuring Transaction, (ix) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, the New Corporate Governance Documents, the Chapter 11 Cases, the pursuit of Confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, (x) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, or any other related agreement, or (xi) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Debtors do not release Claims or Causes of Action (1) that are of a commercial nature and arise in the ordinary course of business, such as accounts receivable and accounts payable on account of goods being sold and services being performed; (2) arising under an Executory Contract or Unexpired Lease that is assumed by the Debtors; or (3) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud, gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud (but not, for the avoidance of doubt, fraudulent transfers, gross negligence, or willful misconduct).  Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person under this Plan, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or any agreement, Claim, or obligation arising or assumed under this Plan or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Debtor Release, which includes by reference each of the related provisions and definitions contained in this Plan, and further, shall constitute the Bankruptcy Court's finding that the Debtor Release is: (1) in exchange for the good and valuable consideration provided by each of the Released Parties, including the Released Parties' substantial contributions to facilitating the Restructuring Transactions and implementing this Plan; (2) a good-faith settlement and compromise of the Claims released by the Debtors; (3) in the best interests of the Debtors and all Holders of Claims and Interests; (4) fair, equitable, and reasonable; (5) given and made after due notice and opportunity for hearing; and (6) a bar to any of the Debtors, the Reorganized Debtors, the Reorganized Parent or the Debtors' Estates asserting any Claim or Cause of Action released pursuant to the Debtor Release.

(b)     Releases by Holders of Claims and Interests.

To the fullest extent permitted by applicable law and approved by the Bankruptcy Court, and except as otherwise expressly set forth in this Plan or the Confirmation Order, as of the Effective Date, in exchange for good and valuable consideration, the adequacy of which is hereby confirmed, each Releasing Party, in each case on behalf of itself and its respective successors, assigns, and Representatives, and any and all other Persons who may purport to assert any Claim or Cause of Action, directly or derivatively, by, through,

51

for, or because of the foregoing Persons, has and is deemed to have, forever and unconditionally, released, and absolved each Released Party from any and all Claims, obligations, rights, suits, damages, and Causes of Action, remedies, and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing or hereinafter arising, in law, equity, or otherwise, including any derivative claims asserted or assertable on behalf of the Debtors, the Estates, the Reorganized Parent, or the Reorganized Debtors that such Person would have been legally entitled to assert in its own right (whether individually or collectively) or on behalf of the Holder of any Claim against, or Interest in, a Debtor or other Person, based on or relating to, or in any manner arising from, in whole or in part, the Debtors, including (i) the governance, management, transactions, ownership, or operation of the Debtors or the Non-Debtor Affiliates, (ii) the purchase, acquisition, sale, merger, or rescission of any business line, Assets, or Security of the Debtors or the Non-Debtor Affiliates, (iii) the subject matter of, or the transactions, events, circumstances, acts or omissions giving rise to, any Claim or Interest that is treated in the Restructuring Transactions, including the negotiation, formulation, or preparation of the Restructuring Transactions, (iv) the business or contractual arrangements between any Debtor or Non-Debtor Affiliate and any other Person (including Consenting Creditors), (v) the Prepetition Funded Debt Documents, (vi) the Debtors' and Non-Debtor Affiliates' in- or out-of-court restructuring efforts, (vii) intercompany transactions, (viii) the formulation, preparation, dissemination, negotiation, solicitation, entry into, Filing, or consummation of this Plan, the Plan Supplement the Disclosure Statement, the Restructuring Support Agreement and related prepetition transactions, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, the New Corporate Governance Documents, the Chapter 11 Cases, or any Restructuring Transaction, (ix) any contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, the Plan Supplement, the Disclosure Statement, the Restructuring Support Agreement, the Definitive Documents, the Equity Rights Offering Documents, the Corporate Governance Documents, or the New Corporate Governance Documents, the Chapter 11 Cases, the pursuit of Confirmation and consummation of the Plan, the administration and implementation of the Plan or Confirmation Order, including the issuance or distribution of securities pursuant to the Plan, (x) the distribution, including any disbursements made by a Distribution Agent, of property under this Plan, or any other related agreement, or (xi) any other act or omission, transaction, agreement, event, or other occurrence related to any of the foregoing and taking place on or before the Effective Date; *provided*, that the Releasing Parties do not release Claims or Causes of Action (1) arising out of, or related to, any act or omission of a Released Party that is determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction to have constituted actual fraud (but not, for the avoidance of doubt, fraudulent transfers), gross negligence, or willful misconduct (it being agreed that any Released Parties' consideration, approval, or receipt of any distribution did not arise from or relate to actual fraud, gross negligence, or willful misconduct) or (2) against a Released Party arising from any obligations owed to the Releasing Party that are wholly unrelated to the Debtors, the Reorganized Parent, or the Reorganized Debtors.  Notwithstanding anything to the contrary in the foregoing, the Releases set forth above do not release (1) any obligations of any Person under this Plan, the Confirmation Order, any other Definitive Document, any Restructuring Transaction, any document, instrument, or agreement (including those set forth in the Plan Supplement) executed to implement this Plan or any agreement, Claim, or obligation arising or assumed under this Plan or (2) any Causes of Action specifically retained by the Debtors pursuant to the Schedule of Retained Causes of Action.

Entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, pursuant to Bankruptcy Rule 9019, of the Third-Party Release, which includes by reference each of the related provisions and definitions contained in this Plan, and, further, shall constitute the Bankruptcy Court's finding that the Third-Party Release is: (1) consensual; (2) given and made after due notice and opportunity

for hearing; and (3) a bar to any of the Releasing Parties asserting any Claim or Cause of Action released pursuant to the Third-Party Release.

### 10.7. *Exculpation*.

Effective as of the Effective Date, to the fullest extent permitted by law, the Exculpated Parties shall neither have nor incur any liability to any Person for any Claims or Causes of Action for any act taken or omitted to be taken between the Petition Date and the Effective Date in connection with, or related to, formulating, negotiating, preparing, disseminating, implementing, administering, confirming or effecting the Confirmation or consummation (as applicable) of this Plan, the Restructuring Support Agreement and related prepetition transactions, and the Disclosure Statement including any disbursements made by a Distribution Agent in connection with this Plan, the Disclosure Statement, the Definitive Documents, the Corporate Governance Documents, the Prepetition Funded Debt Documents, or any Restructuring Transaction, contract, instrument, release, or other agreement or document created or entered into in connection with this Plan, or any other postpetition act taken or omitted to be taken in connection with or in contemplation of the restructuring of the Debtors, the approval of the Disclosure Statement or Confirmation or consummation of this Plan; *provided*, that the foregoing provisions of this exculpation shall not operate to waive or release: (a) any Claims or Causes of Action arising from willful misconduct, gross negligence, or actual fraud (but not, for the avoidance of doubt, fraudulent transfers) of such applicable Exculpated Party as determined by Final Order of the Bankruptcy Court or any other court of competent jurisdiction; and/or (b) the rights of any Person to enforce this Plan. and the contracts, instruments, releases, indentures, and other agreements and documents delivered under or in connection with this Plan, or assumed pursuant to this Plan or Final Order of the Bankruptcy Court; *provided further*, that each Exculpated Party shall be entitled to rely upon the advice of counsel concerning its respective duties pursuant to, or in connection with, the above referenced documents, actions, or inactions.

The Exculpated Parties have, and upon consummation of this Plan shall be deemed to have, participated in good faith and in compliance with the applicable laws with regard to the solicitation of votes and distribution of consideration pursuant to this Plan and, therefore, are not, and on account of such distributions shall not be, liable at any time for the violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or such distributions made pursuant to this Plan.

The foregoing exculpation shall be effective as of the Effective Date without further notice to or order of the Bankruptcy Court, act, or action under applicable law, regulation, order, or rule or the vote, consent, authorization, or approval of any Person.  For the avoidance of doubt and notwithstanding anything else herein, the foregoing exculpation shall be limited to Persons that served as Estate fiduciaries during the Chapter 11 Cases.

