# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

**Civil Action No. 1:25-cv-00306-GPG-KAS**

CHRISTOPHER SKRYPSKI, Individually
and on Behalf of All Others Similarly Situated

      Plaintiff,

v.                                                    JURY TRIAL DEMANDED

L. HEATH SAMPSON, KENNETH
SHEPARD, and BARBARA K.
GUTIERREZ.

      Defendants.

---

# AMENDED CLASS ACTION COMPLAINT
# FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

---

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ................................................................................. 2

II.   JURISDICTION AND VENUE........................................................................... 13

III.  PARTIES .......................................................................................................... 14

    A.    Plaintiff ................................................................................................. 14

    B.    Defendants............................................................................................ 14

    C.    Relevant Non-Parties ........................................................................... 16

IV.   SUBSTANTIVE ALLEGATIONS ..................................................................... 19

    A.    ModivCare is a Healthcare Services Company Whose Core Business is
        Providing Non-Emergency Medical Transportation............................ 19

    B.    ModivCare's NEMT Customers Largely Consists of State Medicaid Programs
        and MCOs.............................................................................................. 20

    C.    ModivCare Primarily Utilizes Three Contract Structures for its NEMT Customers
        ................................................................................................................ 21

        1.    Full-Risk and Shared Risk Capitated Contracts ............................... 22

        2.    Fee-for-Service Contracts ................................................................. 26

    D.    After ModivCare Secures a NEMT Contract, the Company's Implementations
        Team Handles Customer Onboarding ................................................. 27

    E.    During the COVID-19 Pandemic, ModivCare Experienced a Boon from Full Risk
        Contracts with Low Utilization Which Spurred a Series of Costly Acquisitions  28

    F.    Leading Up to the Class Period, ModivCare Shifts from Capitated Full-Risk
        Contracts to Primarily Capitated Shared Risk Contracts................................ 30

    G.    During the Class Period, ModivCare's Free Cash Flow Plummets and Debt
        Balloons Due to COVID-19 Rebates, Loss of Customers due to Service Issues,
        Increased Utilization, and Collectability Issues ............................................. 33

        1.    ModivCare Reimburses Customers Hundreds of Millions of Dollars for Low
        Utilization During COVID-19 ............................................................ 33

        2.    ModivCare's NEMT Service Quality Issues and Outdated Technologies Cause
        a Swell of Member Complaints, Significant Customer Issues, and Contract
        Losses ................................................................................................ 37

        3.    Utilization Increases Driving Up ModivCare's NEMT Expenses...................... 47

        4.    Contrary to Defendants' Claims, ModivCare's Shared Risk Contracts Did Not

Mitigate Financial Impacts or Create Payment Predictability ......................... 53

    5.   ModivCare's Contract Payables and Contract Receivables Balances Fluctuate Dramatically Quarter-to-Quarter and Cash Plummets ................................... 57

V.   DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD AND GRADUALLY REVEALED THE TRUTH THROUGH MULTIPLE PARTIAL DISCLOSURES ....... 61

    A.   ModivCare's 3Q2022 Earnings Call on November 3, 2022 ............................ 62

    B.   ModivCare's 3Q2022 Form 10-Q on November 8, 2022 ............................... 65

    C.   ModivCare's FY2022 Form 10-K on March 7, 2023 ...................................... 70

    D.   ModivCare's 1Q2023 Form 10-Q on May 4, 2023 ......................................... 74

    E.   Defendants Partially Disclosed the Truth on May 4, 2023 in ModivCare's 1Q2023 Press Release and Earnings Call but Continue Making False and Misleading Statements ................................................................................. 75

        1.   Defendants Partially Disclosed the Truth on May 4, 2023 .............................. 75

        2.   Defendants Continue Making False and Misleading Statements on May 4, 2023 ................................................................................................................. 77

    F.   Bank of America Securities' 2023 Health Care Conference on May 10, 2023 . 86

    G.   Defendants Partially Disclosed the Truth on August 3, 2023 during ModivCare's 2Q2023 Press Release and on August 4, 2023 during the Company's 2Q2023 Earnings Call but Continue Making False and Misleading Statements ............ 93

        1.   Defendants Partially Disclosed the Truth on August 3, 2023 and August 4, 2023 ................................................................................................................. 93

        2.   Defendants Continue Making False and Misleading Statements During the 2Q2023 Earnings Call ................................................................................. 94

    H.   ModivCare's 2Q2023 Form 10-Q on August 4, 2023 ................................... 101

    I.   Deutsche Bank's 31st Annual Leveraged Finance Conference on October 3, 2023 ........................................................................................................... 102

    J.   ModivCare's 3Q2023 Earnings Call on November 3, 2023 .......................... 106

    K.   ModivCare's 3Q2023 Form 10-Q on November 3, 2023 .............................. 108

    L.   Bank of America Securities' 2023 – Leveraged Finance Conference on November 28, 2023 ................................................................................... 111

    M.   Defendants' Partially Reveal the Truth in ModivCare's FY2023 Press Release

and During the FY2023 Earnings Call on February 23, 2024 But Continue Making False and Misleading Statements ............................................................ 114

   1.   Defendants' Partially Reveal the Truth in ModivCare's FY2023 Press Release and During the FY2023 Earnings Call........................................................... 114

   2.   Defendants Continue Making False and Statements During the FY2023 Earnings Call ............................................................................................... 120

N.   ModivCare's FY2023 Form 10-K on February 26, 2024............................... 127

O.   ModivCare's 2Q2024 Earnings Call on August 8, 2024 ............................... 131

P.   Defendants Partially Revealed the Truth in ModivCare's Form 8-K Filed with the SEC on September 12, 2024 ....................................................................... 139

Q.   Defendants Partially Revealed the Truth in ModivCare's Form 8-K Filed with the SEC on September 16, 2024 ....................................................................... 140

VI.  POST-CLASS PERIOD EVENTS ........................................................................ 142

A.   ModivCare's Form 8-K Filed with the SEC on October 1, 2024 .................... 142

B.   ModivCare's 3Q2024 Earnings Call on November 7, 2024 ........................... 143

C.   ModivCare's Late Quarterly Filing, Bankruptcy, and De-Listing .................... 147

VII. ADDITIONAL SCIENTER ALLEGATIONS .......................................................... 148

A.   CWs Confirmed Defendants Accessed Real-Time KPIs Related to NEMT Service Issues, and Attended Meetings Discussing the Same ...................... 149

B.   CWs Confirmed That Defendants Received Regular Reports and Participated in Regular Meetings Regarding Contract De-Implementation and Receivable Disputes .................................................................................................... 151

C.   Defendants Were Personally Involved in Contract Negotiations with Payors and Touted Relationships with Payors' Executives as a Means to Reprice Contracts and Protect Contract Margin ........................................................................ 154

D.   Defendants Frequently Discussed ModivCare's NEMT Performance Data During Earnings Calls ................................................................................. 157

E.   Defendants Evasive Answers to Analysts' Questions about the Capitated Shared Risk Contracts Supports Scienter..................................................... 158

F.   Defendants' Statements Concerned ModivCare's Primary Source of Revenue and Core Operation, Further Supporting Scienter ......................................... 161

VIII.LOSS CAUSATION ............................................................................................. 162

-v-

A.      On May 4, 2023, ModivCare Issued the First Set of Corrective Disclosures.. 163

B.      On August 3, 2023 and August 4, 2023, ModivCare Issued the Second Set of Corrective Disclosures .................................................................................. 164

C.      On February 22, 2024 and February 23, 2024, ModivCare Issued the Third Set of Corrective Disclosures ................................................................................ 166

D.      On September 12, 2024, ModivCare Issued the Fourth Corrective Disclosure ........................................................................................................................ 173

E.      On September 16, 2024, ModivCare Issued the Fifth Corrective Disclosure . 176

IX.   CLASS ALLEGATIONS ...................................................................................... 177

X.    PRESUMPTION OF RELIANCE.......................................................................... 179

XI.   NO STATUTORY SAFE HARBOR ...................................................................... 181

XII.  CLAIMS FOR RELIEF ........................................................................................ 182

COUNT I .................................................................................................................... 182

COUNT II ................................................................................................................... 185

PRAYER FOR RELIEF .............................................................................................. 187

DEMAND FOR JURY TRIAL...................................................................................... 187

1.    Lead Plaintiff Christopher Skrypski ("Lead Plaintiff" or "Plaintiff") brings this class action against Defendants (defined below) pursuant Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder by the U.S. Securities and Exchange Commission ("SEC"), individually and on behalf of himself and all persons and entities similarly situated who purchased or otherwise acquired ModivCare Inc. ("ModivCare" or the "Company") securities between November 3, 2022 to September 15, 2024, inclusive (the "Class Period").

2.    Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and upon information and belief as to all other matters. Plaintiff's information and belief is based on the investigation of his undersigned attorneys ("Lead Counsel"), which included, among other things, review and analysis of: (i) public documents, public filings, and wire and press releases published by and regarding ModivCare; (ii) Defendants' other public statements, including transcripts of interviews Defendants participated in; (iii) interviews with individuals who are former employees of ModivCare; (iv) reports of securities and financial analysts, news articles, and other commentary and analysis concerning ModivCare and the industry in which the Company operates; and (v) pertinent court filings.

3.    Lead Counsel's investigation into the matters alleged herein is continuing, and many relevant facts are known only to, or are exclusively within, the custody or control of Defendants. Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

-1-

## I.    NATURE OF THE ACTION

4.    Plaintiff brings this securities fraud class action alleging that, throughout the Class Period, ModivCare's Chief Executive Officer ("CEO") L. Heath Sampson ("Sampson"), the Company's Chief Financial Officer ("CFO") Barbara Guiterrez ("Guiterrez"), and the CFO for the Company's core non-emergency medical transport ("NEMT") business Kenneth Shepard ("Shepard") knowingly or severely recklessly made material misrepresentations to investors concerning the Company's shared risk capitated contracts' ability to offset ModivCare's increased transportation costs from higher NEMT utilization by members. Defendants likewise made material misrepresentations that overstated the quality of ModivCare's NEMT services and their cost-effectiveness for the Company, including with respect to a "multi-modal strategic initiative" that was intended to diversify the transportation methods available to members.

5.    ModivCare is a healthcare services company whose core business entails coordinating and managing non-emergency medical transportation in the United States for individuals who ModivCare refers to as "members." The Company is paid primarily by its members' insurers, which ModivCare calls "payors" and who are state Medicaid programs and managed care organizations ("MCOs").

6.    During the COVID-19 pandemic, ModivCare's members utilized fewer NEMT services due to stay at home orders and a rise in telehealth. Despite this drop-off in utilization (i.e., the rate at which ModivCare's members use its NEMT services), the Company's profits soared as a result of how its contracts with payors were structured. Namely, ModivCare's contracts were predominantly full-risk capitated contracts that

provided the Company with a fixed per-member per-month ("PMPM") fee for each of the payors' eligible members irrespective of whether those members were utilizing the Company's services.

7.      Given that under the full-risk contracts ModivCare would receive the same PMPM if the Company was experiencing a surge in utilization from members (which had the effect of reducing the profit margin considerably as transportation costs increased), the Company began renegotiating to shift its full-risk contracts to shared risk contracts as pandemic restrictions eased and ModivCare anticipated that payors' members would begin to increase their use of the Company's NEMT services.

8.      ModivCare claimed that, under the shared risk contracts, the Company's PMPM would be adjusted upward or downward (depending on the actual realized transportation volumes or costs). The purpose of these adjustments was to purportedly guarantee that the Company would earn a certain profit level regardless of how much payors' members were using the services or how much transportation costs increased. Conversely, ModivCare's profits were also capped under these shared risk contracts, meaning if the Company reached the profit threshold, it would rebate its payors for such overages.

9.      Thus, during the adjustment process for shared risk contracts, ModivCare determined whether the profit threshold had been met or exceeded. If the profit threshold had not been met, then the Company would generally record an asset (i.e., contract receivable) for which it would seek additional payment from the payor. On the other hand,

if the profit threshold was exceeded, then ModivCare would record a liability (i.e., contract payable) that would need to be paid to the payor.

10.    Throughout the Class Period, which begins on November 3, 2022, Sampson relentlessly touted the shared risk contracts' purported benefits for ModivCare and its customers. Indeed, Sampson assured investors that, **"because of**" ModivCare's shared risk **"contracts, we're able to pass [increased transportation costs] through to a lot of our customers**" and further claimed "**if utilization goes way up, we're going to share in that. If costs go up, we're going to share in that. And that's the way these contracts work**." Sampson further vowed that ModivCare was "**going to get paid on"** instances where "**utilization is going up and we're doing more trips and… it's more expensive to us**[.]" Indeed, Sampson assured "**it gets put on the balance sheet, and then we'll collect it over the next 3 to 6 months**." As such, Sampson represented that ModivCare's shared risk contracts were "**structured so we have a win-win**[.]"

11.    Defendant Sampson repeated this mantra on at least 15 occasions during the Class Period, and detailed exactly what "win-win" meant (i.e., ModivCare would "**share in [] increased [transportation] costs**" which would thereby "**allow[] [the Company] to really have stable rigid margins regardless of utilization and cost**[,]" "**add[] [an] additional layer of predictability to [its] cash flow**[,]" and create "**more normalized working capital**[.]").

12.    In addition, every quarterly report filed with the SEC on behalf of ModivCare, falsely represented that "**[t]here have been no material changes**" to the Company's previously issued risk factors in addition to containing purported risk disclosures that

-5-

speculatively cautioned that, *inter alia*, "**implementation of alternative payment models**[,]" **changes in payment levels from … third-party payors**[,]" and "**[d]elays in collection, or non-collection, of our accounts receivable**" "**could adversely affect**" **revenues**[,]" "**operations**[,]" or "**financial condition**[.]"

13.     In reality, unbeknownst to investors, ModivCare's true-up process under the shared risk contracts persistently caused disputes with customers. For instance, CW2, ModivCare's Vice President ("VP") of Transportation, confirmed that mismatches between ModivCare's internal utilization data and payors' actual "encounter data" caused payors to contend that they owed ModivCare far less than the Company claimed. Rather than sharing in higher costs as Defendants' claimed, ModivCare was locked in disputes about how many trips members actually took, which had a significant financial impact. Indeed, CW2 explained that such utilization discrepancies could result in PMPM rates fluctuating $3 or more and would be multiplied across large membership populations. According to CW2, ModivCare was subjected to monthly liquidated damages for rejected encounter data and routinely forced to accept partial payments as settlements as a result of the encounter related true-up disputes.

14.     CW3 likewise stated that ModivCare faced significant disputes over risk corridors and profits. CW3 provided an example where New Jersey—one of the Company's largest contracts—asserted that ModivCare had exceeded its profit cap and

sought repayment. CW3 confirmed that ModivCare was required to return a portion of those profits to the state.

15.     ModivCare not only experienced disputes with customers concerning what was owed to the Company under the shared risk contracts but also faced significant challenges collecting new monthly PMPM payments from payors that ModivCare was in arrears for as a result of previous utilization and mounting contract payables. For instance, CW2 confirmed that such payors withheld monthly payments to offset the balance that ModivCare owed to the payor. According to CW2, even where ModivCare conveyed that payors needed to continue making monthly payments, payors refused—resulting in disputes that dragged on for "a very long time."

16.     Despite ModivCare's claims that its cash flow would become more normalized and predictable through the shared risk contracts, the Company faced a significant cash crunch. ModivCare's working capital was affected by the rampant collectability issues stemming from its true-up disputes as well as "repayments" that ModivCare elected to make to payors who had paid hefty PMPMs during the Covid-19 pandemic despite members' low utilization. Indeed, ModivCare was shelling out hundreds of millions of dollars in cash and drawing down on its revolving credit facility to pay down its contracts payables balance while simultaneously facing a mounting contracts receivables balance that was not coming in the door.

17.     ModivCare's collectability issues under the shared risk contracts were also exacerbated by payors who, dissatisfied with the Company's service and technological shortcomings, placed the Company on performance improvement plans, delayed

payments, sought monthly liquidated damages, and canceled contracts. Indeed, CWs confirmed that, prior to and continuing through the Class Period, ModivCare received increasing complaints about its NEMT service, including driver no shows and on-time performance issues, and about promised technological enhancements, aimed at reducing those very complaints, that ModivCare had not delivered.

18.     For instance, CW3 stated ModivCare consistently failed to provide payors with the technology and system maintenance offerings that the Company committed to delivering in contracts, including ride scheduling, real-time reporting, GPS tracking, and dynamic trip reassignment for medical appointments. As a result, according to CW3, missed appointments and no-shows were significant service issues that ModivCare had throughout CW3's tenure that did not improve. CW3 further recalled that ModivCare consistently failed to meet key performance indicators ("KPIs"), including on-time performance, no vehicle available ("NVAs") (which caused missed rides), and call center complaints regarding delayed call answer, which affected most payors.

19.     CW3 also stated that ModivCare's poor service delivery, long-standing weaknesses in technology, and reliance on an outdated platform caused major contracts to be under threat throughout September 2023 (i.e., the end of CW3's tenure). Likewise, CW2 stated that, beginning around the second quarter of 2022 ("2Q2022") and continuing throughout CW2's tenure, ModivCare's poor operational performance (such as call center failures) led to client dissatisfaction and monthly liquidated damages of hundreds of thousands of dollars. CW1 also stated that, during CW1's last year with ModivCare, the Company began losing NEMT contracts because service levels "were way down" due to

-7-

poor service quality and high employee turnover. Indeed, CW1 stated during this time, payors were "literally cancelling contracts because the service, and the people trying to perform the services, kept changing so much. The service levels were way down."

20.    Customers were also dissatisfied with ModivCare's multi-modal strategic initiative, which was intended to reduce transportation costs and offset the impacts of increased utilization. CWs confirmed that ModivCare's multi-modal strategic initiative was disliked by users and as a result, "fared very poorly" and failed to achieve forecasted cost savings.

21.    Nevertheless, Defendant Sampson professed that ModivCare was "**meeting or exceeding all [its] customers' quality and service level requirements**[,]" including **"on-time performance and reduced miss trips**[,]" and touted that "**[o]ur multimodal transportation partnership strategy has led to increased customer satisfaction and reduced costs**."

22.    Importantly, Defendants knew or recklessly disregarded that payors were dissatisfied with ModivCare's NEMT services and technological shortcomings, as well as the shared risk contract disputes. For instance, during a May 2023 Summit, CW3 presented competitive analyses that showed, *inter alia*, long-standing weaknesses in technology and poor service delivery, to Sampson and others in leadership. Likewise, between March and May of 2023 and continuing throughout the Class Period, Defendant Shepard (who was Defendant Sampson's direct report) participated in customer dispute calls regarding the shared risk contract that had escalated to a point where such customers requested Shepard's involvement. CWs also confirmed that Defendants

Sampson and Shepard attended regular meetings where rising service complaints, contract de-implementations, missed KPIs, and results of the strategic initiatives were discussed in detail, and received presentations regarding de-implementations (which Defendants could also access "whenever they wanted"). Defendants also admittedly monitored NEMT service data and regularly reported on such information and the shared risk contracts in detail during public earnings calls with investors. Moreover, as a result of his admittedly close relationships and frequent discussions with payors' executives regarding contracting and repricing, Sampson also knew that payors were dissatisfied with ModivCare's service levels and technology offerings, were refusing to pay, delaying payments, and seeking liquidated damages, refusing to share in increased costs under the shared risk contracts, and cancelling contracts as a result of service and technology issues.

23.     The truth about ModivCare's shared risk contracts and NEMT services issues was gradually revealed to investors through a series of partial disclosures during the Class Period, often as Defendants continued to simultaneously mislead investors. First, on May 4, 2023, Defendants Sampson and Shepard revealed that ModivCare had a net loss of $4.0 million for the first quarter of 2023 and had expended nearly $3 million in cash as a result of a $7 million reduction in contract payables and $31 million increase in contract receivables during the quarter. On this news, ModivCare's common stock price

fell sharply, declining $11.30 per share, or approximately 16%, from $69.30 per share on May 3, 2023 to $58.00 per share on May 4, 2023.

24.     Next, on August 3, 2023 while reporting second quarter 2023 financials, ModivCare slashed 2023 full-year Adjusted Earnings Before Interest, Taxes, Depreciation, and Amortization ("EBITDA") guidance due to, *inter alia*, "increased utilization and related higher call volumes in NEMT," and disclosed that the Company had used $108.2 million in cash and drew $126.5 million on its revolving credit facility due to "a temporary timing mismatch between [NEMT] payments and collections" and $65 million in accelerated payments made to "a few large state clients" that "occurred earlier than anticipated[.]" In response to this news, ModivCare's common stock price declined $2.86, or approximately 7%, from $38.24 per share on August 3, 2023, to close at $35.38 per share on August 4, 2023.

25.     Then, on February 22, 2024, after the market closed, Defendants disclosed that ModivCare's free cash flow for fourth quarter 2023 and full year 2023 were negative $36.8 million and negative $125.3 million, respectively, and the Company had drawn $113.8 million from its revolving credit facility. ModivCare's dismal financials stemmed from NEMT "margin pressure" related to several contract losses, "sooner than anticipated, large COVID-related working capital needs[,]" and a ~$35.9 million delayed payment from a client. On this news, ModivCare's common stock price fell $17.25 per share, or approximately 39%, from a close of $43.87 on February 22, 2024 to a close of $26.62 on February 23, 2024 on heavy trading volume.

26.    Analysts were caught off guard by Defendants' contract loss disclosures. For instance, in two reports issued on February 23, 2024 Deutsche Bank initially noted that the "contract losses in NEMT" as "new information" while the later report noted that it was "[m]ake or break time" for the Company. The analyst also stated in the first report that "[w]ith several bumps on the road over the past year and struggles with FCF generation, we are unable to continue recommending MODV and downgrade to a Hold." In the second report, the analyst added the "[m]ismatch between receivables and payables has been a persistent cash flow headwind for MODV over the last year" and the "lack of visibility into quarter to quarter performance of the shared risk contract book and the aggressive operating leverage implied in the 2H quarters is likely to result in investors taking a wait-and-see approach."

27.    Nevertheless, even as late as August 8, 2024, when Defendants were already renegotiating prepayment terms with its shared risk NEMT customers in an desperate effort to bring cash in the door, Defendants Sampson and Guiterrez assured investors that ModivCare's shared risk contracts were "**win-win** … **from a margin and P&L perspective**[,]" and "**working as designed and protecting the downside [risk] and protecting the P&L**[.]"

28.    *Only one month later*, on September 12, 2024, contrary to Defendants' misstatements during the Class Period, Defendants revealed that "the Company has not offset the existing and continued accumulation of receivables during the period" and though "collection and mitigation efforts continue, there remains the possibility that the Company will not achieve full resolution in a timely manner or at all if unforeseen

-11-

circumstances arise." The Company's further revealed that its annual report for the year ended December 31, 2023, which was filed with the SEC on Form 10-K on February 26, 2024 ("FY2023 10K"), was updated to reflect a "going concern." In response to this news, ModivCare's common stock price declined $18.43, or approximately 59%, from $31.19 per share on September 11, 2024 to $12.76 per share on September 12, 2024 on heavy trading volume.

29.     Then, on September 16, 2024, Defendants revealed that ModivCare had "experienced delays in the timely collection of approximately $60 million of its outstanding $159.3 million in NEMT segment current contract receivables, primarily from MCO customers, as of June 30, 2024" (*i.e.*, over a month before Defendants' August 8, 2024 misstatements) and Defendants also slashed the Company's 2024 Adjusted EBITDA guidance range "primarily due to NEMT segment pricing accommodations made to strategically retain and expand key customer relationships." In response, ModivCare's common stock price fell $1.40, or nearly 10%, from a close of $14.12 per share on September 13, 2024 to a close of $12.72 per share on September 16, 2024.

30.     Analysts were shocked, particularly given the Company's previous reticence to provide details around the delayed payment dispute. For instance, a September 17, 2024 Barrington Research reduced its price target by $16, expressly highlighted that the collectability concerns were "***particularly troubling*** since the company had explicitly stated in prepared remarks on its Q2 conference call in early August that it had visibility into $60 million of near-term cash collections from a couple of its large customers." The report added that such "***commentary contributed materially***

-12-

*to our decision to upgrade* the shares six weeks ago and probably served as similar comfort to many investors."

31.    Defendants would later admit after the Class Period on November 7, 2024, ModivCare planned to shift its shared risk contracts and the majority of the Company's revenue to fee-for-service ("FFS") arrangements because the shared risk contracts were not offering the Company or its customers a win-win but instead, because ModivCare had been paid lower under the shared risk contacts and the true-up "costs were higher than a lot of [ModivCare's customers] expected[,]" "surprise[d] … a lot of our payers" "[a]nd that was painful."

32.    Defendants' fraudulent and misleading statements served to artificially inflate the price of ModivCare's common stock throughout the Class Period, causing massive investor losses when the price of the stock precipitously declined with each disclosure about ModivCare's shared risk contracts and service issues. Lead Plaintiff hereby seeks damages individually and on behalf of the Class.

## II.    JURISDICTION AND VENUE

33.    The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and § 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

34.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

35.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual who has sufficient minimum contacts with this District to

render the exercise of jurisdiction by the District Court permissible under traditional notions of fair play and substantial justice.

36.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) and § 27 of the Exchange Act because many of the false and misleading statements were made in or issued from this District. ModivCare is headquartered in this District, with its principal place of business located at 6900 Layton Avenue, 12th Floor, Denver, Colorado 80237.

### III.    PARTIES

#### A. Plaintiff

37.    Court-appointed Lead Plaintiff Christopher Skrypski ("Lead Plaintiff" or "Plaintiff") purchased ModivCare common stock during the Class Period, as set forth in his previously filed certification (ECF No. 17-1) and incorporated by reference herein, and suffered damages as set forth herein.

#### B. Defendants

38.    At all relevant times, Defendant L. Heath Sampson served as ModivCare's President and CEO as well as a Director on the Company's Board of Directors ("Board"). Prior to his appointment to such positions, Sampson was ModivCare's Interim CEO between August 1, 2022 and November 1, 2022 and its CFO between February 26, 2021 and September 18, 2023. Defendant Barbara Gutierrez succeeded Sampson as ModivCare's CFO. Sampson also led ModivCare's Mobility (i.e., NEMT) business between January 2022 and April 12, 2022, when he was succeeded by Ilias Simpson as President of the Company's Mobility division.

39.    At all relevant times, Defendant Kenneth Shepard served as ModivCare's CFO for the Company's NEMT business.

40.    Defendant Barbara Gutierrez joined ModivCare on September 18, 2023 as the Company's CFO and held this position throughout the remainder of the Class Period. On May 5, 2025, ModivCare announced Gutierrez's employment was being terminated effective May 31, 2025.

41.    Defendants Sampson, Shepard, and Gutierrez are collectively referred to herein as the "Defendants."

42.    The Defendants, by virtue of their high-level positions at ModivCare, directly participated in the management of ModivCare and were directly involved in the day-to-day operations of ModivCare at the highest levels. As such, they were privy to confidential, proprietary information concerning the Company and its business operations, growth, and financial condition. As set forth below, the materially misstated information conveyed to the public was the result of the individual and collective actions of these individuals.

43.    As senior executives at a publicly held company with securities registered with the SEC and, throughout the Class Period, traded on the Nasdaq Global Select Market ("NASDAQ"), the Defendants each had a duty to disseminate prompt, accurate, and truthful information with respect to the Company's business, operations, financial statements, and internal controls, and to correct any previously issued statements that were or had become materially misleading or untrue, so that the market price of

-15-

ModivCare's publicly traded securities would be based on accurate information. Each Defendant violated these requirements and obligations during the Class Period.

44.    As a result of their positions of control and authority as senior executives, the Defendants were able to and did control the content of the public statements issued by the Company during the Class Period. Each Defendant had the ability to correct the statements or prevent them from being released into the public sphere. Accordingly, the Defendants are responsible for the accuracy of the materially false and misleading public statements detailed in this complaint.

45.    As a result of their positions of control and authority as senior executives, the Defendants had access to adverse, undisclosed information about the Company's business, operations, financial statements, and internal controls through their access to internal corporate documents and conversations with other corporate officers and employees. Defendants knew or recklessly disregarded that the positive representations they made about the Company were materially false and misleading and material facts omitted from positive representations made by Defendants about the Company rendered those representations materially false and misleading, as detailed herein.

### C. Relevant Non-Parties

46.    At all times relevant to this action, ModivCare was a public corporation, organized and existing under the laws of the State of Delaware with its principal place of business and principal executive offices located at 6900 Layton Avenue, 12th Floor, Denver, Colorado 80237. Throughout the Class Period, the Company's securities were traded on the NASDAQ, a national exchange, under the ticker symbol "MODV." On

-16-

August 20, 2025, ModivCare filed for voluntary Chapter 11 bankruptcy protection. On August 28, 2025, the Company's common stock was suspended from trading on the NASDAQ and delisted. Thereafter, ModivCare's common stock began trading on the over-the-counter markets ("OTCMKTS") under the ticker MODVQ.

47.     CW1 was a ModivCare employee from before the Class Period until Q3 2023. As part of CW1's responsibilities, CW1 managed the Company's multi-million-dollar NEMT contracts to provide transportation to payors' members. CW1 was also responsible for de-implementations, which refers to ending payors' contracts with ModivCare.

48.     In CW1's role, CW1 had access to all of the information regarding the Company's NEMT contracts, including the payors, the contracts' dollar amount, the members, the number of members for each contract, "and basically everything in the contract, to understand what it would take for us to provide the service."

49.     CW1 was responsible for coordinating with upper management, including senior vice presidents and presidents, at insurance and healthcare companies to set those payors up on ModivCare's system, help them understand the technology, and set the payor up with the transportation providers that ModivCare works with in the states applicable to the payors' contract. According to CW1, ModivCare's implementation phase for a new payor typically lasted between 90 and 120 days but could last up to 9 months, depending on the payor.

50.     CW1 also worked on ModivCare's strategic initiatives with the Company's operations teams across the country to improve operational performance, start new

initiatives to improve operational efficiencies, and help the Home Health and NEMT divisions.

51.     CW2 served as ModivCare's VP of Transportation before the Class Period and into 2024. CW2 was also responsible for overseeing profit and loss performance for all the contracts in CW2's region.

52.     CW2's daily responsibilities included maintaining customer relationships, meeting regularly with health plans, and ensuring that the Company was meeting contractual metrics by reducing missed rides, increasing on-time performance, and improving service delivery. CW2 also managed the network development team, which was tasked with expanding provider networks and improving service delivery. As of September 2022, CW2 reported to Senior VP of Transportation, Chris Heine, who reported to the President of ModivCare's Mobility Division, Illias Simpson. In CW2's role, CW2 had "tons" of meetings with the Senior VP of Transportation that were largely focused on operations but occasionally involved financial discussions focused on customers' outstanding balances. CW2 also participated in Monthly Leadership Meetings with the President of ModivCare's Mobility Division and in general leadership meetings with Defendant Sampson.

53.     CW3 was employed by ModivCare as a Director of Proposal Management and Marketing Communication prior to the Class Period through April 2023 and as a Senior Director of Proposal Management from April 2023 through September 2023. CW3 oversaw a team of approximately 12 employees who were responsible for identifying and pursuing new contract opportunities nationwide, monitoring aggregated bid sites for

solicitations, preparing and submitting proposals, supporting the sales team with pipeline and reporting information, and coordinating with other departments to develop implementation plans for awarded contracts. CW3 initially reported to Senior VP of Government Affairs Robert Pittman, then to Senior VP of Strategic Solutions Seth Ravine.

