IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:25-cv-00306-GPG-KAS,

CHRISTOPHER SKRYPSKI, individually
and on Behalf of All Others Similarly Situated,

      Plaintiff,

v.

L. HEATH SAMPSON, KENNETH
SHEPARD, and BARBARA K.
GUTIERREZ,

      Defendants.

---

**DEFENDANTS' MOTION TO DISMISS
THE AMENDED CLASS ACTION COMPLAINT
FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS (DKT. 54)**

---

# Table of Contents

I. INTRODUCTION ...................................................................................................... 1

II. STATEMENT OF ALLEGED FACTS ...................................................................... 3

III. LEGAL STANDARD ............................................................................................. 6

IV. ARGUMENT ........................................................................................................ 7

    A.   Plaintiff Fails to State a Claim Under Section 10(b) and Rule 10b-5 .................... 7

        1.   The Complaint Fails to Plead an Actionable Misstatement .............................. 7

        2.   The Complaint Fails to Plead a Strong Inference of Scienter ......................... 18

        3.   The Complaint Does Not Adequately Allege Loss Causation ........................ 28

    B.   Plaintiff Fails to State a Claim Under Section 20(a) ............................................ 30

V. CONCLUSION ..................................................................................................... 30

# Table of Authorities

### Cases

*Adams v. Kinder-Morgan Inc.*,
340 F.3d 1083 (10th Cir. 2003) ................................................................. 30

*In re Alphabet, Inc. Securities Litigation*,
1 F.4th 687 (9th Cir. 2021) .................................................................... 15

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016), ...........................................18, 19, 20, 23, 24, 25, 27

*Bouzaglo v. Inspirato Inc.*,
2024 WL 3738813 (D. Colo. July 16, 2024) ............................................. 23

*City of Philadelphia v. Fleming Cos.*,
264 F.3d 1245 (10th Cir. 2001) .............................................................. 25

*Correa v. Liberty Oilfield Servs., Inc.*,
548 F. Supp. 3d 1069 (D. Colo. 2021) ..................................................... 16

*Cupat v. Palantir Techs., Inc.*,
2024 WL 1374903 (D. Colo. Mar. 31, 2024) ............................................. 9

*Cupat v. Palantir Techs., Inc.*,
2025 WL 1141534 (D. Colo. April 4, 2025) ......................................... 25, 26

*Ellis v. Spectranetics Corp.*,
2018 WL 1583837 (D. Colo. Apr. 2, 2018) ............................................... 24

*Grossman v. Novell, Inc.*,
120 F.3d 1112 (10th Cir. 1997) .......................................................... 12, 16

*Hampton v. root9B Techs., Inc.*,
897 F.3d 1291 (10th Cir. 2018) .............................................................. 17

*Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*,
45 F.4th 1236 (10th Cir. 2022) ...................................................... 15, 16, 18

*Janus Cap. Grp., Inc. v. First Derivative Traders*,
564 U.S. 135 (2011) .............................................................................. 7

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
2010 WL 5129524 (D. Colo. Dec. 10, 2010) ............................................. 9

*In re Level 3 Commc'ns, Inc. Sec. Litig.*,
667 F.3d 1331 (10th Cir. 2012) ......................................................... 3, 7, 19

*Lew v. ON Semiconductor Corp.*,
   2025 WL 1918543 (D. Ariz. July 11, 2025) ............................................................... 18

*Lingam v. Dish Network Corp.*,
   2025 WL 872464 (D. Colo. Mar. 20, 2025) ............................................................... 21

*Medina v. Clovis Oncology, Inc.*,
   215 F. Supp. 3d 1094 (D. Colo. 2017) ...................................................................... 18

*Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems
   Holdings, Inc.*,
   79 F.4th 1209 (10th Cir. 2023) .......................................................... 20, 21, 25, 26

*In re Molson Coors Bev. Co. Securities Litig.*,
   2020 WL 13499995 (D. Colo. Dec. 2, 2020) ....................................................... 19, 24

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
   575 U.S. 175 (2015) ............................................................................................ 16, 17

*Sanchez v. Crocs, Inc.*,
   667 F. App'x 710 (10th Cir. 2016) ........................................................................ 23, 24

*SEC v. Goldstone*,
   952 F. Supp. 2d 1060 (D.N.M. 2013) ......................................................................... 17

*SEC v. Rio Tinto PLC*,
   2019 WL 1244933 (S.D.N.Y. Mar. 18, 2019) .............................................................. 8

*Shafer v. Lightning Emotors, Inc.*,
   2024 WL 691458 (D. Colo. Feb. 20, 2024) ............................................................... 13

*Smallen v. W. Union Co.*,
   950 F.3d 1297 (10th Cir. 2020) ...................................................................... 12, 18, 21

*Sorkin, LLC v. Fischer Imaging Corp.*,
   2005 WL 1459735 (D. Colo. June 21, 2005) ............................................................... 7

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007) .................................................................................... 7, 18, 19, 27

*In re Williams Sec. Litig.-WCG Subclass*,
   558 F.3d 1130 (10th Cir. 2009) ................................................................................ 28

*Wolfe v. AspenBio Pharma, Inc.*,
   587 F. App'x 493 (10th Cir. 2014) ....................................................................... 24, 25

*In re Zagg, Inc. Sec. Litig.*,
   797 F.3d 1194 (10th Cir. 2015) .................................................................................. 6

**Statutes**

15 U.S.C. § 78u-4(b)(1) ............................................................................................. 7, 9

15 U.S.C. § 78u-4(b)(2)(A) ............................................................................................. 7

**Rules**

Fed. R. Civ. P. 9(b) ....................................................................................................... 7

## I. INTRODUCTION

Like many companies, COVID-19 had significant and lasting impacts on ModivCare, Inc., a healthcare company that provides a variety of services including non-emergency medical transportation ("NEMT") services. Plaintiff tries to turn unforeseeable, post-COVID market impacts into securities fraud. That effort fails.

To deliver transportation services to patients, ModivCare enters contracts with state Medicaid programs and other medical insurance providers. Those contracts generally have one of three structures: payment per member covered, regardless of utilization ("full-risk contracts"); payment per service rendered, regardless of members covered ("fee-for-service contracts"); or a combination of payment per member and services rendered ("shared-risk contracts"). COVID's at-home mandates drastically decreased the use of ModivCare's NEMT services, and ModivCare received a windfall from payors with full-risk contracts. As a result, some payors sought to restructure full-risk contracts as shared-risk contracts. ModivCare—expecting NEMT utilization and costs to increase as patients returned to in-person healthcare—agreed, telling investors that this structural shift would allow it to share the expected increase in costs with payors.

The restructured contracts worked as intended, with ModivCare shifting increasing costs to payors as permitted by contract. As ModivCare disclosed, however, full amounts due under shared-risk contracts are not collected until charges are "reconciled," a process that can take three to twelve months *after* each contract's period. In 2023 and 2024, as both ModivCare's costs and its receivables increased, ModivCare began to experience tightening liquidity and negative cash flow. ModivCare disclosed these metrics to

investors, drawing funds from its credit facility to address capital needs. As time went on, ModivCare's liquidity and cash flow did not improve, and some payors refused to make timely payments due under shared-risk contracts. While ModivCare expected to collect per its binding contracts, the collection process was taking longer than expected.

