IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
District Judge Gordon P. Gallagher

Civil Action No. 25-cv-00306-GPG-KAS

CHRISTOPHER SKRYPSKI, individual
and on Behalf of All Others Similarly Situated,

Plaintiff,

v.

L. HEATH SAMPSON,
KENNETH SHEPARD, and
BARBARA K. GUTIERREZ,

Defendants.

---

**ORDER**

---

Before the Court are Defendants' Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (DKT. 54) (D. 61) and Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss Amended Complaint (DKT. 54) (D. 62). The Court GRANTS the request for judicial notice and DENIES the motion to dismiss for the following reasons.

## I. FACTS

This civil action arises from a medical transportation company's financial struggles after the COVID-19 pandemic.[1] Defendants are (or were, during the relevant time period) executives of ModivCare, Inc., a healthcare services company that coordinates and manages non-emergency

[1] The Court draws the operative facts as set forth in the Amended Class Action Complaint for Violations of the Federal Securities Laws (D. 54).

medical transportation (NEMT) to individuals, referred to as "members" (D. 54 at ¶¶ 4–5). Defendants are L. Heath Sampson (President and CEO), Barbara Gutierrez (CFO), and Kenneth Shepard (CFO of NEMT business) (*id.* at ¶¶ 38–40). ModivCare is paid primarily by members' insurers (payors) pursuant to full-risk or shared-risk contracts (*id.* at ¶¶ 5–6). Plaintiffs are investors who purchased ModivCare common stock during the class period (*id.* at ¶ 37).

During the COVID-19 pandemic, ModivCare members utilized fewer NEMT services due to stay at home orders and a rise in telehealth (*id.* at ¶ 6). Because most of ModivCare's contracts were full risk, the company received a fee for each member irrespective of utilization, meaning that its profits soared (*id.*). However, as pandemic restrictions eased, ModivCare began renegotiating these full risk contracts to shared risk contracts in anticipation of higher utilization of NEMT services (*id.* at ¶ 7). Defendant Sampson publicly touted this strategy as a "win-win" (*id.* at ¶ 10).

As a result of shifting to shared risk contracts, ModivCare ended up facing significant disputes with payors over services rendered, leading to collectability issues and a cash crunch (*id.* at ¶¶ 13–16). Investors slowly learned of these issues with ModivCare through partial disclosures released by the company starting in May 2023 and continuing through February 2024 (*id.* at ¶¶ 23–26). Nevertheless, Defendant Sampson maintained to investors that ModivCare was performing well and that the shared risk contracts strategy "led to increased customer satisfaction and reduced costs" (*id.* at¶ 21). Defendants Sampson and Gutierrez assured investors that the shared risk contracts were still a "win-win" (*id.* at ¶ 27). Ultimately, in September 2024, Defendants revealed

that ModivCare had experienced delays collecting on its NEMT contracts, resulting in sharp decreases in its stock prices (*id.* at ¶¶ 28–29).

Plaintiffs filed the instant suit against Defendants for making "fraudulent and misleading statements [that] served to artificially inflate the price of ModivCare's common stock throughout the Class Period, causing massive investor losses when the price of the stock precipitously declined with each disclosure about ModivCare's shared risk contracts and service issues" (*id.* at ¶ 32). Accordingly, Plaintiffs bring two claims for relief—one for violation of Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Securities and Exchange Commission (SEC) Rule 10B-5, 17 C.F.R. § 240,10b-5, and one for violation of section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t (D. 54). Defendants now move to dismiss both claims, arguing that Plaintiffs do not allege that any false or misleading statements were made, that Defendants had the requisite scienter, or that Defendants' conduct resulted in Plaintiffs' economic loss (D. 61). In support of their motion to dismiss, Defendants request that the Court take judicial notice of 12 exhibits (D. 62).

## II. LEGAL STANDARD

Under Rule 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true and interpreted in the light most favorable to the non-moving party, to state a claim to relief that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

Federal Rule of Civil Procedure 9(b) imposes a heightened pleading standard for allegations of fraud or mistake, requiring the alleging party to "state with particularity the

circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). To meet the particularity requirement, a complaint must "set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *Lawrence Nat'l Bank v. Edmonds (In re Edmonds),* 924 F.2d 176, 180 (10th Cir. 1991).