### 10.8. *Retention of Causes of Action/Reservation of Rights*.

In accordance with section 1123(b) of the Bankruptcy Code, but subject in all respects to this Article X, the Reorganized Debtors shall have, retain, reserve and be entitled to assert, and may enforce all rights to commence and pursue, as appropriate, any and all claims or Causes of Action, whether arising before or after the Petition Date, including any actions specifically enumerated in the Schedule of Retained Causes of Action, and such rights to commence, prosecute, or settle such Causes of Action shall be preserved notwithstanding the occurrence of the Effective Date.  The Reorganized Debtors shall have, retain, reserve, and be entitled to assert all rights of setoff or recoupment, and other legal or equitable defenses as fully as if the Chapter 11 Cases had not been commenced, and all of the Debtors' legal and equitable rights in respect of any Unimpaired Claim may be asserted after the Confirmation Date and Effective Date to the same extent as if the Chapter 11 Cases had not been commenced.  The Debtors or the

Reorganized Debtors, as applicable, expressly reserve all rights to prosecute any and all Causes of Action against any Entity not released pursuant to this Plan or the Plan Supplement.

### 10.9.    *Ipso Facto and Similar Provisions Ineffective*.

Except to the extent otherwise allowed hereunder, any term of any prepetition policy, prepetition contract, or other prepetition obligation applicable to a Debtor shall be void and of no further force or effect with respect to any Debtor or Reorganized Debtor, as applicable, to the extent that such policy, contract, or other obligation is conditioned on, creates an obligation of the Debtor as a result of, or gives rise to a right of any Person based on any of the following: (a) the insolvency or financial condition of a Debtor; (b) the commencement of the Chapter 11 Cases; (c) the Confirmation or consummation of this Plan, including any change of control that shall occur as a result of such consummation; or (d) the restructuring.

### 10.10.    *Solicitation of Plan*.

As of and subject to the occurrence of the Confirmation Date: (a) the Debtors, the Exculpated Parties, and the Released Parties, as applicable, shall be deemed to have solicited acceptances of this Plan and to have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code, including sections 1125(a), (e), and (g) of the Bankruptcy Code, and any applicable non-bankruptcy law, rule, or regulation governing the adequacy of disclosure in connection with such solicitation; and (b) (i) the Debtors, (ii) the Consenting Creditors, and (iii) each of the Debtors and Consenting Creditors' respective directors, officers, employees, Affiliates, agents, financial advisors, investment bankers, professionals, accountants, and attorneys shall be deemed to have participated in good faith and in compliance with the applicable provisions of the Bankruptcy Code in the offer and issuance of any Securities under this Plan, and therefore, all of the foregoing parties, are not, and on account of such offer, issuance, and solicitation will not be, liable at any time for any violation of any applicable law, rule, or regulation governing the solicitation of acceptances or rejections of this Plan or the offer and issuance of any Securities under this Plan.

### 10.11.    *Corporate and Limited Liability Company Action*.

Upon the Effective Date, all actions contemplated by this Plan shall be deemed authorized and approved in all respects, including (a) the assumption of the Employee Plans assumed pursuant to Article VIII, Section 8.5(a), subject to Article VIII, Sections 8.5(a)-(b), (b) the selection of the managers, directors, and officers for the Reorganized Debtors, (c) the distribution of the Plan Securities, (d) the approval of the Restructuring Support Agreement and the Definitive Documents, and (e) all other actions contemplated by this Plan (whether to occur before, on, or after the Effective Date), in each case in accordance with and subject to the terms hereof.  All matters provided for in this Plan involving the corporate or limited liability company structure of the Debtors or the Reorganized Debtors, and any corporate or limited liability company action required by the Debtors or the Reorganized Debtors in connection with this Plan shall be deemed to have occurred and shall be in effect, without any requirement of further action by the Holders of Collateral, directors, managers, or officers of the Debtors or the Reorganized Debtors.  On or (as applicable) before the Effective Date, the appropriate officers of the Debtors or the Reorganized Debtors, as applicable, shall be authorized and empowered to issue, execute, and deliver the agreements, documents, Securities, and instruments contemplated by this Plan (or necessary or desirable to effect the transactions contemplated by this Plan) in the name of and on behalf of the Reorganized Debtors, including (w) the New Corporate Governance Documents and (x) any and all other agreements, documents, Securities, and instruments