## IV.    SUBSTANTIVE ALLEGATIONS

### A. ModivCare is a Healthcare Services Company Whose Core Business is Providing Non-Emergency Medical Transportation

54.    ModivCare purports to be a technologically-enabled healthcare services company that offers NEMT services, personal care services ("PCS") and remote patient monitoring solutions ("RPM") throughout the United States. During the Class Period, ModivCare had four reportable business segments: NEMT, PCS, RPM, and Corporate and Other. The Company and its employees would sometimes refer to its NEMT business segment as its Mobility division, and its PCS and RPM businesses as its Home division.

55.    ModivCare's core business is NEMT, which consists of coordinating and managing non-emergency medical transportation services. The Company generates the vast majority of its revenue from NEMT services. For instance, in its financial and operational report for the fourth quarter and full year ended December 31, 2024, which was filed with the SEC on March 6, 2025 on Form 10-K (the "FY2024 Form 10-K"), ModivCare reported the following net service revenues:

| | 2022 | 2023 | 2024 |
|---|---|---|---|
| **NEMT** | $1.768 billion | $1.951 billion | $1.957 billion |
| **PCS** | $667 million | $715 million | $745 million |
| **RPM** | $68.27 million | $77.94 million | $77.73 million |

56.     The Company purports to be the largest manager of NEMT programs for state governments and managed care organizations in the United States. During the Class Period, ModivCare provided NEMT services in 48 states and the District of Columbia to approximately between 33.6 and 36 million members. To facilitate this, ModivCare partners with credentialed transportation providers, including third-party transportation providers, on-demand transportation companies, mass transit entities, mileage reimbursement programs, taxis, and county-based emergency medical service providers, to supply transportation tailored to members individualized health needs. The members are typically Medicaid or Medicare eligible and have limited mobility or financial resources.

**B. ModivCare's NEMT Customers Largely Consists of State Medicaid Programs and MCOs**

57.     For its NEMT business, ModivCare's customers primarily consist of state Medicaid programs and MCOs, the latter of which are health plans (such as Medicare Advantage) or healthcare companies that manage the delivery of healthcare services to its members while aiming to balance costs with maintaining quality service. The Company contracts with these customers (sometimes referred to as "payors") to provide NEMT services to the payors' members. The Company's top 6 payors included UnitedHealthcare, Aetna, Humana, Anthem, Health Care Service Corporation ("HCSC") and Centene.

58.     According to the Company's FY2024 Form 10-K, ModivCare enters contracts with state Medicaid contracts that generally cover a three-to-five-year period and contain "multiple renewal options." By contrast, ModivCare's contracts with MCOs

-20-

typically continue until either party, with reasonable notice, terminates the agreement, and purportedly "allow for regular price adjustments based upon utilization and transportation cost." Utilization refers to the rate at which ModivCare's customers' members use the Company's NEMT services. The Company reports utilization as a monthly average and on a quarterly basis.

59.    ModivCare overwhelmingly derived its NEMT revenue from Medicaid contracts. Indeed, according to the Company's February 22, 2024 investor presentation (the "4Q2023 Investor Presentation") and March 6, 2025 investor presentation (the "4Q2024 Investor Presentation"), approximately 83%, 82% and 85% of NEMT revenue in 2022, 2023 and 2024, respectively, was attributable to Medicaid contracts. The remaining revenue was generated from Medicare contracts. This revenue breakdown remained consistent throughout the Class Period.

60.    ModivCare also earns a significant portion of its NEMT revenue from a small number of key customers. For instance, according to ModivCare's FY2024 Form 10-K, a single state Medicaid agency accounted for around 10.9%, 11.2%, and 10.9% of the Company's NEMT revenue in 2022, 2023, and 2024, respectively. ModivCare earned approximately 19.8%, 19.8%, and 22.4% of its NEMT revenue in 2022, 2023, and 2024 from its next four largest NEMT customers combined.

### C. ModivCare Primarily Utilizes Three Contract Structures for its NEMT Customers

61.    ModivCare primarily utilizes three contract structures for its NEMT customers: (i) capitated full-risk; (ii) capitated shared risk; and (iii) fee-for-service.

62.     Under both capitated contracts and fee-for-service structures, ModivCare arranges for transportation of members through its network of independent transportation providers, whereby ModivCare negotiates rates and remits payment to the transportation providers. According to the Company's FY2024 Form 10-K, to determine the per ride or per mile rates paid under its transportation service contracts, ModivCare purports to use pricing models for specific populations that "take into account factors such as estimated utilization, state specific data, previous experience in the state or with similar services, the medically covered programs outlined in the contract, identified populations to be serviced, estimated volume, estimated transportation provider rates and availability of mass transit."

### 1. Full-Risk and Shared Risk Capitated Contracts

63.     Capitation refers to "a health care payment method in which medical providers or health plan administrators are paid a pre-determined dollar amount for each patient assigned to them, regardless of how much medical care they provide to that patient."[1] Under this payment method, providers are incentivized to provide all of the necessary care to a patient for a total cost under the capitated rate for said patient so that the provider can retain difference in cost as profit.

64.     For both its full-risk and shared risk capitated contracts, ModivCare receives a fixed PMPM for eligible members in a specific geography. ModivCare negotiates the fixed PMPM fee with its customers during the bidding process, and purports to base this

---

[1] "What is capitation?", https://www.healthinsurance.org/glossary/capitation/ (last accessed Jan. 9, 2026).

figure on "actual historical transportation data for the subject geographic region as provided by the payor, actuarial work performed in-house as well as by third party actuarial firms and actuarial analysis provided by the payor."

65.    For its capitated full-risk contracts, ModivCare receives a pre-negotiated, fixed fee from a payor for each of the payor's eligible members per month and is responsible for providing NEMT services to each of those members, regardless of the actual cost of care. This means that, under capitated full-risk contracts, ModivCare receives the same PMPM fee for a member who does not use any NEMT services during the month as it does for a member who frequently uses NEMT services during the month. As such, ModivCare's revenue under its full-risk contracts fluctuates based on costs and utilization. (i.e., the rate at which members use ModivCare's NEMT services, or paid trips per member).

66.    With capitated shared risk contracts, the Company also receives an upfront fixed fee from a payor for each of the payor's eligible members per month, but after the monthly ridership per member is determined, the PMPM fee adjusted through a true-up process to account for the actual realized transportation volumes or costs that may result in refunds to the payor (contract payables), or additional payments due from the payor (contract receivables) based on the contractually agreed upon provisions. As such, the PMPM fee obtained by ModivCare increases or decreases based on transportation costs and utilization. CW3 explained that ModivCare's capitated shared risk contracts varied by customer and used historical utilization data as the basis to structure each agreed upfront payment by mapping out a risk-sharing plan tied to those past trends.

67.    ModivCare offered three different reconciliations provisions for its capitated shared risk contracts: (i) reconciliation; (ii) risk corridor; and (iii) profit rebate.

68.    For capitated contracts with reconciliation provisions, ModivCare receives a partial payment as prepayment during the month that the service is provided. The prepayments are periodically reconciled against actual trip volume and costs. Thus, under a reconciliation provision, ModivCare could either issue a refund to customers or receive additional payments depending on a comparison of the PMPM fee with the actual cost and/or utilization.

69.    With capitated contracts that contain a risk corridor provision, ModivCare and a payor negotiate and agree to allow profit within a certain corridor and once those thresholds are met, the Company stops recognizing revenue.[2] Therefore, through this provision, ModivCare may record an asset (i.e., contract receivable) or liability (i.e., contract payable). For instance, if the Company fails to meet the minimum profit established in the corridor, it records a contract receivable and should receive additional payment from the customer to reach that minimum threshold. On the other hand, if the Company reaches the threshold or maximum, then ModivCare will not recognize any additional revenue but instead, records a contract payable and will either reduce that amount via future increases in trip volume or periodic settlements with the customer.

---

[2] "'Risk corridors' set limits on the dollar amount of risk or gain that may be experienced for individual patients, e.g., 10% to 20% above or below capitation payments." Goodson et al., The Future of Capitation, J Gen Intern Med. 2001 Apr;16(4):250–256, https://pmc.ncbi.nlm.nih.gov/articles/PMC1495203/#ref-list1 (last accessed Jan. 9, 2026).

-25-

70.    For capitated contracts with profit rebate provision, ModivCare and a payor negotiate and agree to a maximum profit and once that threshold is met, the Company stops recognizing revenue. Thus, a profit rebate provision can only result in ModivCare recording a contract payable.

71.    Accordingly, depending on the contract's true-up provisions, ModivCare's capitated shared risk contracts purportedly allowed the Company and its payor to share the risk of increases in costs and utilization, and featured the lowest gross margin variance of the Company's contracts. Indeed, the Company claimed that the shared risk contracts would result in margin stabilization since the PMPM fee received would be adjusted for the costs to provide the transportation services (see **Figure 1** *infra*).

**Figure 1**



### 2.    Fee-for-Service Contracts

72.    ModivCare also utilizes fee-for-service ("FFS") contracts in its NEMT business, wherein the Company charges specific fees for each NEMT service that it provides to a payor's members. Under this contract structure, the Company agrees to provide services based on costs incurred plus a negotiated margin. Similar to capitated full-risk contracts, the Company is entirely responsible for the costs associated with providing the services and must estimate its costs when determining fees. The fees are based on billing rates for specific services or defined membership populations.

73.    ModivCare bills and collects a specified amount for each service provided. The FFS revenue is recognized during the period in which the services are rendered and

is reduced by the estimated impact of contractual allowances and policy discounts for certain third-party payors.

### D. After ModivCare Secures a NEMT Contract, the Company's Implementations Team Handles Customer Onboarding

74.    ModivCare's Implementations Team managed customer onboarding after the Company obtained a new NEMT customer contract. CW1 provided an example of the implementation process using Cigna Healthcare, explaining that if Cigna needed to have transportation set up in Sacramento, California for 2,000 members by November 1st, then the Implementation team would "do everything it takes" to have transportation arranged for those members, including setting up metrics that the payor and ModivCare would track in connection with ModivCare providing the payors' members transportation services, including member satisfaction, responsiveness to complaints, how quickly transportation providers pick up the phone, length of time members remained on the phone with transportation providers, response times, and other KPIs.    According to CW1, ModivCare's implementation phase for a new payor typically lasted between 90 and 120 days but could last up to 9 months, depending on the payor.

75.    According to CW1, the Implementation team tracked utilization during the first 30 days after a payor's implementation was complete after which the responsibility for tracking utilization transitioned to the Operations team. CW1 explained that utilization was definitely a metric that ModivCare tracked carefully.

**E. During the COVID-19 Pandemic, ModivCare Experienced a Boon from Full Risk Contracts with Low Utilization Which Spurred a Series of Costly Acquisitions**

76. Prior to the Class Period, in 2020, ModivCare's contracts were predominantly capitated full-risk with approximately 60% of its NEMT revenue derived from such contracts. During this time, ModivCare experienced low utilization rates due to the COVID-19 pandemic because its customers' members were making less trips as a result of the mandated stay at home orders and rise in telehealth visits.

77. For instance, CW2 explained that ModivCare's full-risk contracts were extremely lucrative during the COVID-19 pandemic because the Company collected millions of dollars in PMPM payments but had virtually no transportation costs due to decreased utilization as members remained at home. As a result, according to CW2, ModivCare experienced a financial boon during the first approximately two years of the COVID-19 pandemic.

78. Indeed, according to the Company's financial report for the fourth quarter and full year ended December 31, 2020, which was filed with the SEC on March 1, 2021 on Form 10-K (the "FY2020 Form 10-K"), ModivCare reported that its 2020 NEMT operating income totaled approximately $120,689,000, which was an approximately 488% increase from the $24,732,000 reported for its 2019 NEMT operating income. The Company primarily attributed the massive increase in NEMT operating income to significantly lower service expenses, which were approximately $1,036,288,000 in 2020 as compared to approximately $1,401,152,000 in 2019.

79.     ModivCare's NEMT operating income remained elevated during 2021 as compared to 2019 pre-COVID levels. For instance, according to the Company's financial report for the fourth quarter and full year ended December 31, 2021, which was filed with the SEC on March 1, 2021 on Form 10-K (the "FY2021 Form 10-K"), ModivCare reported that its 2021 NEMT operating income totaled approximately $73,121,000, which was an approximately 196% increase from the $24,732,000 reported for its 2019 NEMT operating income:[3]

|  | 2019 | 2020 | 2021 |
|---|---|---|---|
| NEMT Service Revenue, Net | $1,509,944,000 | $1,314,705,000 | $1,483,696,000 |
|  |  |  |  |
| NEMT Service Expense | $1,401,152,000 | $1,036,288,000 | $1,186,185,000 |
| NEMT General and administrative expense | $67,244,000 | $133,212,000 | $195,332,000 |
| NEMT Depreciation and amortization | $16,816,000 | $24,516,000 | $29,058,000 |
|  |  |  |  |
| NEMT Operating Income | $24,732,000 | $120,689,000 | $73,121,000 |

80.     Indeed, ModivCare's executives would later acknowledge that the COVID-19 pandemic provided a financial windfall to the Company. For example, at the 2023 Deutsche Bank Conference on October 3, 2023, Defendant Sampson stated:

> [D]uring COVID, obviously, there wasn't a lot of trips … **So we benefited heavily from increased cash coming into our balance sheet as well as on the P&L as well**, but the big bolus was on our balance sheet.

---

[3] ModivCare's increased net service revenues also included $110.0 million of revenue related to contracts from the National MedTrans, LLC acquisition that took place in the second quarter of 2020.

81.     ModivCare utilized its cash surplus along with a series of private senior note placements to make a number of acquisitions between 2020 through 2022 that totaled over a billion dollars. For instance, according to ModivCare's FY2024 Form 10-K: (i) in 2020, the Company acquired National MedTrans, LLC for $80 million and OEP AM, Inc. ("Simplura") for $575 million; (ii)  in 2021, ModivCare spent over $650 million on acquisitions, purchasing WellRyde, Care Finders Total Care, and VRI Intermediate Holdings; and (iii) in 2022, the Company purchased personal care customer contracts from another entity for $7.6 million and also acquired Guardian Medical Monitoring for $71.6 million. These acquisitions were intended to grow ModivCare's Mobility and Home divisions while creating opportunities for cross-selling services and meeting payor's desires for a one-stop shop.

**F.    Leading Up to the Class Period, ModivCare Shifts from Capitated Full-Risk Contracts to Primarily Capitated Shared Risk Contracts**

82.     After the COVID-19 lockdowns, the Company began to renegotiate its NEMT contracts to shift away from capitated full-risk to capitated shared risk.

83.     Prior to that shift, the Company's revenue from full-risk and shared risk capitated contracts was approximately 60% and 25%, respectively. By 2Q 2021, ModivCare reported that, of the approximately 85% of NEMT revenue that was capitated (with the remaining 15% of NEMT revenue being FFS), approximately 44% and 41% were attributable to full-risk and shared risk, respectively. ModivCare's capitated NEMT revenue remained divided roughly in half between full-risk and shared risk capitated contracts, respectively, until the beginning of the Class Period. By 1Q 2023, ModivCare

-30-

reported that, of the approximately 85% of NEMT revenue that was capitated, approximately 20% and 65% were attributable to full-risk and shared risk, respectively.

84.     This transition from capitated full-risk to shared risk contracts had significant implications for ModivCare's balance sheet because, as described in §IV.C.1 *supra*, those contracts contained reconciliation, risk corridor, or profit rebate provisions that could result in the Company booking a contract receivable or contract payable depending on service costs and member utilization. For instance, prior to the Class Period during the Company's June 23, 2022 inaugural Investor Day (the "2022 Investor Day"), Sampson explained that ModivCare "expect[ed]" contracts payable and contracts receivable to "go up, go down" because it would reflect that "the contracts are operating as designed" and added that the Company would "explain that on a quarterly basis how it's fluctuating[.]"

85.     Despite the fluctuation, Defendants claimed that the shift to capitated shared risk contracts would protect ModivCare's margins and provide more stability, including by normalizing working capital and thereby cash flow.[4] Given that the shared risk contracts' structure purportedly allowed ModivCare to pass through increased costs to its customers (thereby protecting ModivCare's downside risk) while limiting the Company's ability to profit from unused services (thereby protecting payors' downside risks), Defendants' characterized its shared risk contracts as "win-win" throughout the Class Period.

---

[4] Working capital is the amount of money a company has available to operate after deducting its current liabilities (i.e., accounts payable and debt) from its current assets (i.e., cash, accounts receivable, etc.). *See* Jason Fernando, Working Capital: Formula Components, and Limitations, Investopedia (June 17, 2025), https://www.investopedia.com/terms/w/workingcapital.asp (last accessed Jan. 9, 2026).

86.     Indeed, during the Company's earnings call for the third quarter of 2022 on November 3, 2022 (the "3Q2022 Earnings Call"), Defendant Sampson explained that ModivCare's shared risk contracts allowed the Company to "pass a large chunk" of "higher cost[s] in [] mobility" onto customers, "protecting the downside in the event that there's some volatility in costs or utilization." Likewise, during the May 10, 2023 Bank of America Securities Health Care Conference and earnings call for the third quarter of 2023 on November 3, 2023 (the "3Q2023 Earnings Call"), Sampson explained that the shared risk contracts' win-win nature provided ModivCare with "stable rigid margins regardless of utilization and cost" and "protect[ed] the downside to [the Company's] cash flow," respectively.

87.     Defendants also provided insight into the mechanics of the shared risk true-up process. For instance, in a slide from ModivCare's August 2023 investor presentation ("2Q2023 Investor Presentation"), the Company represented that shared risk contracts maintained the same net cash flow regardless of utilization due to the contracts "built-in corridors[,]" which allowed ModivCare to make profit up to a certain threshold. After that threshold is met, ModivCare stops recognizing revenue and records a liability within the accrued contract payable account.

88.     To demonstrate how the corridors function, the Company modeled three utilization scenarios in the slide. In the low utilization scenario, transportation costs decrease by $4 per member with ModivCare recording $2 in a contract payable that it will eventually repay the customer due to lower costs than anticipated. In the high utilization scenario, transportation costs increase by $4 per member with ModivCare recording $2

-32-

in a contract receivable that it will eventually receive from the customer to share the higher than anticipated costs. Based on this, ModivCare represented that the "[s]hared risk structure reduce[d] income statement impact from changes in costs with the built-in corridors" (see **Figure 2** *infra*).

**Figure 2**

**G. During the Class Period, ModivCare's Free Cash Flow Plummets and Debt Balloons Due to COVID-19 Rebates, Loss of Customers due to Service Issues, Increased Utilization, and Collectability Issues**

**1. ModivCare Reimburses Customers Hundreds of Millions of Dollars for Low Utilization During COVID-19**

89.   Though ModivCare's NEMT operating income and cash position benefited significantly from low utilization during the COVID-19 pandemic, those financial windfalls were offset by swelling contract payables balances leading up to the Class Period.

90.   For instance, according to the FY2020 Form 10-K, ModivCare's total accrued and long-term contract payable balances for 2020 was $173,778,000. These

-33-

balances represented overpayments and liability reserves related to lower activity due to COVID-19 and corresponded to ModivCare's reconciliation and risk corridor contracts (i.e., ModivCare's shared risk contracts). In other words, although ModivCare's shared risk contracts represented only a portion of ModivCare's contract mix in 2020, the Company was responsible for repaying a significant sum as a result of lower utilization during COVID-19.

91.     By 1Q 2021, ModivCare's total accrued contract payable balance related to shared risk contracts had surged to $245,386,000. Given the true-up aspect of its shared risk contracts, ModivCare anticipated continuing to reimburse those customers for COVID-19 under-utilization. By contrast, ModivCare did not expect to repay most of its full-risk customers for COVID-19 related under-utilization. However, according to CW2, some of ModivCare's health plan customers requested refunds due to the inactivity and in some cases, the Company partially refunded payments "in the spirit of good partnership."

92.     Indeed, during the Company's earnings call for the first quarter of 2021 on May 7, 2021 ("1Q2021 Earnings Call"), Defendant Sampson confirmed that ModivCare had reimbursed some of its full risk customers, stating:

> As a reminder, our full risk contracts are structured, so we bear all the expense management and market fluctuation risk. Our customers with full risk contract models are fully aware of the performance during the pandemic.
>
> ***For some, we have provided or expect to provide retroactive monetary rebates or prospective rate concessions***. However, for the majority, we do not expect to provide any concessions.

-34-

93.     As such, throughout 2021 and leading up to the beginning of the Class Period on November 3, 2022, ModivCare's total contracts payable exceeded its net accounts receivable, as depicted in **Figure 3**:

**Figure 3**



94.     At the start of the Class Period, ModivCare began to pay down its massive contract payables balance. For instance, during the 3Q2022 Earnings Call on November 3, 2022, Defendant Sampson stated that ModivCare "reduced [its] contract payable balance, net of our contract receivables, by $51 million to a net balance of $184 million" and added that the Company "expect[ed] to reduce this net balance by an additional $40 million to $60 million during the fourth quarter" of 2022.

95.     By the end of the fourth quarter of 2022 ("4Q2022"), according to its financial and operational report for the fourth quarter and full year ended December 31, 2022,

-35-

which was filed with the SEC on March 7, 2023 on Form 10-K (the "FY2022 Form 10-K"), the Company reduced its contract payables to $194.3 million.

96.    These payments decimated ModivCare's cash position. Indeed, after paying $134 million to reduce its contracts payables balance in 2022, the Company ended the fourth quarter of 2022 with $14.5 million in cash. Nevertheless, Defendants assured investors that the Company's cash position would normalize.

97.    For instance, during the Company's February 23, 2023 fourth quarter and full-year 2022 earnings call ("FY2022 Earnings Call"), Defendant Shepard stated: "As a reminder, we expect a more normalized level of activity for these contracts payable moving forward and, therefore, a more normalized environment for our free cash flow in 2023."

98.    Likewise, during the same earnings call, Defendant Sampson represented the 3Q2022 and 4Q2022 payments were the final ones to pay off the balances incurred under the Company's shared risk contracts during the COVID-19 pandemic, stating in relevant part: "2022 involves us paying off the cash that we accumulated on our balance sheet through COVID in 2020 and 2021 and the bulk of accumulation -- or a disproportional amount of that accumulation was all paid off in 2022. So the COVID payoff was finished in 2022." With COVID-19 payments purportedly complete, Defendants assured that ModivCare's working capital fluctuations would normalize under the shared risk contracts and as a result, the Company would generate more free cash flow each quarter going forward.

**2.  ModivCare's NEMT Service Quality Issues and Outdated Technologies Cause a Swell of Member Complaints, Significant Customer Issues, and Contract Losses**

99.  Prior to and throughout the Class Period, ModivCare received increasing complaints about its NEMT service and technological platforms, which caused payors to be dissatisfied and led them to place the Company on performance improvement plans and to delay payments, seek liquidated damages, and cancel contracts.

100.  For instance, around 1Q2022, CW1 began hearing that account managers had "struggles to keep the payors happy." According to CW1, beginning around May or June 2022 and continuing throughout CW1's tenure, ModivCare received increasing complaints from payors' members, including reports that drivers were not showing up on time and of miscommunications between drivers and payors. CW1 recalled that account managers' challenges and the increase in member complaints coincided with Simpson's appointment as President of the Mobility Division in April 2022, and explained that with his appointment ModivCare's NEMT operations changed dramatically. According to CW1, Simpson began terminating the employment of senior employees who knew the business really well.

101.  CW1 stated that ModivCare's service quality declined because employees with "core competencies" – the core leaders who really knew the NEMT business and how to manage that side of the business – were fired or laid off. CW1 added that payors knew and trusted the core leaders, but when they were let go, service quality started to decline, complaints from payors increased steadily, until the payors decided to quit ModivCare.

102.    Corroborating CW1, CW3 explained that ModivCare laid off approximately 80% of its customer advocate team and implemented major cost reductions for the operations team when Simpson arrived at the Company. ModivCare's customer advocate team was responsible for supporting the Company's transportation providers by answering inquiries, documenting and resolving complaints, and supporting scheduling, modifying, and canceling reservations.[5]

103.    According to CW3, these staffing cuts eliminated the customer advocate team's capability of working with dispatchers to monitor the NEMT trips live and, as a result, ModivCare's ability to address service issues was diminished. For example, CW3 described that certain technologies of ModivCare's software, such as GPS tracking and dynamic reassignment (meaning a NEMT trip would be automatically re-booked if a driver was unavailable), required dedicated staff advocates because the electronic systems were "plagued by bugs" throughout CW3's tenure and could not fulfill these capabilities without human intervention.

104.    Accordingly, when CW3 heard that the advocate team was eliminated entirely, CW3 knew ModivCare did not have the resources to deliver technological enhancements that the Company promised to payors. As a result, CW3 stated that payors began to consistently express dissatisfaction with ModivCare's service and inquire about no shows and on-time performance issues. CW3 confirmed ModivCare's payors continued to express their dissatisfaction throughout CW3's tenure. Specifically, CW3

---

[5] *See e.g.*, FlexJobs, Customer Advocate I ModivCare,
https://www.flexjobs.com/gjw/modivcare/customer-advocate-i/publicjobs?id=a34c3ad3-4080-47ef-889c-ae5150395f54 (last accessed Jan. 9, 2026).

recalled that ModivCare's local Operations teams in Virginia and Florida lacked capabilities to address service issues, and that no-shows, on-time performance, and overall declining performance were issues in New Jersey.

105.    When asked whether payors refused to pay or delayed payment due to service issues, CW1 responded "absolutely" and explained that if service levels were not met, ModivCare would bear the cost. CW1 added that, throughout the last year of CW1's employment, ModivCare was failing to meet targets for member satisfaction KPIs, including on-time performance, no-show rates, cancellation ratios, and call-center responsiveness KPIs.

106.    CW3 likewise explained that KPIs, such as on time performance, NVA (no vehicle available), and complaint volume, were important to ModivCare's payors. CW3 added that ModivCare consistently failed to meet KPIs, including on-time performance and NVAs (which caused missed rides), throughout CW3's tenure.

107.    CW1 recounted three key trends during CW1's tenure with ModivCare: payors cancelling contracts; leadership getting concerned with revenue coming in, because contracts were being cancelled; and increased concern with operational performance.

108.    CW1 explained that, during CW1's last year with ModivCare, the Company began losing NEMT contracts due to service complaints. CW1 added that ModivCare's service levels "were way down" due to poor service quality and high employee turnover. Indeed, CW1 stated during this time, payors were "literally cancelling contracts because the service, and the people trying to perform the services, kept changing so much. The

service levels were way down." CW1 specifically recalled that payors, such as UnitedHealthcare and HCSC, cancelled services due to ModivCare's failure to meet member satisfaction KPIs.

109.   CW1 also described attending a standing, direct report staff meeting with leaders from Operations, Client Services, Process Optimization, Human Resources, Finance, Project Management, and Strategy during the summer of 2022 where the rise in service complaints and payors' disappointment over the rise in service complaints were being discussed. CW1 explained that meeting attendees were specifically discussing members not feeling comfortable with drivers, increased member complaints including those about vehicle conditions, member satisfaction concerns, and service level agreements.

110.   During the meeting, according to CW1, Simpson told attendants that ModivCare only owned "picking up and dropping" off the member and specifically did ***not*** "own the customer experience." According to CW1, Simpson likened transporting members to Amazon's process for getting packages where they need to go during the meeting. It was at this time, according to CW1, that it became clear to CW1 that ModivCare could be headed for financial troubles since member experience was critical to the NEMT's business' success, but was specifically de-prioritized. CW1 described Simpson's directive to ModivCare's operational leaders as "shocking" and said, "that was the moment in time I realized we could be in trouble."

111.   CW1 explained that Simpson's stance that ModivCare was not responsible for members' experience "100%" contributed to the loss of business. CW1 explained that

-40-

running the company became very difficult, as employees with knowledge about operations were pushed out, and payors became increasingly dissatisfied. CW1 added that ModivCare's abandonment of its core values, such as serving members and firing NEMT experts, and the subsequent rise in complaints, all resulted in the loss of contracts.

112. Corroborating CW1, CW2 attributed ModivCare's damaged payor relationships to ModivCare's new leadership, after former-CEO Daniel Greenleaf departed the Company in August 2022, treating the Company as a logistics operation—focusing narrowly on financials and prioritizing profit over customer service—despite it being a people-driven service business.

113. CW1 also recounted that ModivCare's service issues resulted in a lot of problems with the Big 6, which included UnitedHealthcare, among others. CW1 recalled, during the last year of CW1's tenure, that the payors' executives would bring concerns to ModivCare's operations team but the operations team was often unprepared to respond to their concerns. CW1 said that this "absolutely" contributed to the loss of contracts.

114. When asked whether payors raised these service issues with CW1, CW1 replied "all the time." CW1 also heard about the service issues, including drivers not picking members up on time and miscommunications between drivers and members, from the operations team, executive teams, and "everyone across the country, weekly." CW1 confirmed that the service issues were 100% on Shepard's and Sampson's radars.

115. CW2 also confirmed that ModivCare quantified its customer service failures, explaining that call center performance was tracked. CW2 stated that, beginning around 2Q2022 and continuing throughout CW2's tenure, ModivCare's poor operational

-41-

performance (such as call center failures) led to payor dissatisfaction and monthly liquidated damages of hundreds of thousands of dollars. CW2 stated that these service issues were discussed frequently during Monthly Leadership Meetings.

116.    Similarly, CW3 stated ModivCare consistently failed to provide payors with the technology and system maintenance offerings that the Company committed to delivering in contracts, including ride scheduling, real-time reporting, GPS tracking, and dynamic trip reassignment for medical appointments. Indeed, according to CW3, by the end of CW3's tenure at ModivCare, the Company still remained dependent on the outdated LogistiCare platform,[6] despite spending millions of dollars, over an eight-year period, on supposed upgrades.

117.    CW3 learned about payors' complaints that ModivCare was not fulfilling its commitments from interactions with ModivCare's local Operations Managers or Regional Vice Presidents when the Company began preparations to respond to a new request for proposal ("RFP"). CW3 provided an example where ModivCare promised Virginia-based payors certain technological enhancements, such as a new user interface for the call center, in connection with a 2018 RFP. According to CW3, between 2020 and 2023 while preparing for the next rounds of RFPs, the local Operations Manager raised that these 2018 promises remained unfulfilled, and that the client had complained about the lack of enhancements previously guaranteed during the earlier RFP.

---

[6] On January 6, 2021, the Company was rebranded from Providence Service Corporation to ModivCare Inc. and as a part of this rebrand, the Company's wholly-owned NEMT subsidiary, LogistiCare Solutions, LLC, was rebranded to ModivCare Solutions, LLC.

118.  CW3 also explained that missed appointments and no-shows were significant service issues that ModivCare had throughout CW3's tenure but did not improve on. Indeed, CW3 participated in series of communications with Simpson, the President of Mobility, during the Spring of 2022 to create a roadmap with technology enhancements as part of ModivCare's RFPs to state MCO clients, specifically in response to complaints. Specifically, the roadmap contemplated: GPS tracking with real-time trip assignment to reduce no-shows or late arrivals by transportation providers; improvements to claims so providers could process payments instantly or within 7–14 days; and real-time reporting that would have allowed payors to view on-time performance, complaints, and vehicle availability. Yet, despite promising payors that the Company had such capabilities in its RFPs during the Class Period, the Company ***never delivered on providing these technological enhancements during CW3's tenure***. Indeed, CW3 stated that the technological enhancements in the roadmap never materialized and instead, the Company's systems had not been improved since 2016 and were pieced together with no enhancements.