ModivCare's stock price declined as the market reacted to tightening liquidity and priced potential refinancing options, and Plaintiff filed this lawsuit. The Complaint alleges Defendants misled investors by representing ModivCare's shared-risk contracts as "win-win," arguing Defendants knew—but failed to disclose—that delays in collecting amounts due under shared-risk contracts meant those amounts were inherently uncollectable. Plaintiff's theory has no basis in law or fact. To survive this motion, the Complaint must meet the heightened pleading requirements of the Private Securities Litigation Reform Act ("PSLRA") and Federal Rule of Civil Procedure 9(b), which demand particular factual allegations indicating what statements were false or misleading and why, and that each named defendant made each statement with scienter or the intent to deceive. Despite filing a 187-page Complaint, Plaintiff has not met this standard.

At the outset, the Complaint fails to allege that a false or misleading statement was even made. The Complaint challenges 58 statements made over a two-year period but lacks specific facts explaining why each statement was false or misleading when made. For example, Plaintiff challenges statements regarding the shared-risk contract structure mitigating risk because ModivCare later encountered collection issues. Plaintiff does not allege accounting issues, never claiming that ModivCare's contracts receivable figures were incorrect nor that they had to be restated. These allegations do not demonstrate any

2

statement was false when made. Instead, they sound in fraud by hindsight and fall short of pleading falsity with the specificity required by the PSLRA.

Plaintiff's inability to allege scienter further destroys his allegations of fraud. The Complaint does not allege that any Defendant had reason to lie to investors. When a plaintiff lacks motive allegations, other scienter allegations must be "correspondingly greater" for a complaint to survive dismissal. *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1347 (10th Cir. 2012). Here, the other scienter allegations are equally weak. Plaintiff relies heavily on allegations from three "confidential witnesses" ("CWs"), but not a single CW alleges that any Defendant knew information that contradicted a public statement when it was made. The only inference to be drawn from the facts alleged is a non-fraudulent one: ModivCare restructured contracts to mitigate risks and told investors the new structure could cause fluctuations in contract payables and receivables due to reconciliation periods. Defendants could not anticipate that payors would delay or refuse to remit contractually due amounts, which ultimately caused liquidity and cash flow issues.

This is a case of unforeseen impacts from market events negatively affecting a company, not fraud. The Complaint should be dismissed in its entirety and with prejudice.

## II. STATEMENT OF ALLEGED FACTS

ModivCare is a healthcare services company that provides non-emergency medical transportation. ¶5.[1] ModivCare matches patients with appropriate and cost-

---

[1] References to ¶__ refer to paragraphs in Plaintiff's Amended Class Action Complaint for Violations of the Securities Law (the "Complaint") (Dkt. 54).

Pursuant to the Uniform Civil Practice Standards 7.1B and Local Rule 7.1, the Parties conferred regarding this motion. Plaintiff anticipates opposing this motion.

effective transport options to improve access to healthcare. ¶56.

ModivCare provides NEMT services to state Medicaid and other health plan "payors" through three different contract structures: fee-for-service, full-risk, and shared-risk. ¶¶61, 65, 66. Under fee-for-service contracts, ModivCare charges payors for each service it provides. ¶72. Under full-risk contracts, ModivCare receives a fixed monthly fee for each of its payors' eligible members (the per member per month or "PMPM" fee) and must provide NEMT services to those members regardless of utilization or cost of care. ¶65. Under shared-risk contracts, ModivCare receives a PMPM fee that is later adjusted through a reconciliation process that accounts for utilization and costs. ¶66. If utilization and costs are low, a refund may be due to the payor, which ModivCare records in contracts payable. *Id.* If utilization and costs are high, additional amounts may be due from the payor, which ModivCare records as contracts receivable. *Id.*

During COVID, ModivCare experienced low utilization and costs. ¶76. Under its full- and shared-risk contracts, ModivCare continued to collect PMPM fees. ¶77. This led to an unusual "financial boon" for ModivCare, *id.*, at the "expense of [its] customers." Ex. 1 at 12. During the class period, this also caused increased contracts payable as ModivCare reconciled payments due back to shared-risk payors and "partially refunded payments [to some full-risk payors] 'in the spirit of good partnership.'" ¶¶91–92.

After COVID, some payors restructured their contracts from full-risk to shared-risk contracts. ¶¶7, 82–84. At the time, ModivCare expected NEMT utilization to increase, increasing costs. ¶¶84–86. The federal government was also set to resume reviewing state Medicaid programs to assess member eligibility. Ex. 1 at 5. This "redetermination"

4

process was expected to result in a 10% to 15% reduction in individuals eligible for Medicaid, primarily impacting individuals who did not utilize ModivCare's services. *Id.* This meant ModivCare's PMPM fees would decrease, while its costs would stay the same (or even increase). ¶¶64–66. ModivCare believed restructuring NEMT contracts to shared-risk structures would guard against these headwinds. ¶¶84–85.

Shared-risk contracts were structured to allow ModivCare and payors to share the costs of providing NEMT services, while protecting margins. ¶¶8–9, 71. The exact terms and time required to reconcile and collect shared costs varied by payor and contract. ¶¶68–70. As ModivCare disclosed, this process was lengthy, often spanning three to twelve months after the contract period. ¶¶142, 190, 220. ModivCare told investors that collecting amounts due from shared-risk payors would not be immediate and could result in cash flow "fluctuations." Ex. 4 at 8 ("The primary fluctuations in our quarterly working capital are driven by the shared risk contracts … with payments and reconciliations occurring over varying time periods."). ModivCare also disclosed its contracts receivable and payable balances quarterly, explaining "[c]ontract receivables … represent underpayments and receivables on certain [shared risk] contracts." *E.g.,* Ex. 11 at 17.

Separately, beginning in 2022, ModivCare introduced initiatives aimed at reducing transportation costs and improving service quality. ¶¶132–133, 212. For example, ModivCare's "multimodal" initiative involved matching members with the most appropriate and cost-efficient form of transportation. ¶133. ModivCare explained it would take time to see these initiatives take root, Ex. 3 at 8 (savings over the "next 12 to 18 months"), though over the class period, these initiatives resulted in reduced costs and improved service,

5

*e.g.*, Ex. 1 at 8 (costs); Ex. 2 at 7 (costs); *see also* Ex. 4 at 5 (service).

During the class period, ModivCare's increasing contracts receivable balance "reflect[ed] that [shared-risk] contracts [were] operating as designed" and ModivCare was sharing increasing costs with payors. ¶84. As noted, however, the reconciliation process took several months and could lead to disputed charges. ¶¶142, 147, 175. So even though ModivCare was contractually entitled to collect the increased amounts due, they could take months to collect. At the same time ModivCare's contracts receivable balance was increasing, its contracts payable balance was decreasing as ModivCare paid the amounts it owed as shared-risk contracts were reconciled after COVID. ¶156.