Additionally, "[t]he Private Securities Litigation Reform Act of 1995 (PSLRA) requires plaintiffs alleging securities fraud to plead with particularity (1) the facts constituting the alleged violation and (2) the facts showing the defendant's intention to deceive, manipulate, or defraud." *Lingam v. Dish Network Corp.*, 167 F.4th 1094, 1100–01 (10th Cir. 2026) (citations omitted). "Accordingly, securities plaintiffs . . . must [], with respect to each act or omission alleged state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* (citation modified).

## III. ANALYSIS

### A. Judicial Notice

In general, when ruling on 12(b)(6) motion a court should not look beyond the four corners of the complaint. *MacArthur v. San Juan Cty.*, 309 F.3d 1216, 1221 (10th Cir. 2002). However, Courts may consider matters outside the pleadings without converting a motion to dismiss into a motion for summary judgment if the document is (1) referred to in the complaint, (2) central to the plaintiff's claim, and (3) the parties do not dispute its authenticity. *See Gee v. Pacheco*, 627 F.3d 1178, 1186 (10th Cir. 2010); *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). Such documents "may only be considered to show their contents, not to prove the truth of matters asserted therein." *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir.2006) (citation omitted).

Plaintiffs do not oppose Defendants' request for judicial notice "except to the extent that Defendants seek noticed materials to be considered for the truth of the matter(s) asserted" (D. 64). Therefore, Defendants' request is granted, and the Court will consider the submitted exhibits as showing their contents but not proving the truth of those contents.

**B. Count One: Section 10(b) and Rule 10b-5**

To prevail on a claim under Section 10(b) and Rule 10b-5, a plaintiff bears the burden of proving:

> (1) the defendant made an untrue or misleading statement of material fact, or failed to state a material fact necessary to make statements not misleading; (2) the statement complained of was made in connection with the purchase or sale of securities; (3) the defendant acted with scienter, that is, with intent to defraud or recklessness; (4) the plaintiff relied on the misleading statements; and (5) the plaintiff suffered damages as a result of his reliance.

*Lingam v. Dish Network Corp.*, 167 F.4th 1094, 1099 (10th Cir. 2026) (emphasis omitted) (quoting *Smallen v. W. Union Co.,* 950 F.3d 1297, 1304 (10th Cir. 2020)). Here, Defendants argue that Plaintiffs fail to establish elements (1), (3), and (5) for any of the challenged statements (D. 61).

The Court finds that Plaintiffs have sufficiently established challenged elements (1), (3), and (5) for at least some of Defendants' alleged statements—namely, those pertaining to ModivCare's Form 10-K and 10-Q risk disclosures. In each of ModivCare's Form 10-Ks filed in March 2023 and February 2024, Defendants identified delays in collection or non-collection of accounts receivable as a risk that could adversely affect ModivCare's financial condition and cash flows (D. 54 at ¶¶ 171–172, 178–179, 279–280). In ModivCare's Form 10-Qs filed in May 2023, August 2023, and November 2023, Defendants stated that the company's risks "remain[ed] current in all material aspects" and had not materially changed (*id.* at ¶¶ 184, 225, 244). Plaintiffs argue

these statements were misleading because the risks had already materialized by the time they were disclosed.

The finding that at least some of Plaintiffs' allegations are actionable is sufficient for Plaintiffs' entire Section 10(b) and Rule 10b-5 claim to survive because Plaintiffs challenge all 50+ of Defendants' alleged statements as a singular claim. As a result, the Court does not address Defendants' arguments regarding other challenged statements.

### 1. *Defendants' Disclosures Were Materially Misleading*

For risk disclosures to be materially false or misleading under Section 10(b) and Rule 10b-5, the warned-of risks must have already occurred or been "virtually certain" to occur. *Indiana Pub. Ret. Sys. v. Pluralsight, Inc.*, 45 F.4th 1236, 1255 (10th Cir. 2022). "Cautionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again." *Id.* (quoting *Set Cap. LLC v. Credit Suisse Grp. AG,* 996 F.3d 64, 85 (2d Cir. 2021)).