54

relating to the foregoing.  The authorizations and approvals contemplated by this Article X, Section 10.11 shall be effective notwithstanding any requirements under non-bankruptcy law.

## ARTICLE XI.

### RETENTION OF JURISDICTION.

11.1.   *Retention of Jurisdiction*.

On and after the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction over all matters arising in, arising under, and related to the Chapter 11 Cases for, among other things, the following purposes:

(a)      to hear and determine motions and/or applications for the assumption, assumption and assignment, or rejection of Executory Contracts and Unexpired Leases, including resolution of all disputes regarding Cure Claims, and the allowance, classification, priority, compromise, estimation, or payment of Claims resulting therefrom;

(b)      to determine any motion, adversary proceeding, proceeding, application, contested matter, and other litigated matter pending on or commenced after the Confirmation Date;

(c)      to hear and resolve any disputes arising from or related to (i) any orders of the Bankruptcy Court granting relief under Bankruptcy Rule 2004 or (ii) any protective orders entered by the Bankruptcy Court in connection with the foregoing;

(d)      to ensure that distributions to Holders of Allowed Claims are accomplished as provided for in this Plan and Confirmation Order and to adjudicate any and all disputes arising from or relating to the manner of, or entitlement to, distributions under this Plan;

(e)      to consider the allowance, classification, priority, compromise, estimation, or payment of any Claim or any counterclaim related thereto;

(f)      to enter, implement or enforce such orders as may be appropriate in the event the Confirmation Order is for any reason stayed, reversed, revoked, modified, or vacated;

(g)      to issue injunctions, enter and implement other orders, and take such other actions as may be necessary or appropriate to restrain interference by any Entity with the consummation, implementation, or enforcement of this Plan, the Confirmation Order, or any other order of the Bankruptcy Court;

(h)      to hear and determine any application to modify this Plan in accordance with section 1127 of the Bankruptcy Code, to remedy any defect or omission or reconcile any inconsistency in this Plan, or any order of the Bankruptcy Court, including the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effects thereof;

(i)      to hear and determine all Professional Fee Claims;

(j)      to hear and determine disputes arising in connection with or related to the interpretation, implementation, or enforcement of this Plan, the Plan Supplement, or the Confirmation Order or any agreement, instrument, or other document created by or in connection with, governing, or relating to any of the foregoing;

(k)    to take any action and issue such orders as may be necessary to construe, interpret, enforce, implement, execute, and consummate this Plan;

(l)    to determine such other matters and for such other purposes as may be provided in the Confirmation Order;

(m)    to hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code (including any requests for expedited determinations under section 505(b) of the Bankruptcy Code);

(n)    to hear and determine matters concerning Securities laws exemptions under section 1145 of the Bankruptcy Code;

(o)    to hear, adjudicate, decide, or resolve any and all matters related to Article X of this Plan, including the releases, discharge, exculpations, and injunctions issued thereunder;

(p)    to resolve disputes concerning Disputed Claims or the administration thereof;

(q)    to resolve any disputes concerning whether a Person had sufficient notice of the Chapter 11 Cases, the Disclosure Statement, any solicitation conducted in connection with the Chapter 11 Cases, any claims bar date established in the Chapter 11 Cases, or any deadline for responding or objecting to a Cure Claim, in each case, for the purpose of determining whether a Claim or Interest is discharged hereunder or for any other purposes;

(r)    to hear and determine any other matters related hereto and not inconsistent with the Bankruptcy Code and title 28 of the United States Code;

(s)    to enter a final decree closing the Chapter 11 Cases;

(t)    to recover all Assets of the Debtors and property of the Debtors' Estates, wherever located; and

(u)    to hear and determine any rights, claims, or Causes of Action held by or accruing to the Debtors pursuant to the Bankruptcy Code or pursuant to any federal statute or legal theory.