119.  As a result, CW3 likewise stated that ModivCare's poor service delivery, long-standing weaknesses in technology, and reliance on an outdated platform caused major contracts to be under threat throughout CW3's tenure. Indeed, between November 2022 and the end of CW3's tenure in September 2023, CW3 held several meetings with ModivCare's leadership, including Defendant Sampson, during which CW3 warned leadership that the Company's contracts were at risk because they were failing to keep up with their competitors.

120.    Specifically, CW3 issued such a warning to Defendant Sampson during a week-long, in-person Summit in May 2023 at ModivCare's Denver headquarters, which was attended by CW3, Defendant Sampson, the President of ModivCare's Mobility Division Simpson, the Senior VP/Head of Mobility Product Edward Hoffman, and "the full c-suite" (the "May 2023 Summit"). During the May 2023 Summit, CW3's team presented competitive analyses that compared ModivCare's offerings to competitors and emphasized long-standing weaknesses in technology, poor service delivery, and a disjointed operational model based on the outdated LogistiCare platform.

121.    CW3 explained that Senior VP of Government Affairs Robert Pittman, Senior VP of Mobility Edward Hoffman, and Defendant Sampson instructed CW3 to highlight capabilities to customers in RFPs that did not exist, including technology platforms the company had long promised but never delivered. Indeed, CW3 stated that the guidance to CW3's team was to continue to falsely represent ModivCare's capabilities in RFP even when the technology was not yet implemented or would never be. CW3 added the RFPs were essentially highlighting vaporware.[7]

122.    CW3 recalled that ModivCare's local Operations Mangers did not want these capabilities listed in the RFP if they could not be delivered but due to executive mandates from then-Senior VP of Strategic Solutions Seth Ravine, Pittman and Sampson, such requirements were included in the RFPs. CW3 further confirmed that Sampson and leadership were aware of ModivCare's technological shortcomings and that

---

[7] Vaporware refers to "a computer-related product that has been widely advertised but has not and may never become available." *See* Merrium Webster, vaporware, https://www.merriam-webster.com/dictionary/vaporware (last accessed Jan. 9, 2026).

representing the Company had such capabilities in the RFPs was not truthful. CW3 further stated that clients repeatedly complained about ModivCare's technological systems, and some states placed ModivCare on performance improvement plans ("PIPs") during 2022 and 2023. According to CW3, ModivCare's leadership often ignored the impact of the PIPs and instead, operated with the mindset that the Company was largest provider and industry leader, and as a result of this position, payors needed to align with ModivCare's direction. CW3 added that ModivCare developed a poor reputation that made it increasingly difficult to win contracts.

123.    CW3 also explained that customers in New York had major complaints centered on technology, call center performance (such as delays in answering calls, extended hold times, the interactive voice response failing to recognize natural language, problematic translation services, and similar matters), and lack of responsiveness from the executive team. Specifically, CW3 stated that New York State expressed concerns regarding the timeliness of local call teams and took issue with the Company transferring call centers overseas. CW3 also stated ModivCare made unilateral program changes without client approval, and failed to deliver GPS tracking and claims systems that had been promised. Further, CW3 recalled that ModivCare consistently failed to meet KPIs, including on-time performance, NVAs (which caused missed rides), and the call center answering calls within 30 seconds or 4 rings, which affected most payors.

124.    As a result, according to CW3, ModivCare lost clients during CW3's tenure with the Company and after CW3's departure. For instance, according to CW3, the Company: (i) lost the majority of its NEMT business in New York in 2022; (ii) was informed

-45-

by Virginia during 2022 – 2023 that the Company would not be considered for upcoming RFPs because of their low performance; (iii) ModivCare lost the Elevance contract, other minor player contracts in NEMT, MCOs, and large organizations like UHC and Humana withdrew; and (iv) lost all of the business with Florida in 2024.

125.    Corroborating CW1 and CW3, CW2 confirmed that contract attrition was an issue in multiple regions and remained an issue through CW2's tenure. Indeed, CW2 recalled that ModivCare lost MCO Medicaid contracts in New York that were valued at $100 million annually during CW2's tenure due, in part, to New York State transitioning members to its state Medicaid program.

126.    CW1 explained that de-implementations were "a huge, huge concern, probably across the entire company, but certainly the transportation division." CW1 added that the majority of concerns about lost business were NEMT-related. CW1 stated that Sampson and Shepard were "definitely" concerned about the increase in de-implementations. CW1 added that when ModivCare was losing more business, and utilization was increasing, the implementations team was given a "spotlight." Indeed, CW1 participated in a meeting with Sampson regarding de-implementations where he asked questions about why ModivCare was losing business and for dollar amounts related to the same.

127.    CW1 estimated that de-implementations represented more than $10 million during CW1's last year but added that this was "probably a low-ball number." CW1 also observed that implementations declined to about 10 or 15, at most, during the last year of CW1's tenure. By contrast, according to CW1, the average for new payor

implementations for the prior two years was 30 to 40, some of which related to ModivCare's acquisition of another NEMT company. CW1 added that, during the last year of CW1's employment, de-implementations were adeptly managed because they were so common.

### 3.  Utilization Increases Driving Up ModivCare's NEMT Expenses

128.    Beginning in 2Q2021, as the COVID-19 restrictions eased and payors' customers resumed in-person health care appointments, the Company experienced increasing utilization rates and anticipated further increases. For instance, during the 2022 Investor Day, Defendant Sampson disclosed that monthly utilization was 7.6% in 2021 but remained below pre-pandemic levels, which neared 13% in 2019. Going forward in 2022 and 2023, the Company expected utilization to increase from 7.6% to approximately 9-10%.

129.    As a result of the increased utilization, ModivCare's profits began to shrink. For instance, CW2 stated that, as the pandemic waned and members began using transportation services again, ModivCare's profits slimmed.

130.    CW1 also recalled hearing that ModivCare's profits were declining because payors' members were using ModivCare's NEMT services more as the pandemic waned and as payors encouraged their members to use the NEMT services. CW1 explained that member utilization was growing each year but the Company's ability to provide efficient, cost-effective transportation services significantly declined due to constant senior leadership turnover, mass layoffs every three months to meet quarterly earnings, and actions by senior leadership that were detrimental to operational performance. CW1

added that the constant loss of people with NEMT expertise, structural operational changes, and poor operational performance led to a loss of payor confidence which led to fewer contracts each year.

131. CW1 further explained that, during CW1's last year with ModivCare, everyone was "trying to figure out how to manage" members' increased NEMT utilization. CW1 added that utilization was a constant topic of discussion because it was "throwing off the KPIs," including cost per trip, service level agreements, and member satisfaction KPIs. According to CW1, when member utilization was on the increase, ModivCare "became upside-down" on their contracting.

132. CW1 recalled that, around the first quarter of 2022, ModivCare began introducing initiatives to have members use other transportation modes, such as using public transportation, using ride-share, or relying on family members and friends. CW1 explained that then-Vice President of Transportation Insights and Strategy Ross Peterson was responsible for and introduced goals to reduce ModivCare's transportation costs through these initiatives. According to CW1, ModivCare tracked these initiatives "to the nth degree." CW1 confirmed that Sampson had access to the data related to these initiatives through an application.

133. In line with this, Sampson publicly assured the market that ModivCare's cost savings initiatives would offset the increased utilization and the increased costs of inflation and driver wage pressure. For instance, during the earnings call for the second quarter of 2022 on August 4, 2022 (the "2Q2022 Earnings Call"), Defendant Sampson explained that ModivCare's multi-modal strategies—initiatives to have payor's customers use mass

transit, receive mileage reimbursement for transport provided by family or friends, or use ride-sharing services—would temper the impacts of utilization, wage pressure, and inflation, stating in relevant part:

> And really, for the last 3 quarters, consistent with everything that's happening across the globe, and specifically even in the U.S., there has been the inflation and wage pressures. And you see that in our stats. Likely, we're hitting the peak on the wage, the wage pressures in there and then the initiatives that we have, primarily that are in our multimodal strategies. Those will take hold and hopefully bring those down. We expect in the numbers that we've given and the guidance we've given, we don't expect material decrease in that for the rest of the year. So very comfortable with the guidance we've given on that side. And then utilization, we expect that nominal uptick to continue for the rest of this year.

> So long story short, basically, the margins are relatively consistent for Q3 and Q4. ***The changes that will come in utilization, which will continue to happen will be offset by these strategies that were articulated on the mobility side, again, primarily the multimodal, but also the partnership model that really ensures that our transportation providers are making the right level of money, getting the consistent volume.*** And then we ourselves will ensure that we get the right quality at a lower price. ***So all those together, we feel really confident in our ability to offset any increases in utilization that we expect over the couple of years***.

134.    CW1 explained that the initiatives to decrease utilization by encouraging members to use public transportation, use ride-share, or rely on family members were unrealistic. Indeed, according to CW1, members disliked these initiatives. As such, according to CW1, these initiatives "fared very poorly" and the cost savings that the Company forecasted to achieve through these initiatives "never really transpired." CW1 added that the Company also fell far short of achieving the metrics associated with the initiatives to reduce ModivCare's transportation costs, including reducing utilization

-49-

overall, reducing ride share utilization, increasing use of public transportation, and increasing reliance on members' friends/family members.

135.    Likewise, CW3 explained that some customers reported that that multi-modal trips were generally more expensive. For instance, according to CW3, ModivCare relied more on Uber Health and Lyft as Transport Network Companies ("TNCs"), which increased costs per trip and particularly for interstate trips, such as those in between New York and New Jersey, which could be $300 to $400 or more. CW3 added that other cost-saving initiatives were not pursued because ModivCare was facing on-time performance issues that led to cost overrides, meaning ModivCare would pay transportation providers 2-3 times more for trip acceptance.

136.    Accordingly, as a result of the higher utilization rates and inability to reduce transportation costs, ModivCare's NEMT service expense generally increased throughout the Class Period. The Company's NEMT service expense consists of purchased services as well as payroll and other service expenses. Purchased services account for transportation costs for NEMT services and these costs are affected by trip volumes, service levels, and contract rates. Payroll and other service expenses include costs for ModivCare's contact center operations, customer advocacy, and transportation network teams as well as facility overhead costs.

137.    As depicted below in **Figure 4**, NEMT service expense increased by over 10% between 3Q2022 and 3Q2024. The increase was almost entirely driven by an increase in purchased services during the same period of almost 13%.

**Figure 4**



138.    As indicated above, ModivCare largely correctly estimated the increase in

utilization and, by its own assurances, should have been able to offset some of the costs

through its initiatives or share the predicted increase in purchased services costs with

customers. Indeed, ModivCare's shift to capitated shared risk contracts should have

allowed the Company to protect and improve NEMT margins by sharing increased costs

from higher utilization with customers. However, despite that close estimation, capitated

shared risk contracts were not "win-win" and did not improve NEMT financial results

because, as discussed more thoroughly below, ModivCare's customers frequently

disputed the increased costs that the Company sought through the true-up process and

delayed payments or refused to pay.

139.    As a result, in part due to higher service expense, utilization, and inability to

offset higher costs by shifting them to payors, throughout the Class Period, ModivCare's

NEMT margins decreased substantially. As illustrated by **Figure 5**, ModivCare's NEMT adjusted EBITDA margin declined by around 28% between 3Q2022 and 3Q2024:

**Figure 5**



140.    Nevertheless, as a result of Defendants' Class Period misstatements, analysts expected that ModivCare restructuring its contract mix would lead to less volatility. For example, a January 3, 2023 report by Barrington Research indicated that "ModivCare has made great efforts to restructure many of its NEMT contracts to smooth volatility in operating results." An August 4, 2023 Jefferies report that discussed the Company's second quarter 2023 ("2Q2023") financial results included that "[m]ost of MODV's contracts are 'shared risk' deals that limit (but not eliminate) downside caused by increased service utilization, so we believe we're now seeing the bottoming of MODV's earnings/margins as the risk-sharing aspect of these contracts kicks in."

**4. Contrary to Defendants' Claims, ModivCare's Shared Risk Contracts Did Not Mitigate Financial Impacts or Create Payment Predictability**

141.   Contrary to Defendants' assurances that ModivCare's shared risk contracts allowed the Company to pass higher mobility costs including those related to increased utilization through to payors, protected against downside risk to cash flow, and provided financial predictability and stable rigid margins, CWs confirmed that ModivCare's true-up process under the shared risk contracts caused disputes with payors. As a result, payors frequently refused to pay for the higher costs, negotiated settlements that were detrimental to ModivCare's financial position, and delayed payments.

142.   For instance, CW2 stated that, under the shared risk contracts, ModivCare reconciled utilization in a true-up every six months and depending on the actual ride volume, payors either owed the Company money or vice versa. CW2 added that the true-up process caused regular disputes between ModivCare and payors because the Company's internal utilization data and claims data did not match the payors' "encounter data." Indeed, CW2 explained that ModivCare billed payors based on rides provided by third-party drivers, but payors based their payments to the Company only on the actual claims submitted by those providers, which frequently led to payment disputes between ModivCare and payors.

143.   CW2 provided an example, stating if ModivCare calculated utilization at 175% but the encounter data only showed 150% utilization, then the payor would rely on the encounter data as authoritative and would refuse to pay the Company's higher figures.

-53-

CW2 added that the utilization discrepancy could result in PMPM rates fluctuating $3 or more and would be multiplied across large membership populations.

144.   CW2 explained that ModivCare wanted payors to pay the Company for authorized rides in real time but, because ModivCare's service providers had 120 days to submit claims and sometimes submitted those claims late, payors disagreed with paying in real time and would only reimburse paid authorizations. This, according to CW2, created a persistent timing and data mismatch. As a result, according to CW2, payors contended that they owed ModivCare far less than the Company claimed.

145.   CW2 also stated that ModivCare's payor payment disputes often forced the Company to expend considerable effort to chase contracts receivables and ended in a settlement where the Company accepted partial payment. For instance, CW2 explained that ModivCare would tell a payor: "Pay me $50 million, and we'll write off the other $10 million."

146.   CW2 also stated that, beginning around 2Q2022 and continuing throughout CW2's tenure, ModivCare's failure to provide accurate encounter data (along with the Company's poor operational performance) led to payor dissatisfaction and monthly liquidated damages of hundreds of thousands of dollars for rejected encounters.

147.   CW2 further stated that ModivCare's payors paid on a monthly basis but sometimes those payments were late. For instance, CW2 explained that if a payor believed that ModivCare owed it money as a result of the true-up process, then that payor might withhold its monthly payments to offset the balance that ModivCare owed to the payor. According to CW2, ModivCare would tell payors that they needed to continue

-54-

making their monthly payments even while disputing the true-ups because the true-up balances could later change but payors refused. CW2 confirmed that these disputes dragged on for "a very long time."

148.    Corroborating CW2, CW3 stated that ModivCare faced significant disputes over risk corridors and profits. CW3 added that ModivCare experienced payor collectability issues under Sampson due to the Company charging more for trips despite service and technological shortcomings. CW3 confirmed that payors grew dissatisfied and sought to renegotiate with ModivCare and pushed for increased clarity regarding trip costs and for the Company to fulfill promised capabilities.

149.    For instance, CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments from UnitedHealthcare ("UHC") and New Jersey, and some states capping profits. For example, CW3 stated that UHC demanded repayment or repricing, but ModivCare care resisted, expecting UHC to comply due to the size of the ModivCare organization. However, according to CW3, this dispute caused ModivCare to lose to a $100 million contract loss in 2023.

150.    Likewise, CW3 stated that ModivCare had a dispute with its New Jersey payors, one of the Company's largest contracts, because the Company reinvested repayments into transportation providers to manage profit risks rather than pay those funds back to the payor. According to CW3, New Jersey reported that ModivCare performed outside the profit cap, and they sought to recoup the funds from the Company. According to CW3, such disputes were on both Sampson and Shephard's radar.

151.    CW3 added that, in New Jersey and Virginia, there were instances where ModivCare was required to return a portion of profits to the state, but due to prior spending, the Company was unable to repay these funds on time and delayed payment.

152.    CW2 also participated in calls with Shepard between March and May of 2023 where payor disputes had escalated to a point where the payor requested Shepard's involvement. CW2 confirmed that these negotiation calls were ongoing conversations that occurred weekly throughout 2023.

153.    CW2 provided an example where a Florida-based customer, Sunshine Health, withheld payments for an extended period of time, leading to a $60 million receivable dispute. CW2 first learned about ModivCare's dispute with Sunshine Health in October 2023 when the Company's Florida market leadership, including the Vice President and Senior Director for that region, discussed Sunshine Health's refusal to pay with CW2. CW2 confirmed that ModivCare's receivables balance was large and unresolved in October 2023. CW2 stated that ModivCare's dispute with Sunshine Health ultimately became public and caused the Company's stock price to decline approximately 30%.

154.    CW2 learned about the true-up dispute settlements from leadership because some of the disputed accounts were CW2's customers. CW2 also learned about the settlements through conversations with peers responsible for other regions and in Monthly Leadership Meetings attended by Market Leaders, Regional VPs, the Underwriting Department, and Financial Planning, some of whom directly reported to Defendant Shepard. CW2 stated that encounter data rejected by payors was frequently

-56-

discussed during Monthly Leadership Meetings. CW2 also explained that receivable disputes were a standing agenda item during Monthly Leadership Meetings and included regular updates such as, "Health plan X is only paying us Y, or 30% of what's owed." CW2 added that the receivable disputes were "definitely a hot topic" that occurred "month after month" at every monthly meeting between 2023 and 2024. CW2 confirmed that ModivCare delayed recognition of receivables until settlements were reached because the negotiations were protracted and outcomes uncertain.

**5.    ModivCare's Contract Payables and Contract Receivables Balances Fluctuate Dramatically Quarter-to-Quarter and Cash Plummets**

155.    Despite Defendants' assurances that the shared risk contracts would result in greater predictability and stability, the Company's contract payables and contract receivables balances fluctuated significantly throughout the Class Period. For instance, as illustrated in **Figure 6**, ModivCare's total contract payables decreased by 14.8%, on average, between 2Q2022 and 3Q2024. Over the same period, the Company's total reconciliation contract receivables increased 17%, on average, as indicated by **Figure 7**.

**Figure 6**



**Figure 7**



156. Although Defendants' claimed that ModivCare's cash flow would become more normalized and predictable through the shared risk contracts after the Company completed its COVID-19 payments, contracts payables and contracts receivables continued to fluctuate significantly as did the timing of when the Company paid and received payments from payors, all of which contributed to ModivCare's cash flow crunch. For instance, the Company's contracts receivables balance increased each quarter during the Class Period (except in 3Q2024) (see **Figure 7** *supra*) as a result of the Company's inability to collect payments from its customers. On the other hand, ModivCare's contract payables balance decreased each quarter during the Class Period (except for 3Q2023 and 1Q2024) (see **Figure 6** *supra*), indicating the Company was paying its customers the cash owed from true-ups under their shared risk contracts.

157. This combination of increasing contract receivables and decreasing contract payables created a cash flow nightmare. As evidenced by **Figure 8**, ModivCare had a precipitous decline in cash and cash equivalents during the Class Period that never recovered. Similarly, ModivCare's free cash flow (i.e., the Company's cash flow from operations less applicable capital expenditures included in purchase of property and equipment) also declined and never stabilized, as illustrated by **Figure 9**.

**Figure 8**



**Figure 9**



158.    As a result of ModivCare's inability to manage its cash flow from NEMT

contracts, the Company had to pursue less favorable avenues to obtain cash. For

example, ModivCare amended credit agreements to access additional financing during the Class Period. Around August 2024, according to a report published by J.P. Morgan on August 9, 2024, the Company also "factored" or, sold, the right to collect some of its receivables to another party at a discount as a result of "the [Company's] possible risks/delays to realizing its contract assets or facing any contract payable accelerations[.]" Factoring is used by companies to obtain cash, rather than waiting to collect payment from customers.[8]

## V. DEFENDANTS MADE MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS THROUGHOUT THE CLASS PERIOD AND GRADUALLY REVEALED THE TRUTH THROUGH MULTIPLE PARTIAL DISCLOSURES

159. Throughout the Class Period, Defendants made materially misleading statements and omissions relating to ModivCare's NEMT shared risk contracts, service offerings, and multi-modal initiatives. These material misstatements and omissions created a false impression that: (i) ModivCare's shared risk contracts were structured to create a "win-win" for the Company and its customers, including by allowing ModivCare to pass increased costs through to ModivCare's NEMT customers; (ii) ModivCare's shared risk contracts would protect against downside risk and volatility in costs and utilization, achieve long-term margin objectives, normalize its contracts payables, free cash flow, or working capital, and thereby create more predictable cash flow; (iii) ModivCare was providing high quality care or services to its members in a cost-effective

---

[8] "Factoring can help companies improve their short-term cash needs by selling their receivables in return for an injection of cash from the factoring company." *See* Factor Definition: Requirements, Benefits, and Example, Investopedia (Jan. 25, 2025), https://www.investopedia.com/terms/f/factor.asp (last accessed Jan. 9, 2026).

manner through its NEMT offerings; and (iv) ModivCare's multi-modal initiative was working to improve member experience and to reduce transportation costs.

160. All the statements that Plaintiffs allege are false and/or misleading are bolded and underlined (**example**) within this Section (V). All other statements are included for context.

### A. ModivCare's 3Q2022 Earnings Call on November 3, 2022

161. On November 3, 2022, ModivCare held an earnings call at 8:00 a.m. E.T., before the stock market opened for trading, wherein Defendant Sampson reported on the Company's financial and operational results for its third quarter ended September 30, 2022 ("3Q2022 Earnings Call").

162. During his prepared remarks on the 3Q2022 Earnings Call, Defendant Sampson touted ModivCare's ability to pass on increased transportation costs to its customers under its shared risk capitated contracts, which he claimed reduced fluctuations between PMPM revenue recognition and costs and enabled the Company to achieve its long-term NEMT margins:

> The macro environment remains capricious, primarily due to inflation and the labor market. That said, we have received favorable reimbursement rates for our personal care business, which has helped with caregiver recruitment and retention. **And we have been able to pass through higher transportation costs in our mobility business**.
>
> . . .
>
> I'll now provide some operational highlights for our business segments, starting with Mobility or NEMT segment. During the third quarter, strong NEMT revenue was driven by increased trip growth as membership grew to approximately 36 million members. Although we continue to experience higher transportation cost per trip due to driver shortages and higher fuel prices, **we've been able to contractually share these costs with many of our customers**.

-62-

As noted on previous calls, we have deliberately renegotiated many contracts over the last 18 months to protect the downside. And while it limits excess margin, **it helps with fluctuations in membership and cost**. This balanced and transparent approach with our customers has shifted the focus to providing the proper level of service that is better tailored to the unique needs of members. Our more symbiotic, customer-focused approach will continue to mature and focus on improving the member experience and outcomes, which no doubt will enable us to grow and achieve our long-term margin objectives.

163.    Defendant Sampson further reiterated that Defendants were pleased with ModivCare's ability to recoup increased costs under its shared risk contracts, stating in relevant part: "While we continue to experience transportation cost pressures, **we are pleased with our recovery of the costs through contractual pass-through** and contract repricing."

164.    During the question and answer portion of the 3Q2022 Earnings Call, in response to an analyst's question seeking clarity on what the Company was seeing with respect to "reimbursement related to fuel costs and labor issues on the Mobility business[,]" Sampson represented that the Company's shared risk capitated contracts were "win-win[,]" stating in relevant part:

On the transportation side, as you know, most of our -- 85% of our contracts are capitated. So there's really no kind of reimbursement change in the NEMT side. It is really about how we manage through that. In addition, and this is also something we've done over the last 12 to 18 months, is **ensuring our contracts have been structured so we have a win-win, and able to share in these increased costs that are currently happening primarily in the transportation with the driver. So that's been beneficial to us. So those costs have come up that our transportation providers actually have to bear**.

At the same time, we want to make sure that they are making money, and most importantly, ensuring that we are picking people up on time and having a great member experience because that is the most important thing for our customers. And therefore, **because of our contracts, we're able to pass**

-63-

**those through to a lot of our customers as well, or call it share in those costs**. So that's the differences between what's happening on the reimbursement rate on the personal care side, specifically in the home business. And then **the higher cost in the mobility, we're able to pass a large chunk of those through based on the way we've developed our contracts**.

165.    During the same call, another analyst pressed Defendant Sampson for additional details regarding contract repricing and whether such actions were related to declining contracts, to which he responded:

How much was declining? So our contracts have not been declining. What the point of the contract discussion was to show that **we have been**, over the last 18 months, **renegotiating contracts to ensure that they are a win-win, and in essence, protecting the downside in the event that there's some volatility in costs or utilization. So our contracts are working, which is why I feel really good about the margins that we have been articulating.** That was the whole point of the contract discussion, to ensure that we're doing the right stuff and our numbers have rigid earnings as opposed to maybe the volatility that was -- that happened pre-COVID.

166.    The statements identified in ¶¶162-165 above were each materially false and misleading, lacked any reasonable basis and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's shared risk capitated contracts were not "win-win" and the Company was not passing increased costs through to ModivCare's NEMT customers such that it was able to mitigate fluctuations in membership and costs and protect against downside risk and volatility in costs and utilization. Nor did Defendant Sampson have a reasonable basis to be pleased with ModivCare's purported ability to recover costs through pass-through provisions or the margins that the Company was articulating.

167. The material falsity of Defendant Sampson's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (i.e., actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

**B. ModivCare's 3Q2022 Form 10-Q on November 8, 2022**

168. On November 8, 2022, before the stock market opened for trading that day, ModivCare filed with the SEC a Form 10-Q to report on the Company's financial and

operational results for its third quarter ended September 30, 2022 (the "3Q2022 Form 10-Q"), which was signed by Defendant Sampson.

169.    The 3Q2022 Form 10-Q also contained a section titled "Risk Factors" wherein the Company represented that the risk factors enumerated in ModivCare's FY2021 Form 10-K, which was filed with the SEC on March 1, 2023, to report on the Company's financial and operational results for its fourth quarter ended December 31, 2021 (the "FY2021 Form 10-K"), "remain[ed] current in all material respects" and affirmed that "there have been no material changes from the risk factors disclosed in the Annual Report[,]" stating in relevant part:

> The risks described under the caption "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2021 (the "Annual Report") could materially and adversely affect our business, financial condition, and results of operations, and could cause the trading price of our common stock to decline. **The discussion of the risks included under that caption in our Annual Report remains current in all material respects, and there have been no material changes from the risk factors disclosed in the Annual Report**. The risk factors that we have discussed do not identify all risks that we face; our operations could also be affected by factors that are not presently known to us or that we currently consider to be immaterial to our operations. Due to risks and uncertainties, known and unknown, our past financial results may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods.

170.    ModivCare's FY2021 Form 10-K, which as a result of the statements in the 3Q2022 Form 10-Q referenced in ¶169, *supra.*, incorporated by reference the following purported risks, including in relevant part:

> **The implementation of alternative payment models** and the transition of Medicaid and Medicare beneficiaries to MCOs may limit our market share and **could adversely affect our revenues.**
> . . .

-66-

We may be similarly impacted by increased enrollment of Medicare and Medicaid beneficiaries in managed care plans, shifting away from traditional fee-for-service models.

. . .

Difficulties with operational processes may negatively affect our revenue growth rates, cash flow and profitability for services provided. **Other alternative payment models**, such as value-based billing, **capitated rates and per member per month pricing**, may be required by the government, MCOs and other commercial payors to control their costs while shifting financial risk to us, which **could also materially affect our operations and financial condition**.

171. Another risk factor in ModivCare's FY2021 Form 10-K discussed changes to the Company's ability to timely collect from payors, stating in relevant part:

Future cost containment initiatives undertaken by private third-party payors may limit our future revenue and profitability.

Our commercial payor and managed Medicaid revenue and profitability are affected by continuing efforts of third-party payors to maintain or reduce costs of healthcare by lowering payment rates, narrowing the scope and utilization of covered services, increasing case management review of services and negotiating pricing. **There can be no assurance that third-party payors will make timely payments for our services**, and there is no assurance that we will continue to maintain our current payor or revenue mix. We will continue our efforts to develop our commercial payor and managed Medicaid sources of revenue and **any changes in payment levels from current or future third-party payors could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows**.

172. ModivCare's FY2021 Form 10-K also included a risk factor that discussed the Company's ability to time collect its accounts receivable related to NEMT, which stated:

**Delays in collection, or non-collection, of our accounts receivable**, particularly during any business integration process, **could adversely affect our business, financial position, results of operations and liquidity**.

-67-

Prompt billing and collection are important factors in our liquidity. Billing and collection of our accounts receivable are subject to the complex regulations that govern Medicare and Medicaid reimbursement and rules imposed by nongovernment payors. Our inability to bill and collect on a timely basis pursuant to these regulations and rules could subject us to payment delays that could have a material adverse effect on our business, financial position, results of operations and liquidity. **It is possible that documentation support, system problems, Medicare, Medicaid or other payor issues**, particularly in markets transitioning to managed care for the first time*,* or industry trends **may extend our collection period**, which may materially adversely affect our working capital, and our working capital management procedures may not successfully mitigate this risk.

. . .

In addition, we may experience delays in reimbursement as a result of the failure to receive prompt approvals related to change of ownership applications for acquired or other facilities or from delays caused by our or other third parties' information system failures. We may also experience delayed payment of reimbursement rate increases that are subject to the approval of the CMS and/or various state agencies before claims can be submitted or paid at the new rates. **Any delays experienced for the foregoing or other reasons could have a material adverse effect on our business, results of operations and financial condition**.

173.    ModivCare's FY2021 Form 10-K included a risk factor that discussed utilization, which stated:

**If we fail to estimate accurately the cost of performing certain contracts, we may experience reduced or negative margins and our results of operations could be materially adversely affected**.

. . .

**If the utilization of our services is more than we estimated, the contract may be less profitable than anticipated, or may not be profitable at all**.

. . .

Revenue under certain contracts may be adjusted prospectively if client volumes are below expectations. **If we are unable to adjust our costs accordingly, our profitability may be negatively affected.** In addition, certain contracts with state Medicaid agencies are renewable or extended at the state's option without an adjustment to pricing terms. If such renewed contracts require us to incur higher costs, including inflation or regulatory

-68-

changes, than originally anticipated, our results of operations and financial condition may be adversely affected.

174.    The statements identified in ¶¶169-173 above was materially false, and misleading when made, because the risks included in the FY2021 Form 10-K had actualized and therefore, "material changes" had occurred. ModivCare and Defendant Sampson had a duty to update the Company's risk factors in the 3Q2022 Form 10-Q to reflect those material changes. Indeed, the FY2021 Form 10-K risk factors were posed as mere hypotheticals, when those risk had actualized given that: (i) ModivCare's shift to entering into more shared risk contracts was already negatively, materially impacting the Company's operations and financial condition; (ii) ModivCare was experiencing delays in payments and collecting its accounts receivable that were already extending the Company's collection period and having a materially adverse impact on the Company's business and consolidated financial condition; and (iii) ModivCare was already experiencing an inability to adjust costs under its shared risk contracts, utilization increases, and increased costs that were having a materially adverse impact on the Company's results of operations and profitability.

175.    The material falsity of Defendant Sampson's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (i.e., actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of

dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

### C. ModivCare's FY2022 Form 10-K on March 7, 2023

176. On March 7, 2023, before the stock market opened for trading that day, ModivCare filed its Form 10-K with the SEC to report on the Company's financial and operational results for its fourth quarter ended December 31, 2022 (the "FY2022 Form 10-K").[9] The FY2022 10-K was signed by Sampson.

177. ModivCare's FY2022 Form 10-K contained a section describing risk factors that "could materially and adversely affect [ModivCare's] business, financial condition and results of operations." One such risk factor discussed fee models that were alternative to FFS, stating in relevant part:

> **The implementation of alternative payment models** and the transition of Medicaid and Medicare beneficiaries to MCOs may limit our market share and **could adversely affect our revenues**.