Beginning in May 2023, ModivCare disclosed that its contracts receivable balance increased more than anticipated due to increased utilization and costs, and underpayments on shared-risk contracts. ¶188. Defendants anticipated that, as the reconciliation process played out, ModivCare would receive the payments owed later in the year. Ex. 1 at 15. As the class period progressed, cash flow continued to be constrained as ModivCare had difficulties collecting contractually owed fees. ¶¶15–16, 138, 252. On September 12, 2024, ModivCare disclosed a "going concern" about its ability to meet its obligations following "delays in collecting receivables under outstanding contracts." ¶¶290–291. This lawsuit was filed thereafter.

### III. LEGAL STANDARD

Congress enacted the PSLRA "[t]o reduce frivolous suits" and "curb abuse in private securities lawsuits." *In re Zagg, Inc. Sec. Litig.*, 797 F.3d 1194, 1201 (10th Cir. 2015). To that end, plaintiffs bringing securities fraud claims face a "heavy burden at the

pleading stage." *Id.* To state a claim under Section 10(b), a plaintiff must satisfy the pleading requirements of both Rule 9(b) *and* the PSLRA. *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318–22 (2007). Rule 9(b) requires that plaintiffs "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The PSLRA further elevates this standard, requiring plaintiffs to "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading," and state "with particularity facts giving rise to a strong inference that the defendant acted with" scienter or the intent to deceive. 15 U.S.C. § 78u-4(b)(1), (2)(A). "Bald assertions and legal conclusions" do not suffice, *Sorkin, LLC v. Fischer Imaging Corp.*, 2005 WL 1459735, at *8 (D. Colo. June 21, 2005), and complaints that fail to satisfy these "exacting pleading requirements" must be dismissed, *Tellabs*, 551 U.S. at 313.

## IV. ARGUMENT

### A.     Plaintiff Fails to State a Claim Under Section 10(b) and Rule 10b-5

A plaintiff alleging securities fraud must plead that each defendant (1) made a material misrepresentation or omission, (2) in connection with the purchase or sale of a security, (3) with scienter, and (4) that the plaintiff relied on the misrepresentation or omission, thereby (5) causing economic loss. *In re Level 3*, 667 F.3d at 1333. Failure to adequately allege any one element warrants dismissal. Here, Plaintiff fails to allege three.

#### 1.     The Complaint Fails to Plead an Actionable Misstatement

The statements[2] challenged in the Complaint fall into three categories: (1) shared-

---

[2] Plaintiff repeatedly alleges multiple Defendants are responsible for a statement because multiple Defendants were on earnings calls. *E.g.*, ¶¶193–194, 198–199. Each Defendant can only be liable for a statement they made. *Janus Cap. Grp., Inc. v. First Derivative*

7

risk contracts, (2) quality of service and multimodal initiatives, and (3) risk disclosures. The Complaint fails to adequately allege falsity for any of these statements.

### a.    Plaintiff's blanket allegations of falsity are insufficient.

Despite challenging 58 statements made over the course of nearly two years, the Complaint fails to allege specific facts indicating *why* each challenged statement was false or misleading. Instead, the Complaint recites one of three sets of conclusory allegations that supposedly demonstrate falsity for each challenged statement. For example, Plaintiff challenges several statements made regarding ModivCare's service and cost initiatives, including statements that ModivCare was "confident that the initiatives implemented over the past few quarters will drive efficiencies" and it was working on "getting the right modality to our members at the right cost, and that's working." ¶¶192–195. Plaintiff alleges these statements, and *every other* challenged statement regarding cost and service initiatives, were false and misleading based on the same alleged "evidence," including that (a) CW1 stated "service quality started to decline around April 2022," (b) "during the last year of CW1's tenure, ModivCare began losing NEMT customers due to service complaints," (c) CW3 stated "customer advocate staffing cuts greatly diminished ModivCare's ability to address service issues," (d) CW3 stated "missed

---

*Traders*, 564 U.S. 135, 143 (2011). Allegations that a Defendant can be responsible for a statement they did not make just because they were present on a call "do[] not satisfy" *Janus*. *SEC v. Rio Tinto PLC*, 2019 WL 1244933, at *13 (S.D.N.Y. Mar. 18, 2019).

Plaintiff challenges only one statement made by Shepard, and only one statement made by Gutierrez (six including filings "signed by" Gutierrez). Not only are these statements not adequately alleged to be false, Plaintiff fails to allege Shepard and Gutierrez acted with scienter with respect to each statement made. *See infra* at Sections A, B. Shepard and Gutierrez should be dismissed entirely and with prejudice.

appointments and no-shows were significant service issues," and (e) CW1 concluded the "multi-modal initiative 'fared very poorly.'" *E.g.*, ¶¶196, 213, 218, 276, 289. These generic "why false" allegations do not connect to, or demonstrate falsity for, each service- and initiative-related statement. Plaintiff adopts this same approach for the challenged statements concerning ModivCare's shared-risk contracts, *e.g.*, ¶¶167, 175, 182, 203, 210, 223, 234, 242, 246, 251, 283, 288, and risk disclosures, *e.g.*, ¶¶174, 181, 185, 226, 245, 282. To survive this motion, the PSLRA demands more than these blanket allegations of falsity. *See* 15 U.S.C. § 78u-4(b)(1); *In re Level 3 Commc'ns, Inc. Sec. Litig.*, 2010 WL 5129524, at *7 (D. Colo. Dec. 10, 2010), *aff'd*, 667 F.3d 1331 (10th Cir. 2012) (criticizing "length and complexity" of complaint given its "highly repetitive quality"); *Cupat v. Palantir Techs., Inc.*, 2024 WL 1374903, at *1 (D. Colo. Mar. 31, 2024) (rejecting 212-page complaint for its repetition, noting "'[j]udges are not like pigs, hunting for truffles buried in' the parties' pleadings").

### b.    Plaintiff lacks particularized facts indicating any statement was false *when made*.

**Shared-Risk Contracts.** Plaintiff challenges statements Defendants made about the structure of ModivCare's shared-risk contracts and their ability to offset increased transportation costs, including statements like "we've been able to contractually share these costs with many of our customers," ¶162, "we have been … renegotiating contracts to ensure that they are a win-win and in essence, protecting the downside in the event that there's some volatility in costs or utilization," ¶165, and "the contracts are working as designed," ¶284. Plaintiff claims these statements were false because the shared-risk contracts were not "win-win," ModivCare "was not passing increased costs through" to

9

payors, and ModivCare was not "able to mitigate fluctuations in membership and costs and protect against downside risk and volatility." *E.g.*, ¶¶166, 287. But the "facts" alleged do not demonstrate these statements were false or misleading when made.