The Complaint indicates that by March 2023, ModivCare was already experiencing delays in collection and non-collections that were adversely affecting ModivCare's financial condition and cash flows. Confidential Witness 2 (CW2), ModivCare's former Vice President of Transportation, stated that ModivCare's true-up process for the shared risk contracts caused regular disputes with payors starting in the second quarter of 2022 (*id.* at ¶¶ 115, 146), and, as a result, ModivCare was often forced to chase contract receivables and accept partial payment as settlement (*id.* at ¶ 175). CW2 apparently "participated in calls with Shepard between March and May of 2023 where payor disputes had escalated to a point where the payor requested Shepard's involvement" (*id.* at ¶ 152). CW2 also confirmed that the payor negotiation calls "were ongoing

conversations that occurred weekly throughout 2023, and in October 2023, CW2 learned of Sunshine Health's refusal to pay on its contract (*id.* at ¶¶ 152, 153). CW2 added that "receivable disputes were a standing agenda item during Monthly Leadership Meetings and included regular updates such as, 'Health plan X is only paying us Y, or 30% of what's owed'" (*id.* at ¶ 154).

Figures 8 and 9 in the Complaint show that ModivCare's cash and free cash flow dropped significantly from the first quarter of 2022 to the first quarter of 2023 (*id.* at ¶ 157). ModivCare's cash and cash equivalents dropped from $194,063,000 to $12,848,000 and its free cash flow dropped from $60,486,000 to negative $15,975,000 (*id.*). Over the same time period, ModivCare's contract receivables increased from $28,785,000 to $102,348,000 (*id.* at ¶ 155). ModivCare's cash and cash equivalents hit a nadir in the fourth quarter of 2023 while its free cash flow hit a low of negative $117,100,000 in the second quarter of 2023 (*id.* at ¶ 157). ModivCare's contract receivables increased steadily throughout 2023 and maxed out at $165,857,000 in the second quarter of 2024. All of these numbers indicate that Defendants failed to reveal that ModivCare was actively facing collection and liquidity problems as early as March 2023, instead identifying them as possible risks.

For these reasons, Plaintiffs have alleged facts establishing that the risk identified in the Form 10-Ks and 10-Qs was already occurring by the time Defendants filed the forms, and these disclosures are materially misleading.

2. *Defendants Acted with the Requisite Scienter*

The Tenth Circuit has described the scienter required under the PSLRA as:

> [A] mental state embracing (1) intent to deceive, manipulate, or defraud, or (2) recklessness. . . . Recklessness is conduct that is an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or

> sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.
>
> Under the PSLRA, a plaintiff must, with respect to each act or omission alleged state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind. In assessing the sufficiency of a plaintiff's allegations under the PSLRA, a court must consider the complaint in its entirety and decide whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard. . . . Under this standard, a complaint survives dismissal only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged.

*Pluralsight,* 45 F.4th at 1258–1259 (citation modified).

The same evidence indicating Defendants' statements were misleading also supports an inference that Defendants knew the risks identified had materialized. As stated above, by March 2023, Defendant Shepard was attending weekly calls to negotiate delayed collection and non-collections, which continued throughout 2023 (D. 54 at ¶ 152), and receivable disputes were "definitely a hot topic" raised "month after month" at Monthly Leadership Meetings between 2023 and 2024 (*id.* at ¶ 330). Furthermore, before the class period even started, Defendant Sampson touted direct involvement with contract negotiations and close relationships with payors' executives (*id.* at ¶¶ 331–338), indicating that he knew or should have known ModivCare's payors were disputing their payment obligations. Therefore, Plaintiffs have alleged facts supporting a strong inference that Defendants knew that ModivCare was experiencing delays in collection and non-collections that were adversely affecting ModivCare's financial condition and cash flows when they filed the Form 10-K and 10-Q disclosures.