11.2.    *Courts of Competent Jurisdiction*.

If the Bankruptcy Court abstains from exercising, or declines to exercise, jurisdiction or is otherwise without jurisdiction over any matter arising out of this Plan, such abstention, refusal, or failure of jurisdiction shall have no effect upon and shall not control, prohibit, or limit the exercise of jurisdiction by any other court having competent jurisdiction with respect to such matter.

## ARTICLE XII.

### MISCELLANEOUS PROVISIONS.

12.1.    *Payment of Statutory Fees*.

On the Effective Date and thereafter as may be required, the Reorganized Debtors shall pay all fees incurred pursuant to sections 1911 through 1930 of chapter 123 of title 28 of the United States Code, together with interest, if any, pursuant to § 3717 of title 31 of the United States Code for each Debtor's

case, or until such time as a final decree is entered closing a particular Debtor's case, a Final Order converting such Debtor's case to a case under chapter 7 of the Bankruptcy Code is entered, or a Final Order dismissing such Debtor's case is entered.

### 12.2. *Substantial Consummation of this Plan*.

On the Effective Date, this Plan shall be deemed to be substantially consummated under sections 1101 and 1127(b) of the Bankruptcy Code.

### 12.3. *Request for Expedited Determination of Taxes*.

The Debtors shall have the right to request an expedited determination under section 505(b) of the Bankruptcy Code with respect to tax returns Filed, or to be Filed, for any and all taxable periods ending after the Petition Date through the Effective Date, and in the case of any Debtor that is to be dissolved, through the completion of its dissolution.

### 12.4. *Exemption from Certain Transfer Taxes*.

Pursuant to and to the fullest extent permitted by section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of any Securities, instruments or documents, (b) the creation, filing or recording of any Lien, mortgage, deed of trust, or other security interest, (c) the making, assignment, filing or recording of any lease or sublease or the making or delivery of any deed, bill of sale, assignment or other instrument of transfer under, pursuant to, in furtherance of, or in connection with this Plan, including any deeds, bills of sale, or assignments executed in connection with any of the transactions contemplated under this Plan or the reinvesting, transfer, or sale of any real or personal property of the Debtors pursuant to, in implementation of or as contemplated in this Plan (whether to one or more of the Reorganized Debtors or otherwise), and (d) the issuance, renewal, modification, or securing of indebtedness by such means, and the making, delivery or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, this Plan, including the Confirmation Order, shall constitute a "transfer under a plan" within the purview of section 1146 of the Bankruptcy Code and shall not be subject to or taxed under any law imposing any stamp or similar tax, including any document recording tax, conveyance fee, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, sales tax, use tax, or other similar governmental assessment. Consistent with the foregoing, each recorder of deeds or similar official, officer or agent for any county, city, or Governmental Unit in which any instrument hereunder is to be recorded shall, pursuant to the Confirmation Order, be ordered and directed to accept such instrument without requiring the payment of any filing fees, documentary stamp tax, deed stamps, transfer tax, intangible tax, or other stamp or similar taxes.

### 12.5. *Amendments*.

(a)     *Plan Modifications*. Subject to the consent rights set forth in the Restructuring Support Agreement, this Plan may be amended, modified, or supplemented by the Debtors in the manner provided for by section 1127 of the Bankruptcy Code or as otherwise permitted by applicable law without additional disclosure pursuant to section 1125 of the Bankruptcy Code. In addition, after the Confirmation Date, so long as such action does not materially and adversely affect the treatment of Holders of Allowed Claims or Interests pursuant to this Plan, subject to the consent rights set forth in the Restructuring Support Agreement, the Debtors may remedy any defect or omission or reconcile any inconsistencies in this Plan or the Confirmation Order with respect to such matters as may be necessary to carry out the purposes of

effects of this Plan, and any Holder of a Claim or Interest that has accepted this Plan shall be deemed to have accepted this Plan as amended, modified, or supplemented.