---

[9] According to ModivCare's Form 12b-25 Notification of Late Filing filed with the SEC on March 2, 2023, the FY2022 10-K was filed late due to Company's expectation that it would report material weaknesses related to its Information Technology systems and the revenue and payroll processes in its business units.

. . .

We may be similarly impacted by increased enrollment of Medicare and Medicaid beneficiaries in managed care plans, shifting away from traditional fee-for-service models.

. . .

Difficulties with operational processes may negatively affect our revenue growth rates, cash flow and profitability for services provided. **Other alternative payment models**, such as value-based billing, **capitated rates and per member per month pricing** may be required by the government, MCOs and other commercial payors to control their costs while shifting financial risk to us, which **could also materially affect our operations and financial condition**.

178.    Another risk factor in ModivCare's FY2022 Form 10-K discussed changes to the Company's ability to timely collect from payors, stating in relevant part:

Future cost containment initiatives undertaken by private third-party payors, especially if we are unable to maintain or reduce our cost of services below rates set forth by payors, may limit our future revenue and profitability and cause us to experience reduced or negative margins and our results of operations could be materially adversely affected.

Our commercial payor and managed Medicaid revenue and profitability are affected by continuing efforts of third-party payors to maintain or reduce costs of healthcare by lowering payment rates, narrowing the scope and utilization of covered services, increasing case management review of services and negotiating pricing. **There can be no assurance that third-party payors will make timely payments for our services**, and there is no assurance that we will continue to maintain our current payor or revenue mix. We will continue our efforts to develop our commercial payor and managed Medicaid sources of revenue and **any changes in payment levels from current or future third-party payors could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows**.

179.    ModivCare's FY2022 Form 10-K also included a risk factors that discussed the Company's ability to time collect its accounts receivable related to NEMT, which stated:

**Delays in collection, or non-collection, of our accounts receivable**, particularly during any business integration process, **could adversely**

**affect our business, financial position, results of operations and liquidity**.

Prompt billing and collection are important factors in our liquidity. Billing and collection of our accounts receivable are subject to the complex regulations that govern Medicare and Medicaid reimbursement and rules imposed by nongovernment payors. Our inability to bill and collect on a timely basis pursuant to these regulations and rules could subject us to payment delays that could have a material adverse effect on our business, financial position, results of operations and liquidity. **It is possible that documentation support, system problems, Medicare, Medicaid or other payor issues**, particularly in markets transitioning to managed care for the first time, or industry trends **may extend our collection period**, which may materially adversely affect our working capital, and our working capital management procedures may not successfully mitigate this risk.

. . .

In addition, we may experience delays in reimbursement as a result of the failure to receive prompt approvals related to change of ownership applications for acquired or other facilities or from delays caused by our or other third parties' information system failures. We may also experience delayed payment of reimbursement rate increases that are subject to the approval of the CMS and/or various state agencies before claims can be submitted or paid at the new rates. **Any delays** experienced for the foregoing or **other reasons could have a material adverse effect on our business, results of operations and financial condition**.

180.    ModivCare's FY2022 Form 10-K included a risk factor that discussed utilization, which stated:

**If we fail to estimate accurately the cost of performing certain contracts, we may experience reduced or negative margins and our results of operations could be materially adversely affected**.

. . .

**If the utilization of our services is more than we estimated, the contract may be less profitable than anticipated, or may not be profitable at all**.

. . .

Revenue under certain contracts may be adjusted prospectively if client volumes are below expectations. **If we are unable to adjust our costs**

-72-

**accordingly, our profitability may be negatively affected**. In addition, certain contracts with state Medicaid agencies are renewable or extended at the state's option without an adjustment to pricing terms. If such renewed contracts require us to incur higher costs, including inflation or regulatory changes, than originally anticipated, our results of operations and financial condition may be adversely affected.

181.    The statements identified in ¶¶177-180 above each were materially false, and misleading when made, because the risks included in the FY2022 Form 10-K were posed as mere hypotheticals, when those risk had actualized given that: (i) ModivCare's shift to entering into more shared risk contracts was already negatively, materially impacting the Company's operations and financial condition; (ii) ModivCare was experiencing delays in payments and collecting its accounts receivable that were already extending the Company's collection period and were having a materially adverse impact on the Company's business and consolidated financial condition; and (iii) ModivCare was already experiencing an inability to adjust costs under its shared risk contracts, utilization increases, and increased costs that were having a materially adverse impact on the Company's results of operations and profitability.

182.    The material falsity of Defendant Sampson's statements is supported by evidence.CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (i.e., actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with

payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

### D. ModivCare's 1Q2023 Form 10-Q on May 4, 2023

183.    On May 4, 2023, before the stock market opened for trading that day, ModivCare filed with the SEC a Form 10-Q to report on the Company's financial and operational results for its first quarter ended March 31, 2023 (the "1Q2023 Form 10-Q"), which was signed by Defendant Sampson.

184.    The 1Q2023 Form 10-Q contained a section titled "Risk Factors" wherein the Company represented that the risk factors enumerated in the ModivCare's FY2022 Form 10-K "remain[ed] current in all material respects" and affirmed that "there have been no material changes from the risk factors disclosed in the Annual Report[,]" stating in relevant part:

> The risks described under the caption "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2022 (the "Annual Report")

could materially and adversely affect our business, financial condition, and results of operations, and could cause the trading price of our common stock to decline. **<u>The discussion of the risks included under that caption in our Annual Report remains current in all material respects, and there have been no material changes from the risk factors disclosed in the Annual Report</u>**. The risk factors that we have discussed do not identify all risks that we face; our operations could also be affected by factors that are not presently known to us or that we currently consider to be immaterial to our operations. Due to risks and uncertainties, known and unknown, our past financial results may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods.

185.    The statement identified in ¶184 above was materially false, and misleading when made, because, for the reasons outlined in ¶¶181-182 above, the risks included in the FY2022 Form 10-K had actualized and therefore, material changes had occurred. Defendant Sampson had a duty to update the Company's risk factors in the 1Q2023 Form 10-Q to reflect material changes to its risk factors.

> **E. Defendants Partially Disclosed the Truth on May 4, 2023 in ModivCare's 1Q2023 Press Release and Earnings Call but Continue Making False and Misleading Statements**

> **1.    Defendants Partially Disclosed the Truth on May 4, 2023**

186.    On May 4, 2023, before the stock market opened for trading, ModivCare published a press release announcing the Company's financial results for the three months ended March 31, 2023 on its website and concurrently filed it with the SEC on Form 8-K, signed by Defendant Sampson ("1Q2023 Press Release"). In the 1Q2023 Press Release, ModivCare reported a net loss of $4.0 million, that the Company

expended approximately $2.7 million in cash for operating activities, and that the NEMT Adjusted EBITDA margin decreased from 9.3% in 1Q2022 to 7.5% in 1Q2023.

187.   That same day, ModivCare also held an earnings call at 8:00 a.m. E.T., before the market opened for trading, to report on the Company's financial and operational results for its first quarter ended March 31, 2023 ("1Q2023 Earnings Call"), which Defendants Sampson and Shepard participated in.

188.   Despite previous assurances that ModivCare's shared risk contracts represented a "win-win" for ModivCare and were allowing the Company to share in its costs with customers, during the call, Defendant Shepard revealed that ModivCare used $3 million in cash related to a $7 million reduction in contract payables and incurred "$31 million increase in contract receivables[,]" stating in relevant part:

> Turning to our cash flow and balance sheet. Consolidated cash-flow from operations in the first quarter of 2023 was **the use of approximately $3 million due to a $7 million reduction in contract payables and $31 million increase in contract receivables**. Excluding these items, our cash flow from operation would have been better in the first quarter by $38 million. **The increase in contract receivables**, which represent under payments and receivables on certain contracts with reconciliation or risk corridor provisions **was higher than our expectations in the first quarter**.

189.   Shepard's statements revealed that ModivCare's shared risk customers had paid less than what the Company anticipated through the reconciliation or risk corridor provisions. As such, Shepard's statements partially corrected the misimpression created by Defendants' previous statements representing that ModivCare was "contractually shar[ing]" its "higher transportation costs" with its customers, that Defendants were "pleased with [their] recovery of the costs" through the same, and that

-76-

the negative impacts to the Company's financials from the shared risk contracts, and untimely payments and delayed collections were mere hypotheticals.

190. Nevertheless, Shepard—speaking jointly on behalf of himself and Sampson— attempted to ally investor concerns by assuring that "we will be collecting on these receivables later this year, which will contribute to stronger cash flow in the second half of 2023." Indeed, with respect to contract payables, Shepard explained that ModivCare had anticipated receiving a payment in 2Q2023 that would purportedly be "spread throughout the year[:]"

> Our contract payables, which primarily relate to overpayments and contract liabilities on certain NEMT contracts were in line with expectations in Q1 at a $7 million reduction. ***However, we have 1 large settlement during the second quarter that we previously expected, will be spread throughout the year. This will likely result in cash flow from operations in Q2 being in a similar range as the first quarter***. For all of 2023, we continue to expect our contract payables and receivables will be much less impactful compared to last year. However, our cash flow generation will be more second half weighted due to these timing issues.

191. Upon the news, ModivCare's stock price declined $11.30, or approximately 16%, from $69.30 per share on May 3, 2023 to $58.00 per share on May 4, 2023.

### 2. Defendants Continue Making False and Misleading Statements on May 4, 2023

192. Still, Defendants Sampson and Shepard continued making false and misleading statements in the 1Q2023 Press Release and during the 1Q2023 Earnings Call. For instance, the 1Q2023 Press Release included a quote from Defendant Sampson, stating:

> <u>**Our offerings provide high quality care and services to our members in a cost-effective manner**</u>, aligning with the evolving needs of the healthcare landscape. Our focus for 2023 remains steadfast to build for

scale and grow our business. **We are confident that the initiatives implemented over the past few quarters will drive efficiencies and operating leverage throughout the year**.

193. Also, during his prepared remarks on the 1Q2023 Earnings Call, Defendant Sampson, speaking jointly on behalf of himself and Shepard, emphasized the purported benefits of the Company's multi-modal partnership model, stating in relevant part:

> **Our multimodal partnership model is expected to drive lower transportation cost per trip throughout the year as** we narrow our network of transportation providers and we **continued to shift more trips to our preferred providers matching the right type of ride with the members needs**.

194. During the question-and-answer portion of the 1Q2023 Earnings Call, in response to an analyst's question about what mechanisms were present to protect ModivCare from higher utilization, Defendant Sampson—again speaking jointly on behalf of himself and Shepard— represented that the Company's margins were being protected by ModivCare's initiatives to reduce costs through its multi-modal partnerships, stating in relevant part:

> The one thing that we have to do and have been doing to ensure that we can make sure that our margins get back to where we want and at the higher range in Mobility side, it's two-fold. **It's the transportation costs, and those initiatives are taking hold**. That's again narrowing the network and ensuring that we are with our most -- the partners that match what we need for that specific member. **Those initiatives are taking hold** and that cost will come down. And then the other item, well, there's 3 items.
>
> . . .
>
> So the contracts, the way we've restructured them, coupled with **these initiatives that are taking hold**, coupled with where we think utilization has been, **all those together are showing that it's working**, and our plans are taking hold. So again, **we feel really good about that business**.

195.     In response to an analyst's question regarding the expectation for operating cash flow in FY2023, Sampson again assured that ModivCare's multi-modal initiative was working, stating in relevant part:

> From a margin perspective on mobility side, it's two-fold. It's the cost per trip that we pay. That has improved, and I expect that to accelerate throughout the year. And that, again, that's on getting the right members and **the right modality to our members at the right cost, and that's working.** And I expect that to be kind of ramping throughout the year at the current pace that it is.

196.     The statements identified in ¶¶192-195 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because they generated a misimpression regarding customer satisfaction with ModivCare's service and related cost savings—indeed, ModivCare was not providing high quality care or services to its members in a cost-effective manner through its offerings nor was the Company's multi-modal initiative "taking hold" and working to reduce transportation costs. Defendants Sampson and Shepard also did not have a reasonable basis to: (i) be confident that the Company's multi-modal partnership initiative would drive efficiencies, operating leverage, or lower transportation costs throughout the year; (ii) suggest that said initiative would continue to improve performance and increase member satisfaction; or (iii) feel really good about the Company's NEMT business. The material falsity of Defendants Sampson's and Shepard's statements is supported by ample evidence given that:

a.     CW1 stated that ModivCare's service quality started to decline around April 2022. CW1 also confirmed that ModivCare had "struggles to keep the payors happy" beginning around 1Q2022 and the Company received an increase in complaints,

including driver miscommunications and untimely pickups, from payors' members around May or June 2022. As a result, CW1 confirmed that, throughout the last year of CW1's employment, ModivCare was failing to meet targets for its member satisfaction KPIs. CW1 further confirmed that service issues resulted in a lot of problems with the Big 6 and payors "absolutely" refused to pay or delayed payments due to ModivCare's service issues.

b.        CW1 stated that, during the last year of CW1's tenure, ModivCare began losing NEMT customers due to service complaints. CW1 also confirmed that NEMT de-implementations were "common" during the last year of CW1's tenure due to poor service quality and service complaints. Corroborating CW1, CW2 confirmed that contract attrition was an issue in multiple regions and remained an issue throughout CW2's tenure.

c.        CW3 stated that customer advocate staffing cuts greatly diminished ModivCare's ability to address service issues because the Company's GPS tracking and dynamic reassignment technologies "were plagued by bugs" throughout CW3's tenure and could not fulfill these capabilities without human intervention. As a result, according to CW3, payors consistently expressed dissatisfaction, particularly around no shows and on-time performance, which continued throughout CW3's tenure.

d.        CW3 stated that missed appointments and no-shows were significant service issues that ModivCare had throughout CW3's tenure but did not improve on. CW3 added that ModivCare consistently failed to meet KPIs, including on-time performance and NVAs (which caused missed rides), throughout CW3's tenure.

e.        CW1 confirmed that ModivCare's multi-modal initiative "fared very poorly"

because payors' members disliked them. As a result, according to CW1, the Company fell far short of achieving the stated metrics associated with the initiative, including forecasted cost savings that "never really transpired."

f.      CW3 explained that that multi-modal trips with ride-share TNCs were generally more expensive than traditional transportation providers, and other cost-saving initiatives were hampered by on-time performance issues that resulted in the Company paying its transportation providers 2-3 times more for trip acceptance.

g.      CW1 confirmed that ModivCare's decision to de-prioritize members' experience "100%" contributed to the loss of business. CW2 corroborated that Defendants' decision to treat ModivCare as a logistics company rather than a people-driven service business damaged customer relationships.

h.      CW2 confirmed that, beginning around 2Q2022 and continuing throughout CW2's tenure, ModivCare's poor operational performance (such as call center failures) led to client dissatisfaction and monthly liquidated damages of hundreds of thousands of dollars.

i.      CW3 stated that ModivCare instructed CW3 to highlight technological capabilities that the Company did not have to customers and never delivered on providing during CW3's tenure, which caused customers to repeatedly complain and place ModivCare on PIPs during 2022 and 2023. CW3 confirmed that ModivCare's poor service delivery, long-standing weaknesses in technology, and reliance on an outdated platform caused major contracts to be under threat.

j.      CW3 confirmed that New York-based customers had major complaints

centered on technology, call center performance, and lack of responsiveness from the executive team. CW3 confirmed that ModivCare consistently failed to meet call center KPIs related to answering-time during CW3's tenure.

k.      CW3 confirmed that ModivCare lost the majority of its New York NEMT business in 2022 and the Elevance contract, was not considered for an RFP re-bid in Virginia in 2022-2023, and had withdrawals from minor NEMT player contracts, MCOs, UHC, and Humana due to its poor service delivery and long-standing weaknesses in technology.

l.      CW2 confirmed that ModivCare lost MCO Medicaid contracts in New York that were valued at $100 million annually during CW2's tenure due, in part, to New York State transitioning members to its state Medicaid program.

197.    During his prepared remarks on the 1Q2023 Earnings Call, Defendant Sampson also discussed ModivCare's intentional shift from capitated full-risk to capitated shared risk and FFS contracts and how the shift would protect the Company and its customers, including from the effects of redetermination, stating in relevant part:

> When we exit the pandemic in 2020 and 2021, we made a conscious effort to effectively and efficiently transition, a large portion of our previous full-risk contracts to contracts that are shared risk or fee-for-service arrangements, protecting ourselves and our customers. **These shared risk contracts significantly derisk the financial impact from redetermination by setting contractual revenue rates, primarily based on trip volumes as opposed to membership. In many situations, we can fully offset the gross profit impact from lower membership from re-determination as these contracts reset monthly**.

198.    During the question-and-answer portion of the 1Q2023 Earnings Call, in response to an analyst's question about what mechanisms were present to protect

ModivCare from higher utilization, Defendant Sampson—speaking jointly on behalf of himself and Shepard—emphasized the Company's shift toward capitated shared risk contracts:

> Yes. So the utilization increases like we've been saying for a while, have been steady increases as we come out of COVID, and more normal trip volume takes hold and that continues to happen. The other thing -- and we talked about this today, primarily we're talking around redetermination. But in general, **our contracts that we have reset, renegotiated to ensure that it's a win-win for us and the customer as well**, as you see that now full-risk is down to 20% of our mix versus pre-COVID 60%. **So those structural changes in our contracts allow us to grow with our customers and utilization being as planned. So, that's a good thing from a structural perspective.**
>
> …
>
> **So the contracts, the way we've restructured them**, coupled with these initiatives that are taking hold, **coupled with where we think utilization has been**, **all those together are showing that it's working**, and our plans are taking hold. So again, **we feel really good about that business**.

199.    Later, during the same call, in response to an analyst's question regarding how capitated shared risk contracts were different from and purportedly more beneficial than the company's previous contracts, Defendant Sampson—again speaking jointly on behalf of himself and Shepard—characterized capitated shared risk contracts as "win-win" and that they would provide rigid NEMT margins:

> Yes. And so COVID and really when I got here a couple of years ago, really highlighted that we had a misbalance in these contracts. We did very well at the expense of our customers in 2020 and 2021. Even before that, by the way, in 2018 and 2019, it was the opposite. Our customers did very well, and we didn't. So when I got here, this doesn't make sense, right? This win-lose relationship that was anchored on this kind of capitation that happened 5, 6 years ago. The business in transportation and NEMT changed over these last 10 years. We were not kind of caught up to this win-win relationship. And you couple that with what has happened really over the last couple of years in COVID, and continues to accelerate.

I touched on this a little bit with Brian's question, Healthcare now realizes or has realized, but now it's an important focus because we were able to track and have data. Transportation matters. It matters to people's clinical outcomes eventually. So you put all that together, **we have been enabled to change the contract, where we actually have a win-win relationship.** And as, **whether or not utilization or cost fluctuations happen, we share in the upside and downside for that. So the change to where we are today, I expect that to continue.**

So 60% pre-COVID on full-risk, which full-risk, again, is we get a PMPM. And then we're responsible for everything regardless of cost of utilization. Now the contract has worked where there is a sharing within that utilization change or cost change. Again, I expect that to continue, **and that contributes again to the rigidness in our margin profile,** especially when we get to the high-end, when we finish off with these initiatives like I articulated a little bit earlier.

200.    In response to another analyst's question regarding ModivCare's contract receivables and contract payables balances, Defendant Sampson stated that ModivCare's shift toward capitated shared risk contracts had normalized contract receivables and contract payables:

And then on the redetermination, and the -- our disclosure around the redetermination is primarily people that aren't utilizers. The reason why we disclosed that is similar to the question that Pito had. It explains why from a utilization perspective, you could see that being higher because that's the phenomenon with people -- people going away, they don't take trips. **But the reason why we also talked about our contract mix, you see that being shared. So even though utilization is up, you're seeing that being shared in the way our contracts are structured.**

**So it's helping you model the coming out of COVID with redetermination and showing that our contracts actually work.** So, even on what Ken just talked about, **the increase in receivables is right in line with how we've organized these contracts.** And they -- out of the -- we had a lot of noise with paying back COVID expenses in 2022. **Those now are done. Now you see the normal fluctuations between receivables and payables that are happening here in 2023.** We still have a little bit of noise that's happening in Q1 and Q3 on COVID stuff, but the

majority of our working capital fluctuations, as evidenced by what Ken just talked about have to do with the way our contracts are set up.

201. In response to another analyst's question regarding the Company's free cash flow, Defendant Shepard—speaking jointly on behalf of himself and Sampson—responded that ModivCare's capitated shared risk contracts with customers were working as expected:

> But then, as we think about the second half of the year, we'll also benefit from the reversal of some of these build and receivables, we're going to be collecting on these receivables in the second half of this year. And so that's going to be from a working capital perspective, a benefit. And then, you also have the typical -- I think, what Heath is referring to in terms of normalization is that you'll also have this benefit of just, EBITDA less CapEx and interest in the second half of the year.

> And so I think to that range that you've given of like the $80 million to $100 million, it's probably going to be in that range, depending on how working capital really shakes out through the rest of the year. **But yes, like we're feeling very confident that, as Heath has alluded to, the contracts are working as they should be.** And really, the cash flow generation is going to be accelerating. So that's all good stuff.

202. The statements identified in ¶¶197-201 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's shared risk contracts were not "win-win" and did not enable the Company to share in cost fluctuations, "fully offset the gross profit impact from lower membership[,]" or have rigid margins and normalized contract receivable and payables fluctuations. Sampson and Shepard also had no reasonable basis to be confident that ModivCare's contracts were working as they should be.

203.    The material falsity of Defendants Sampson's and Shepard's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (i.e., actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payors by ModivCare as a result of the true-up process. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

**F.  Bank of America Securities' 2023 Health Care Conference on May 10, 2023**

204.    On May 10, 2023, Defendant Sampson participated in the Bank of America Securities' 2023 Health Care Conference on behalf of ModivCare. Notably, no oral

-86-

statement was made to warn investors that Sampson may make forward-looking statements or to direct investors to any cautionary language.

205.    During the question-and-answer portion of the conference session, Defendant Sampson touted the Company's transition to capitated shared risk contracts as purportedly guarding against Medicaid redetermination impacts, stating in relevant part:

> Yes. So the good thing for us is we have been planning for this for multiple years. So it's just going to hit everybody in the face these last couple of months. For us, we've been planning for this for the last number of years. It benefits us coming out of COVID and also it allows us to be proactive in Medicaid redetermination that's happening now. So the good thing of this for us, we're aligned with all our specific states and understand what needs to happen. **So part of what we prepared for is changing how we contract with our states and our payers. And that primary is a move to a kind of win-win relationship.**
>
> **So when there is a fluctuation in utilization, which redetermination would be, the cost, which could relate to redetermination, those we share. So we're protected from a margin perspective on the P&L.** So that's an important point. So that has happened and some of the stuff that we talked about prior to COVID, we would have had a lot more exposure. About 60% of our contracts plus we're exposed in the event that this happened. Benefitted us during COVID, now we're down to 20%. And that 20%, we know where they are. **We have relationships with them. based on historically how we have reset and redone pricing, we feel really good our ability to partner and manage through that with each of the areas.**

206.    Later during the conference, when asked by an analyst about challenges with the Company's contract payables, Defendant Sampson touted how ModivCare's capitated shared risk contracts protected the Company's margins and cash flow, stating in relevant part:

> Well, it's a really important point, and you really have to dive into our contracts to look it as simple as possible. Starting off the bat again, **with**

-87-

**the changes we've made, the margin in the P&L is protected with these changes.**

207.    Defendant Sampson also reiterated that ModivCare's shared risk contracts were "win-win" and stabilizing the Company's margins, stating in relevant part:

> Yes. So the way we contract, again, that's mobility-centric, which is mobility and EMT, which is 60% of our business. The other 45% is the home business. So this is centered on mobility. And then within that, the big change that we have made is moving to this win-win relationship with our payers, which gets to moving from a fully capitated full-risk contract to a shared risk contract. **And that moving to 20% is allowing us to really have stable rigid margins regardless of utilization and cost** because it really is about the member experience. So that's -- though, again, from a working capital and timing paying that back because the payables and receivables range from anywhere from 6 to 18 months. Yes, that's a near-term capital issue but **we are aligned now. And based on that contract structure, we feel really good about our future** and even managing through determination.

208.    Sampson's point landed with analyst Kalle J. Ahl, who repeated Sampson's statement, stating in relevant part: "We're moving away from that full capitation, if you will, that mitigates the risk of that. The volatility around the payables and receivables." In response, Sampson agreed, stating that the Company's shared risk contracts demonstrated "**[t]he true win-win relationship that we have**" with payors.

209.    The statements identified in ¶¶205-208 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's shared risk contracts were not "win-win" and did not enable the Company to share cost fluctuations with clients such that the Company's margins were protected, stable, or rigid. Defendant Sampson also had no reasonable basis to feel really good about the Company's ability to manage through cost fluctuations with the shared risk contracts or to feel good about the Company's future.

210.    The material falsity of Defendant Sampson's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (i.e., actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

211.    During the same conference, in response to a question about ModivCare's NEMT cost savings initiatives, Defendant Sampson emphasized that those initiatives,

including the multi-modal initiative, were "taking hold" and members were satisfied with

them, stating in relevant part:

> Yes. So from a cost perspective, yes, **the initiatives are taking hold**. You
> can see that in the numbers, and I expect that to continue. It's tangible items
> that we've implemented now it's just about scaling them. So the team has
> done an amazing job. **And the initiatives** that we can go through probably
> at a later date **are showing high member satisfaction as well as
> allowing us to take out costs** as well which is why we reaffirmed our
> guidance and reaffirmed our long-term margin targets as well.

212.    Later during the conference, in response to a question about ModivCare's

margin opportunity as it related to the Company's "multi-partnership model and the

transportation side[,]" Defendant Sampson doubled down on the initiative's ability to lower

costs and improve member service quality, stating in relevant part:

> It is. Yes. **It's that multimodal partnership model**, which is really the
> people and owners of these cars, ensuring that they're partners of ours, and
> we ensure they make money … **Just by doing that, ensuring partnership
> and coordination is a critical part of how we have – we're able to lower
> the cost and also increase the quality**. That also includes Uber and Lyft,
> that also includes mass transit, that also includes driving yourself and
> getting reimbursed. So it depends on the member and how to fit that
> member to the type of transportation we have.

213.    The statements identified in ¶¶211-212 above were each materially false

and misleading and/or omitted material facts necessary to make the statements therein

not false or misleading when made because they generated a misimpression regarding

customer satisfaction with ModivCare's service and related cost savings—indeed,

ModivCare's multi-modal initiative was not "taking hold[,]" "showing high member

satisfaction" or "allowing [the Company] to take out costs[,]" "lower the cost" or "increase

the quality." The material falsity of Defendant Sampson's statements is supported by

ample evidence given that:

a.     CW1 stated that ModivCare's service quality started to decline around April 2022. CW1 also confirmed that ModivCare had "struggles to keep the payors happy" beginning around 1Q2022 and the Company received an increase in complaints, including driver miscommunications and untimely pickups, from payors' members around May or June 2022. As a result, CW1 confirmed that, throughout the last year of CW1's employment, ModivCare was failing to meet targets for its member satisfaction KPIs. CW1 further confirmed that service issues resulted in a lot of problems with the Big 6 and payors "absolutely" refused to pay or delayed payments due to ModivCare's service issues.

b.     CW1 stated that, during the last year of CW1's tenure, ModivCare began losing NEMT customers around August 2022 due to service complaints. CW1 also confirmed that NEMT de-implementations were "common" during the last year of CW1's tenure due to poor service quality and service complaints. Corroborating CW1, CW2 confirmed that contract attrition was an issue in multiple regions and remained an issue throughout CW2's tenure.

c.     CW3 stated that customer advocate staffing cuts greatly diminished ModivCare's ability to address service issues because the Company's GPS tracking and dynamic reassignment technologies "were plagued by bugs" throughout CW3's tenure and could not fulfill these capabilities without human intervention. As a result, according to CW3, payors consistently expressed dissatisfaction, particularly around no shows and on-time performance, which continued throughout CW3's tenure.

d.     CW3 stated that missed appointments and no-shows were significant

-91-

service issues that ModivCare had throughout CW3's tenure but did not improve on. CW3 added that ModivCare consistently failed to meet KPIs, including on-time performance and NVAs (which caused missed rides), throughout CW3's tenure.

e.      CW1 confirmed that ModivCare's multi-modal initiative "fared very poorly" because payors' members disliked them. As a result, according to CW1, the Company fell far short of achieving the stated metrics associated with the initiative, including forecasted cost savings that "never really transpired."

f.      CW3 explained that that multi-modal trips with ride-share TNCs were generally more expensive than traditional transportation providers, and other cost-saving initiatives were hampered by on-time performance issues that resulted in the Company paying its transportation providers 2-3 times more for trip acceptance.

g.      CW1 confirmed that ModivCare's decision to de-prioritize members' experience "100%" contributed to the loss of business. CW2 corroborated that Defendants' decision to treat ModivCare as a logistics company rather than a people-driven service business damaged customer relationships.

h.      CW2 confirmed that, beginning around 2Q2022 and continuing through CW2's tenure, ModivCare's poor operational performance (such as call center failures) led to client dissatisfaction and monthly liquidated damages of hundreds of thousands of dollars.

i.      CW3 confirmed that ModivCare lost the majority of its New York NEMT business in 2022 and the Elevance contract, was not considered for an RFP re-bid in Virginia in 2022-2023, and had withdrawals from minor NEMT player contracts, MCOs,

UHC, and Humana due to its poor service delivery and long-standing weaknesses in technology.

j.    CW2 confirmed that ModivCare lost MCO Medicaid contracts in New York that were valued at $100 million annually during CW2's tenure due, in part, to New York State transitioning members to its state Medicaid program.

## G. Defendants Partially Disclosed the Truth on August 3, 2023 during ModivCare's 2Q2023 Press Release and on August 4, 2023 during the Company's 2Q2023 Earnings Call but Continue Making False and Misleading Statements

### 1. Defendants Partially Disclosed the Truth on August 3, 2023 and August 4, 2023

214.    On August 3, 2023, ModivCare issued a press release disclosing its 2Q2023 financial results (the "2Q2023 Press Release"). The Company disclosed that it was lowering its 2023 full-year Adjusted EBITDA guidance from a range of $225 million to $235 million to a range of $200 million to $210 million due to "increased utilization and related higher call volumes in NEMT, along with new contract win implementation delays, and contract attrition from prior years . . ." ModivCare also disclosed that it used $108.2 million in cash from operating activities, drew $126.5 million on its revolving credit facility, and amended the 2022 Credit Agreement's maximum Total Net Leverage Ratio.

215.    The following day, on August 4, 2023 at 8:30 am, the Company held an earnings call to report on the Company's financial and operational results for its second quarter ended June 30, 2023 (the "2Q2023 Earnings Call") wherein Defendants Sampson and Shepard participated. During the 2Q2023 Earnings Call, Defendants further elaborated that ModivCare's use of $108 million in cash flow and $111.5 million credit

-93-

draw stemmed from "a temporary timing mismatch between payments and collections" related to the Company's shared risk NEMT contracts and accelerated payments made to "a few large state clients" that "occurred earlier than anticipated[.]" Indeed, ModivCare chalked the approximately $65 million accelerated payments up to "[p]rioritizing long-term customer relationships[.]"

216. In response to Defendants' corrective disclosures in the 2Q2023 Press Release and the 2Q2023 Earnings Call, ModivCare's common stock price declined $2.86, or approximately 7%, from $38.24 per share on August 3, 2023, to close at $35.38 per share on August 4, 2023.