To begin, the Complaint lacks allegations suggesting the shared-risk contracts were *not* structured to be win-win or ModivCare was *not* passing costs to payors. While Plaintiff points to CW allegations, these allegations center on disputes between ModivCare and payors regarding the reconciliation process. *E.g.*, ¶¶142–154. Just because ModivCare and payors had disputes does not mean the contracts themselves were not structured to benefit both parties, that ModivCare was not properly allocating costs, or even that ModivCare would not ultimately collect the amounts owed. For example, CW2 claims they participated in calls with Shepard "between March and May of 2023 where payor disputes had escalated."[3] ¶152. CW2 does not allege the shared-risk contracts did not allow ModivCare to shift costs to payors or even that Shepard was told payors would not pay amounts contractually owed. CW3's allegations are similarly lacking. CW3 alleges UnitedHealthcare ("UHC") demanded repayment or repricing under a shared-risk contract and, when ModivCare refused, it lost the contract. ¶149. That UHC sought to renegotiate says nothing about how shared-risk contracts were structured or whether they worked as intended. ModivCare's increasing contracts receivable balances, which it disclosed quarterly, demonstrated the contracts were "working as designed," ¶284, with ModivCare allocating expenses while it engaged in the reconciliation process,

---

[3] The Complaint does not allege that CW2, a VP of Transportation for some unspecified region, would have insight into ModivCare's collection efforts. Indeed, CW2's description of their purported "daily responsibilities" focuses almost exclusively on operations. ¶52.

¶142. Even if the timing of reconciliation and collection subsequently put pressure on ModivCare's liquidity, that does *not* mean the contracts were not "working as designed" and allowing ModivCare to share transportation expenses with payors. Plaintiff offers no facts to support his assertion otherwise.

Moreover, when viewed in context, it is clear the challenged statements were not false or misleading when made. For example, Plaintiff claims that, because ModivCare was delayed in collecting some amounts owed under the shared-risk contracts, Defendants falsely portrayed the contracts as leading to stable cash flow. *See, e.g.*, ¶¶219, 220, 221, 231, 239, 249. This twists the challenged statements. On the August 2023 earnings call, Sampson described fluctuations between contract payables and receivables as "normal" *when compared to the unusual COVID swings*, making clear contract payables and receivables would still "bump around." ¶220. Similarly, when Sampson referred to the shared-risk contracts as providing an "additional layer of predictability to our cash flow," he was referring to how a "few large state clients" now had "*established clear timelines for reconciliation*, adding [an] additional layer of predictability to our cash flow." ¶219 (emphasis added); *see also* ¶220 ("[I]t really is kind of a 3- to 6-month time frame. So *this* predictability and normalization coming out of COVID allows us to have a more predictable cash flow and then a more normalized working capital.") (emphasis added); ¶¶221, 231. That payors later did not adhere to these timelines does not mean any challenged statement regarding the shared-risk structure and cash flow was false when made. In any event, Defendants disclosed that ModivCare's contracts

11

receivable balance was increasing, making clear ModivCare was not immediately collecting amounts owed. *E.g.*, Ex. 9 at 20; Ex. 10 at 15; Ex. 11 at 17; Ex. 12 at 16.

The Complaint's remaining allegations of falsity are entirely conclusory. Plaintiff claims Defendants misrepresented that the shared-risk contracts would protect margins. *E.g.*, ¶¶205–207, 219, 228, 237, 240, 284. But Plaintiff alleges ModivCare did not recognize the amounts it recorded as contract receivables until the true-up process was settled, ¶154, so it is not clear how Defendants would have known their statements about protecting or more predictable margins were false when made, especially given the lengthy reconciliation timelines. Plaintiff also claims Defendants portrayed the shared-risk contracts as protecting against redetermination by basing payment on trip volumes rather than membership, ¶197, but the Complaint lacks allegations supporting this conclusion.

At bottom, Plaintiff's core theory of falsity—that Defendants' statements about the shared-risk contracts *must* be false simply because ModivCare was later delayed in collecting the amounts it was owed—sounds only in "fraud by hindsight." *Smallen v. W. Union Co.*, 950 F.3d 1297, 1309 (10th Cir. 2020) (quoting *Grossman v. Novell, Inc.*, 120 F.3d 1112, 1124 (10th Cir. 1997)) ("Plaintiff may not rely on a subsequent event triggering a decrease in stock price 'to say that the later, sobering revelations make the earlier, cheerier statement a falsehood.'"). These allegations should be dismissed.

**Service and Multimodal Initiatives.** Plaintiff challenges statements like "[o]ur multimodal partnership model is expected to drive lower transportation cost per trip throughout the year," ¶193, "those initiatives are taking hold," ¶194, and "[w]e're meeting or exceeding all our customers' quality and service requirements as seen in our key

12

performance indicators," ¶217. Plaintiff alleges that these statements were false because ModivCare did not provide high-quality or cost-effective care. *E.g.*, ¶¶196, 213. This theory is unavailing for at least three reasons.

First, this theory of falsity has a significant timing issue. Many of the alleged "facts" supporting this theory are either from 2022 or are undated. ¶¶100–18, 122–27, 130–32, 134–35. The first alleged misstatement concerning the quality of ModivCare's services is from May 2023 and makes clear that Sampson was discussing initiatives that had been "implemented over the past few quarters." ¶192. Many of the challenged statements concerned whether those initiatives were "taking hold." ¶¶194, 211. CW anecdotes about historical service issues cannot render later statements about whether recently implemented initiatives were "taking hold" false when made.

Second, the CW allegations do not demonstrate falsity. Many CW allegations are vague "service" complaints from unidentified payors and disagreement with strategic decisions made by the President of Mobility—who is not a defendant. *E.g.*, ¶¶100–18, 123, 126–27, 130–32, 134–35. "CWs' statements must support a finding that the statements at issue are false or misleading, not merely that the company could have made better choices to meet the challenges it was facing." *Shafer v. Lightning Emotors, Inc.*, 2024 WL 691458, at \*9 (D. Colo. Feb. 20, 2024), *report and recommendation adopted*, 2024 WL 1509166 (D. Colo. Mar. 26, 2024). Nor do the few allegations that concern specific payors show any statement was false when made. For example, CW3 claims ModivCare "lost clients during CW3's tenure" and "after CW3's departure," ¶124—but this does not contradict a challenged statement, nor demonstrate that any payor left

13

due to service issues plaguing ModivCare *during* the class period. CW3 claims ModivCare lost most of its NEMT business in New York in 2022—before the class period—implying it was due to unspecified service issues, *id.*, while CW2 alleges the lost business was due to New York transitioning members to its state Medicaid program, ¶125. CW3 also claims that Virginia would not consider ModivCare for RFPs during 2022 and 2023 because of "service" issues, ¶124—but those issues necessarily had to predate that timeframe, so this does not contradict Sampson's statements during the class period.