*3. Plaintiffs Suffered Damages as a Result of Defendants' Statements*

The PSLRA "makes clear Congress' intent to permit private securities fraud actions for recovery where, but only where, plaintiffs adequately allege and prove the traditional elements of

causation and loss." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346, (2005). Those traditional elements are economic loss and proximate causation. *See id.* Economic loss and causation are "easiest to show when a corrective disclosure reveals the fraud to the public and the price subsequently drops—assuming, of course, that the plaintiff could isolate the effects from any other intervening causes that could have contributed to the decline." *In re Williams Sec. litigation-WCG Subclass*, 558 F.3d 1130, 1137 (10th Cir. 2009). The relevant collective disclosure "need not precisely mirror the earlier misrepresentation, but it must at least relate back to the misrepresentation and not to some other negative information about the company." *Id.* at 1140.

Defendants argue that Plaintiffs do not adequately plead loss causation because the five partial corrective disclosures Plaintiffs rely on "do not reveal 'new' information related to the challenged statements, much less 'correct' an alleged misstatement" (D. 61 at 33). However, as Defendants admit, the alleged corrective disclosures "reveal issues with collections" (*id.* at 34), which directly relate back to the risk disclosure misrepresentations regarding delayed collections and non-collection.

For example, the second set of corrective disclosures, issued on August 3 and 4, 2023, revealed that ModivCare used[2] $108 million in cash flow and $111.5 million in credit due to "a temporary timing mismatch between payments and collections" (D. 54 at ¶ 358). In response to these disclosures, ModivCare's common stock price declined approximately 7% in one day (*id.* at ¶ 359). In February 2024, ModivCare revealed that it had not recouped an anticipated $35.9 million payment from a client (*id.* at ¶ 365), and Defendant Gutierrez disclosed that ModivCare's cash flow was negative $37 million because a large customer "delayed payments under multiple

[2] The Amended Class Action Complaint is unspecific as to exactly how the funds were used.

contracts" (*id.* at ¶ 369). As a result of these disclosures, ModivCare's common stock price fell approximately 39% from February 22 to February 24, 2024 (*id.* at ¶ 370). On September 12, 2024, ModivCare filed a Form 8-K explaining that though "collection and mitigation efforts continue, there remains the possibility that the Company will not achieve full resolution in a timely manner at all if unforeseen circumstances arise" (*id.* at ¶ 379). That same day, ModivCare's common stock price declined approximately 59% (*id.* at ¶ 380). Finally, on September 16, 2024, ModivCare filed another Form 8-K revealing that it had "experienced delays in the timely collection of approximately $60 million" (*id.* at ¶ 387). This disclosure caused the common stock price to fall nearly 10% (*id.* at ¶ 388). Each of these disclosures revealed that ModivCare was experiencing issues collecting on contracts.

At bottom, the Complaint makes a clear case that Defendants knew ModivCare's ship was listing, if not sinking, yet they continued to paint a rosy picture to the public and investors that all was well and good. Defendants knew they were not getting paid on contracts and were being forced to settle for less than they were owed, placing ModivCare in precarious financial straits, and not only failed to provide any indication of such to investors but touted the benefits and efficacy of those contracts for months thereafter. This is obviously misleading behavior. Therefore, the Court finds the Court finds that Plaintiffs have alleged economic loss and causation.

**C. Count Two: Section 20(a)**

Defendants argue that because Plaintiffs fail to allege a primary violation under Section 10(b), their Section 20(a) claims must also fail. As the Court has found that Plaintiffs do allege a primary violation under Section 10(b), this argument necessarily fails.

## IV. CONCLUSION

Accordingly, Defendants' Request for Judicial Notice in Support of Defendants' Motion to Dismiss Amended Complaint (DKT. 54) (D. 62) is GRANTED and their Motion to Dismiss the Amended Class Action Complaint for Violations of the Federal Securities Laws (DKT. 54) (D. 61) is DENIED.

DATED August 7, 2026.

BY THE COURT:

Gordon P. Gallagher
United States District Judge