(b)    *Other Amendments*.  Subject to the consent rights set forth in the Restructuring Support Agreement, before the Effective Date, the Debtors may make technical adjustments and modifications to this Plan and the documents contained in the Plan Supplement without further order or approval of the Bankruptcy Court.

### 12.6.    *Effectuating Documents and Further Transactions*.

Each of the officers of the Reorganized Debtors is authorized, in accordance with his or her authority under the resolutions of the applicable board of directors or managers, to execute, deliver, File, or record such contracts, instruments, releases, indentures, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

### 12.7.    *Revocation or Withdrawal of this Plan*.

The Debtors reserve the right to revoke or withdraw this Plan prior to the Effective Date as to any or all of the Debtors with the consent of the Required Consenting First Lien Lenders (except as provided in the Restructuring Support Agreement); *provided*, that the Debtors may revoke or withdraw this Plan without such consent in the exercise of the Debtors' fiduciary duty or as otherwise permitted under the Restructuring Support Agreement.  If, with respect to a Debtor, this Plan has been revoked or withdrawn prior to the Effective Date, or if Confirmation or the occurrence of the Effective Date as to such Debtor does not occur on the Effective Date, then, with respect to such Debtor: (a) this Plan shall be null and void in all respects; (b) any settlement or compromise embodied in this Plan (including the fixing or limiting to an amount any Claim or Interest or Class of Claims or Interests), assumption of Executory Contracts or Unexpired Leases affected by this Plan, and any document or agreement executed pursuant to this Plan shall be deemed null and void; and (c) nothing contained in this Plan shall (i) constitute a waiver or release of any Claim by or against, or any Interest in, such Debtor or any other Entity; (ii) prejudice in any manner the rights of such Debtor or any other Entity; or (iii) constitute an admission of any sort by any Debtor, any of the Consenting Creditors, or any other Entity.

### 12.8.    *Severability of Plan Provisions*.

If, before the entry of the Confirmation Order, any term or provision of this Plan is held by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court, at the request of the Debtors and with the consent of the Required Consenting First Lien Lenders (except as provided in the Restructuring Support Agreement), shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted; *provided* that any such alteration or interpretation shall be consistent with the Restructuring Support Agreement and the remainder of the terms and provisions of this Plan will remain in full force and effect and will in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is (a) valid and enforceable pursuant to its terms, (b) integral to this Plan and may not be deleted or modified

without the consent of the Debtors or the Reorganized Debtors (as the case may be), and (c) non-severable and mutually dependent.

### 12.9. *Governing Law*.

Except to the extent that the Bankruptcy Code or other federal law is applicable, or to the extent an exhibit hereto or a Definitive Document provides otherwise, the rights, duties, and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of New York, without giving effect to the principles of conflict of laws thereof.

### 12.10. *Time*.

In computing any period of time prescribed or allowed by this Plan, unless otherwise set forth herein or determined by the Bankruptcy Court, the provisions of Bankruptcy Rule 9006 shall apply.

### 12.11. *Dates of Actions to Implement this Plan*.

In the event that any payment or act under this Plan is required to be made or performed on a date that is on a Business Day, then the making of such payment or the performance of such act may be completed on or as soon as reasonably practicable after the next succeeding Business Day, but shall be deemed to have been completed as of the required date.

### 12.12. *Immediate Binding Effect*.

Notwithstanding any Bankruptcy Rule providing for a stay of the Confirmation Order or Plan, including Bankruptcy Rules 3020(e), 6004(h), 7062, or otherwise, upon the occurrence of the Effective Date, the terms of this Plan and Plan Supplement shall be immediately effective and enforceable and deemed binding upon and inure to the benefit of the Debtors, the Holders of Claims and Interests, the Released Parties, and each of their respective successors and assigns, including the Reorganized Debtors, all Entities that are parties to or are subject to the settlements, compromises, releases, and injunctions described in this Plan, and any and all non-Debtor parties to Executory Contracts and Unexpired Leases with the Debtors.  All Claims shall be as fixed, adjusted, or compromised, as applicable, pursuant to this Plan regardless of whether any Holder of a Claim, Interest, or debt has voted on this Plan.