### 2. Defendants Continue Making False and Misleading Statements During the 2Q2023 Earnings Call

217. During the 2Q2023 Earnings Call, Defendant Sampson jointly presented with Defendant Shepard and while speaking on behalf of "we" —i.e., both himself and Shepard—continued to make materially misleading statements. During his prepared remarks during the 2Q2023 Earnings Call, Defendant Sampson affirmed that ModivCare's NEMT cost reduction initiatives were working, stating in relevant part:

> Our focus on centralization and operational excellence facilitated by technology has considerably improved our NEMT services, **We're meeting or exceeding all our customers' quality and service level requirements as seen in our key performance indicators, such as on-time performance and reduced miss trips. Our multimodal transportation partnership strategy has led to increased customer satisfaction and reduced costs**.

218. The statement identified in ¶217 above was materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare was not "meeting or exceeding all our

customers' quality and service level requirements[,]" seeing improved on-time performance and reduced missed trips, nor was the Company's multi-modal transportation partnership strategy increasing customer satisfaction or reducing costs. The material falsity of Defendants Sampson's and Shepard's statements is supported by ample evidence given that:

a.      CW1 stated that ModivCare's service quality started to decline around April 2022. CW1 also confirmed that ModivCare had "struggles to keep the payors happy" beginning around 1Q2022 and the Company received an increase in complaints, including driver miscommunications and untimely pickups, from payors' members around May or June 2022. As a result, CW1 confirmed that, throughout the last year of CW1's employment, ModivCare was failing to meet targets for its member satisfaction KPIs. CW1 further confirmed that service issues resulted in a lot of problems with the Big 6 and payors "absolutely" refused to pay or delayed payments due to ModivCare's service issues.

b.      CW1 stated that, during the last year of CW1's tenure, ModivCare began losing NEMT customers due to service complaints. CW1 also confirmed that NEMT de-implementations were "common" during the last year of CW1's tenure due to poor service quality and service complaints. Corroborating CW1, CW2 confirmed that contract attrition was an issue in multiple regions and remained an issue throughout CW2's tenure.

c.      CW3 stated that customer advocate staffing cuts greatly diminished ModivCare's ability to address service issues because the Company's GPS tracking and dynamic reassignment technologies "were plagued by bugs" throughout CW3's tenure

and could not fulfill these capabilities without human intervention. As a result, according to CW3, payors consistently expressed dissatisfaction, particularly around no shows and on-time performance, which continued throughout CW3's tenure.

d. CW3 stated that missed appointments and no-shows were significant service issues that ModivCare had throughout CW3's tenure but did not improve on. CW3 added that ModivCare consistently failed to meet KPIs, including on-time performance and NVAs (which caused missed rides), throughout CW3's tenure.

e. CW1 confirmed that ModivCare's multi-modal initiative "fared very poorly" because payors' members disliked them. As a result, according to CW1, the Company fell far short of achieving the stated metrics associated with the initiative, including forecasted cost savings that "never really transpired."

f. CW3 explained that that multi-modal trips with ride-share TNCs were generally more expensive than traditional transportation providers, and other cost-saving initiatives were hampered by on-time performance issues that resulted in the Company paying its transportation providers 2-3 times more for trip acceptance.

g. CW1 confirmed that ModivCare's decision to de-prioritize members' experience "100%" contributed to the loss of business. CW2 corroborated that Defendants' decision to treat ModivCare as a logistics company rather than a people-driven service business damaged customer relationships.

h. CW2 confirmed that, beginning around 2Q2022 and continuing throughout CW2's tenure, ModivCare's poor operational performance (such as call center failures) led to client dissatisfaction and monthly liquidated damages of hundreds of thousands of

dollars.

i.     CW3 stated that ModivCare instructed CW3 to highlight technological capabilities that the Company did not have to customers and never delivered on providing during CW3's tenure, which caused customers to repeatedly complain and place ModivCare on PIPs during 2022 and 2023. CW3 confirmed that ModivCare's poor service delivery, long-standing weaknesses in technology, and reliance on an outdated platform caused major contracts to be under threat.

j.     CW3 confirmed that New York-based customers had major complaints centered on technology, call center performance, and lack of responsiveness from the executive team. CW3 confirmed that ModivCare consistently failed to meet call center KPIs related to answering-time during CW3's tenure.

k.     CW3 confirmed that ModivCare lost the majority of its New York NEMT business in 2022 and the Elevance contract, was not considered for an RFP re-bid in Virginia in 2022-2023, and had withdrawals from minor NEMT player contracts, MCOs, UHC, and Humana due to its poor service delivery and long-standing weaknesses in technology.

k.     CW2 confirmed that ModivCare lost MCO Medicaid contracts in New York that were valued at $100 million annually during CW2's tenure due, in part, to New York State transitioning members to its state Medicaid program.

219.     In his prepared remarks during the 2Q2023 Earnings Call, Defendant Sampson (again speaking on behalf of himself and Shepard, who jointly presented with Sampson) assured investors that ModivCare's shared risk contracts were yielding

-97-

positive results, adding predictability to cash flow, providing long-term stability, and

balancing profitability with customer satisfaction, stating in relevant part:

> The second quarter of 2023 marks a notable shift in our working capital. We've resolved pandemic era balance sheet disparities, transitioning into a net receivable position where our contract receivables surpass our contract payables. This occurred earlier than anticipated, largely due to accelerate payments from a few large state clients. Furthermore, these clients now have established clear time lines for reconciliation, **adding additional layer of predictability to our cash flow**.

> We anticipate the collection of these receivables to balance out, if not surpass payable repayments for the rest of the year, positively impacting our cash flow in the second half of 2023. **Our effort to realign contracts with our customers' needs is yielding positive results. We've safeguarded our margins, trading some pandemic era upside for long-term stability.** Now our cash flow mirrors our P&L more closely, indicating improved financial management and **a balance between profitability and customer satisfaction**.

220.    Analysts drilled into ModivCare's contracts payable and receivables during

the question-and-answer portion of the call. For instance, CJS Securities, Inc. analyst

Robert James Labick questioned whether ModivCare was "at a normalized level overall?"

Defendant Sampson unequivocally stated "**Yes, yes**" and affirmed on behalf of himself

and Shepard that the shared risk contracts were working, stating in relevant part:

> Basically, **our contracts are working post COVID. So the contracts that we've restructured primarily around really implementing these shared risk contracts have been very helpful for us and help protect our kind of long-term margin**. So that's -- you will see fluctuations as we move through the years going in quarters. Those will still fluctuate.

> So the good thing now though, because of the COVID benefits, now the contracts are going to work how they are. And I think they'll bump around. But the good thing is we have the receivables and the payables. And because we have so many contracts, we expect that to be kind of a normalized working capital fluctuations in and out, not the big swings like we've seen over the last couple of quarters.

-98-

And then the other item coming out of COVID now, all the states or MCOs, **we have more predictable and rigid time frames for when we pay this back**. So it really is kind of a 3- to 6-month time frame. **So this predictability and normalization coming out of COVID allows us to have a more predictable cash flow and then a more normalized working capital. So which is why we have a lot of confidence in the back part of this year that we will generate cash flow in accordance with how our P&L works**. And I expect that to continue throughout the quarter into 2024.

221.    In response to another analyst's question regarding "the cadence" of the Company's payables, Defendant Sampson again affirmed, speaking on behalf of himself and Shepard, that they had "a lot of predictability" with ModivCare's customers, stating in relevant part:

No, that is exactly -- during COVID, it was -- the time lines were all over the place. And as recently as 90 days ago, and this is why it was explicit, I wanted to give data around really, it was 2 large customers that had this lack of time line, that is cleared up. We have the time line. We're out of COVID, and we're aligned with them and **now we have a lot of predictability**.

222.    The statements identified in ¶¶219-221 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's contracts were not "safeguard[ing]" or "protect[ing]" the Company's margins, "adding additional layer of predictability to [the Company's] cash flow[,]" "yielding positive results[,]" or creating "a balance between profitability and customer satisfaction." Defendants Sampson and Shepard had no reasonable basis to suggest that ModivCare had "more predictable and rigid time frames" or "a lot of predictability" for collecting its receivables such that the Company would have "more predictable cash flow and then a more normalized working capital." Nor did Defendants Sampson and Shepard have a reasonable basis to "have a

-99-

lot of confidence" that ModivCare would "generate cash flow" "in the back part of [the] year[.]"

223.    The material falsity of Defendant Sampson's and Shepard's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (i.e., actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

**H. ModivCare's 2Q2023 Form 10-Q on August 4, 2023**

224. On August 4, 2023, before the stock market opened for trading that day, ModivCare filed with the SEC a Form 10-Q to report on the Company's financial and operational results for its second quarter ended June 30, 2023 (the "2Q2023 Form 10-Q"), which was signed by Defendant Sampson.

225. The 2Q2023 Form 10-Q contained a section titled "Risk Factors" wherein the Company represented that the risk factors enumerated in the ModivCare's FY2022 Form 10-K "remain[ed] current in all material respects" and affirmed that "there have been no material changes from the risk factors disclosed in the Annual Report[,]" stating in relevant part:

> The risks described under the caption "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2022 (the "Annual Report") could materially and adversely affect our business, financial condition, and results of operations, and could cause the trading price of our common stock to decline. **The discussion of the risks included under that caption in our Annual Report remains current in all material respects, and there have been no material changes from the risk factors disclosed in the Annual Report**. The risk factors that we have discussed do not identify all risks that we face; our operations could also be affected by factors that are not presently known to us or that we currently consider to be immaterial to our operations. Due to risks and uncertainties, known and unknown, our past financial results may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods.

226. The statement identified in ¶225 above was materially false, and misleading when made, because, for the reasons outlined in ¶¶181-182 above, the risks included in the FY2022 Form 10-K had actualized and therefore, material changes had occurred. Defendant Sampson had a duty to update the Company's risk factors in the 2Q2023 Form 10-Q to reflect material changes to its risk factors.

-101-

**I. Deutsche Bank's 31st Annual Leveraged Finance Conference on October 3, 2023**

227.    On October 3, 2023, Defendant Sampson participated in the Deutsche Bank's 31st Annual Leveraged Finance Conference on behalf of ModivCare. Notably, no oral statement was made to warn investors that Sampson may make forward-looking statements or to direct investors to any cautionary language.

228.    During the conference session, Defendant Sampson responded to a question about when risk sharing kicked in to address increased utilization, stating in relevant part:

> … And then this middle part, the 65% is the shared risk contract. And that's the way actually I expect things to continue to move, more in line with managed Medicaid, definitely in line with MA, is to have this focus on the member and therefore these shared risk contracts. And the way these shared risk contracts work are exactly that. Utilization and cost, no one should be burdened in the wrong way, us or the customer. That's the purpose of that. **So if utilization goes way up, we're going to share in that. If costs go up, we're going to share in that. And that's the way these contracts work**. And it's a good thing that we did that, especially coming out of COVID, **it really allows us to protect the downside** that we've limited the upside if there's, God forbid, another COVID situation **to ensure that we are in a win-win relationship**. **So those are allowing us to ensure that we -- as we come out of COVID, we're in a great space to grow and maintain our margins on top of that**.

229.    Unsatisfied with Defendant Sampson's non-answer, the analyst pressed him again on precisely when risk-sharing was triggered:

Philip Chickering
Deutsche Bank AG, Research Division

And so you indicated that utilization was sort of a driver of the risk sharing kicking in. Can you just confirm that? And then maybe can you just talk to us about when do they kick in? Does utilization have to get to 12%, like it was pre-COVID, before this sharing kicks in? Or where does that start to have an impact?

-102-

L. Heath Sampson
CEO, President, Interim President of Modivcare Home & Director

. . . So it really is – there's no really big thresholds. We're asset thresholds right now. **So if utilization is going up on those shared risk contracts, we're passing that through**.

230.    The analyst then pressed Sampson on whether the shared risk contracts protected ModivCare at any utilization increase, regardless of magnitude. In response, Defendant Sampson assured that the Company was protected under its shared risk contracts, stating in relevant part: "**Yes. So on the utilization, we're protected, right?** It's not going to be 25%. **But yes, we're protected right now on all those shared risk contracts** and fee-for-service contracts."

231.    In response to the analyst's next question regarding "how does the actual hedge accrue to you[,]" Defendant Sampson explained that the Company received true-up payments within 3 to 6 month, stating in relevant part:

Yes. So it is. It's an increase in that PMPM. **It basically is if utilization is going up and we're doing more trips and we thought it's more expensive to us, we're going to get paid on that**. The reality is, and this is one of the things, how it works is when that situation happens, **it gets put on the balance sheet, and then we'll collect it over the next 3 to 6 months**. And the inverse is there. The other side, if it's too low, and this was a big part of COVID, it actually gets put on the balance sheet as a payable

232.    Again, the analyst pressed Sampson on whether there would "be an actual hedge" with the shared risk contracts. Sampson unequivocally stated "yes":

Yes. No, exactly. That's the whole purpose of the contracts. Where it gets to -- so an increase in utilization or trip volume for that matter, **we're protected on our contracts, the big dollars**.

. . .

-103-

And that's -- and then as utilization goes up, our estimates on what we've given for – what's happening in 2024 assume that higher utilization, assume that redetermination happen. **So we feel really good about our initiatives to have in place to offset those as well as get back to the strong margins**.

233.    The statements identified in ¶¶228-232 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's shared risk contracts were not "win-win" and did not protect the Company's downside from increases in utilization or costs such that the Company could grow and maintain its margins. ModivCare was also not passing through increased utilization costs to customers. Defendant Sampson also had no reasonable basis to suggest that the Company would collect its contracts receivable balance "over the next 3 to 6 months" or to suggest he felt "really good about [ModivCare's] initiatives" to offset costs and "get back to the strong margins."

234.    The material falsity of Defendant Sampson's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (*i.e.*, actual claims) that customers reported to the payors. As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included

-104-

regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. CW2 also added that, at least as early as October 2023, Sunshine Health refused to pay ModivCare its large receivables balance and withheld payments from the Company. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

235.    Defendant Sampson's statement purporting to "feel really good about [ModivCare's] initiatives" ability to offset higher utilization and "get back to the strong margins" (identified in ¶232 above) was also materially false and misleading, omitted material facts necessary to make the statements therein not false or misleading when made, and/or lacked a  reasonable basis because, CW1 confirmed that ModivCare's multi-modal initiative "fared very poorly" because payors' members disliked them. As a result, according to CW1, the Company fell far short of achieving the stated metrics associated with the initiative, including forecasted cost savings that "never really transpired." CW3 likewise explained that multimodal trips with ride-share TNCs were generally more expensive than traditional transportation providers, and other cost-saving

initiatives were hampered by on-time performance issues that resulted in the Company

paying its transportation providers 2-3 times more for trip acceptance.

**J.  ModivCare's 3Q2023 Earnings Call on November 3, 2023**

236.  On November 3, 2023, ModivCare held the 3Q2023 earnings call at 7:30

a.m. E.T., before the stock market opened for trading that day, to report on the Company's

financial and operational results for its third quarter ended September 30, 2023.

Defendant Sampson jointly presented with Defendant Gutierrez, and while speaking on

behalf of "we" was referring to both himself and Gutierrez.

237.  During his prepared remarks on the 3Q2023 Earnings Call, Defendant

Sampson emphasized the benefits of shared risk contracts, stating in relevant part: "**Our

shared risk contracts are operating effectively and as intended, safeguarding our

gross margins against the backdrop of increasing utilization and costs**."

238.  When discussing the NEMT segment results in more detail during his

prepared remarks, Sampson stated that shared risk contracts allowed ModivCare to pass

through trip volume and costs as well as protect cash flow:

> Over the past year, as we frequently pointed out, **our mobility revenue has been grossed up by passthrough trip volume and costs.** This trend has become increasingly evident as health care utilization returns to an expected and normalized level. Although this may make challenge to understand our percent margins within this pass-through revenue, **our shared risk contracts with the customers are protecting the downside to our cash flow, creating a win-win situation for us and our customers.**

239.  During the question-and-answer portion of the 3Q2023 Earnings Call, in

response to another analyst's question seeking clarity on ModivCare's contract payables,

contract receivables, and collection timing, Sampson represented that the Company

would have more normal variations between contract payables and receivables, stating

in relevant part:

> But unlike in the past where we had to -- had a lot of payables because of COVID, **now they're at a more matching level.**

240.    Another analyst pressed Sampson on his confidence in ModivCare's ability

to sustainably deliver positive free cash flow, to which he responded by emphasizing the

"win-win" nature of capitated shared risk contracts and the margin protection they provide:

> **So really the item that all of you are looking at and that we should continue to pay attention going forward, it's the mobility or an NEMT margins**. So the good thing for us because of all the work we've done over the last 18 months, 2 years, **we have these contracts where we have a win-win with our customers.**

241.    The statements identified in ¶¶237-240 above were each materially false

and misleading and/or omitted material facts necessary to make the statements therein

not false or misleading when made because ModivCare's capitated shared risk contracts

were not: (i) "win-win[;]" (ii) "operating effectively and as intended[;]" (iii) "safeguarding"

the Company's gross margins; or (iv) "protecting the downside to our cash flow, creating

a win-win situation for us and our customers." ModivCare was also not passing increased

costs through to its NEMT customers through its shared risk contracts such that the

Company's cash flow was protected from downside risk.

242.    The material falsity of Defendants Sampson's and Gutierrez's statements is

supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process

for the shared risk contracts caused regular disputes with payors that dragged on for "a

very long time" because the Company billed payors based on internal projections of

utilization and claims data that did not match the payors' "encounter data" (i.e., actual

claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. CW2 also added that, at least as early as October 2023, Sunshine Health refused to pay ModivCare its large receivables balance and withheld payments from the Company. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

**K.  ModivCare's 3Q2023 Form 10-Q on November 3, 2023**

243.    On November 3, 2023, before the stock market opened for trading that day, ModivCare filed with the SEC a Form 10-Q to report on the Company's financial and

operational results for its third quarter ended September 30, 2023 (the "3Q2023 Form 10-Q"). The 3Q2023 Form 10-Q was signed was signed by Sampson and Gutierrez.

244. The 3Q2023 Form 10-Q contained a section titled "Risk Factors" wherein the Company represented that the risk factors enumerated in the ModivCare's FY2022 Form 10-K "remain[ed] current in all material respects" and affirmed that "there have been no material changes from the risk factors disclosed in the Annual Report[,]" stating in relevant part:

> The risks described under the caption "Risk Factors" in our Annual Report on Form 10-K for the year ended December 31, 2022 (the "Annual Report") could materially and adversely affect our business, financial condition, and results of operations, and could cause the trading price of our common stock to decline. **The discussion of the risks included under that caption in our Annual Report remains current in all material respects, and there have been no material changes from the risk factors disclosed in the Annual Report**. The risk factors that we have discussed do not identify all risks that we face; our operations could also be affected by factors that are not presently known to us or that we currently consider to be immaterial to our operations. Due to risks and uncertainties, known and unknown, our past financial results may not be a reliable indicator of future performance and historical trends should not be used to anticipate results or trends in future periods.

245. The statement identified in ¶244 above was materially false, and misleading when made, because the risks included in the FY2022 Form 10-K had actualized and therefore, "material changes" had occurred. Defendants Sampson and Gutierrez had a duty to update the Company's risk factors in the 3Q2023 Form 10-Q to reflect material changes to its risk factors. Indeed, at the time of the 3Q2023 Form 10-Q statements: (i) ModivCare's shift to entering into more shared risk contracts was already negatively, materially impacting the Company's operations and financial condition; (ii) ModivCare was experiencing delays in payments and collecting its accounts receivable that were

-109-

extending the Company's collection period and already having a materially adverse impact on the Company's business and consolidated financial condition; and (iii) ModivCare was already experiencing an inability to adjust costs under its shared risk contracts, utilization increases, and increased costs that were having a materially adverse impact on the Company's results of operations and profitability.

246. The material falsity of Defendants Sampson's and Gutierrez's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (*i.e.*, actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true up process. CW2 also added that, at least as early as October 2023, Sunshine Health refused to pay ModivCare its large receivables balance and withheld payments from the Company. Corroborating CW2, CW3 stated ModivCare experienced significant disputes

over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

**L. Bank of America Securities' 2023 – Leveraged Finance Conference on November 28, 2023**

247.   On November 28, 2023, Defendants Sampson and Gutierrez participated in the Bank of America Securities' 2023 Leveraged Finance Conference on behalf of ModivCare. Defendant Sampson jointly presented with Defendant Gutierrez, and while speaking on behalf of "we" was referring to both himself and Gutierrez.  Notably, no oral statement was made to warn investors that Sampson may make forward-looking statements or to direct investors to any cautionary language.

248.   During the question-and-answer portion of the conference session, when asked by an analyst about ModivCare's NEMT contract mix and the impact on margins, Defendant Sampson touted the Company's shift toward capitated shared risk contracts and its overall contract mix:

> Yes. So the NEMT or nonemergency medical transportation or mobility business segment, which is just over 60% of our EBITDA is a critical part for our business, and there -- over these last 24 months and really over the last 12 months, there's been a shift in how we engage with our customers and how we contract with our customers. And it really gets back in line with the strategy of where our customers want to go. It really is, the trip is important, critically important to health care. So ensuring that we do that with the right quality is important, but really, it's what you do more. And that's what we're doing now.
>
> And that's why we're able to move these contracts to where 20% are full risk, so more of the traditional capitated model, 15% are fee-for-service. **And in the middle of that is the shared risk or win-win, where utilization**

-111-

**or costs we share in that with our customers**. And that's the common way now of contracts we do primarily with managed Medicaid. So that mix, I expect to stay -- it shifted a lot over the last 12 months. I expect it to be in line for at least the next, call it, 12 to 24 months. **So we're at the right structure. We have the right profile. We have the right relationships in all our contracts that we have, whether that's full risk fee-for-service or managed Medicaid, all in line with our expectations now.** Now that we're through COVID. That was a bigger push, right?

249.    At the same conference, an analyst asked (as stated below in pertinent part) whether, based on almost even contract receivables and payables, ModivCare's cash flow structure was normalized after COVID-19:

Bank of America Securities Analyst

…I think contracts, receivables, payables netting to zero more or less now. So would we see a more normalized cash flow structure if -- the way we think about it into '24 and beyond? Kind of that COVID, I don't call it COVID, but the bubble, if you will.

L. Heath Sampson
CEO, President, Interim President of ModivCare Home & Director

Yes. **And so the bubble is behind us. It really was Q2 for us, right?** From a COVID -- paying off COVID payables, that was a big driver as well as **our contracts were structured the right way and receivables up. So it was a -- Q2 was the bubble**.

250.    The statements identified in ¶¶248-249 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's shared risk contracts were not "win-win" nor was the Company sharing utilization and costs with its customers. Defendants Sampson and Gutierrez also had no reasonable basis to suggest that the Company's contracts were "structured the right way" and with "receivables up[,]"or that the COVID-19 bubble was limited to Q2 and "behind" ModivCare.

-112-

251.    The material falsity of Defendants Sampson's and Gutierrez's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (*i.e.*, actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true up process. CW2 also added that, at least as early as October 2023, Sunshine Health refused to pay ModivCare its large receivables balance and withheld payments from the Company. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

-113-

**M. Defendants' Partially Reveal the Truth in ModivCare's FY2023 Press Release and During the FY2023 Earnings Call on February 23, 2024 But Continue Making False and Misleading Statements**

**1. Defendants' Partially Reveal the Truth in ModivCare's FY2023 Press Release and During the FY2023 Earnings Call**

252. On February 22, 2024, after the market closed, ModivCare published a press release announcing the Company's financial results for the three months and full year ended December 31, 2023 on its website and concurrently filed it with the SEC on Form 8-K, signed by Defendant Sampson (the "FY2023 Press Release"). The FY2023 Press Release disclosed disappointing financial results, including: (i) a net loss of $5.3 million and $2,751.2 million for 4Q2023 and FY2023, respectively; (ii) negative free cash flow of $36.8 million for 4Q2023 "primarily related to a delayed payment from a single client" and negative free cash flow of $125.3 million for FY2023; and (iii) that contract receivables increased by $14.7 million to $144.0 million and contract payables decreased by $16.1 million to $117.5 million, resulting in net contract receivables of $26.5 million as of December 31, 2023.

253. In another press release filed with the SEC on Form 8-K on the same day, ModivCare announced that it entered into a second amendment to its February 3, 2022 credit agreement. The Company further revealed in the FY2023 Press Release that ModivCare drew $113.8 million on its revolving credit facility. ModivCare added in the FY2023 Press Release that it had encountered "some near-term financial headwinds, due to sooner than anticipated, large COVID-related working capital needs and margin pressure in our NEMT segment."

254.    On February 23, 2024, ModivCare held an earnings call at 8:30 a.m. E.T., before the stock market opened for trading that day, to report on the Company's financial and operational results for its fourth quarter and full year ended December 31, 2023 ("FY2023 Earnings Call"), in which Defendants Sampson and Gutierrez participated. Defendants Sampson and Gutierrez jointly presented the FY2023 Earnings Call, and while speaking on behalf of "we" were each referring to both themself and the other.

255.    During the FY2023 Earnings Call, Defendant Sampson elaborated further as to the Company's "challenges…stemming from the recovery period following the pandemic[,]" stating in relevant part:

> Before addressing the transformation progress we've made, **I'd like to address some of the challenges we've encountered primarily stemming from the recovery period following the pandemic. Firstly, our free cash flow for the fourth quarter was negative $37 million, which was below expectations, primarily due to delay in payment from an MCO client within a specific contract in Florida**. Looking ahead, and primarily to us managing redetermination and the increased healthcare utilization environment, we anticipate our free cash flow for the first half of the year will be constrained to the ongoing build in contract receivables and the settlement of several large payables expected in the second quarter.

256.    Sampson nevertheless assured that ModivCare would collect its contract receivables balance over time and revealed that the Company had been renegotiating prepayment terms on certain shared risk contracts, stating in relevant part:

> It's important to note that our $144 million balance in contract receivables is an asset that we aim to collect in 6 months to 9 months. Consistent with what we have been doing the last several months, **we are proactively working to renegotiate the prepayment terms on a number of our shared risk contracts. This realigns the payments we eventually reconcile as redetermination unfolds and utilization and cost normalize higher, post the pandemic**. This will improve our working capital by securing more cash upfront. For the second half of 2024, our free cash flow will begin to normalize as redetermination ends.

-115-

257.    Sampson next discussed ModivCare's 2024 adjusted EBITDA guidance and revealed that the Company had lost contracts, stating in relevant part:

> Next, I want to share our 2024 adjusted EBITDA guidance, which we expect will be in a range of $190 million to $210 million, and our first quarter 2024 adjust EBITDA guidance in a range of $28 million to $33 million. We are guiding first quarter EBITDA to help explain the ramp in the second half of the year. During the first quarter, **we are addressing headwinds from a couple of contracts and membership losses prior to the 2023 contract wins starting implementation in the second quarter**. These front loaded challenges are further impacted by the ongoing normalization of healthcare utilization and Medicaid redetermination.
>
> The root causes of these contract losses include a few MCO clients not securing their state contracts. **A state health department's decision to transition to a full broker model favoring an incumbent competitor, and a client's decision to diversify volume away from us due to legacy issues**. However, it's important to note that these legacy issues have been addressed through our transformation, and I'm proud of my team for doing that.

258.    In her prepared remarks, Defendant Gutierrez also partially revealed the truth that capitated shared risk contracts did not protect NEMT margins or provide the Company with more predictable cash flow, stating in relevant part:

> Full year 2023 adjusted EBITDA was $204 million and adjusted EBITDA margin was 7.4%, a 140 basis point year-over-year decline, primarily due to higher service expense partially offset by lower G&A related to our cost saving initiatives. Full year gross margin decreased 270 basis points to 16.4%, **primarily attributable to higher NEMT purchase services expense driven by higher utilization and the normalizing healthcare utilization environment**.

259.    Defendant Gutierrez also reiterated that, for 4Q2023, ModivCare's "net cash used in operating activities was approximately $26 million and free cash flow was negative $37 million as quarter-over-quarter contract receivables increased

-116-

approximately $15 million and contract payables decreased $16 million." Gutierrez added

that:

> ***Our free cash flow for the fourth quarter of 2023 was less than we originally anticipated, primarily attributable to delayed payments under multiple contracts from one of our large MCO clients***, which we expect to collect in the coming months.
>
> The net contract receivable and payable balance at the end of the fourth quarter was $27 million, which was in line with our previously stated range of $20 million to $30 million. ***The primary fluctuations in our quarterly working capital are driven by the shared risk contracts with our NEMT clients, with payments and reconciliations occurring over varying time periods***.

260.    Guiterrez's statements disclosing that decreasing gross margins related to

increased NEMT purchase services expense, delayed payments, and fluctuations in the

working capital due to the shared risk contracts partially corrected Defendants'

misstatements representing that ModivCare's shared risk contracts were protecting the

Company against downside risk of higher costs, contributing to the rigidness of

ModivCare's margin profile, and that the NEMT strategic initiatives, specifically the multi-

modal transportation partnership, were reducing costs.

261.    Gutierrez continued to provide additional detail on the Company's lower

than anticipated cash flow, noting that "[t]he confluence of increasing utilization, Medicaid

redetermination and higher shared risk revenue is creating a temporary challenge in

working capital" (*i.e.*, ModivCare's capitated contracts were heavily weighted towards

shared risk and the variability in timing of payments and reconciliations was pressuring

the Company's financials):

> Since our business has undergone a significant transformation, coupled with the impact of redetermination and a normalizing healthcare utilization

backdrop, we expect continued variability in our quarterly cash flow with improvement occurring in the second half of 2024. While free cash flow is expected to improve meaningfully in 2024, going from negative $125 million in 2023 to a range of $40 million to $60 million in 2024, we expect that free cash flow in the first half of 2024 will be negative with a positive exit rate into 2025.

***The confluence of increasing utilization, Medicaid redetermination and higher shared risk revenue is creating a temporary challenge in working capital. As we work with clients to reset the contractual prepayments to more closely align with recent utilization trends, we are continuing to build contract receivables. We also expect to repay certain contract payables in the second quarter of 2024***. The tension on free cash flow will be partially offset by collections on contract receivables and improvements from resetting prepayment rates. However, we expect the full benefit of these items to be weighted in the second half of the year.

262.    Gutierrez then summarized ModivCare's FY2023 results, stating in relevant

part:

In summary, our fourth quarter revenue and adjusted EBITDA results were in line with our expectations. However, ***free cash flow was lower than we expected due to the timing of collections under multiple contracts from one of our MCO clients***. To reiterate what Heath said, we expect to exit 2024 with a run rate for adjusted EBITDA between $220 million to $230 million, and free cash flow will improve materially in the second half of 2024 with a high cash flow conversion rate.

263.    In providing further detail on ModivCare's purportedly temporary working capital challenges and collection issues, Gutierrez's statements partially corrected Defendants' statements assuring that the Company's cash flow was more predictable, working capital had normalized, and that collection of receivables and payables were fluctuating normally in 2023.

264.    During the question-and-answer portion of the FY2023 Earnings Call, in response to an analyst's questions about ModivCare's contracts losses, Sampson

-118-

assured that legacy issues were resolved through the Company's multi-modal transformation, stating in relevant part:

Brooks Gregory O'Neil
Lake Street Capital Markets, LLC, Research Division

That's helpful*. So let's just talk briefly about the NEMT, really, in particular the contract losses, which I think are relatively unexpected*. Obviously, some factors are beyond your control, but if you could highlight nicely on the factors you see or have heard from customers that are driving contract losses? And then just highlight quickly, what do you think you could do to fix those problems?