Third, Plaintiff's theory regarding service and cost statements falls apart when considered in context. ModivCare disclosed key performance indicators and how its initiatives improved service and reduced costs throughout the class period. For instance, during the FY2022 earnings call, ModivCare disclosed that its "on time performance was at its highest level in two years," it "exceeded service level expectations in our contact centers[,] and reduce[d] missed trips by about a third." Ex. 5 at 5; *see also* Ex. 1 at 6 (decreased "missed trips"), 8 ("[T]ransportation costs per trip decreased 1% sequentially, due to early successes in our multimodal … model"); Ex. 2 at 7 (transportation costs per trip "decreased 5% sequentially …. driven [in part] by our strategic initiatives … through our multimodal delivery"). Despite alleging payors were not happy and ModivCare's costs did not improve, Plaintiff does not challenge these statements as false.

**Risk Disclosure Statements.** Plaintiff alleges that risk disclosure statements made in ModivCare's annual and quarterly filings were false when made because the warned-of risks had already materialized. ¶¶169–173, 177–180, 184, 225, 244, 278–281. The risk disclosures at issue cautioned investors about how payment models, timing,

collections, and increased utilization could affect ModivCare's financial performance. *E.g.*, Ex. 7 at 23–27, 30–32; Ex. 8 at 26–30, 32–36. For risk disclosures to be false, the warned-of risks must have already occurred or been "virtually certain" to occur. *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1255 (10th Cir. 2022). Plaintiff does not plead any specific facts indicating that, when these risk disclosures were made, the warned-of risks had materialized or were certain to occur.

The facts alleged here are not like those alleged in cases where risk factors have been found to be misleading. For example, in *In re Alphabet, Inc. Securities Litigation*, the Ninth Circuit concluded that Google's risk factor warning that cybersecurity concerns *could* hurt the company was misleading when made because Google had *already* suffered (but not disclosed) a massive data breach that negatively impacted its business. 1 F.4th 687, 703 (9th Cir. 2021). Here, Plaintiff relies on CW allegations regarding disputes between payors and ModivCare over amounts due under shared-risk contracts. ¶¶153–154. These allegations fail to show that any material, warned-of "risk" regarding timing or collectability had materialized. To the contrary, these allegations show ModivCare was working to collect the receivables owed by contract.[4] *See Pluralsight*, 45 F.4th at 1255–56 (distinguishing *Alphabet*; holding risk disclosures regarding a failure to

---

[4] As alleged, the timeline for reconciliation was "protracted" and took "a very long time." ¶154. The Complaint is devoid of any allegations indicating that, before May 4, 2023, when Defendants first disclosed that ModivCare's contracts receivable balance had increased more than anticipated (representing some underpayments), ¶188, Defendants understood ModivCare would not collect on the timelines defined by the various shared-risk contracts. Even after May 4, 2023, the Complaint lacks any allegations that would support that it was *virtually certain* that ModivCare would not collect the owed amounts.

hire sales personnel were not false "even if Pluralsight had already fallen behind its sales ramp capacity plan" because "that problem *could still be remedied*" (emphasis added)).

In assessing falsity, the challenged risk disclosures must also be considered in light of the circumstances in which they were made. *See Grossman*, 120 F.3d at 1120 (statements "'must be analyzed in context' when determining whether or not they are materially misleading"). Here, the challenged risk factors were accompanied by disclosures that ModivCare's utilization was increasing (which increased costs), ¶¶200, 214, 237, 258, 261, contracts payable were decreasing (meaning cash was used to pay amounts due), ¶¶188, 200, 252, 259, and contracts receivable were increasing (meaning there was no new cash coming in), ¶¶188, 200, 252, 259, 290, 295. *See also, e.g.*, Ex. 9 at 20; Ex. 10 at 15; Ex. 11 at 17; Ex. 12 at 16. Considered in context, a reasonable investor would not have been misled regarding ModivCare's cash position when the challenged risk disclosures were made.

### c.      The challenged statements of opinion are not actionable.

Section 10(b) prohibits "untrue statement[s] of fact," which "express[] certainty about a thing," rather than opinions, which do not. *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015). An opinion is actionable only if it was not sincerely believed when made or implies untrue facts while omitting qualifying language. *Cf. Correa v. Liberty Oilfield Servs., Inc.*, 548 F. Supp. 3d 1069, 1082–83 (D. Colo. 2021). These are narrow pathways for liability, and Plaintiff does not satisfy them.

Plaintiff challenges several statements made by Sampson that are quintessential opinions, like Sampson being "pleased with [ModivCare's] recovery of the costs through

contractual pass-through," ¶163, "feel[ing] really good about [ModivCare's] future," ¶207, and ModivCare being "in a great space to grow and maintain our margins," ¶228. Plaintiff does not allege facts indicating that Sampson did not sincerely hold these opinions, nor that the opinions had no reasonable basis. Instead, Plaintiff attempts to treat later developments as proof that earlier judgments must have been fraudulent. That is not a well-pled theory of subjective disbelief. *See Hampton v. root9B Techs., Inc.*, 897 F.3d 1291, 1299 (10th Cir. 2018) (opinions are not actionable unless they "inaccurately represent 'the speakers' beliefs concerning *then-present* factual conditions'") (emphasis added); *SEC v. Goldstone*, 952 F. Supp. 2d 1060, 1231 (D.N.M. 2013) ("[A] statement's falsity cannot be established by events occurring after the statement was made.").

Moreover, it "is no small task" to allege that a defendant omitted a material fact that rendered the opinion misleading. *Omnicare*, 575 U.S. at 194. Not once does the Complaint allege that, at the time any challenged opinion was disclosed, Defendants knew, but failed to disclose, a fact that undercut the opinion. While the Complaint alleges that ModivCare was, at some point in time, engaged with discussions with customers regarding payments due under certain contracts, that does not render statements about being "pleased" with the recovery of costs and feeling "good" about the future false or misleading. "[C]ompeting facts" do not render a statement of opinion false. *Id.* at 190. "Reasonable investors understand that opinions sometimes rest on a weighing of competing facts; indeed, the presence of such facts is one reason why an issuer may frame a statement as an opinion, thus conveying uncertainty." *Id.* at 189–90. The statements quoted in ¶¶163, 194, 201, 207, 228, 232, 248, 270, and 274 are inactionable

opinions and should be dismissed.

### d.     The challenged statements of optimism are not actionable.

Plaintiff challenges statements that are "mere puffery" or "the kind of rosy affirmations" that are inactionable because "no reasonable investor could find them important." *Pluralsight*, 45 F.4th at 1249. For example, Plaintiff challenges statements that contracts were "renegotiated to ensure that it's a win-win," ¶198, that ModivCare was "in a great space to grow," ¶228, and that ModivCare "feel[s] really good about our initiatives," ¶232. These "loosely optimistic" statements that "lack[] in specificity" are immaterial and inactionable. *Pluralsight,* 45 F.4th at 1249; *see also Medina v. Clovis Oncology, Inc.*, 215 F. Supp. 3d 1094, 1122 (D. Colo. 2017) (statements using language like "compelling" or "impressive" are non-actionable puffery); *Lew v. ON Semiconductor Corp.*, 2025 WL 1918543, at *12 (D. Ariz. July 11, 2025) ("On its face, what constitutes a 'win-win' is subjective and so broad and ambiguous that it is incapable of objective verification."). The Court should dismiss the statements in ¶¶163–65, 192–94, 198–99, 205, 207–08, 211, 228, 232, 238, 240, 248, 270, 274 and 284–86 as inactionable puffery.