### 12.13. *Deemed Acts*.

Subject to and conditioned on the occurrence of the Effective Date, whenever an act or event is expressed under this Plan to have been deemed done or to have occurred, it shall be deemed to have been done or to have occurred without any further act by any party, by virtue of this Plan and the Confirmation Order.

### 12.14. *Successor and Assigns*.

The rights, benefits, and obligations of any Entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor, or permitted assign, if any, of each Entity.

12.15.  *Entire Agreement*.

On the Effective Date, this Plan, the Plan Supplement, and the Confirmation Order shall supersede all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into this Plan.

12.16.  *Exhibits to Plan*.

All exhibits, schedules, supplements, and appendices to this Plan (including the Plan Supplement) are incorporated into and are a part of this Plan as if set forth in full herein.

12.17.  *Notices*.

All notices, requests, and demands to or upon the Debtors to be effective shall be in writing (including by electronic transmission) and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or addressed as follows:

    (a)    if to the Debtors or the Reorganized Debtors:

ModivCare Inc.
6900 E Layton Ave, Suite 1100 & 1200
Denver, CO 80237
Faisal Khan (Faisal.Khan@modivcare.com)

with a copy (which will not constitute notice) to:

Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
Ray C. Schrock (ray.schrock@lw.com)
Keith Simon (keith.simon@lw.com)
George Klidonas (george.klidonas@lw.com)
Jon Weichselbaum (jon.weichselbaum@lw.com)

Hunton Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, TX 77002
Timothy A. ("Tad") Davidson II (taddavidson@hunton.com)
Catherine A. Rankin (crankin@hunton.com)
Brandon Bell (bbell@hunton.com)

    (b)    if to the Consenting Creditors, to:

Paul Hastings LLP
200 Park Avenue
New York, NY 10166
Kris Hansen (krishansen@paulhastings.com)

and

Paul Hastings LLP
71 S Wacker Drive, Floor 45
Chicago, IL 60606
Matt Warren (mattwarren@paulhastings.com)
Lindsey Henrikson (lindsey.henrikson@paulhastings.com)

After the Effective Date, the Debtors and the Reorganized Debtors, as applicable, are authorized to limit the list of Persons receiving documents pursuant to Bankruptcy Rule 2002, to those persons who have filed after Confirmation a renewed request to receive documents pursuant to Bankruptcy Rule 2002.

[*Remainder of page intentionally left blank.*]

Dated:     September 4, 2025

Respectfully submitted,

By:       */s/ Chad J. Shandler*
Name:    Chad J. Shandler
Title:     Chief Transformation Officer

On behalf of ModivCare Inc. and its Debtor Affiliates

**<u>Exhibit B</u>**

Organizational Structure

modivcare

**Key**

**Entity Type**

| | |
|---|---|
| Corporation | Unlimited liability company |
| Limited liability company | Disregarded Entity |
| H — Higi | N — Non-Emergency Medical Transportation (NEMT) |
| R — Remote Patient Monitoring (RPM)/Tech | P — Personal Care Services (PCS) |
| | O — Other/Corporate |

**Funded Indebtedness**

| | |
|---|---|
| | Issuer under the Unsecured Notes |
| | Borrower under the 1L Term Loan and 2L Notes |
| | Guarantor under the 1L Term Loan and 2L Notes |

**Exhibit C**

Liquidation Analysis

[TO COME]

Case No. 1:25-cv-00306-GPG-KAS    Document 42-2    filed 09/19/25    USDC Colorado
Case 25-90309   Document 120 pg 174 of 176 B on 09/04/25   Page 173 of 175

**<u>Exhibit D</u>**

Financial Projections

[TO COME]

**Exhibit E**

Valuation Analysis

[TO COME]