L. Heath Sampson
CEO, President, Interim President of ModivCare Home & Director

Well, so since I took over in November of 2022, the focus quickly shifted to our customers. And our customers that are specific to MA that are managed Medicaid and of course our state customers. And they actually all have different needs. And then you layer on what they're actually going through, whether that's because of the RADV rules that CMS came out with on Medicare, or whether that's the increased focus of SDoH within Medicaid and then even within the state related bids, the requirement of innovation to do more free members.

My point on that is what was in the past is different now from a customer expectation. For sure, you need to have the right quality, pick people up on time, have lower complaints, but you need to do more than that. And then you even need to start integrating with the customer to ensure that they can properly manage the member experience or integrate with a facility so they can book the trip on behalf. All those items have been part of our transformation.

*You look back a year ago, even 2 years ago, some of that, we weren't -- we weren't where we needed it to be*. And that gets to -- and this is why I have a lot of conviction around what we've done, because of what the team has done. Those issues that we had around quality are gone. In fact, we're back to best-in-class. Integrating with our customers so they can control the membership. Member experience is happening now. Having an understanding of that member, so you know that whether they made their dialysis trip 3 times, so we can communicate that, we're doing that now. So all the stuff that we are in the place that we're in now, we didn't have before. *And that's a big reason why some of our competitors were able to get*

-119-

*in. And it's a driver for one of the reasons why we lost part of that contract before*.

265.    Defendant Sampson's statements starkly contrasted Defendants' prior statements representing that ModivCare was "meeting or exceeding all our customers' quality and service levels" and that its strategic initiatives had already "led to increased customer satisfaction[.]"

266.    Another analyst pressed Sampson on whether there was a "material disagreement between the parties in terms of what's actually owed" during the FY2023 Earnings Call. Defendant Sampson punted on the question and instead pointed to the purported complexity of the shared risk contracts, stating in relevant part:

> Well, so, it's -- *all of our contracts that are with shared risk, this is why they reconcile over many months. So it's complicated.* But we've been under this contract with this customer. Well, one, they've been a longtime customer of ours many, many years. And this contract structure started in late 2022. So we feel really good about the math and the collection of the entire amount. It's in line with the requirements of the contract. So we'll collect it within the next 60 days or so.

267.    Upon the news, ModivCare's stock price declined approximately 39% from $43.87 per share at close on February 22, 2024 to $26.62 per share at close on February 23, 2024 on heavy trading volume of approximately 1.75 million shares, as compared to the previous day of 86,499 shares.

### 2.    Defendants Continue Making False and Statements During the FY2023 Earnings Call

268.    During the FY2023 Earnings Call, Defendants Sampson and Gutierrez, who were jointly presenting and referring to both themselves and the other when speaking on behalf of "we," continued to make materially misleading statements.

-120-

269.    For instance, during her prepared remarks on the FY2023 Earnings Call, Defendant Gutierrez assured investors that, in addition to producing higher NEMT revenue, capitated shared risk contracts protected NEMT margins from higher utilization and redetermination, stating:

> **As a reminder, our margins are protected from increased utilization from redetermination on our shared risk contracts.** Our shared risk Medicaid contracts accounted for approximately 60% of our NEMT revenue in 2023. Even though we'll lose some Medicaid members in these contracts, we expect higher pass through revenue under our shared risk contracts. Finally, the remainder of NEMT revenue, approximately 20% is generated from Medicaid advantage and fee-for-service arrangements.

270.    During the question-and-answer portion of the FY2023 Earnings Call, in response to an analyst's question regarding the "the shortfall on the NEMT outlook" and whether there was a "cost issue" influencing it, Defendant Sampson stated that capitated shared risk contracts would not only protect, but improve ModivCare's NEMT margins:

> …So, which gets to why I have a lot -- why we gave the guidance as an exit. A lot of it has to do with our conviction around the cost and we're seeing in the data, and I expect to continue. Just to summarize again that **the headwinds were in the short-term are to do with redetermination and utilization**, and then those mismatching of the contract losses to the onboarding of the win. So with that clarity and with the cost structure that we're taking out, you put that to our scale, **we're in a really good spot as we exit this year.**

271.    The statements identified in ¶¶269-270 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's shared risk contracts did not protect the Company from increased utilization and redetermination. Defendants Gutierrez and Sampson also had no reasonable basis to suggest that ModivCare's

-121-

"headwinds" were "short-term" and only related to "redetermination and utilization" or that the Company was "in a really good spot as we exit this year."

272.    The material falsity of Defendants Sampson's and Gutierrez's statements is supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (*i.e.*, actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. CW2 also added that, at least as early as October 2023, Sunshine Health refused to pay ModivCare its large receivables balance and withheld payments from the Company. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that

complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

273. During his prepared remarks on the FY2023 Earnings Call, Defendant Sampson assured investors that NEMT contract losses were due to legacy issues that were no longer present:

> The root causes of these contract losses include a few MCO clients not securing their state contracts. A state health department's decision to transition to a full broker model favoring an incumbent competitor, and a client's decision to diversify volume away from us **due to legacy issues.** However, **it's important to note that these legacy issues have been addressed through our transformation**, and I'm proud of my team for doing that.

274. Another analyst questioned what factors were driving the Company's contract losses. In response, Sampson represented that ModivCare's quality issues were "gone[,]" stating in relevant part:

> Brooks Gregory O'Neil
> Lake Street Capital Markets, LLC, Research Division
>
> That's helpful. So let's just talk briefly about the NEMT, really, in particular the contract losses, which I think are relatively unexpected. Obviously, some factors are beyond your control, but if you could highlight nicely on *the factors you see or have heard from customers that are driving contract losses?* And then just highlight quickly, what do you think you could do to fix those problems?
>
> L. Heath Sampson
> CEO, President, Interim President of ModivCare Home & Director
>
> …My point on that is what was in the past is different now from a customer expectation. For sure, you need to have the right quality, pick people up on time, have lower complaints, but you need to do more than that. And then you even need to start integrating with the customer to ensure that they can properly manage the member experience or integrate with a facility so they can book the trip on behalf. All those items have been part of our transformation.

-123-

> You look back a year ago, even 2 years ago, some of that, we weren't -- we weren't where we needed it to be. And that gets to -- and this is why I have a lot of conviction around what we've done, because of what the team has done. **Those issues that we had around quality are gone. In fact, we're back to best-in-class.** Integrating with our customers so they can control the membership. Member experience is happening now. Having an understanding of that member, so you know that whether they made their dialysis trip 3 times, so we can communicate that, we're doing that now. So all the stuff that we are in the place that we're in now, we didn't have before. And that's a big reason why some of our competitors were able to get in. And it's a driver for one of the reasons why we lost part of that contract before.

275.    During the same call, in response to an analyst's question regarding the timing for collecting a delayed payment and whether there were any issues between what the customer thought it "should pay versus what you guys have recognized[,]" Defendant Sampson—speaking on behalf of himself and Defendant Guiterrez— assured that ModivCare would be paid and that its relationship was on solid ground, stating in relevant part:

> Yes. We wanted to be specific that it was one contract and one area because we have a lot of relationships with that payer across the country, which we are in great standing. **This specific issue has not been paid at the same time, why I said the next couple of months is because we will get it paid** because it's contractually owed. So I wanted to make sure I set it because it was the main driver for the cash flow change in Q4. But I also wanted to be explicit about it and give the amount because it's contractually owed and **we'll get it paid within the next kind of 60 days.**

276.    The statements identified in ¶¶273-275 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's "legacy issues" had not been "addressed through [the Company's] transformation[.]" The Company's service levels were also not back to best in class nor were the quality issues gone. Defendants Sampson

-124-

and Guiterrez also had no reasonable basis to suggest that ModivCare would receive payment from the Florida-based client "within the next kind of 60 days."  The material falsity of Defendant Sampson's statements is supported by ample evidence given that:

a.      CW1 stated that ModivCare's service quality started to decline around April 2022. CW1 also confirmed that ModivCare had "struggles to keep the payors happy" beginning around 1Q2022 and the Company received an increase in complaints, including driver miscommunications and untimely pickups, from payors' members around May or June 2022. As a result, CW1 confirmed that, throughout the last year of CW1's employment, ModivCare was failing to meet targets for its member satisfaction KPIs. CW1 further confirmed that service issues resulted in a lot of problems with the Big 6 and payors "absolutely" refused to pay or delayed payments due to ModivCare's service issues.

b.      CW1 stated that, during the last year of CW1's tenure, ModivCare began losing NEMT customers around August 2022 due to service complaints. CW1 also confirmed that NEMT de-implementations were "common" during the last year of CW1's tenure due to poor service quality and service complaints. Corroborating CW1, CW2 confirmed that contract attrition was an issue in multiple regions and remained an issue throughout CW2's tenure.

c.      CW3 stated that customer advocate staffing cuts greatly diminished ModivCare's ability to address service issues because the Company's GPS tracking and dynamic reassignment technologies "were plagued by bugs" throughout CW3's tenure and could not fulfill these capabilities without human intervention. As a result, according

-125-

to CW3, payors consistently expressed dissatisfaction, particularly around no shows and on-time performance, which continued throughout CW3's tenure.

d. CW3 stated that missed appointments and no-shows were significant service issues that ModivCare had throughout CW3's tenure but did not improve on. CW3 added that ModivCare consistently failed to meet KPIs, including on-time performance and NVAs (which caused missed rides), throughout CW3's tenure.

e. CW1 confirmed that ModivCare's multi-modal initiative "fared very poorly" because payors' members disliked them. As a result, according to CW1, the Company fell far short of achieving the stated metrics associated with the initiative, including forecasted cost savings that "never really transpired."

f. CW3 explained that that multi-modal trips with ride-share TNCs were generally more expensive than traditional transportation providers, and other cost-saving initiatives were hampered by on-time performance issues that resulted in the Company paying its transportation providers 2-3 times more for trip acceptance.

g. CW1 confirmed that ModivCare's decision to de-prioritize members' experience "100%" contributed to the loss of business. CW2 corroborated that Defendants' decision to treat ModivCare as a logistics company rather than a people-driven service business damaged customer relationships.

h. CW2 confirmed that, beginning around 2Q2022 and continuing throughout CW2's tenure, ModivCare's poor operational performance (such as call center failures) led to client dissatisfaction and monthly liquidated damages of hundreds of thousands of dollars.

-126-

i. CW3 stated that ModivCare instructed CW3 to highlight technological capabilities that the Company did not have to customers and never delivered on providing during CW3's tenure, which caused customers to repeatedly complain and place ModivCare on PIPs during 2022 and 2023. CW3 confirmed that ModivCare's poor service delivery, long-standing weaknesses in technology, and reliance on an outdated platform caused major contracts to be under threat.

j. CW3 confirmed that New York-based customers had major complaints centered on technology, call center performance, and lack of responsiveness from the executive team. CW3 confirmed that ModivCare consistently failed to meet call center KPIs related answering-time during CW3's tenure.

k. CW3 confirmed that ModivCare lost the majority of its New York NEMT business in 2022 and the Elevance contract, was not considered for an RFP re-bid in Virginia in 2022-2023, and had withdrawals from minor NEMT player contracts, MCOs, UHC, and Humana due to its poor service delivery and long-standing weaknesses in technology.

l. CW2 confirmed that ModivCare lost MCO Medicaid contracts in New York that were valued at $100 million annually during CW2's tenure due, in part, to New York State transitioning members to its state Medicaid program.

**N. ModivCare's FY2023 Form 10-K on February 26, 2024**

277. On February 26, 2024, before the stock market opened for trading that day, ModivCare filed its Form 10-K with the SEC to report on the Company's financial and

operational results for its fourth quarter ended December 31, 2023 (the FY2023 Form 10-K. The FY2023 10-K was signed by Sampson and Gutierrez.

278.    ModivCare's FY2023 Form 10-K contained a section describing risk factors that "could materially and adversely affect [ModivCare's] business, financial condition and results of operations." One such risk factor discussed fee models that were alternative to FFS, stating in relevant part:

> **The implementation of alternative payment models** and the transition of Medicaid and Medicare beneficiaries to MCOs may limit our market share and **could adversely affect our revenues**.
>
> . . .
>
> We may be similarly impacted by increased enrollment of Medicare and Medicaid beneficiaries in managed care plans, shifting away from traditional fee-for-service models.
>
> . . .
>
> Difficulties with operational processes may negatively affect our revenue growth rates, cash flow and profitability for services provided. **Other alternative payment models**, such as value-based billing, **capitated rates and per member per month pricing**, may be required by the government, MCOs and other commercial payors to control their costs while shifting financial risk to us, which **could also materially affect our operations and financial condition**.

279.    Another risk factor in ModivCare's FY2023 10-K discussed changes to the Company's ability to timely collect from payors, stating in relevant part:

> Our commercial payor and managed Medicaid revenue and profitability are affected by continuing efforts of third-party payors to maintain or reduce costs of healthcare by lowering payment rates, narrowing the scope and utilization of covered services, increasing case management review of services and negotiating pricing. **There can be no assurance that third-party payors will make timely payments for our services**, and there is no assurance that we will continue to maintain our current payor or revenue mix. We will continue our efforts to develop our commercial payor and managed Medicaid sources of revenue and **any changes in payment levels from current or future third-party payors could have a material adverse effect on our business and consolidated financial condition, results of operations and cash flows**.

280.    ModivCare also included a risk factor that discussed the Company's ability

to timely collect its accounts receivable related to NEMT, which stated:

> **Delays in collection, or non-collection, of our accounts receivable**, particularly during any business integration process, **could adversely affect our business, financial position, results of operations and liquidity**.
>
> Prompt billing and collection are important factors in our liquidity. Billing and collection of our accounts receivable are subject to the complex regulations that govern Medicare and Medicaid reimbursement and rules imposed by nongovernment payors. Our inability to bill and collect on a timely basis pursuant to these regulations and rules could subject us to payment delays that could have a material adverse effect on our business, financial position, results of operations and liquidity. **It is possible that documentation support, system problems, Medicare, Medicaid or other payor issues**, particularly in markets transitioning to managed care for the first time, or industry trends **may extend our collection period**, which may materially adversely affect our working capital, and our working capital management procedures may not successfully mitigate this risk.
>
> . . .
>
> In addition, we may experience delays in reimbursement as a result of the failure to receive prompt approvals related to change of ownership applications for acquired or other facilities or from delays caused by our or other third parties' information system failures. We may also experience delayed payment of reimbursement rate increases that are subject to the approval of the CMS and/or various state agencies before claims can be submitted or paid at the new rates. **Any delays** experienced for the foregoing or **other reasons could have a material adverse effect on our business, results of operations and financial condition**.

281.    ModivCare's FY2023 10-K also included a risk factor that discussed

utilization, which stated:

> **If we fail to estimate accurately the cost of performing certain contracts, we may experience reduced or negative margins and our results of operations could be materially adversely affected**.
>
> . . .

-129-

**If the utilization of our services is more than we estimated, the contract may be less profitable than anticipated, or may not be profitable at all**.

. . .

Revenue under certain contracts may be adjusted prospectively if client volumes are below expectations. **If we are unable to adjust our costs accordingly, our profitability may be negatively affected**. In addition, certain contracts with state Medicaid agencies are renewable or extended at the state's option without an adjustment to pricing terms. If such renewed contracts require us to incur higher costs, including inflation or regulatory changes, than originally anticipated, our results of operations and financial condition may be adversely affected.

282.    The statements identified in ¶¶278-281 above each were materially false, and misleading when made, because the risks included in the FY2023 Form 10-K were posed as mere hypotheticals, when those risk had actualized given that: (i) ModivCare's shift to entering into more shared risk contracts was already negatively, materially impacting the Company's operations and financial condition; (ii) ModivCare was experiencing delays in payments and collecting its accounts receivable that were extending the Company's collection period and were already having a materially adverse impact on the Company's business and consolidated financial condition; and (iii) ModivCare was already experiencing an inability to modify and reprice its contracts, utilization increases, and increased costs that were having a materially adverse impact on the Company's results of operations and profitability.

283.    The material falsity of Defendants Sampson's and Gutierrez's statements is also supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections

of utilization and claims data that did not match the payors' "encounter data" (*i.e.*, actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. CW2 also added that, at least as early as October 2023, Sunshine Health refused to pay ModivCare its large receivables balance and withheld payments from the Company. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

### O.  ModivCare's 2Q2024 Earnings Call on August 8, 2024

284.    On August 8, 2024, ModivCare held an earnings call at 7:30 a.m. E.T., before the stock market opened for trading that day, to report on the Company's financial and operational results for its first quarter ended June 30, 2024 ("2Q2024 Earnings Call"), in which Sampson and Gutierrez participated.  Sampson jointly presented with Defendant

Gutierrez and while speaking on behalf of "we" was speaking on behalf of both himself and Gutierrez. During the question-and-answer portion of the 2Q2024 Earnings Call, in response to an analyst's question regarding $60 million in contract receivables the Company planned to collect and how ModivCare would achieve strong free cash flow in the second half of FY2024, Defendant Sampson again emphasized the importance of shared risk contracts and the predictability they provided, stating:

> Yes. I'll start here and Barb can add some color. And we did in the investor deck, I think Slide 18, we gave a lot of disclosure and even some disclosure of what we expect for contracts payable and contracts receivable for Q3 and Q4. So, it really gives a good kind of picture of what we expect.
>
> So, the main driver for us, because the businesses are performing on our working capital, is the contracts, right? **And again, the contracts, especially over the last 2 years, 18 months, have been redesigned to ensure that we're in this win-win relationship from a margin and P&L perspective.** But where we're hit, just as a reminder, you know very well, but many other people, with redetermination and then utilization with the settlement times within our shared risk contracts, that goes on the balance sheet, mainly in AR. And then we have from the past being below that, we're at the same time paying contracts payable.
>
> **So that the contracts are working as designed and protecting the downside and protecting the P&L,** but there's no question there is a working capital challenge that we've been working through. **So, within those contracts, we know the timing and when those happen**. They're written down. Unlike it was in the past, they were a little more ambiguous because COVID was new and wasn't contemplated. But now they're all contemplated in the contract. So, that's the general statement.

285.   During the same call, Defendant Sampson engaged in the following exchange with an analyst regarding collection timing for capitated shared risk contracts:

Philip Chickering
Deutsche Bank AG, Research Division

Just going back to the timing of cash flows from NEMT risk contracting. Medicaid liquid determination and liquidation has been hot the last sort of 2 years. So why is this happening this quarter versus other quarters? Is there any debate around how much is owed on these contracts? Have you had any issues collecting revenue from these risk-sharing contracts in the last 12 months?

L. Heath Sampson
CEO, President, Interim President of ModivCare Home & Director

Yes. So you're on it, and you've covered the payors and I think many people on this phone know what's happening. It's pretty clear that utilization has been hot and it continues really to be hot.

. . .

Yes. And just a little bit on that because what does that mean? Just -- so let's just say it's 12 months and we're halfway through and we're knowing -- and we and the client are knowing that utilization is going up. So we know, I don't know, 6 months from now we're going to have a large true-up or settlement that.

So we go to the client and say, hey, it's going to be so large, you can see this, you see the data, **which is why we've been, oh, okay, let's kind of reset that line, so we don't have a big growing receivable and payment at the end. And our clients, again, are in a win-win relationship with us to ensure that we're doing that.** And that's why, as Barb articulated, we've been successful in a few of those large contracts to do that ahead of time.

286.    In response to another analyst's question, Sampson again assured that the

shared risk contracts were "win-win" and ModivCare was meeting service expectations,

stating in relevant part:

Rishi Surendra Parekh
JPMorgan Chase & Co, Research Division

First, on the contract renegotiations that you were referring to earlier, I get that as a win-win, or at least you note it as a win-win with the payers. But

-133-

can you just help me better understand, how is it a win for the actual payer? I mean, I get that you're getting paid earlier, but are you giving up price, or are you reducing price, or what are the economics that you're changing to make sure that the payers are paying you early? And what does this also mean for payables? Are you going to also have to pay those out faster?

L. Heath Sampson
CEO, President, Interim President of ModivCare Home & Director

Yes. No, on the payable side. **But the win-win, yes**, the payer wants the best price. So we're able to offer the best price because of what we've done with our platform. But we've estimated that. So it's not different than what we thought. They are getting a better price as we re-underwrite these deals. For us, just in general, because of the other item, we need to perform. **So you need to ensure that on NEMT that, of course, you're picking people up on time. There's no complaints**.

And then you're starting to do more at the individual population. A dialysis member is very different than a mental health member. **So we are doing all that**. So that is really the main reason why our customer status is high. Layer on that we can be the lowest cost, even better. So that's what I mean by win-win.

287.   The statements identified in ¶¶284-286 above were each materially false and misleading and/or omitted material facts necessary to make the statements therein not false or misleading when made because ModivCare's shared risk contracts were not "win-win … from a margin and P&L perspective[,]" did not produce "win-win" customer relationships, or provide predictable collection timelines. The material falsity of Defendants Sampson's and Gutierrez's statements is supported by ample evidence given that Defendants admitted on September 16, 2024, that, as of June 30, 2024, ModivCare had "experienced delays in the timely collection of approximately $60 million of its outstanding $159.3 million in NEMT segment current contract receivables, primarily from MCO customers[.]"

288.    The material falsity of Defendants Sampson's and Gutierrez's statements is also supported by evidence. CW2 confirmed, for example, that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors that dragged on for "a very long time" because the Company billed payors based on internal projections of utilization and claims data that did not match the payors' "encounter data" (*i.e.*, actual claims). As a result, CW2 confirmed ModivCare often was forced to expend considerable efforts to chase contract receivables, subjected to monthly liquidated damages of hundreds of thousands of dollars, and/or forced to accept partial payment as a settlement for true-up disputes with payors. Beginning in 2023 and continuing throughout CW2's tenure, CW2 confirmed that Monthly Leadership Meetings included regular updates "month after month" regarding receivable dispute settlements that resulted in ModivCare receiving a fraction of what was owed. Further, CW2 confirmed that in other instances payors would withhold monthly payments that ModivCare was expecting to offset the balance that ModivCare owed to the payor by ModivCare as a result of the true-up process. CW2 also added that, at least as early as October 2023, Sunshine Health refused to pay ModivCare its large receivables balance and withheld payments from the Company. Corroborating CW2, CW3 stated ModivCare experienced significant disputes over risk corridors and profits, and collectability issues related to the Company charging more for trips despite service and technological shortcomings. CW3 explained that complaints about the shared risk contracts resulted in payors refusing to pay for trips, delayed payments, states capping profits, and lost contracts.

289.    Defendant Sampson's statement claiming that ModivCare was "ensur[ing] that on NEMT that …you're picking people up on time[,]" that "[t]here's no complaints[,]" and that ModivCare was "doing all that" (identified in ¶286 above) was also materially false and misleading, omitted material facts necessary to make the statements therein not false or misleading when made, and/or lacked a reasonable basis because ModivCare was not "picking people up on time" or ensuring "no complaints." The material falsity of Defendant Sampson's statements is supported by ample evidence given that:

a.    CW1 stated that ModivCare's service quality started to decline around April 2022. CW1 also confirmed that ModivCare had "struggles to keep the payors happy" beginning around 1Q2022 and the Company received an increase in complaints, including driver miscommunications and untimely pickups, from payors' members around May or June 2022. As a result, CW1 confirmed that, throughout the last year of CW1's employment, ModivCare was failing to meet targets for its member satisfaction KPIs. CW1 further confirmed that service issues resulted in a lot of problems with the Big 6 and payors "absolutely" refused to pay or delayed payments due to ModivCare's service issues.

b.    CW1 stated that, during the last year of CW1's tenure, ModivCare began losing NEMT customers around August 2022 due to service complaints. CW1 also confirmed that NEMT de-implementations were "common" during the last year of CW1's tenure due to poor service quality and service complaints. Corroborating CW1, CW2 confirmed that contract attrition was an issue in multiple regions and remained an issue throughout CW2's tenure.

c.      CW3 stated that customer advocate staffing cuts greatly diminished ModivCare's ability to address service issues because the Company's GPS tracking and dynamic reassignment technologies "were plagued by bugs" throughout CW3's tenure and could not fulfill these capabilities without human intervention. As a result, according to CW3, payors consistently expressed dissatisfaction, particularly around no shows and on-time performance, which continued throughout CW3's tenure.

d.      CW3 stated that missed appointments and no-shows were significant service issues that ModivCare had throughout CW3's tenure but did not improve on. CW3 added that ModivCare consistently failed to meet KPIs, including on-time performance and NVAs (which caused missed rides), throughout CW3's tenure.

e.      CW1 confirmed that ModivCare's multi-modal initiative "fared very poorly" because payors' members disliked them. As a result, according to CW1, the Company fell far short of achieving the stated metrics associated with the initiative, including forecasted cost savings that "never really transpired."

f.      CW3 explained that that multi-modal trips with ride-share TNCs were generally more expensive than traditional transportation providers, and other cost-saving initiatives were hampered by on-time performance issues that resulted in the Company paying its transportation providers 2-3 times more for trip acceptance.

g.      CW1 confirmed that ModivCare's decision to de-prioritize members' experience "100%" contributed to the loss of business. CW2 corroborated that Defendants' decision to treat ModivCare as a logistics company rather than a people-driven service business damaged customer relationships.

-137-

h.        CW2 confirmed that, beginning around 2Q2022 and continuing throughout CW2's tenure, ModivCare's poor operational performance (such as call center failures) led to client dissatisfaction and monthly liquidated damages of hundreds of thousands of dollars.

i.        CW3 stated that ModivCare instructed CW3 to highlight technological capabilities that the Company did not have to customers and never delivered on providing during CW3's tenure, which caused customers to repeatedly complain and place ModivCare on PIPs during 2022 and 2023. CW3 confirmed that ModivCare's poor service delivery, long-standing weaknesses in technology, and reliance on an outdated platform caused major contracts to be under threat.

j.        CW3 confirmed that New York-based customers had major complaints centered on technology, call center performance, and lack of responsiveness from the executive team. CW3 confirmed that ModivCare consistently failed to meet call center KPIs related answering-time during CW3's tenure.

k.        CW3 confirmed that ModivCare lost the majority of its New York NEMT business in 2022 and the Elevance contract, was not considered for an RFP re-bid in Virginia in 2022-2023, and had withdrawals from minor NEMT player contracts, MCOs, UHC, and Humana due to its poor service delivery and long-standing weaknesses in technology.

l.        CW2 confirmed that ModivCare lost MCO Medicaid contracts in New York that were valued at $100 million annually during CW2's tenure due, in part, to New York State transitioning members to its state Medicaid program.

-138-

**P. Defendants Partially Revealed the Truth in ModivCare's Form 8-K Filed with the SEC on September 12, 2024**

290.    ModivCare filed a Form 8-K with the SEC on September 12, 2024 (the "September 12, 2024 Form 8-K"). The Company announced it added Note 19 (Events Subsequent to the Date of the Issuance of the Financial Statements (Unaudited)) to its FY2022 and FY2023 Form 10-Ks. The September 12, 2024 Form 8-K provided the following explanation for the update to the FY2023 Form 10-K:

> As previously disclosed, the Company continues to pursue collection of outstanding contract receivables for services rendered. While a portion of these receivables has been collected, *the Company has not offset the existing and continued accumulation of receivables during the period*. Management believes it has made substantial progress in reaching oral and written assurances and agreements from its customers related to collecting these outstanding receivables. However, *various factors beyond the Company's control have delayed and extended the timeline beyond original expectations. Although these collection and mitigation efforts continue, there remains the possibility that the Company will not achieve full resolution in a timely manner or at all if unforeseen circumstances arise*.

291.    ModivCare further disclosed that "[t]he accompanying consolidated financial statements for the year ended December 31, 2023 were prepared assuming the Company will continue as a going concern" and provided the following admission:

> *Since February 26, 2024*, the date the consolidated financial statements were previously issued, *the Company has faced delays in collecting receivables under outstanding contracts with customers due to complexities in Medicare, Medicaid, and nongovernmental payor arrangements. These delays*, which the Company has not historically experienced, *have extended the Company's collection periods and increased the uncertainty concerning the timing of the collection of these outstanding contract receivables*.
>
> As of the date hereof, the Company has reassessed its financial condition and determined that the extended collection periods and uncertainty concerning the timing of the collection of outstanding contract receivables has changed the Company's projections of its ability to meet certain

-139-

financial covenants in its debt instruments. *As a result, it has been determined that substantial doubt exists about the Company's ability to meet its obligations as they come due within one year from the date of issuance of the consolidated financial statements*.

While the Company continues to monitor cash generated from operations, available credit, and other liquid assets, sustaining operations relies heavily on the timely collection of contract receivables and compliance with the Total Net Leverage Ratio covenant in our New Credit Facility, as amended to date. Failure to meet this covenant or others could cause our obligations under the New Credit Facility, as amended to date, and the Company's Notes due 2029, to become immediately due and payable, and *we may not have sufficient liquidity to satisfy such obligations*. *In such event, we would expect to be required to restructure our existing debt or seek additional equity or debt financing to meet our obligations and maintain our existence as a going concern*.

Management intends to undertake actions to seek additional capital, including filing a shelf registration statement with the SEC, and take other available measures to further address these issues, support the funding of our operations and improve our liquidity. There can be no assurance, however, that these or other funds will be available when needed on terms acceptable to the Company, or at all, or in an amount sufficient to enable the Company to satisfy its obligations or sustain operations in the future.

292.    The September 12, 2024 Form 8-K partially corrected Defendants' prior false statements assuring that the Company would be able to recoup delayed payments within 60 days of the FY2023 Earnings Call.

293.    Upon the news, ModivCare's stock price declined $18.43, or approximately 59%, from a close of $31.19 per share on September 11, 2024 to a close of $12.76 per share on September 12, 2024 on heavy trading volume of 3.59 million shares, compared with the previous day's volume of 93,892 shares.

### Q. Defendants Partially Revealed the Truth in ModivCare's Form 8-K Filed with the SEC on September 16, 2024

294.    On September 16, 2024 at 6:30 a.m. ET, before the market opened, ModivCare filed an 8-K with the SEC ("September 16, 2024 Form 8-K") "Provid[ing]

Financial Update" wherein the Company clarified that it did "not plan to issue equity at this time" but instead, was "focused on seeking near-term covenant relief under its revolving credit facility to address potential delays in contract receivable collections."

295.    Defendants disclosed that "the Company has experienced delays in the timely collection of approximately $60 million of its outstanding $159.3 million in NEMT segment current contract receivables, primarily from MCO customers, as of June 30, 2024[.]" The September 16, 2024 Form 8-K added that "[t]his situation is primarily driven by the impacts of Medicaid redeterminations and the resulting increase in utilization under its shared risk contracts."

296.    The September 16, 2024 Form 8-K provided "Adjusted Guidance[,]" "revis[ing] its 2024 Adjusted EBITDA guidance range from $185–$195 million to $170–$180 million, primarily due to NEMT segment pricing accommodations made to strategically retain and expand key customer relationships." It also "provided guidance for Adjusted EBITDA growth in excess of 10% in 2025, based on the updated 2024 guidance."

297.    The September 16, 2024 Form 8-K partially corrected Defendants' prior false statements assuring that the shared risk contracts were protecting ModivCare "downside and protecting the P&L[,]" and that collectability timing was clear. The September 16, 2024 Form 8-K also partially corrected Defendants' statements representing that the Company expected to recoup "higher pass through revenue under [its] shared risk contracts" and that Company's utilization headwinds were "short-term."

-141-

298.    Upon the news, ModivCare's stock price declined $1.40, or nearly 10%, from a close of $14.12 per share on September 13, 2024 to a close of $12.72 per share on September 16, 2024.