### 2.     The Complaint Fails to Plead a Strong Inference of Scienter

Securities fraud plaintiffs have a "heightened duty" to plead scienter. *Anderson v. Spirit Aerosystems Holdings, Inc.*, 827 F.3d 1229, 1237 (10th Cir. 2016), *as amended* (July 6, 2016). To adequately allege scienter, the Complaint must allege particular facts that show each defendant made each false or misleading statement intentionally or with recklessness "akin to conscious disregard." *Smallen*, 950 F.3d at 1305. "[I]n determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take

into account plausible opposing inferences," including inferences unfavorable to the plaintiff. *Tellabs*, 551 U.S. at 323. The inference of scienter must be more than "'reasonable' or 'permissible,'" it must be "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Anderson*, 827 F.3d at 1237 (cleaned up). Here, the Complaint fails to plausibly allege any inference of scienter, much less a cogent or compelling inference that outweighs non-fraudulent explanations.

### a.    Plaintiff does not allege any motive for the alleged fraud.

Plaintiff does not allege *any* Defendant had *any* motive or reason to deceive investors. The Complaint contains no allegations of stock sales, performance-based compensation, or any other allegation indicating Defendants "benefitted from the alleged fraud in some concrete and personal way." *In re Molson Coors Bev. Co. Securities Litig.*, 2020 WL 13499995, at *7 (D. Colo. Dec. 2, 2020) (quotation omitted). The "absence of a motive cuts strongly against an inference of scienter." *Id.*; *see also Anderson*, 827 F.3d at 1238 ("[a]bsence of a particularized motive" is a "factor mitigating against" scienter).

Where a complaint lacks allegations of motive, the strength of its other scienter allegations "must be correspondingly greater" to survive dismissal. *In re Level 3*, 667 F.3d at 1347 (quotation omitted). Here, Plaintiff attempts to allege scienter through a variety of allegations. *See* ¶¶313–348. But those allegations, whether viewed independently or holistically, do not give rise to a cogent or compelling inference that Defendants intended to deceive investors. *See, e.g.*, *Anderson*, 827 F.3d at 1251 (concluding plaintiffs "do not create a cogent, compelling inference of scienter" despite allegations of motive, corroborating witnesses, core operations, accounting violations, and a large loss).

19

### b.     The CW allegations do not support an inference of scienter.

Plaintiff attempts to allege scienter through allegations from three CWs. For CW allegations to support a strong inference of scienter, they must allege with particularity "reliable personal knowledge of the defendants' mental state" when the challenged statements were made. *See Anderson*, 827 F.3d at 1244 (quotation omitted). This requires specific allegations that each Defendant knew, was informed of, or actually accessed to information that directly contradicted his or her challenged statements when those statements were made. *See id.* at 1240. In *Anderson*, the Tenth Circuit rejected CW allegations that primarily consisted of "[g]eneral accounts of [alleged] mismanagement." *Id.* That result is warranted here.

**Awareness of Mental States.** The CW allegations cannot support an inference of scienter because the CWs were "removed from the defendants" in the reporting structure and, therefore, cannot "provide evidence bearing on the executives' mental states." *Anderson*, 827 F.3d at 1244; *Meitav Dash Provident Funds & Pension Ltd. v. Spirit AeroSystems Holdings, Inc.*, 79 F.4th 1209, 1220 (10th Cir. 2023) (criticizing allegations from CW who was three levels removed from defendant). While the Complaint offers no detail as to CW1's title or reporting structure (which itself is insufficient), ¶47, it alleges CW2 and CW3 were separated from Defendants by several reporting layers.[5] ¶¶52–53.

No CW alleges a close working relationship with any Defendant or an accounting

---

[5] The lack of detail as to CW1's and CW2's employment positions and dates of employment undercuts the reliability of their allegations. The Court should not credit CW3's allegations given that Plaintiff's response to CW3's Motion to Seal, or in the Alternative, to Strike Confidential Information (Dkt. 57), suggests that CW3 did not approve of the allegations attributed to them in the Complaint. *See* Dkt. 58 at 3–4.

20

or finance position that would provide insight into expected cash flow, liquidity or public disclosures. Nor do the CWs allege specific interactions that indicate any Defendant knew or recklessly disregarded information that contradicted public statements. Indeed, the CW allegations here are just like those that this Court rejected in *Lingam v. Dish Network Corp.*, 2025 WL 872464, *5 (D. Colo. Mar. 20, 2025), *aff'd.*, ----F.4th----, 2026 WL 438881 (10th Cir. 2026). In *Lingam*, this Court reasoned generic allegations that CWs "sat in on the meetings discussing integration issues and network construction" could not support a conclusion that the defendants had already pushed back a project timeline due to those issues. *Id.*; *see also Smallen*, 950 F.3d at 1308 n.6 (finding "little, if any weight" in CW allegations that failed to allege defendants "knew" about compliance failure).

The majority of CW1's allegations are limited to descriptions of their own work preparing reports, vague and undated descriptions of meetings on "NEMT initiatives and metrics" with Shepard, or "briefings" to Sampson and Shepard on "strategy, modes of transportation, KPI reviews, financials, services levels, and implementations." *See* ¶¶315–318, 322–328. CW1 also claims to have provided Sampson "with updates in response to his periodic requests about specific contracts," ¶316, and alleges they attended a "meeting" where Sampson "asked questions about why ModivCare was losing business," ¶328. Given the lack of detail as to *when* these meetings occurred or what information in the reports, meetings, or briefings specifically contradicted Sampson's or Shepard's alleged misstatements, these allegations add nothing to the scienter calculus. *See Meitav Dash*, 79 F.4th at 1216–17 ("[I]t's not enough to allege briefings to a speaker on the underlying data or the speaker's access to internal reports.").

21

CW2's allegations fare no better. CW2 alleges "encounter data rejected by payors was frequently discussed during Monthly Leadership Meetings," but does not allege that *any* Defendant attended these meetings. *See, e.g.*, ¶¶ 52, 115, 154, 318, 330. CW2 also claims they participated in "calls with Shepard between March and May of 2023 where payor disputes" were at issue. ¶¶152, 329. But even if Shepard participated in these calls, that does not show he intentionally concealed anything from investors—CW2 does not even allege this payor said it would not pay, or that it did not ultimately pay.

CW3[6] claims to have attended meetings with "ModivCare's leadership, including Sampson" between November 2022 and September 2023, where CW3 purportedly "warned leadership that ModivCare's contracts were at risk because they were failing to keep up with their competitors" and presented on alleged "long-standing weaknesses in technology, poor service delivery, and a disjointed operational model" in May 2023. ¶¶319–20. CW3's allegations are consistent with Sampson's public statements about ModivCare's quality of service and initiatives over this same period as ModivCare made clear that it was working to implement new initiatives aimed at member satisfaction and cost reduction. *E.g.*, ¶192. CW3 does not allege to have knowledge regarding shared-risk contracts and otherwise fails to allege direct interactions with any Defendant.