299.    Analysts voiced concerns about ModivCare's representations regarding the collectability of the $60 million in outstanding contract receivables. For example, a September 17, 2024 Barrington Research report stated that news of the collection delays and potential violation of debt covenants "was particularly troubling since the company had explicitly stated in prepared remarks on its Q2 conference call in early August that it had visibility into $60 million of near-term cash collections from a couple of its large customers." The report added "[t]hat commentary contributed materially to our decision to upgrade the shares six weeks ago and probably served as similar comfort to many investors."

## VI.    POST-CLASS PERIOD EVENTS

### A.   ModivCare's Form 8-K Filed with the SEC on October 1, 2024

300.    On October 1, 2024, ModivCare filed a Form 8-K ("October 1, 2024 Form 8-K") with the SEC announcing that the Company had "successfully collected all of the approximately $60 million in contract receivables that were previously reported as delayed[.]" The October 1, 2024 Form 8-K also disclosed that the Company entered into its Fourth Amendment to its Credit Agreement that raised the Company's leverage limit and reduced its interest ratio.

### B. ModivCare's 3Q2024 Earnings Call on November 7, 2024

301. On November 7, 2024, ModivCare held an earnings call with analysts and investors to discuss the Company's third quarter 2024 results ("3Q2024 Earnings Call"). During the 3Q2024 Earnings Call, despite assuring investors that ModivCare's shared risk contracts were a "win-win relationship from a margin and P&L perspective" and that "the contracts are working as designed and protecting the downside and protecting the P&L" only one quarter earlier, Defendants abruptly changed its characterizations of the capitated shared risk, further confirming that ModivCare's contracts had not produced the predictability and protection management promised.

302. During the 3Q2024 Earnings Call, Defendant Sampson acknowledged that ModivCare had been working to reset the payment provisions for some of its shared risk contracts "[o]ver the last several quarters" and "working to address [its] remaining shared risk contracts through further prepayment updates and in many cases, shifting to fee-for-service arrangements, which will have monthly and quarterly payments."

303. Analysts pressed Defendants Sampson and Guiterrez on "why" ModivCare was switching to fee-for-service during the 3Q2024 Earnings Call, what customers would be impacted, and on the implications to the Company's margins. In response, Sampson disclosed that changes predominantly related to the shared risk contracts and that the change was intended to "ensure that we can get paid on a monthly basis or a quarterly basis[:]"

> …So the state Medicaid, the contracts will likely remain full risk. We're seeing that. And so I don't expect those to move from where they are. And again, we've seen our renewals in that space and those continue to be at the full risk side of things, which is, again, 40%-ish of our revenue. ***And***

*then the shared risk is definitely where you'll see the change.* And this is a change that we are supportive of and pushing towards to ensure that we can get paid on a monthly basis or a quarterly basis.

304.    During the 3Q2024 Earnings Call, in response to an analyst's question about the Company's cash flow, accounts receivable and accounts payable in the back half or mid-2025, Defendant Sampson explicitly acknowledged what Defendants had revealed in their previous partial disclosures—that the shared risk contracts were not actually as beneficial for the Company as management had previously presented, stating in relevant part:

> Yes. So we couldn't be more proud of the team and actually the partnership with all our clients out there to get through this -- the health care industry and specifically *our clients that we're managing on the shared risk side with redetermination coupled with higher utilization, the costs were higher than a lot of them expected*. *And that was painful*, which is why these last couple of quarters, we've been disclosing these items. But it's -- and that was '23 cycle as well as '24 because, again, most of these contracts, especially in a weighted perspective are 12 months and then you have a quarter after that a reconciliation.
>
> So we're through that tough period, which is why we gave so much disclosure on how much we have collected and where we are. But we still have the '24 contracts to roll off. And that's why we've given that -- and why we've given the information around mid-2025, why we have a lot of clarity around the timing and the amount is because we're through that.
>
> But we do have to roll off these shared risk contracts through 2024 and that will take time through the middle of 2025. *And a lot of those contracts as well in the middle part or early part of next year will be switched to that fee-for-service as well.* But again, we've got to roll off the remaining 2024 contracts that are shared risk.

305.    In response to another analyst's question about the transition to fee-for-service, Defendant Sampson acknowledged that the shared risk contracts had resulted

-144-

in margin compression and lower payments over the last couple of years, stating in

relevant part:

> Yes. So the full risk model, primarily in the state business and those are large contracts, there really is only a couple of people now that can do that work and which is why you have seen the benefit of us continuing to extend that. So we feel really good about those and those are at full risk contracts and they'll remain there, which are at the appropriate risk-adjusted margin, which is obviously higher. ***Where the margin compression is, again, is in that shared risk component. And really from a shared risk component, what we've been getting paid over the last couple of years anyway, has been lower***.

> So moving to fee-for-service, again, the cost to capital far outweighs any additional margin compression that is happening. But where the competitors are and this has been consistent, is in that individual -- maybe there's a small part of a state plan -- I mean, sorry, in a state where there's an MCO, it's primarily MCO and it's primarily smaller sections that the competition has been.

306. Analysts also pressed Defendant Sampson on the expectation that the

"evolution of [ModivCare's] contract structure and the potential to improve reconciliation

be paid faster[.]" Defendant Sampson's response starkly contrasted Defendants' Class

Period statements regarding predictability of payments, stating in relevant part:

> …Hopefully, it was in the comments and I'll kind of double-down on, I think the thing that I'm most positive on is the clarity we have and what the amounts are going to be and the timing is going to be. ***As we didn't have that clarity 2 quarters ago or even a quarter ago because we were all -- the industry was kind of caught flat-footed***.

> And we were making assumptions on what we could settle early on or what we could get changes on. That noise is through the system.

307. Another analyst sought to pin down Defendant Sampson on whether

ModivCare was entirely shifting away from shared risk contracts, stating in relevant part:

> Scott J. Fidel
> Stephens Inc., Research Division

-145-

So basically, just to simplify it, *we should think about NEMT ultimately exiting '25 at sort of 60% fee-for-service relating to the -- basically the managed care business and then around 40% full risk relating to the state business*. Is that a fair assumption?

L. Heath Sampson
CEO, President, Interim President of ModivCare Home & Director

*Yes. Yes*. But I want to give one clarity on fee-for-service. And it kind of also is to the point of Pito's question, are we kind of having a -- is there – what's the competitive advantage? I think with some of our large payers, we're going to have and this is what we want, kickers to do with cost and quality.

308.    During the same call, another analyst pressed Sampson on how many contracts had already been switched from shared risk to fee-for-service. In response, Sampson acknowledged that ModivCare transitioning the majority of its revenue to fee-for-service was the "right thing to do" given how, contrary to their Class Period statements suggesting the shared risk contracts were a win-win, customers were surprised by the pricing under those agreements:

So the move to fee-for-service in our numbers right now and in the near term, you won't see the -- any material change in fee-for-service because we're still on the contracts that we have set for 2024. The fee-for-service revenue and related margin will start coming on in 2025 as we are renegotiating these contracts. But maybe underneath your question, *we're in discussions with the majority of our revenue to move to fee-for-service.* So that's why I have a lot of conviction around that in 2025, but it's not hitting our financial statements, it will hit in 2025. And then the -- to your question around compression and that's to -- I do expect that to be compression across the board. *But again, it's the right thing to do*.

And again, we're able to manage that because of the quickness in getting the cash as well as the cost out. We're really competitively advantaged to win there. And then the *specific items that we talked about last quarter had to do with the surprise that a lot of our payers had, really in some of in 2023 in their 2024 contracts*.

***Those are where the price -- the lumpy price compressions have been
given***. So -- and then for those specific companies that we've given that
price compression in their 2024 contracts, the go-forward contracts after
that are in line with the estimates that I talked about in the normal price
compression again, which we'll be able to manage through at the right level.
So if you're – there's no need to kind of extrapolate or annualize these lumpy
price compressions that we gave because those are isolated to the 2024
contracts. The go forward is as I articulated.

### C.  ModivCare's Late Quarterly Filing, Bankruptcy, and De-Listing

309.   On August 12, 2025, ModivCare filed a Notification of Late Filing on Form
12b-25 with the SEC, stating that the Company was "unable [to] file its Quarterly Report
on Form 10-Q for the quarter ended June 30, 2025 (the "Form 10-Q") by the prescribed
due date without unreasonable effort or expense because the Company requires
additional time to complete its ongoing assessment of goodwill for potential impairment
and to report the results of such analysis in its consolidated interim unaudited financial
statements." The Notice further revealed that "the Company require[d] additional time to
complete an investigation being conducted by the Company's outside counsel at the
direction of the Audit Committee of the Company's Board of Directors with respect to
compliance hotline allegations, including matters related to the Company's culture."

310.   On August 20, 2025, ModivCare published a press release, titled
"Modivcare Enters into Comprehensive Restructuring Agreement to Strengthen its
Future, Reduce Debt and Inject Capital[,]" announcing that the Company had "filed for
voluntary Chapter 11 protection in the U.S. Bankruptcy Court for the Southern District of
Texas to implement a comprehensive restructuring transaction with the support of a
supermajority of its key stakeholders." The following day, August 21, 2025, ModivCare
filed a Form 8-K with the SEC, reiterating that the Company had filed for Chapter 11

bankruptcy protection and publishing, *inter alia*, the Restructuring Support Agreement entered with its creditors.

311. Then, on August 22, 2025, ModivCare filed another Form 8-K with the SEC, disclosing that, on August 21, 2025, the Company had received a letter from the Listing Qualifications Department of NASDAQ notifying the Company that the NASDAQ "had determined to commence proceedings to delist the Company's common stock" because "the Company [was] no longer suitable for listing … as a result of the Company's commencement of voluntary proceedings under Chapter 11 of the United States Bankruptcy Code on August 20, 2025." "Nasdaq [also] informed the Company that the Common Stock would be suspended at the opening of business on August 28, 2025." ModivCare did not appeal the de-listing.

312. On August 28, 2025, the Company's common stock was suspended from trading on the NASDAQ and delisted. Thereafter, ModivCare's common stock began trading on OTCMKTS.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

313. As alleged herein, Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading when made. The Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws. The Defendants, by virtue of their receipt of information reflecting the true

-148-

facts regarding ModivCare, and their control over and/or receipt and/or modification of ModivCare's allegedly materially misleading misstatements, were active and culpable participants in the fraudulent scheme alleged herein.

**A. CWs Confirmed Defendants Accessed Real-Time KPIs Related to NEMT Service Issues, and Attended Meetings Discussing the Same**

314.    CWs confirmed that the Defendants accessed, reviewed, and discussed detailed data regarding NEMT performance metrics and service issues.

315.    For instance, CW1 explained that ModivCare tracked certain metrics in connection with the Company providing the payors' members transportation services, including member satisfaction, responsiveness to complaints, how quickly transportation providers pick up the phone, length of time members remained on the phone with transportation providers, response times, and other KPIs. CW2 also confirmed that ModivCare quantified its customer service failures, explaining that call center performance was tracked.

316.    CW1 confirmed that Shepard regularly attended meetings where the NEMT initiatives and metrics were discussed. Specifically, CW1 explained that Shepard, Shepard's team, and the team upon which CW1 worked were considered "business partners" that supported Simpson and his direct reports. As such, according to CW1, Shepard was a "standing member" at regular meetings with Simpson's direct reports, Shepard's team, and CW1's team. CW1 likewise briefed Sampson and Shepard on strategy, modes of transportation, KPI reviews, financials, services levels, and implementations, and provided Sampson with updates in response to his periodic requests about specific contracts.

317.   CW1 also described attending a standing, direct report staff meeting with operational leaders during the summer of 2022 where the rise in service complaints and payors' disappointment over the rise in service complaints were being discussed. During the meeting, according to CW1, Simpson told attendants that ModivCare only owned "picking up and dropping" off the member and specifically did *not* "own the customer experience." It was at this time, according to CW1, that it became clear to CW1 that ModivCare could be headed for financial troubles since member experience was critical to the NEMT's business' success, but was specifically de-prioritized. CW1 described Simpson's directive as "shocking" and said, "that was the moment in time I realized we could be in trouble."

318.   When asked whether payors raised these service issues with CW1, CW1 replied "all the time." CW1 also heard about the service issues, including drivers not picking members up on time and miscommunications between drivers and members, from the operations team, executive teams, and "everyone across the country, weekly." Accordingly, CW1 confirmed that the service issues were 100% on Shepard's and Sampson's radars. CW2 also stated that service issues, including rejected encounters and call center failures, were discussed frequently during Monthly Leadership Meetings.

319.   Between November 2022 and the end of CW3's tenure in September 2023, CW3 held several meetings with ModivCare's leadership, including Defendant Sampson, during which CW3 warned leadership that the Company's contracts were at risk because they were failing to keep up with their competitors.

320.    CW3's team also presented competitive analyses that compared ModivCare's offerings to competitors and emphasized long-standing weaknesses in technology, poor service delivery, and a disjointed operational model based on the outdated LogistiCare platform to Sampson, the President of ModivCare's Mobility Division Simpson, the Senior VP/Head of Mobility Product Edward Hoffman, and "the full c-suite" during the May 2023 Summit.

321.    Nevertheless, according to CW3, Senior VP of Government Affairs Robert Pittman, Senior VP of Mobility Edward Hoffman, and Defendant Sampson instructed CW3 to highlight capabilities to customers in RFPs that did not exist, including technology platforms the company had long promised but never delivered. CW3 further confirmed that Sampson and leadership were aware of ModivCare's technological shortcomings and that representing the Company had such capabilities in the RFPs was not truthful.

**B. CWs Confirmed That Defendants Received Regular Reports and Participated in Regular Meetings Regarding Contract De-Implementation and Receivable Disputes**

322.    CW1 prepared regular reports related to ModivCare's implementations, which included information about members, contract size, and data from a utilization forecasting tool. CW1 stated that Sampson and Shepard received this information twice a month at the very least, and that Simpson received this information on a weekly basis. CW1 added these reports were "well distributed" to ModivCare's upper management.

323.    CW1 tracked the dollar amounts related to implementations and de-implementations closely. According to CW1, this information was also shared with vice presidents, senior vice presidents, and the executive team. CW1 also prepared

presentations, similar to PowerPoint slides shows, related to ModivCare's implementations and de-implementations that were submitted to the executive team, including Sampson. CW1 added that any leader could access these reports, "whenever they wanted."

324. CW1 confirmed that Shepard, Simpson and Simpson's operational vice presidents received briefings on contract implementations and de-implementations during bi-monthly meetings, which were held over Microsoft Teams. During these meetings, a report was displayed, which was a shared document that attendees could access, to walk the attendees through various data points concerning implementations and contracts lost, including contract sizes, dollar amounts, and number of members served. CW1 confirmed that these reports were sent to Simpson.

325. CW1 confirmed that Shepard, Shepard's team, Simpson, Simpson's direct reports received bi-weekly oral reports on all projects, which were documented in the meeting minutes. CW1 stated that Shepard received these implementation updates bi-weekly, at the very least. According to CW1, the information from the implementation updates was sometimes presented in a "higher-level update to the executive team" in which Sampson participated.

326. CW1 attended regular meetings with Shepard, Shepard's team, Simpson, and Simpson's direct reports wherein ModivCare's strategic initiatives and metrics related to implementation of those strategic initiatives were discussed. CW1 explained that concerns related to the NEMT contracts were discussed during these regular meetings.

For instance, CW1 stated these meetings involved regular discussions about the rise in de-implementations, the reasons for the increase, and "why are we losing business."

327.   CW1 confirmed that Sampson and Shepard were "definitely" concerned about the increase in de-implementations. CW1 added that when ModivCare was losing more business, and utilization was increasing, the implementations team was given a "spotlight."

328.   CW1 participated in a meeting with Sampson regarding de-implementations where he asked questions about why ModivCare was losing business and for dollar amounts related to the same. CW1 explained that de-implementations were "a huge, huge concern, probably across the entire company, but certainly the transportation division." CW1 added the majority of concerns about lost business were NEMT-related.

329.   Similarly, CW2 participated in calls with Shepard between March and May of 2023 where payor disputes had escalated to a point where the payor requested Shepard's involvement. CW2 confirmed that these negotiation calls were ongoing conversations that occurred weekly throughout 2023.

330.   CW2 also stated that encounter data rejected by payors was frequently discussed during Monthly Leadership Meetings. CW2 also explained that receivable disputes were a standing agenda item during Monthly Leadership Meetings and included regular updates such as, "Health plan X is only paying us Y, or 30% of what's owed." CW2 added that the receivable disputes were "definitely a hot topic" that occurred "month after month" at every monthly meeting between 2023 and 2024.

**C. Defendants Were Personally Involved in Contract Negotiations with Payors and Touted Relationships with Payors' Executives as a Means to Reprice Contracts and Protect Contract Margin**

331.   Prior to and during the Class Period, Defendant Sampson touted his direct involvement with contract negotiations and the benefits that his close working relationships with payors' executives had on the same. For instance, prior to the Class Period during the Company's 2022 Investor Day presentation, Sampson emphasized his close working relationships with payors' CEOs afforded ModivCare with the ability to engage in contemporaneous re-pricing discussions to address NEMT costs fluctuations. Indeed, during that same presentation, Sampson stated that "the beauty" is that "we can get meetings with the CEO[.]" Defendant Sampson then provided an example where he personally met with a payor's CEO just the month prior and highlighted the importance of that relationship for future contract negotiations:

> …I was with a payer. ***We were doing [a] planning session on how to grow their MA business nationally, 8-hour working session with them***. And it was primarily around transportation. The other thing they said, "If we do what we're planning to do, Heath, we're just going to give you everything else."

> My point there is, is that ***the relationships to the CEO level is enabling us to make sure that we increase the pricing***. So if utilization was to increase another 1%, ***the amount of negotiation that I need to increase on our contracts is in the single-digit range***. First lever to pull, and we're doing it today. ***So that's why I feel really good***.

332.   Likewise, during the Company's 2Q2022 Earnings Call on August 4, 2022, Defendant Sampson again emphasized close payor relationships and the significance of those relationships for contracting:

> …In addition, and this relates to the out of period, ***we are very close to our clients***. And as we're moving through what has changed, costs are up, and you can see that in our metrics and ***we are appropriately getting the***

-154-

*pricing change to reflect that increase in cost and also reflect the services that we provide*.

333.   Defendant Sampson also admitted that he was personally involved with NEMT contract negotiations during the Deutsche Bank's 30th Annual Leveraged Finance Conference on September 20, 2022:

> …If it gets a little bit where it's too imbalanced, *we'll restructure the contract*. And we've been doing that for the last 12 months very successfully because it makes sense. The margins that we have in that business, and I'm not apologetic about it, *and I say this directly to our customers*, a 10% EBITDA margin to ensure that we pick your members up on time is the right margin.

334.   Defendant Sampson also touted the benefits of working closely with payors' executives during that same conference call, stating in relevant part: "[w]e have senior relationships *at the C level* and down … how valuable it is that a company like ours has senior level relationships at the highest level."

335.   Sampson also stressed the benefits of its payor relationships during the Class Period. For instance, on December 6, 2022, during Bank of America Securities' Home Care Conference, Sampson emphasized consistent contact with ModivCare's customers regarding NEMT contract re-pricing:

> *So contract repricing and engagement on our customers' populations happen all the time*. Even though we may have a 3- to 5-year contract, *our methodology and approach is to stay engaged with our customers*. And we're really looking at that. And if you look about -- since -- kind of I've been here in the last 2 years. We have appropriately increased pricing or decreased pricing to ensure it's aligned with that mix of population. That will always continue.

336.   Defendant Sampson reiterated ModivCare's unique relationships with payors during J.P. Morgan's 41st Annual Healthcare Conference on January 11, 2023,

stating: "[a]nd really over these last couple of years, we are contracting in each state, but

*our relationship is at the highest level of these large players, the C-level*

*relationships*. This is *really unusual in healthcare services*. So that really matters."

He added that:

> And then lastly, and this is something that's happened over the last couple of years since I've been here, and *it gets to our strong relationships*. And I like this. *So our strong partnerships will reprice, if appropriate*. We've proven to do that up or down over these last couple of years.

337.   Similarly, during J.P. Morgan's 42nd Annual Healthcare Conference on

January 11, 2024, when an analyst asked about investments ModivCare was making to

automate the NEMT segment, Sampson provided another example of personally

interacting with a payor:

> So change to transportation typically means a challenge. So how do you get ahead of that? You integrate and allow that facility to manage and book and really API into our modern technology to ensure that they manage that. Critical component. *I was with another large payer and he was saying, with our dialysis facilities, we spend about an extra $50 million that we shouldn't spend because transportation is hard*.

338.   Because Defendant Sampson had close relationships and frequent

discussions with payors' executives regarding contracting and repricing due to utilization

and cost increases, he either knew or should have known that payors were dissatisfied

with ModivCare's service levels and technology offerings, were refusing to pay, delaying

payments, and seeking liquidated damages, refusing to share in increased costs under

the shared risk contracts, and cancelling contracts as a result of service and technology

issues. Thus, Defendant Sampson's misleading representations throughout the Class

Period were made with knowledge or reckless disregard for the fact that ModivCare's shared risk contracts were not win-win and did not protect the Company's financials.

**D. Defendants Frequently Discussed ModivCare's NEMT Performance Data During Earnings Calls**

339.    Defendants also discussed service performance in granular detail during earnings calls, which evidences that they were closely tracking NEMT performance metrics. For example, during the FY2022 Earnings Call, Sampson jointly presented with Defendant Shepard and while speaking on behalf of "we" — *i.e.*, both himself and Shepard—affirmed that they were closely monitoring and knowledgeable of ModivCare's NEMT performance. There, Defendant Sampson stated that "our fourth quarter on time performance was at its highest level in two years. We also exceeded service level expectations in our contact centers and reduce[d] missed trips by about a third."

340.    Defendants likewise admitted that ModivCare shared data concerning NEMT performance metrics with their customers. For instance, during J.P. Morgan's 41st Annual Healthcare Conference on January 11, 2023, Defendant Sampson elaborated on the data partnership and how it was used to establish NEMT contract prices. He stated that "[s]o when we go in and if we're on a full-risk state and the mix is 25% dialysis, ***our data people know that, their data people know that, and we price appropriately.*** So it's the same, it's been, and it's working well."

341.    During the Deutsche Bank's 30th Annual Leveraged Finance Conference on September 20, 2022, Defendant Sampson described the Company's partnership with state customers and stated that "[s]o I love that ***they're in that dialogue that we're sharing data***, and that's where the conversation and contracting is going."

-157-

342.    Defendant Gutierrez likewise admitted that ModivCare was heavily focused on utilizing data analytics to drive decision making. For example, during Bank of America Securities' 2023 Leveraged Finance Conference on November 28, 2023, Gutierrez stated that there was "a big focus on data analytics to help the company really make good data-driven decisions. You ask questions about our contracts and the profitability, and just really continuing to refine that focus on that process."

343.    Given Defendants' focus on sharing data with customers and making data-informed decisions, Defendants knew or should have known that ModivCare's NEMT service levels were declining, payors were dissatisfied with ModivCare's service levels and technology offerings, were refusing to pay, delaying payments, and seeking liquidated damages, refusing to share in increased costs under the shared risk contracts, and cancelling contracts as a result of service and technology issues.

### E. Defendants Evasive Answers to Analysts' Questions about the Capitated Shared Risk Contracts Supports Scienter

344.    Throughout the Class Period, Defendants evaded questions about contract receivable collectability under the Company's capitated shared risk contracts. For instance, during the FY2023 Earnings Call, Sampson jointly presented with Defendant Gutierrez and while speaking on behalf of "we" — *i.e.*, both himself and Gutierrez — affirmed that they were involved with and knowledgeable of ModivCare's outstanding delayed payment dispute. Nevertheless, Defendant Sampson dodged an analyst's question about why ModivCare did not collect from a managed care contract in Florida and instead, insisted that the Company would collect the funds:

Philip Chickering
Deutsche Bank AG, Research Division

A couple for me here. For the managed care contract in [ Florida's ] revenues, you guys didn't collect this quarter. I believe you said you collect them in the next few months. *Can I ask sort of why you didn't collect it in the time period that you thought you would? Is there any issue on what they think they should pay versus what you guys have recognized?*

L. Heath Sampson
CEO, President, Interim President of ModivCare Home & Director

Yes. We wanted to be specific that it was one contract and one area because we have a lot of relationships with that payer across the country, which we are in great standing. *This specific issue has not been paid at the same time, why I said the next couple of months is because we will get it paid because it's contractually owed*. So I wanted to make sure I set it because it was the main driver for the cash flow change in Q4. But I also wanted to be explicit about it and give the amount because it's contractually owed and we'll get it paid within the next kind of 60 days.

345.    Another analyst, picking up on Defendant Sampon's non-answer regarding whether there was a material disagreement between ModivCare and the Florida customer, pressed on whether such a disagreement existing during FY2023 Earnings Call. Again, Sampson punted:

Michael John Petusky
Barrington Research Associates, Inc., Research Division

So appreciate the commentary around your confidence in the collectability of the delayed payment and the possible timing. I didn't catch, though, if you commented on it. *Is there a material disagreement between the parties in terms of what's actually owed?*

-159-

L. Heath Sampson
CEO, President, Interim President of ModivCare Home & Director

Well, so, it's -- all of our contracts that are with shared risk, this is why they reconcile over many months. ***So it's complicated***. But we've been under this contract with this customer. Well, one, they've been a longtime customer of ours many, many years. And this contract structure started in late 2022. ***So we feel really good about the math and the collection of the entire amount***. It's in line with the requirements of the contract. So we'll collect it within the next 60 days or so.

346.    In a report published on February 26, 2024, Barrington commented on the Company's evasive answers, stating:

***The company's decision not to answer certain questions during its conference call frankly rattled us a bit***. Historically, management has seemed largely forthcoming. ***Questions that were specifically asked but not clearly answered or items which could have given clarity but seemed to be left intentionally murky included 1) expectations for the likely cash flow deficit in Q1 and Q2 – this could have provided an insight into exactly how back-end loaded FCF guidance actually is***; 2) the actual adjusted EBITDA generated at Matrix in 2023 - this is simply a number and would have been an easy question to have answered and; 3) ***whether or not there is a "material disagreement" regarding the $35.9 million that ModivCare believes it is contractually owed*** – an answer such as "Yes, clearly a disagreement, but not one of significant size" would have provided some comfort that this issue will probably not drag out beyond management's 30-60 day forecast for resolution and, in a worst case scenario, could be quickly settled for a figure close to the estimated amount.

347.    Defendant Sampson's evasive answers suggest that he and Gutierrez were aware of the material dispute that ModivCare and its Florida-based customer had regarding the true-up provisions of the shared risk contracts but wanted to avoid discussing it or otherwise downplay the significance of the true-up dispute.

348.    Indeed, after the Class Period, Defendant Sampson (again speaking on behalf of himself and Gutierrez, who jointly presented the call) admitted that the shared

risk contracts and their true-up provisions were painful stating in relevant part during the 3Q2024 Earnings Call:  "the health care industry and specifically our clients that we're managing on the shared risk side with redetermination coupled with higher utilization, *the costs were higher than a lot of them expected. And that was painful*.""

**F. Defendants' Statements Concerned ModivCare's Primary Source of Revenue and Core Operation, Further Supporting Scienter**

349.    Defendants' scienter is further supported by the fact that the NEMT was ModivCare's "core" operation. Indeed, the NEMT segment made up the overwhelming majority of ModivCare's total revenue, accounting for approximately 70% of the Company's total revenue during the Class Period. The shared risk contracts also represented the largest component of those revenues during the Class Period.

350.    Defendants also consistently indicated that the NEMT or Mobility segment constituted ModivCare's core operation, indicating Defendants monitored the segment closely. During the January 11, 2023 JPMorgan Healthcare Conference, Defendant Sampson confirmed that ModivCare's "transportation is *our largest segment*, about $1.7 billion in revenue, close $170 million, $175 million adjusted EBITDA, again, 36 million lives." Defendant Sampson confirmed that ModivCare's "*mobility business . . . is our core business*" at the Deutsche Bank's 31st Annual Leveraged Finance Conference on October 3, 2023.

351.    Thus, the NEMT division's critical importance to ModivCare's core operations raises a strong inference that the Defendants made their false and misleading statements throughout the Class Period with scienter. Moreover, as ModivCare's senior officers and/or directors, who had continuous access to NEMT service data and KPIs,

participated in meeting wherein service KPIs and issues were discussed, and were in frequent communication with its NEMT customers, it strains credulity to suggest that Defendants were unaware of the negative impact of the service and relations technology issues and customers pushback on paying increased cost for service under the shared risk contracts, when those issues concerned the services and contract structure that made up the vast majority of the Company's NEMT revenue. In the alternative, Defendants acted with reckless disregard for the truth when they failed to ascertain and disclose the readily available facts regarding service and relations technology issues and shared risk contracts disputes affecting the Company's core business.

## VIII.   LOSS CAUSATION

352.   During the Class Period, as detailed herein, Defendants materially misled the investing public, thereby inflating the price of ModivCare securities and/or maintaining the artificial inflation in ModivCare securities and, by publicly issuing materially false and/or misleading statements and omitting to disclose material facts necessary to make those statements, as set forth herein, not materially false or misleading. Said statements and omissions were materially false and/or misleading in that they failed to disclose materially adverse information and/or misrepresented the truth about ModivCare's NEMT shared risk contracts, NEMT services, and NEMT strategic initiatives, thus causing ModivCare's securities to be overvalued and artificially inflated at all relevant times.

353.   At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiff and other members of the Class.

As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements concerning the Company's business prospects. These material misstatements and/or omissions had the cause and effect of creating in the market an unrealistically positive assessment of the Company and its well-being and prospects, thus causing the Company's securities to be overvalued and artificially inflated at all relevant times and resulting in Plaintiff and other members of the Class purchasing ModivCare's securities at artificially inflated prices, thus causing the damages complained of herein.

354.    When Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of ModivCare's common stock declined significantly as the prior, artificial inflation came out of the prices of the common stock as follows:

### A. On May 4, 2023, ModivCare Issued the First Set of Corrective Disclosures

355.    On May 4, 2023, in response to Defendants' corrective disclosures in the 1Q2023 Press Release and 1Q2023 Earnings Call which revealed the Company had a net loss of $4.0 million for the quarter and had expended nearly $3 million in cash as a result of a $7 million reduction in contract payables and $31 million increase in contract receivables, ModivCare's common stock price fell sharply, declining $11.30 per share, or approximately 16%, from $69.30 per share on May 3, 2023 to $58.00 per share on May 4, 2023, thereby removing the artificial inflation caused and/or maintained by Defendants' false and misleading statements and causing economic loss to investors who had purchased ModivCare's securities during the Class Period.

-163-

356.    Analysts were concerned by the Company's reported cash flow and NEMT performance. For instance, on May 5, 2023, Barrington Research issued a report reducing its price target from $143 to $92 "due to the uncertainties currently overhanging both NEMT and personal care" and "less debt reduction in FY/23 than … previously envisioned due to Q1's weak FCF performance."

357.    The May 5, 2023 Barrington report also expressed disappointment with the Company's NEMT's Adjusted EBITDA margin, stating in relevant part:

> ***NEMT's 7.5% adjusted EBITDA margin in the quarter was disappointing*** and was down 180 bps versus the comparable quarter a year ago. This result was due to increased service expense per trip and increased trips per member.