**Attendance at Meetings.** CW1 alleges that Shepard was a "standing member" at

---

[6] CW3 claims that Sampson and others directed her to include in "RFPs" "capabilities ... that did not exist, including technology platforms the company had long promised but never delivered." ¶321. CW3 left Modivcare in September 2023, however, and so they cannot have any knowledge of whether Modivcare ultimately developed these alleged capabilities highlighted in the RFPs. Either way, even if this were true, it does not demonstrate that any challenged statement was knowingly false when made.

"regular meetings" where "the NEMT initiatives and metrics were discussed," ¶316, that Shepard "received briefings on contract implementations and de-implementations" and "bi-weekly oral reports on all projects," ¶¶324–26, and that Sampson attended one meeting at some unknown date "regarding contract de-implementations," ¶328. CW3 also claims that Sampson attended "meetings with ModivCare's leadership" and a May 2023 meeting about ModivCare's and competitors' capabilities. ¶¶319–20. These "generalized descriptions of internal meetings," even when attributed to CWs, "do not contribute to a cogent, compelling inference of scienter." *Anderson*, 827 F.3d at 1239; *see also Bouzaglo v. Inspirato Inc.*, 2024 WL 3738813, at *6 (D. Colo. July 16, 2024) (mere participation in "meetings regarding financial issues" did not "meaningfully contribute evidence" of knowledge of accounting errors).

**Access to Reports.** The CW allegations also allude to the preparation of various "reports" or "briefings." But these allegations similarly fail to imply that any information in these reports contradicted any challenged statement. *See, e.g.*, ¶¶322–23. For example, CW1 alleges that they "prepared regular reports related to ModivCare's implementations" that were allegedly "'well distributed' to ModivCare's upper management." ¶322. But CW1 does not allege that anything in these reports contradicted a challenged statement, much less that a Defendant had access to any report that contradicted a challenged statement when that statement was made. "[N]egative characterizations of reports relied on by insiders, without specific reference to the contents of those reports, are insufficient to meet the heightened pleading requirements" of the PSLRA. *Anderson*, 827 F.3d at 1241 (quotation omitted); *see also Sanchez v. Crocs, Inc.*, 667 F. App'x 710, 721 (10th Cir.

2016) (plaintiffs failed to "specifically identify the reports and statements" containing contradictory information).

**Awareness of Complaints.** The CWs allege that Sampson and Shepard were aware of payor complaints. *See, e.g.*, ¶318 ("service issues were 100% on Shepard's and Sampson's radars"), ¶321 ("Sampson and leadership were aware of ModivCare's technological shortcomings"). Plaintiff alleges these allegations give rise to an inference of scienter. ¶313. But these conclusory, speculative CW allegations also lack particularized facts indicating any Defendant had contradictory knowledge at the time any challenged statement was made. *See Wolfe v. AspenBio Pharma, Inc.*, 587 F. App'x 493, 498 (10th Cir. 2014) (remark to executive that product "just wasn't working" was "so vague and global as to be unhelpful as a benchmark for scienter"); *Ellis v. Spectranetics Corp.*, 2018 WL 1583837, at *11 (D. Colo. Apr. 2, 2018) (no fraudulent intent based on allegations defendants were aware of competing product's negative impact on business).

### c.    The "core operations" theory does not support scienter.

Plaintiff alleges scienter can be inferred because "NEMT was ModivCare's 'core' operation." ¶349. The Tenth Circuit has "declin[ed] to accept a 'core operations' inference in order to plead scienter, absent particularized facts showing what executives actually knew." *In re Molson Coors*, 2020 WL 13499995, at *8–9; *see also Anderson*, 827 F.3d at 1245 (10th Cir. 2016) ("We cannot infer scienter based only on a defendant's position in a company or involvement with a particular project."). Here, there are no particularized allegations showing knowledge or reckless disregard of information that contradicted Defendants' statements. Plaintiff relies on the theory that, because issues

24

arose "concern[ing] the services and contract structure that made up the vast majority of the Company's NEMT revenue," Defendants *must have* known information that contradicted their statements to investors. ¶351. The Tenth Circuit repeatedly rejects this argument, *see Meitav Dash*, 79 F.4th at 1216–17 (collecting cases), and it should be rejected here. *See, e.g.*, *City of Philadelphia v. Fleming Cos.*, 264 F.3d 1245, 1263–64 (10th Cir. 2001) (management positions and access to information do not show scienter).

### d. The other allegations of scienter in the Complaint fail.

**Contract Negotiations.** The Complaint alleges that Sampson's involvement in contract negotiations and his statements about ModivCare's relationships with payors support an inference of scienter. *See* ¶¶331–37. But it is well established that courts "cannot infer scienter based only on a defendant's … involvement with a particular project." *Anderson*, 827 F.3d at 1245. General statements highlighting Sampson's involvement in and commitment to ModivCare's business do not establish fraudulent intent or a reckless disregard of the truth. *See Cupat v. Palantir Techs., Inc.*, 2025 WL 1141534, at *9 (D. Colo. April 4, 2025) (defendants' emphasis on "strong visibility" into revenue growth "[did] not equate to total visibility" and did not support scienter). Indeed, Sampson's statements do not imply he knew payors were dissatisfied or that they would refuse to pay for amounts owed under shared-risk contracts. In fact, many of the statements Plaintiff focuses on were made in 2022, prior to the start of the purported class period, *see* ¶331 (June 2022 Investor Day), ¶332 (August 2022 earnings call), ¶333 (September 2022 conference), and shed no light on Sampson's state of mind during the class period. *See AspenBio Pharma, Inc.*, 587 F. App'x at 498 (statement made before

25

class period could not establish scienter).

**Data Analytics.** The Complaint alleges that Defendants' statements regarding making "data-informed decisions" supports an inference of scienter because Defendants must have known service levels were declining, payors were dissatisfied, and payors were refusing or delaying payments due under shared-risk contracts. ¶343. To allege scienter, a complaint *must* include "particularized allegations that, if proven, would show a speaker's knowledge or reckless disregard of contradictory information." *Meitav Dash*, 79 F.4th at 1216; *see also Cupat*, 2025 WL 1141534 at *9 ("Simply because Defendants could have accessed data that contradicted their statements (assuming that data even existed) does not mean Defendants knew what that data reflected or acted with reckless disregard to the falsity of any statements …."). Here, general statements that ModivCare "utiliz[ed] data analytics," ¶342,[7] "data people kn[ew]" the allocation of risk and the nature of the patient population for full-risk contracts, ¶340, and ModivCare "shar[ed] data" with its customers, ¶341, do not suggest that Defendants had access to any information that contradicted any challenged statement.