### B. On August 3, 2023 and August 4, 2023, ModivCare Issued the Second Set of Corrective Disclosures

358.    On August 3, 2023, after the market closed, Defendants disclosed in the 2Q2023 Press Release that ModivCare slashed 2023 full-year Adjusted EBITDA guidance due to  "increased utilization and related higher call volumes in NEMT," "new contract win implementation delays, and contract attrition from prior years[,]" and that the Company had used $108.2 million in cash and drew $126.5 million on its revolving credit facility. The following day, during the 2Q2023 Earnings Call, Defendants further elaborated that ModivCare's use of $108 million in cash flow and $111.5 million credit draw stemmed from "a temporary timing mismatch between payments and collections" related to the Company's shared risk NEMT contracts and accelerated payments made to "a few large state clients" that "occurred earlier than anticipated." Indeed, ModivCare

-164-

chalked the approximately $65 million accelerated payments up to "[p]rioritizing long-term customer relationships[.]"

359.    In response to Defendants' corrective disclosures in the 2Q2023 Press Release and the 2Q2023 Earnings Call, ModivCare's common stock price declined $2.86, or approximately 7%, from $38.24 per share on August 3, 2023, to close at $35.38 per share on August 4, 2023.

360.    Analysts were alarmed by ModivCare's reported cash flow and debt. For instance, in an August 4, 2023 report published by Deutsche Bank (the "August 2023 Deutsche Bank Report"), the analyst noted that 2Q fell short of expectations and "the forward outlook deteriorated more materially[,]" stating in relevant part:

> ***While 2Q came in short of expectations, the forward outlook deteriorated more materially and resulted in MODV cutting FY23 EBITDA guidance by 11% at the mid-point***. The lower EBITDA outlook alongside an acceleration in the balancing of COVID-era payables and receivables forced MODV to draw down further on its revolver and seek an amendment to increase the leverage covenant with FCF coming in at negative $117m for the quarter.

361.    The August 2023 Deutsche Bank report attributed the lowered outlook to NEMT service expenses costs, stating in relevant part: "the cut to the outlook clearly indicates that the elevated service expense cost pressures will remain in place through at least the rest of the year."

362.    The August 2023 Deutsche Bank report further noted ModivCare's "unexpected acceleration" of payments to NEMT customers that pressured cash flow, stating in relevant part:

> Separately, ***MODV experienced an unexpected acceleration in the balancing of its contract payables and receivables in 2Q that created***

*a $96m drag on cash from operations. The unexpected cash flow pressure forced MODV to draw another $112m on its revolver in 2Q, ending with ~$6m in cash on the balance sheet*. The intra-quarter increase in the revolver's leverage covenant has had MODV's bonds under pressure over the last month, with the 2025 issue now trading at about ~ $0.89 on the dollar and the 2029's trading down to ~$0.66.

363.    In an August 7, 2023 report, Barrington Research noted that ModivCare's "Cash Flow Concerns, Leverage & Operational Risks Overshadow[ed]" the Company's 2Q2023 performance, stating in relevant part:

ModivCare ended the quarter with $7.0 million in cash and equivalents and about $1.1 billion in total debt. *Cash flows from operations in the quarter were around -$108.2 million largely due to the material impact from* the COVID-related reconciliation and *refunding actions in certain contracts with profit corridors*. Management stated that *a couple of customers received accelerated payments of around $65 million in aggregate that were not anticipated a few months ago in terms of the timing*. The quarter's cash flows were also negatively impacted by a $17 million growth in receivables and a $9.6 million settlement with the company's former CEO.

364.    As a result, Barrington Research reduced its price target for ModivCare's stock from $92 to $58, stating in relevant part:

We are maintaining an OUTPERFORM investment rating on MODV but are *materially reducing our price target to $58 (from $92 previously) due to* the difficult macro backdrop as well as *the lower-than-anticipated cash flow outlook in FY/23 and high balance sheet leverage*.

### C. On February 22, 2024 and February 23, 2024, ModivCare Issued the Third Set of Corrective Disclosures

365.    On February 22, 2024, after the market closed, Defendants disclosed in the FY2023 Press Release that ModivCare's free cash flow for 4Q2023 and FY2023 were negative $36.8 million and negative $125.3 million, respectively, the Company had drawn $113.8 million from its revolving credit facility, had encountered NEMT margin pressure

as well as "sooner than anticipated, large COVID-related working capital needs[,]" and had not recouped an anticipated ~$35.9 million payment from a client.

366.    In analyst reports published prior to the Company's FY2023 Earnings Call the following day, analysts once again expressed concern about ModivCare's cash flow and debt. For instance, a February 23, 2024 Deutsche Bank report, titled "First blush — another bump in the road, downgrade to Hold[,]" (the "DB Pre-EC Report") acknowledged the Company's guidance miss, stating: "MODV is guiding 1Q24 EBITDA to be $30.5m, which is 36% below consensus." The report attributed the miss to "several reasons[,]" stating in relevant part:

> There are several reasons to this miss. The one we were expecting was around redetermination, which MODV sizes up at $6 - $8m and believes we are now 70% through the process. ***However, the new information was around contract losses in NEMT***.
>
> These contract losses make up $10 - $12m of the miss versus consensus and are made up of three components: (1) Some of MODV customers lost state RFPs, so MODV lost that business and we estimate this headwind at ~$4m; ***(2) MODV used to have a carve out with the NY Health Department, which no longer exists, and we estimate this as a ~$4m headwind; (3) One of MODV's largest customers, which we believe is UNH, has transitioned some of the business away from MODV to a competitor and we believe this is about $9m of the impact***.

367.    The DB Pre-EC Report also noted that "[c]ash flows are once again an issue for MODV, which could attract some unpleasant attention." The report elaborated, stating in relevant part:

> After struggling for FCF over the past few years, investors were optimistic that normalized earnings could lead to cash flows returning. In 4Q, MODV had a $31m use of cash due to contract payables and receivables and another $6m from restructuring costs and had to draw on its revolver for $31m in order to finish the year with $2m of cash on the BS. ***Equity***

*investors typically view companies drawing on the revolver to fund operations as a red flag*.

Management is guiding FCF to be $40 - $60m in 2024 which will, once again, be back end loaded. *The pressure is coming from $20 - $30m working capital due to redetermination and utilization returning and another $10 - $20m of restructuring costs*.

368.   In its conclusion, the DB Pre-EC Report downgraded ModivCare to hold, stating in relevant part:

*With several bumps on the road over the past year and struggles with FCF generation, we are unable to continue recommending MODV and downgrade to a Hold*. Our new price target is $40, which is based on 8.4x 2024 EV/EBITDA (vs 8.3x previously). *Our target multiple is moderately below MODV's historical average, which we believe is justified due to the uncertainty surrounding redetermination/ utilization risks in NEMT, cash flow issues, and high leverage*. We continue to like this company and management team and hope that the hockey stick of both EBITDA and FCF materialize in 2H:24, for us to view the stock more positively.

369.   Then, on February 23, 2024, before the market opened, Defendants further disclosed that ModivCare's shared risk contracts were not serving to normalize the Company's cash flow or working capital. Instead, Defendant Gutierrez disclosed that ModivCare's cash flow was negative $37 million because a large MCO customer "delayed payments under multiple contracts" and that "[t]he primary fluctuations in [the Company's] quarterly working capital [were] driven by the shared risk contracts with our NEMT clients, with payments and reconciliations occurring over varying time periods." Defendants also disclosed that ModivCare was facing headwinds due to several contract losses, including "a few MCO clients not securing their state contracts[,]" a state health department's decision to transition business to a competitor, and another payor's decision to allocate

-168-

business volume away from ModivCare due to the Company's purported legacy service issues.

370.    In response to Defendants' corrective disclosures in the FY2023 Press Release and FY2023 Earnings Call, ModivCare's common stock price fell $17.25 per share, or approximately 39%, from a close of $43.87 on February 22, 2024 to a close of $26.62 on February 23, 2024 on heavy trading volume.

371.    Analysts were exasperated about the Company's dismal financial results, focusing on the unexpected loss of customers and delayed payments. For instance, a February 23, 2024 Deutsche Bank report, titled "Make or break time, need to execute" ("DB Post-EC Report") noting that the Company's "initial 2024 EBITDA guidance of $190m to $210m disappointed street expectation of $211m." The DB Post-EC Report elaborated on ModivCare's "1Q Miss and Contract Issues[,]" stating in relevant part:

> The 36% miss on the 1Q EBITDA outlook relative to consensus is mainly driven by lost contracts and wallet share with a key client. These items are expected to be a combined $11m drag on 1Q EBITDA at the mid-point (we had previously assumed $17m due to including restructuring charges), though we suspect some of the $5m headwind from G&A could be related to the lower fixed cost leverage as a result of the lost revenues.
>
> 25% of this headwind is due to MODV customers losing state RFPs and, hence, no longer requiring MODV's services. While this is an unfortunate development, it is largely out of the company's control and is likely more 1x in nature.
>
> **Another 25% is driven by a lost contract with the NY Health Department. MODV lost the contract because the dept. had been operating under a carve out but transitioned to a full-broker model, opening up competition and resulting in MODV losing the deal. While we don't know exactly why MODV didn't win the new contract, it could be related to the legacy technology and quality issues that impacted the third item**.

-169-

*The third and largest headwind in this bucket is business that MODV lost to a competitor at one of its largest customers, which we believe to be UNH*. MODV didn't lose the entire contract and is still the largest vendor for this customer, but *the previously mentioned tech/quality issues, specifically around integration into the payors systems, cost MODV a material chunk of business with this payor*.

372.    The DB Post-EC Report elaborated on the largest headwind, stating in relevant part:

While the first item is out of MODV's control and the NY contract loss is a relatively unique situation given the previous carve out, *we retain some concern around the loss of wallet share with the large customer. Management indicated that tech. improvements have been implemented* and MODV can now integrate payors' systems with its own, which it believes will protect its remaining business with this client and drive future contract wins. *But we believe the potential of further losses with this customer or others needs to be monitored given the recent developments, which could offset the net new business tailwinds slated to start coming through in 2Q that are required to stabilize the business.* We also note that all MCO contracts here are evergreen – so when the vendor performs well, it typically retains the business, but it works the same way going the other direction which can result in abrupt losses like this.

373.    The DB Post-EC Report also addressed ModivCare's "FL Payment Delay and FCF[,]" recognizing that Defendant Sampson dodged providing specifics for the delayed payment, stating in relevant part:

4Q FCF came in at -$37m on -$25.6m of cash from operations as one of MODV's clients in Florida delayed a payment, driving a $15m increase in receivables as payables declined $16m. *Mismatch between receivables and payables has been a persistent cash flow headwind for MODV over the last year. While much of the 2023 headwind was driven by the broad-based increase in utilization, this 4Q headwind is related to this one specific client. Commentary around why the payment was not made was light, and while MODV sounded confident it would receive payment in the next six months as the contract states, the continued volatility in and unpredictability of cash flows is both pressuring leverage levels and results in investors ascribing a lower multiple to MODV's FCF*, even when it does improve. With FCF projected negative in

-170-

Case No. 1:25-cv-00306-GPG-KAS    Document 54    filed 01/09/26    USDC Colorado
pg 176 of 193

1H but at $40-$60m for the full-year and MODV already raising its covenant leverage limits, we look for manageable burn levels in 2Q ahead of the 2H inflection as well as improved visibility and consistency here.

374.    The DB Post-EC Report next commented on ModivCare's "NEMT margins and back half ramp[,]" noting that there was a "lack of visibility into quarter to quarter performance of the shared risk contract book[:]"

> MODV expects to see strong sequential growth in paid trips throughout the year as the impact from redetermination crests in 2Q as the company brings on new contract wins. The strong volume growth outlook, combined with ongoing cost savings initiatives, drives the company's view that NEMT margins can exit 2024 in the 8-8.5% range, which we estimate represents 350-400 bps of expansion from 1Q->4Q. While trip growth has been solid and MODV should have reasonable visibility into '24 volume growth given the new contracts are coming online in the next couple months, **we are more cautious on the margin side**. MODV has pointed toward an easing labor market recently, and the company's efficiency initiatives should continue to drive service expense per trip lower. ***But lack of visibility into quarter to quarter performance of the shared-risk contract book and the aggressive operating leverage implied in the 2H quarters is likely to result in investors taking a wait-and-see approach***. Longer-term, MODV targets a 9-12% EBITDA margin for NEMT vs 7.1% in FY23. While we continue to see this level of profitability as achievable, ***we see significant uncertainty around the timing of when NEMT can consistently run in the targeted range***.

375.    The DB Post-EC report remarked on the uncertainties surrounding the Company, stating in relevant part:

> We continue to like the MODV management team and its plans to stabilize the business, ***but the combination of headwinds and uncertainties around lost contracts, NEMT margins, cash flow generation and leverage, we simply see too much risk to recommend the stock at current levels***. If MODV is able to get through 1H and execute the guided 2H ramp on margins and cash flows, the stock should bounce back and the company can start to position its messaging around improved margins and consistency in 2025. But given the several false starts over the last few years and the pertinent near-term items discussed above, we remain Hold rated.

376.    In a February 26, 2024 report, titled "Q4 Results OK but Multiple Operational Uncertainties Plus High Leverage is Too Much; Reduce to MARKET PERFORM with New Speculative Suitability Rating" (the "February 2024 Barrington Report"), Barrington Research downgraded its rating of ModivCare's stock from "outperform" to "market perform" due to "the near-term operational uncertainties plus a massively leveraged balance sheet[.]" The report added that the Company's FY2024 initial guidance was "well below what we had previously been modeling."

377.    The February 2024 Barrington Report also noted that material impact of the NEMT delayed payments and lost contracts, stating in relevant part:

> ***On the other hand, the company also disclosed that one of its clients ("an MCO client with a specific contract in Florida") had not paid $35.9 million that ModivCare believes is owed contractually***. Management is hopeful that a successful resolution (i.e. a full payment) will be forthcoming over the next 30-60 days. In addition, ***the company stated that a large client had recently decided to diversify volume away from ModivCare and that this would materially impact Q1/24 results in NEMT***. In addition, a few MCO clients were not able to secure their state contracts thereby negatively impacting MODV. Finally, a state health department also made a decision to transition to a full broker model favoring an incumbent competitor.

378.    Like the DB Post-EC report, the February 2024 Barrington Report expressly noted Defendants' elusive responses to questions concerning whether the delayed payment concerned "material disagreements" regarding the balance owed, stating in relevant part:

> The company seems to anticipate negative free cash flow in 1H/24 and materially positive free cash generation in 2H/24 as new contract starts and cost savings initiatives start to impact in a meaningful way. That said, ***the company's forecast of $40-60 million in FCF in FY/24 is largely fueled by collecting the $35.9 million receivable it believes is owed by a client in Florida***.

…

***The company's decision not to answer certain questions during its conference call frankly rattled us a bit***. Historically, management has seemed largely forthcoming. ***Questions that were specifically asked but not clearly answered or items which could have given clarity but seemed to be left intentionally murky included 1) expectations for the likely cash flow deficit in Q1 and Q2 – this could have provided an insight into exactly how back-end loaded FCF guidance actually is***; 2) the actual adjusted EBITDA generated at Matrix in 2023 - this is simply a number and would have been an easy question to have answered and; 3) ***whether or not there is a "material disagreement" regarding the $35.9 million that ModivCare believes it is contractually owed*** – an answer such as "Yes, clearly a disagreement, but not one of significant size" would have provided some comfort that this issue will probably not drag out beyond management's 30-60 day forecast for resolution and, in a worst case scenario, could be quickly settled for a figure close to the estimated amount.

### D. On September 12, 2024, ModivCare Issued the Fourth Corrective Disclosure

379.   On September 12, 2024, ModivCare filed a Form 8-K with the SEC disclosing that the Company was still facing collectability and cash flow issues, despite most of the Company's NEMT contracts being capitated shared risk contracts. In the Form 8-K, Defendants disclosed that ModivCare added a note disclosing events subsequent to the issuance of its FY2023 Form 10-K regarding the Company's collectability issues. The note explained that "the Company has not offset the existing and continued accumulation of receivables during the period" and though "collection and mitigation efforts continue, there remains the possibility that the Company will not achieve full resolution in a timely manner or at all if unforeseen circumstances arise."

380.   The Form 8-K further revealed that the Company's "accompanying consolidated financial statements for the year ended December 31, 2023 were prepared assuming the Company will continue as a going" and as of September 12, 2024, due to

uncertainty around the "timing of the collection of outstanding contract receivables[,]" "substantial doubt exists about the Company's ability to meet its obligations as they come due within one year from the date of issuance of the consolidated financial statements."

381. In response to Defendants' corrective disclosure in the September 12, 2024 Form 8-K, ModivCare's common stock price declined $18.43, or approximately 59%, from $31.19 per share on September 11, 2024 to $12.76 per share on September 12, 2024 on heavy trading volume.

382. Analysts were dismayed and expressed significant concern about the Company's ability to collect on its contracts and the lack of visibility regarding the same. For instance, a September 12, 2024 Deutsche Bank report, titled "Cash is king, and without cash things become tricky" (the "September 2024 Deutsche Bank Report") stated:

> MODV filed an 8-K this morning and stated: (1) ***There is now risk that previously recognized revenues could be uncollectable***; (2) If that was to occur the Total Net Leverage Ratio covenant in the New Credit facility could be breached and become immediately due and payable and MODV doesn't have sufficient liquidity to satisfy such obligations. If that occurs, MODV will seek to restructure the existing debt or raise equity or raise debt to meet those obligations.

383. The September 2024 Deutsche Bank report explained that the "issue keeps going back to NEMT[,]" stating in relevant part:

> The issue keeps going back to NEMT. Looking at 2019, pre-COVID, the segment ran at a 3.4% margin on a targeted 10% margin. Because the contracts were per member per month (PMPM) when COVID hit margins spiked to 20% in 2Q:20 as utilization dropped dramatically as 66% of the business was full risk, 10% shared risk and 13% fee for service. ***As of last quarter, this had shifted to 49% shared risk, 20% full risk and 14% fee for service, which in theory protects NEMT margins as utilization creeps up***. In 2022 when 45% [o]f the business was shared risk the margins were 9.6%, but as utilization continued to rebound margins were 7.1% in 2023 and guided to be relatively flat in 2024. ***Our understanding***

*was that these shared risk contacts would protect those margins as utilization continued to rebound post COVID.*

MODV talked about issues collecting from a contact in Florida early this year where they only collected 75% of what they expected to on these shared risk arrangements. We asked three questions on this topic on last quarter's conference call, but *it now looks like the confidence around collecting those receivables has collapsed*.

384. The September 2024 Deutsche Bank report further highlighted that ModivCare's collectability issues contradicted Defendants' prior statements, stating in relevant part:

What to do from here? The quick answer is we don't know. When companies have revenue recognition issues, it[']s very challenging for an outsider to assess probabilities on those collections, *especially as management expressed high level of confidence on collecting those 60 days ago.* Our default scenario is to go to the worst case scenario and find a baseline and if the news is better than expected, allow upside from that baseline.

385. A September 12, 2024 Jefferies report, titled "A/R Collection Issues Persist, Driving Liquidity Concerns and Stock Pressure" (the "September 2024 Jefferies Report") shared similar concerns, stating in relevant part:

*MODV shares are down ~60% today after mgmt announced through an 8-k filing that A/R collections are behind schedule, which could cause the company to trip debt covenants*. Given MODV's inability to collect on ~$60MM of A/R previously expected to drive cash inflows in Q3, the company also filed a shelf registration that would allow it to raise up to $200MM. Given continued A/R and working capital challenges, we maintain our Hold, reduce PT to $14.

386. The September 2024 Jefferies report further commented on ModivCare's lack of visibility into payment collections under a section titled, "Inability to Collect Adequate A/R Leads to Debt Covenant Issues and Liquidity Squeeze[:]"

-175-

As the company has struggled to collect receivables from its payor clients, MODV is now facing the prospects of tripping its credit covenants. ***At the same time, the lack of visibility into the timing of cash collections and ongoing cash burn caused by lengthening A/R cycles is impairing MODV's liquidity position***, forcing mgmt to seek to raise fresh capital. The prospects of technical default (that could cost the company as they seek covenant waivers from lenders) and the need to raise fresh capital to plug the cash hole that the A/R collection issue has caused, which could potentially dilute existing investors, has understandably put meaningful pressure on the stock.

### E. On September 16, 2024, ModivCare Issued the Fifth Corrective Disclosure

387. On September 16, 2024, Defendants filed another Form 8-K with the SEC to "Provide[ a] Financial Update[,]" which revealed that ModivCare had "experienced delays in the timely collection of approximately $60 million of its outstanding $159.3 million in NEMT segment current contract receivables, primarily from MCO customers, as of June 30, 2024[.]" The September 16, 2024 Form 8-K added that "[t]his situation is primarily driven by the impacts of Medicaid redeterminations and the resulting increase in utilization under its shared risk contracts." Defendants also issued "Adjusted Guidance" in the September 16, 2024 Press Release, "revis[ing] its 2024 Adjusted EBITDA guidance range from $185–$195 million to $170–$180 million, primarily due to NEMT segment pricing accommodations made to strategically retain and expand key customer relationships."

388. In response to Defendants' corrective disclosure in the September 12, 2024 Form 8-K, ModivCare's common stock price fell $1.40, or nearly 10%, from a close of $14.12 per share on September 13, 2024 to a close of $12.72 per share on September 16, 2024.

-176-

389.    Analysts continued to be shocked by ModivCare's about-face regarding its visibility into the collectability of the $60 million. For instance, a September 17, 2024 Barrington Research report, titled "ModivCare Cash Collection Struggles Wreck Stock but No Plan to Issue Equity Currently & Will Seek Near-Term Covenant Relief from Lenders; Maintain OUTPERFORM Rating; Price Target Reduced to $19 to $35" recapped the Company's contract delays as "Last week's bombshell" and stated:

> ModivCare announced late last week that it had experienced delays in collecting outstanding receivables from a couple of key payor customers and that, as a result, it would likely be in violation of its debt covenants by the end of the current quarter (September). ***This news was particularly troubling since the company had explicitly stated in prepared remarks on its Q2 conference call in early August that it had visibility into $60 million of near-term cash collections from a couple of its large customers. That commentary contributed materially to our decision to upgrade the shares six weeks ago and probably served as similar comfort to many investors.*** Shares declined approximately 60% last Thursday due to this disappointing news and there was certainly intense speculation last week (due to a $200 million mixed shelf filing) that equity in some form would need to be issued to bridge the gap created by the receivables' shortfall.

## IX.    CLASS ALLEGATIONS

390.    Plaintiff brings this action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a class of all persons or entities that purchased or otherwise acquired ModivCare securities between November 3, 2022 and September 15, 2024, inclusive, seeking to pursue remedies under the Exchange Act. Excluded from the Class are ModivCare and its subsidiaries and affiliates, and their respective officers and directors at all relevant times, and any of their immediate families, legal representatives, heirs, successors, or assigns, and any entity in which any Defendant has or had a controlling interest.

391.    Because ModivCare had approximately 14 million shares of common stock outstanding during the Class Period, which actively traded on the NASDAQ, the members of the Class are so numerous that joinder of all Class members is impracticable. While the exact number of Class members is unknown at this time and can only be ascertained through discovery, Plaintiff believes that there are hundreds or thousands of Class members. Members of the Class may be identified from records maintained by ModivCare or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice customarily used in securities class actions.

392.    Plaintiff's claims are typical of those of the members of the Class, as all Class members have been similarly affected by Defendants' wrongful conduct as alleged herein. Moreover, Plaintiff will fairly and adequately protect the interests of the Class and have retained competent counsel who are experienced in class action and securities litigation.

393.    Common questions of law and fact exist as to all Class members and predominate over any questions solely affecting individual Class members. These common questions include:

- Whether Defendants violated the federal securities laws as alleged herein;

- Whether Defendants' statements to the investing public during the Class Period misrepresented material facts about ModivCare's business and operations;

- Whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

-178-

- Whether Defendants acted knowingly or recklessly in issuing false and misleading public statements during the Class Period; and

- Whether the members of the Class have sustained damages and, if so, the proper measure of damages.

394. A class action is superior to all other available methods for the fair and efficient adjudication of this matter as joinder of all Class members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    PRESUMPTION OF RELIANCE

395. Plaintiff is presumed to have relied on Defendants' misrepresentations and omissions under the fraud-on-the-market doctrine. At all times, the market for ModivCare's securities was an efficient market that promptly digested current information related to the Company from all publicly available sources and reflected such information in the prices of the Company's common stock. Throughout the Class Period:

- ModivCare's securities were actively traded on the NASDAQ;

- The market price of ModivCare securities reacted promptly to the dissemination of public information regarding the Company;

- ModivCare's stock was followed by several financial analysts, including those cited in this Complaint;

- The average weekly trading volume for ModivCare stock during the Class Period was approximately 223,000 shares;

- As a regulated issuer, ModivCare filed with the SEC periodic public reports during the Class Period;

- ModivCare regularly communicated with public investors via established market communication mechanisms; and

- During the Class Period, ModivCare had over 14 million shares in the public float and the Company's market capitalization ranged between approximately $1.56 billion and $181.14 million.

396.    Throughout the Class Period, ModivCare was consistently followed by the market, including securities analysts and the media. The market relies upon ModivCare's financial results and management to accurately present the Company's financial results. During the Class Period, Defendants continued to pump materially false and misleading information into the marketplace regarding ModivCare and material facts concerning the status and capability of ModivCare's NEMT shared risk contracts and NEMT services. This information was promptly reviewed and analyzed by analysts and institutional investors and assimilated into the price of ModivCare's securities.

397.    As a result of the misconduct alleged herein, including Defendants' false and misleading statements and omissions, the market for ModivCare securities was artificially inflated. Under such circumstances, the presumption of reliance available under the "fraud-on-the-market" theory applies. Thus, Class members are presumed to have indirectly relied upon the misrepresentations and omissions for which Defendants are responsible.

398.    Plaintiff and other Class members justifiably relied on the integrity of the market price for the Company's securities and were substantially damaged as a direct and proximate result of their purchases of ModivCare securities at artificially inflated prices and the subsequent decline in the price of that stock when the truth was disclosed.

399.    Plaintiff and the other Class members are also entitled to a presumption of reliance under *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because claims asserted in this Complaint against Defendants are predicated upon omissions of material fact for which there was a duty to disclose.

400.    Had Plaintiff and other members of the Class known of the material adverse information not disclosed by Defendants or otherwise been aware of the truth behind Defendants' material misstatements, they would not have purchased ModivCare securities at artificially inflated prices.

## XI.    NO STATUTORY SAFE HARBOR

401.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements plead in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.

402.    In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

403.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking

-181-

statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of ModivCare who knew that the statement was false when made.

## XII. CLAIMS FOR RELIEF

### COUNT I

### FOR VIOLATION OF SECTION 10(B) OF THE EXCHANGE ACT AND SEC RULE 10B-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

404. Plaintiff realleges each allegation as if fully set forth herein.

405. This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against all Defendants named herein.

406. During the Class Period, Defendants carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of ModivCare securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire ModivCare securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants, and each of them, took the actions set forth herein.

407. During the Class Period, Defendants, by the use of means and instrumentalities of interstate commerce: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted material facts necessary to make the statements made not misleading; and (c) engaged in acts, practices and a course of business which operated as a fraud and deceit upon Plaintiff

-182-

and the Class, all in an effort to maintain artificially high market prices for ModivCare securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Defendants acted individually and in concert in a continuous course of conduct to conceal non-public, adverse material information about the Company's outlook and condition, as reflected in the misrepresentations and omissions set forth above.

408.    During the Class Period, Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of ModivCare's allegedly materially misleading statements, and/or their associations with ModivCare which made them privy to confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

409.    Defendants, who are senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them, or other personnel of ModivCare to members of the investing public, including Plaintiff and the Class.

410.    As a result of the foregoing, the market price of ModivCare securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements and knowing and/or reckless inability to effectuate their purported business plans, Plaintiff and the other members of the Class relied on the statements and business plans described above and/or the integrity of the market price of ModivCare securities during the Class Period in purchasing ModivCare securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

411.    Had Plaintiff and the other Class members of the Class been aware that the market price of ModivCare securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased ModivCare securities at the artificially inflated prices that they did, or at all.

412.    As a result of the wrongful conduct alleged herein, Plaintiff and the other members of the Class have suffered damages in an amount to be established at trial. Plaintiff's and the Class's losses were proximately caused by Defendants' scheme to defraud the investing public by, among other things, failing to fully and accurately disclose to investors adverse material information regarding the Company. Plaintiff and other members of the Class purchased ModivCare securities in reliance on the integrity of the market price of the securities, and Defendants manipulated the price of ModivCare securities through their misconduct as described herein.  Plaintiff's and the Class's losses were a direct and foreseeable consequence of Defendants' concealment of, among other

things, Defendants' concealment of material facts related to ModivCare's business and operations, in violation of federal and state laws.

413.    By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of ModivCare securities during the Class Period.

**COUNT II**

**FOR VIOLATION OF SECTION 20(A) OF THE EXCHANGE ACT AGAINST ALL DEFENDANTS**

414.    Plaintiff realleges each allegation as if fully set forth herein.

415.    This claim is brought under Section 20(a) of the Exchange Act, 15 U.S.C. § 78t, against Defendants.

416.    Defendants are liable as primary violators of Section 10(b) of the Exchange Act and Rule 10b-5 as set forth herein.

417.    Defendants acted as controlling persons of ModivCare within the meaning of Section 20(a) of the Exchange Act. Because of their positions, Defendants had the power and authority to cause ModivCare to engage in the wrongful conduct complained of herein. By reason of such conduct, Defendants are liable pursuant to Section 20(a) of the Exchange Act.

418.    Specifically, Defendants, by reason of their status as senior executive officers and/or directors of ModivCare, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of Section 20(a) of the Exchange Act. Defendants directly or indirectly controlled the

-185-

content of the Company's SEC filings, press releases and interviews with various news sources cited herein related to Plaintiff's and the Class's investments in ModivCare securities within the meaning of Section 20(a) of the Exchange Act. Therefore, Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

419. Defendants controlled and had the authority to control the content of the Company's SEC statements, press releases and other public statements. Because of their close involvement in the everyday activities of the Company, and because of their wide-ranging supervisory authority, Defendants reviewed or had the opportunity to review these documents prior to their issuance or could have prevented their issuance or caused them to be corrected.

420. Defendants knew or recklessly disregarded the fact that ModivCare's representations were materially false and misleading and/or omitted material facts when made. In so doing, Defendants did not act in good faith.

421. By virtue of their high-level positions and their participation in and awareness of ModivCare's operations and public statements, Defendants were able to and did influence and control the Company's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

422. As set forth herein, Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5, thereunder, by their acts and omissions as alleged herein. By virtue

-186-

of their positions as controlling persons, Defendants are further liable pursuant to Section 20(a) of the Exchange Act.

423.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase or acquisition of ModivCare securities.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying the Plaintiff as Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs;

D.    Granting Plaintiff leave to amend this complaint to conform to the evidence; and

E.    Awarding such equitable/injunctive or other relief in Plaintiff's favor as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Plaintiff demands a jury trial of all issues involved, now, or in the future, in this action.

-187-

Dated: January 9, 2026

Respectfully submitted,
LEVI & KORSINSKY, LLP


/s/ Gregory M. Potrepka
Shannon L. Hopkins
Gregory M. Potrepka
Morgan M. Embleton
Tyler C. Winterich
1111 Summer Street, Suite 403
Stamford, CT 06905
Tel: (203) 992-4523
Fax: (212) 363-7171
Email: shopkins@zlk.com
Email: gpotrepka@zlk.com
Email: membleton@zlk.com
Email: twinterich@zlk.com

*Lead Counsel for Lead Plaintiff Christopher Skrypski and the Class*

-188-