**Analyst Questions.** Plaintiff also alleges scienter should be inferred because Sampson provided "evasive" answers in response to analyst questions. ¶344. Plaintiff's

---

[7] Plaintiff's only allegation of scienter with respect to Gutierrez is that she said ModivCare used data analytics to drive decision-making. ¶342. Not only does this statement fail to show access to information that contradicted any challenged statement, Plaintiff takes the statement itself out of context. When Gutierrez made the statement at issue, she was explaining that one of the areas she wanted to focus on as ModivCare's new CFO was using data analytics to help ModivCare make data-driven decisions. Ex. 6 at 11–12. This statement does not, and cannot, support *any* inference that Gutierrez intentionally misled investors when stating, months later on February 23, 2024, that shared-risk contracts were structured to protect against the effects of redetermination. ¶269.

characterization of Sampson's responses as "evasive" is not supported by the facts alleged. For example, one analyst asked: "Can I ask sort of why you didn't collect it in the time period that you thought you would? Is there any issue on what they think they should pay versus what you guys have recognized?" ¶344. Sampson responded, "Yes," then provided additional explanation that ModivCare expected to collect within "the next couple of months" because "it's contractually owed." *Id.* This answer was neither "evasive" nor a "non-answer." ¶¶344–345. "To establish scienter, the plaintiffs must establish that a scienter inference is more cogent and compelling than an inference that the defendants had not believe[d] they had a continuing duty to disclose information." *Anderson*, 827 F.3d at 1246–47 (quotations omitted). Here, the inference that Sampson was seeking to preserve a customer relationship while trying to resolve a dispute is far more cogent and compelling than an inference that Sampson knew the customer would not pay contractually due amounts and was trying to deceive investors about the same.

### e.    The non-fraudulent inference is far more compelling.

"A complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 325. Plaintiff alleges Defendants, without any motive, misled investors regarding the structure of ModivCare's shared-risk contracts and the quality of its services, despite knowing customers would refuse to pay amounts due under contract and terminate contracts due to service issues, resulting in liquidity issues. This theory of fraud lacks logic and common sense. The non-fraudulent inference to be drawn from the facts alleged is far more cogent and compelling.

During COVID, the use of ModivCare's NEMT services declined while the payments it received remained consistent, initially resulting in windfall profits. ¶¶6, 78, 80. As a result, some ModivCare contracts were restructured to more equitably share market risks. ¶¶82, 85–86. This shared-risk contract structure allowed ModivCare to share costs from the expected increase in NEMT utilization post-COVID and prevented windfalls by setting "risk corridors." ¶¶69, 87–88. ModivCare disclosed that the shared-risk contracts were designed to provide more stable margins over time but involved long reconciliation processes that could result in quarter-to-quarter swings in contracts payable and receivable balances. ¶¶68, 84. ModivCare's costs did increase post-COVID and the shared-risk contract structure worked as intended, with ModivCare charging customers for increased costs. The long reconciliation process, however, resulted in large contract receivables, ¶¶155–56, with some customers ultimately challenging or refusing to pay amounts due under contract, ¶¶15, 138. This ultimately resulted in liquidity issues for ModivCare. ¶16. These facts do not support an inference of fraud, only unfortunate impacts associated with evolving and unanticipated market conditions.

### 3.    The Complaint Does Not Adequately Allege Loss Causation

To plead loss causation, a plaintiff must allege disclosures that correct or reveal prior misstatements, not merely point to disclosures that reveal "some other negative information about the company." *In re Williams Sec. Litig.-WCG Subclass*, 558 F.3d 1130, 1140 (10th Cir. 2009). Plaintiff alleges the "truth" was revealed through five partial corrective disclosures. ¶¶352–89. But these disclosures do not reveal "new" information related to the challenged statements, much less "correct" an alleged misstatement.

28

Plaintiff claims that the alleged misstatements concerning shared-risk contracts were "corrected" by disclosures providing contracts receivable balances and the Company's corresponding liquidity or "free cash flow." ¶¶355, 358, 365, 367, 369, 387. But these "corrective disclosures" do not relate back to the alleged misstatements or reveal that the challenged statements were false or misleading. For example, Plaintiff alleges that the May 4, 2023 disclosure regarding a $7 million reduction in contract payables, and a $31 million increase in contract receivables, was "corrective." ¶355. But this "corrective" disclosure does not reveal that ModivCare was *not* able to contractually share its expenses with payors, nor that it was not doing so. *See* ¶¶87–88. Similarly, disclosures about ModivCare's tightening liquidity or credit facility do not render challenged statements regarding the structure of shared-risk contracts false or misleading. Again, these alleged "corrective" disclosures do not reveal that the Company was not entitled to receive the amounts due under the shared-risk contracts, they only reveal issues with collections. Instead, these disclosures reflect changing business conditions in a volatile, post-COVID market.

Plaintiff similarly makes no effort to connect any purported "corrective" disclosures to alleged misstatements regarding ModivCare's quality of service or multimodal initiatives. *See* ¶¶352–89 (alleging no corrective disclosures at all regarding multimodal initiatives). While the alleged "corrective" disclosure on February 23, 2024 discussed certain "contract losses," ¶369, these losses do not relate back to or correct prior alleged misstatements. For example, contract losses due to customers failing to secure state contracts and a state's decision to shift to a different business model, *see id.*, do not relate

29

back to or correct any alleged misstatement. The fact that one client decided to "allocate business volume away … due to legacy service issues," *id.*, also fails to relate back to or correct any specific alleged misstatement. Moreover, because a corrective disclosure must *follow* an alleged misstatement, Plaintiff lacks *any* alleged corrective disclosure for the challenged statements regarding service that post-date February 23, 2024.

The Complaint should be dismissed because it does not allege loss causation.

**B.    Plaintiff Fails to State a Claim Under Section 20(a)**

To state a claim for "control person" liability under Section 20(a), a complaint must show "(1) a primary violation of the securities laws and (2) 'control' over the primary violator by the alleged controlling person." *Adams v. Kinder-Morgan, Inc.*, 340 F.3d 1083, 1107–08 (10th Cir. 2003). Because Plaintiff fails to allege a primary violation, the control person claims should also be dismissed.

## V. CONCLUSION

The Court should dismiss the Complaint in its entirety and with prejudice.

Dated: March 10, 2026                          GIBSON, DUNN & CRUTCHER LLP


By: */s/ Monica K. Loseman*
    Monica K. Loseman
    mloseman@gibsondunn.com
    Allison Kostecka
    akostecka@gibsondunn.com
    Lydia Lulkin
    llulkin@gibsondunn.com
    GIBSON, DUNN & CRUTCHER, LLP
    1900 Lawrence St, Suite 3000,
    Denver, CO 80202
    Telephone: 303.298.5700
    Facsimile: 303.298.2829

    Brian M. Lutz
    blutz@gibsondunn.com
    GIBSON, DUNN & CRUTCHER, LLP
    One Embarcadero Center, # 2600,
    San Francisco, CA 9411
    Telephone: 415.393.8200


*Counsel for L. Heath Sampson, Kenneth
Shepard, and Barbara K. Gutierrez*

31

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 10, 2026, a true and correct copy of the foregoing was served via the CM/ECF to counsel of record.

<u>*s/ Lynette Apodaca*</u>
Lynette Apodaca